IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **JAMES PETER CONLAN,** | **CIVIL ACTION NO. 3:15-CV-02841 (CCC)** |
| **PLAINTIFF** | |
| V. | |
| **THE MID-ATLANTIC REGION COMMISSION** | |
| **ON HIGHER EDUCATION** doing business as | **Federal Question: All Writs Act & Civil** |
| the **Middle States Association of Colleges** | **Rights: Writ of Assize of Novel Disseisin,** |
| **and Schools** and the **MIDDLE STATES** | **Writ of Assize of Nuisance;** |
| **COMMISSION ON HIGHER EDUCATION** | **Writ of Entry; Writ of Waste** |
| **(MSCHE);** | **Federal Question: R.I.C.O. Injunctive Relief** |
| **JOHN DOE**, insurer of MSCHE; **RICHARD** | **and private plaintiff treble damages** |
| **ROE**, insurer; | **enforcement** |
| AND | **Diversity: Fraudulent Certification, Breach** |
| **LA ASOCIACION PUERTORRIQUENA DE PROFESORES UNIVERSITARIOS, INC.** (APPU); | **of Warranty** |
| **LA HERMANDAD DE EMPLEADOS EXENTOS NO DOCENTES DE LA UNIVERSIDAD DE PUERTO RICO (HEEND);** | **DEMAND FOR JURY TRIAL** |
| **THE SINDICATO DE TRABAJADORES DE LA UNIVERSIDAD DE PUERTO RICO (STUPR);** | |
| **UNIÓN BONAFIDE DE OFICIALES DE SEGURIDAD UPR (UBOS)** | |
| **ORGANIZACIÓN DE PROFESORES UNIVERSITARIOS** | |
| **UPR-RP GENERAL STUDENT COUNCIL** | |
| AND | |
| **THE UNIVERSITY OF PUERTO RICO (UPR),** | |
| **THE UNIVERSITY OF PUERTO RICO BOARD OF GOVERNORS a.k.a Junta de Gobierno UPR (UPR JG);** **Dr. Jorge L. Sánchez Colón M.D.**, **Dr. Carlos Pérez Díaz,** **Dra. Gloria Butrón Castelli,** | |

| | |
|---|---|
| **Dr. Juan B. Aponte Vázquez,**<br>**Mr. Harold E. Soto Fortuño,**<br>**Dr. Edgard Resto Rodríguez,**<br>**Mr. Dennis Hickey Rivera,**<br>**Hon. Rafael Román Meléndez,**<br>**Mr. Fernando San Miguel Lloveras, Esquire,**<br>**Dra. Ana María García Blanco,**<br>**Mr. Rafael Escalera Rodríguez, Esquire,**<br>**Mr. Christian Arvelo Forteza,**<br><br>AND<br><br>**Uroyoán R. Walker-Ramos, Ph.D.,**<br>**Carlos Severino, Ph.D.,**<br><br>AND<br><br>**FULANO DE TAL, INC., insurer of the**<br>**University of Puerto Rico**<br><br>**FULANA DE TAL, INC., insurer of the**<br>**University of Puerto Rico Board of**<br>**Governors**<br><br>**AND**<br><br>**The HON. ALEJANDRO GARCIA PADILLA,**<br>**Governor of the Commonwealth of Puerto**<br>**Rico,**<br><br>**DEFENDANTS** | |

## SECOND AMENDED COMPLAINT

May it please the Honorable Court,

Comes now PLAINTIFF, James P. Conlan, Ph.D., Esquire, respectfully before this honorable district court to substitute this SECOND AMENDED COMPLAINT for the ORIGINAL COMPLAINT whereby he very respectfully alleges the following facts and prays:

### I. STATEMENTS OF JURISDICTION

**1. The WRIT OF ASSIZE OF NOVEL DISSEISIN**

The honorable District Court has jurisdiction at law under U.S. Const. Article III, §2, 28 U.S.C. §1331 (federal question), 28 U.S.C. §1323(a)(3)-(4), 42 U.S.C. §1983, 42 U.S.C. §1988, and the All Writs Act, 28 U.S.C. §1651, part of the Judiciary Act of 1789, to issue a WRIT OF ASSIZE OF NOVEL DISSEISIN to direct the U.S. Marshal BOTH to take possession of the campus commons

of the University of Puerto Rico, Rio Piedras Campus, AND to convene an assize or jury of twelve good persons to restore seisin of DEMANDANT'S servitude in the campus commons of the UPR, Rio Piedras Campus, and to award simple damages pursuant the Assize of Northampton, 22 Henry II, c. 9 & 10; Statute of Merton, 20 Henry III, c. 3, Statute of Merton, 20 Henry III, c. 4, as it informs Stat. of Westminster 2, 13 Ed. I, c. 25, Stat. Westminster 2, 13 Ed. I, c. 30; to award DOUBLE DAMAGES against disseisor pursuant to 1 Richard II, c. 9 or disseisor and/or they whom they have enfeoffed pursuant to 4 Henry IV, c. 7, when disseisor has collusively enfeoffed multiple anonymous feoffees to deforce disseisee and thereby impede his possessory remedy; And to award TREBLE DAMAGES pursuant to 8 Henry VI, c. 9,  to disseisee deforced by forcible entry or held out by use of force that, pursuant to 11 Henry VI, c. 3, may be enforced against Disseisors or their feoffees, AND TO AWARD DEMANDANT COSTS AND FEES, pursuant to Statute of Gloucester, 6 Edw. I, c. 1,[1] and 42 U.S.C. §1988, INASMUCH AS the UPR alienated the campus commons to third party alienees the UPR-RP Chancellor (its Bailee); APPU, OPU (and/or its successor) HEEND, STUPR, UBOS, and the UPR-RP Student Council, who have disseised Demandant of his rights of access, in the process impairing covenants found in UPR Gen. Reg. Art. 27, Art. 32.2, Art. 34.2, Art. 35.2.17, and arts. 7 & 8 of UPR-JS-Cert. 49 (2004-5), such covenants constitutionally unavoidable under U.S. Const. Article 1, §10 (the Impairment of contracts clause) as explained in *Trustees of Dartmouth College v. Woodward,* 17 U.S. 518, 563-565 (1819) (argument for plaintiff-in-error who prevailed), and *Fletcher v. Peck*, 10 U.S. (6 Cranch) 87 (1810), the Fourteenth Amendment Due Process Clause as applies to the States, the Fourteenth Amendment Equal Protection Clause, as applies to the States, the Due Process and Equal Protection Clauses of Art. 2, §7 of the Constitution of the Commonwealth of Puerto Rico of 1952.

### 2.   THE WRIT OF ASSIZE OF NUISANCE

The honorable court has jurisdiction under U.S. Const. Article III, §2, 28 U.S.C. §1331 (federal question), 28 U.S.C. §1323(a)(3)-(4), 42 U.S.C. §1983, and the All Writs Act, part of the Judiciary Act of 1789, to issue a WRIT OF ASSIZE OF NUISANCE pursuant to Common law, supplemented by Statute of Westminster 2, 13 Edward I, c. 24, and 6 Richard Stat. 1, c. 3, *and*

11 Henry VI, c. 3, to to direct the U.S. Marshal  BOTH to take possession of the University of Puerto Rico, Rio Piedras Campus, AND to convene an assize or jury of twelve good persons BOTH to abate the NUISANCE customarily erected in the campus commons by alienees, defined in law as a PUBLIC NUISANCE in the holding in UPR v. LABORDE, 2010 TSPR 225, 180 DPR 253 (2010), and Law 3 of 4 February 2011, and the Sherman Act, not exempted by the Clayton Act, AND EQUALLY A PRIVATE NUISANCE PER SE, interposed in the campus commons between DEMANDANT and ingress and egress to his freehold, ousting demandant from the full enjoyment of his freehold, (sometimes impairing covenants of protection owed by the UPR to the demandant, covenants described in found in UPR Reg. Gen. Art. 16, Art, 27, Art. 32.2, Art. 34.2, Art. 35.2.17, and arts. 7 & 8 of UPR-JS-Cert. 49 (2004-5), UPR General Student Regulation §2.18(1)  (2)(5)(6) & (7), UPR General Student Regulations Arts. 2.15(B) & 2.15(C); 2.18; 2.19; 6.2(5); 6.2(6) of UPR JS Cert. 13 (2009-10); and Arts. 7 & 8 of UPR JS Cert. 90 (2004-5). other times using trespass *vi at armis* to affect this end), AND TO AWARD DAMAGES TO DEMANDANT OWING TO THE HARMS CAUSED BY THIS NUISANCE against the defendant that levied the nuisance or the tenant to whom that nuisance was transferred that impaired his free ingress into the campus commons and those of the students he was charged to teach,[2] and TO AWARD FEES AND COSTS under 42 U.S.C. §1988.

### 3.  THE WRIT OF ENTRY

The honorable district court has jurisdiction under U.S. Const. Article III, §2, 28 U.S.C. §1331 (federal question), and BOTH 28 U.S.C. §1323(a)(3)-(4) and 42 U.S.C. §1983, and the All Writs Act, to ISSUE A WRIT OF ENTRY IN THE FORM OF ENTRY, also called *de Quibus* or *Quod Permittat*, pursuant to 4 Henry IV, c. 8, 31 Eliz. I. c. 11, 8 Henry VI, c. 9, and Statute 8 & 9 W. III. c. 11, TO TRY THE RIGHT OF ENTRY OF DISSEISOR UPR,  conclaves of professors disabled from conveying possession of the commons under English law, Coke, *On Littleton* 43a, (analogous to prohibitions in Stat. Westminster, 13 Ed. I, c. 41, against monks alienating lands) such conveyances lying outside the jurisdiction of the Academic Senate under Law 1 of 20 January 1966, and UPR General Regulations Art. 16, Art. 35.2.17, UPR JG Cert. 160 (2014-2015), and impairing covenants of common use promised to plaintiff in U.P.R. General

Regulation, Arts. 27, 32.2 & 32.4 & 34.2, UPR Student Regulation §2.18(1)  (2)(5)(6) & (7), and UPR General Student Regulations Arts. 2.15(B) & 2.15(C); 2.18; 2.19; 6.2(5); 6.2(6) of UPR JS Cert. 13 (2009-10);  and Arts. 7 & 8 of UPR JS Cert. 90 (2004-5), the authority to convey lacking in the State entity, no right to convey existing, the conveyance thus an impairment of the obligations of contract violating Article I, §10 of the Constitution of the United States. *Fletcher v. Peck*, 10 U.S. (6 Cranch) 87 (1810),. AND THEREBY TO DECLARE VOID all title of alienees to possession of UPR-RP campus commons under color of the Institutional Policy of Nonconfrontation, TO AWARD DEMANDANT SIMPLE DAMAGES for wrongful deforcement AND TO AWARD DEMANDANT THREEFOLD DAMAGES, costs and fees, to remedy such injuries sustained by demandant in such cases where alienor has willfully and maliciously allowed, condoned and not abated in breach of covenant that said conspiracy of joint tenant alienees and/or its feoffees from willfully and maliciously using force and violence to enter into the campus commons to obstruct demandant's access to his freehold, trespassing *vi et armis* to oust demandant from the campus commons and/or his freehold, or has permitted said conspiracy of joint tenant alienees to forcibly enter into possession or to unlawfully maintain its unlawful possession by force to the prejudice of demandant, AND TO AWARD FEES AND COSTS under 42 U.S.C. §1988.

## 4.    R.I.C.O. EQUITABLE RELIEF AGAINST ALIENEES

The Honorable District Court has jurisdiction under U.S. Const. Article III, §2, 28 U.S.C. §1331 (federal question), and BOTH 28 U.S.C. §1323(a)(3)-(4) and 42 U.S.C. §1983 AND 18 U.S.C. §1964(a) of The Racketeering Influenced and Corrupt Organizations Act (R.I.C.O), to "prevent and restrain" violations of 18 U.S.C. 1962, R.I.C.O,, among which predicate acts are violations of The Travel Act, 18 U.S.C. §1952, the Crime of Wire Fraud, 18 U.S.C. 1343, and State law extortion, as defined in Puerto Rico Penal Code Art. 200 (2004), and earlier and later statutes criminalizing extortion as a felony punishable by more than one year imprisonment, OR extortion as defined by the Hobbs Act, 18 U.S.C. §1952(b)(2) which defines extortion as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. §1952(b)(2) (interstate nexus

implicating the Hobbs Act broadly construed so that "(i)f it is interstate commerce that feels the pinch, it does not matter how local the operation which applies the squeeze." *United States v. Women's Sportswear Mfrs. Ass'n*, 336 U.S. 460, 464, 69 S.Ct. 714, 716, 93 L.Ed. 805 (1949), the language of the High Court enunciated in an antitrust context, as applied to the Hobbs Act in *U.S. v. Mazzei*, 521 F.2d 639, 642 (C.A.3 (Pa.), 1975),  soliciting, conspiring and aiding-and-abetting the same), with "fear" broadly construed under the Hobbs Act to include both fear of economic loss owing to physical interference with the local movement of goods acquired in interstate commerce, *United States v. Varlack*, 225 F2d 665 (2nd Cir (NY) 1955), and fear of defamation per se as both "a type of activity generally known as extortionate since money was to be obtained from the victim by virtue of fear and threats of exposure," (or, in this case of threatened defamation per se and per quod and false light defamation, false exposure) *United States v. Nardello*, 393 U.S. 286, 296 (1969), and, published online, an action aimed at damaging the professors' public reputation and thereby threatening that property right of soliciting out-of-state business that the Hobbs Act protects, *United States v. Tropiano* 418 F2d 1069 (2nd Cir 1969), AND TO AWARD FEES AND COSTS under 18 U.S.C. §1964(c) and 42 U.S.C. §1988.

**5. R.I.C.O. EQUITABLE RELIEF AGAINST ALIENOR UPR, THE UPR GOVERNING BOARD, THE GOVERNOR OF THE COMMONWEALTH OF PUERTO RICO THE PRESIDENT OF THE UPR AND THE CHANCELLOR OF THE UPR-RP CAMPUS**

The honorable District Court has jurisdiction to grant equitable relief against the Governor of the Commonwealth of Puerto Rico and the UPR Board of Governors and others enumerated in the second complaint under the copulation of U.S. Const. Article III, §2, 28 U.S.C. §1331 (federal question), 28 U.S.C. §1323(a)(3)-(4) and 42 U.S.C. §1983, as explained in *Lipsett v. University of Puerto Rico*, 864 F. 2d 881, 902 (1st Cir. 1988) (holding supervising public employees responsible under 42 U.S.C. §1983 for their "supervisory encouragement, condonation, or acquiescence" or "gross negligence amounting to deliberate indifference" for actions committed by their subordinates) and 18 U.S.C. §1964(a) of The Racketeering Influenced and Corrupt Organizations Act (R.I.C.O.), to "prevent and restrain" violations of 18 U.S.C. 1962, R.I.C.O, understanding that ""[Under] a conspiracy charge, not a substantive § 1962(c) charge, [a]ll [the plaintiff or] government ha[s] to show was that another member of the enterprise committed the two

predicate acts and that [the accused] "knew about and agreed to facilitate the scheme." *Salinas v. United States*, 522 U.S. 52, 66, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997).  *United States v. Garcia*, 754 F.3d 460, 477 (7th Cir., 2014), recognizing that in a racketeering context, "if an individual fails to act when he has an affirmative duty to do so, negative inferences concerning his intent can be drawn from this inaction." *U.S. v. Local 560 of Intern. Broth. of Teamsters, Chauffeurs, Warehousemen, and Helpers of America*, 780 F.2d 267 (C.A.3 (N.J.), 1986) *U.S. v. Local 560 of Intern. Broth. of Teamsters, Chauffeurs, Warehousemen, and Helpers of America*, 780 F.2d 267 (C.A.3 (N.J.), 1986), that, "under the Pinkerton doctrine, a defendant can be found liable for the substantive crime of a coconspirator provided the crime was reasonably foreseeable and committed in furtherance of the conspiracy." *United States v. Gobbi*, 471 F.3d 302, 309 n. 3 (1st Cir.2006) (citing *Pinkerton v. United States*, 328 U.S. 640, 647-48, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946)). *U.S. v. Vazquez-Botet*, 532 F.3d 37, 62 (1st Cir., 2008); and that "[A]n actor who does not himself commit or agree to commit the two or more predicate acts requisite to a" § 1962(c) conviction **may nonetheless be liable under § 1962(d) if he "adopt[s] the goal of furthering or facilitating the criminal endeavor."** Id. at 64. [AND THAT] "An overt act is not even required for § 1962(d) liability; the conspirator need only "agree[] to facilitate . . . some of the acts leading to the substantive offense." Id. 63, 65. Salinas v. United States. See 522 U.S. 52, 63, 65 (1997) , as quoted in *Marrero-Rolón v. Autoridad de Energía Eléctrica de P.R.* (D.P.R., 2015) at 61, AND TO AWARD FEES AND COSTS under 18 U.S.C. §1964(c) and 42 U.S.C. §1988.

**6.  THE R.I.C.O. CIVIL ENFORCEMENT MECHANISM FOR TREBLE DAMAGES**

(a) The Honorable District Court has jurisdiction under U.S. Const. Article III, §2, 28 U.S.C. §1331 (federal question), and 18 U.S.C. §1964(c) of The Racketeering Influenced and Corrupt Organizations Act (R.I.C.O), to award PLAINTIFF injured in his business and property TREBLE DAMAGES for injuries sustained under 18 U.S.C. §1962(c), costs of bringing the suit and a reasonable attorney's fee when an associated-in-fact racketeering enterprise engaging in a pattern of racketeering activity affects his business and property and his injuries arise by reason of or naturally flowing from the commission of predicate acts of racketeering defined in 18 U.S.C. §1961(1).

(b) AND FURTHER, if, in violation of 18 U.S.C. §1962(d), said injuries arise by reason of or naturally flowing from a **conspiracy to violate 18 U.S.C. §1962(a)(b) or (c)** the defendant is also responsible for these acts "provided **the crime was reasonably foreseeable and committed in furtherance of the conspiracy**. *United States v. Gobbi*, 471 F.3d 302, 309 n. 3 (1st Cir.2006) (citing *Pinkerton v. United States*, 328 U.S. 640, 647-48, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946)). *U.S. v. Vazquez-Botet*, 532 F.3d 37, 62 (1st Cir., 2008).

(c) AND TO AWARD FEES AND COSTS under 18 U.S.C. §1964(c) and 42 U.S.C. §1988.

## 7. JURISDICTION FOR A WRIT OF WASTE

This honorable district court has jurisdiction to issue a WRIT OF WASTE upon complaint presented by a next friend suing on behalf of the University of Puerto Rico, an enloined ward of the Board of Governors, to recover the place from its Guardian and for treble damages against present guardians, present tenants and/or present assignees owing to wastage caused and/or unabated by them under U.S. Const. Article III, §2, 28 U.S.C. §1331 (federal question), 18 U.S.C. §1964(c), R.I.C.O. (the Writ of Waste a suit for treble damages, in this case wastage to to UPR property arising by reason of or naturally flowing from predicate acts of Hobbs Act and State law extorion and acts of wire fraud, mail fraud, and violations of the Travel Act) AND 28 U.S.C. §1323(a)(3)-(4), 42 U.S.C. §1983, 42 U.S.C. §1988, the All Writs Act, 28 U.S.C. §1651, part of the Judiciary Act of 1789, pursuant to the Statute of Gloucester, 6 Edward I, c. 5, (authorizing recovery of place and treble damages), see See *Lavington v. Seymark*, Hil. 11 Edward II (1317); The Statute of Westminster, 13 Edward I, c. 14, (clarifying that the cause of action for waste ran with the land, lying against present tenants and guardians even if the wastage was caused prior to the Tenants' occupying the land), see See *Lavington v. Seymark*, Hil. 11 Edward II (1317); the Statute of Waste, 20 Edward I, (providing that "One who inherits or succeeds to an estate may sue for a writ of waste owing the "Waste and destruction made in Lands and Tenements of his own Inheritance, as well as in the Times of his Ancestors, as at any other time that the fee and inheritance descended unto him, and shall be answered unto therefore; and that he shall recover the Tenements wasted, and Damages, as it is ordained in the [Second Statute] of Westminster, of Damage to be recovered in a Writ of Waste, if the Tenant be convicted of Waste….And likewise it

is commanded unto the Justices that they shall cause all the foresaid things to be straitly observed before them from henceforth.  Statute of Waste, 20 Edward I, 1 S.R. 109; *Pollard v. Shaffer*, 1 U.S. 210 (1787), finding that liability lies against both the lessee and the assignee, and declaring that "This point has been fully settled in Spencer's case, 5 Co. 16. b. and 1 Salk. 199. 2 Levinz. 206. 1 Rolls Abr. title, (covenant) letter M pl. 1, and N. pl. 2. Vin. Abr. 6 vol. pa. 411. letter M. pl. 1. 2. 1 Bacon's Abr. 534. c. 5. and the books cited in these abridgements."  and the Statute of Westminster, 13 Edward I, c. 15, 1 S.R. 82 [marginal gloss explaining statute: Infants enloined may pursue by Prochein Amy] allowing Demandant's standing as next friend for the Wastage touching to the library holdings the University of Puerto Rico, Rio Piedras Campus, an infant, closest to the Demandant's freehold.

## 8.  JURISDICTION AT DIVERSITY FOR FRAUDULENT CERTIFICATION AND FALSE WARRANTY

The honorable district court has jurisdiction to award plaintiff simple damages against defendant MSCHE under U.S. Const. Article III, §2, 28 U.S.C. §1332 (Diversity), for negligent or maliciously fraudulent warranty of compliance with Standard 6: Integrity, negligent or maliciously fraudulent warranty of adequate education, and negligent or maliciously fraudulent warranty of sufficient institutional resources, informed by the terms of Title IV of the Higher Education Act of 1966, as amended, and 34 C.F.R. part 602, *passim*, offered by defendant, accrediting agency, citizen of Pennsylvania, where accrediting agency, citizen of Pennsylvania's breach of duty under federal law, Title IV of the Higher Education Act of 1966, as amended, and 34 C.F.R. part 602, *passim*, and under published contract, foreseeably caused damages in excess of jurisdictional minimum $100,000 to plaintiff, employee of improperly accredited institution, the UPR, member of the public and citizen of the Commonwealth of Puerto Rico.

## 9.    JURISDICTION TO AWARD REMEDIES PURSUANT TO CIVIL RIGHTS VIOLATIONS

The Honorable district court has jurisdiction under U.S. Const. Article III, §2, 28 U.S.C. §1331 (federal question) and 28 U.S.C. §1323(a)(3)-(4) and 42 U.S.C. §1983, to award Plaintiff simple damages, costs and fees against the MSCHE and the UPR AND/OR its subdivisions for civil rights violations owing to their conspiracy to impair the obligations of plaintiff's contract,

prohibited under U.S.Const. Art. 1 §10, AND under 28 U.S.C. §1323(a)(1)-(4)  and 42 U.S.C. §1983, for uncorrected violations of UPR General Student Regulations Arts. 2.15(B) & 2.15(C); 2.18; 2.19; 6.2(5); 6.2(6) of UPR JS Cert. 13 (2009-10), and UPR General Regulations §32, as explained in *Lipsett v. University of Puerto Rico*, 864 F. 2d 881, 902 (1st Cir. 1988) where the First Circuit held supervising public employees responsible for their "supervisory encouragement, condonation, or acquiescence" or "gross negligence amounting to deliberate indifference" for actions committed by their subordinates), and to AND TO AWARD FEES AND COSTS under 42 U.S.C. §1988.

**10.  JURISDICTION TO ADJUDICATE RESIDUAL STATE LAW CLAIMS**

Inasmuch as he First Circuit teaches that,

"Under 28 U.S.C. § 1367(a), a federal court that exercises federal question jurisdiction over a claim may also assert supplemental jurisdiction over all state-law claims that arise from the same operative facts. See *BIW Deceived*, 132 F.3d at 833; *Rodriguez v. Doral Mortgage Corp.*, 57 F.3d 1168, 1175 (1st Cir.1995). *Massachusetts School of Law at Andover, Inc. v. American Bar Ass'n*, 142 F.3d 26, 39 (C.A.1 (Mass.), 1998),

this honorable district court has supplemental jurisdiction if not diversity jurisdiction, as cause arises under the same nexus of operative fact, to award plaintiff simple damages under U.S. Const. Article III, §2, 28 U.S.C. §1332 (Diversity), for false certification and warranty of sufficient Institutional Resources, knowing that plaintiff's employer had failed to and had not budgeted compensate plaintiff and his class for (a) the certain price authorized in the employment contract, (an unavoidable debt under Article 1434 of the Puerto Rico Civil Code of 1930, the UPR General Regulations §55.1.1; UPR General Regulations §55.2, the impairment of contracts clause of Article 2, §7 of the Constitution of the Commonwealth of Puerto Rico of 1952 and Article 1, §10 of the Constitution of the United States of America; and the Takings Clauses of Article 2, §7 of the Constitution of the Commonwealth of Puerto Rico, and the Fourteenth Amendment of the Constitution of the United States, as applied to the States, and (b) compensation in accordance with the principle of quantum meruit for change orders imposing a larger class size and/or a longer semester on plaintiff than contractually accorded in 2005, 2010, 2011, 2012, 2014 2014 and 2015, in accordance with Article 1473 of the Puerto Rico Civil Code (1930), authorizing a court with jurisdiction to determine the value of services rendered in conformity with the principle

*quantum meruit*, in particular when there has been a novation to the duties required under the original contract not contemplated in the price certain of the original contract, (c) in breach of warranty published in consent decree of 18 November 2011, (d) the two-year term specified in 34 CFR §602.20 (1)&(2) for accrediting agency to initiate adverse action owing to institutional noncompliance with term of consent decree of 17 November 2011 acknowledging plaintiff a third-party beneficiary, and informed by plaintiff's personal objection to reaccreditation in September 2011, having expired, and (e) "Ample discretion" to award moral damages owing to "the mental and emotional suffering of a party which follows as a foreseeable consequence of a defendant's acts or omissions," *González Marín v. The Equitable Life Assurance Society of the United States*, 845 F2d 1140 (1988), citing *Pereira v. International Basic Economy Corp.*, 95 D.P.R. 28, 54-59 (1967) including when such acts and omissions affect the quality of the plaintiff's freehold, as in *Pereira*, and when the dishonoring of a contractual right contributes to the degradation of the plaintiff's condition, as in *González Marin v. The Equitable Life Assurance, supra.*

## II.  PARTIES TO THE SECOND AMENDED COMPLAINT

### A.  DEMANDANT/PLAINTIFF

**1.       DEMANDANT/PLAINTIFF, JAMES PETER CONLAN, PH.D., Esquire**, a male citizen of the United States domiciled in the Commonwealth of Puerto Rico, is a 51-year-old unmarried tenured full professor of English in the College of Humanities at the Río Piedras Campus of the University of Puerto Rico, titled in and in continuous possession of Freehold (*Plaza*) #079-010 at the UPR-RP since 1999. He was also the author and principal director of the UPR Letterpress Treasures Project, an NEH supported grant.  His District Court number is 232007.  He resides at Condominio San Mateo Plaza Apt. PH-3, 1626 San Mateo Street, San Juan, Puerto Rico 00912, 787-996-9301 james.conlan@gmail.com; AMENDED COMPLAINT, Exhibits 1, 2, 3; SECOND AMENDED COMPLAINT, Exhibits 1, 2 [*Graduate Catalog 2000-2003*, p. 81].

### B.      DEFENDANT ALIENEES / Members of the Local Associated-in-fact Enterprise

1. **LA ASOCIACION PUERTORRIQUENA DE PROFESORES UNIVERSITARIOS, INC.** (APPU) is a PROFESSIONAL ORGANIZATION, incorporated under the laws of Puerto Rico in 1961, made up exclusively of university professors employed at institutions of higher education in

Puerto Rico. A resident of San Juan, Puerto Rico, APPU is domiciled in Puerto Rico, and has offices both on the Río Piedras Campus of the UPR.  Its address is Asociación Puertorriqueña de Profesores Universitarios , Inc., University of Puerto Rico, Rio Piedras Campus, San Juan, PR 00931  787-758-8282; 787-764-0000 exts. 3008/5690 appu.nacional@gmail.com.   Its Mailing address is APPU, Apartado 22511, San Juan, PR 00931-2511.

2. **LA HERMANDAD DE EMPLEADOS EXENTOS NO DOCENTES DE LA UNIVERSIDAD DE PUERTO RICO** (**HEEND**) is a LABOR UNION of nonteaching employees at the UPR, Río Piedras Campus, incorporated under the laws of Puerto Rico.  Its national address is Calle 2 N.E. 1001, Puerto Nuevo, Puerto Rico, 00920; its mailing address is PO Box 360334, San Juan, Puerto Rico, 00936-0334.  Its phone numbers are (787) 781-7965 / (787) 783-8790. Its principal webpage is http://www.heendupr.com/

3. **THE SINDICATO DE TRABAJADORES DE LA UNIVERSIDAD DE PUERTO RICO**, (STUPR) according to plaintiff's information and belief, is a labor union recognized by the UPR of nonteaching, nonexempt employees. Its address is Unión Trabajadores Industriales de Puerto Rico, D/B/A Sindicato de Trabajadores de la Universidad de Puerto Rico, 1006 Calle Vallejo, Río Piedras, PR 09925-3814.  Its Mailing address is Sindicato de Trabajadores UPR, P.O. Box 22014, San Juan, PR  00931-2014, 787-767-2166 (phone number of Secretary General David Muñoz, 787-767-2178, m.castro@tusindicato.com

4.  **UNIÓN BONAFIDE DE OFICIALES DE SEGURIDAD UPR** (**UBOS**) is the employee organization or union with ambitions to engage in collective bargaining on behalf of the Security guards operating on the UPR-RP campus of unknown physical address or mailing address.

5.  **ORGANIZACIÓN DE PROFESORES UNIVERSITARIOS** is an organization once incorprorated under the laws of the Commonwealth of Puerto Rico that is listed as a member of the Coordinating Security Board (JCS) established by way of UPR-RP AS Cert. 49 (2003-4).  It has registered itself dissolved in Commonwealth of Puerto Rico department of State.

6. **UPR-RP GENERAL STUDENT COUNCIL** is an organization of students elected by students duly matriculated the UPR-RP Campus, whose present president is **GUILLERMO GUASP**, with an office of unknown address on the UPR-RP Campus, whose autonomy is limited by the UPR

General Student Regulations and other UPR norms.  Art. 3.5, UPR General Student Regulations; UPR-JS   Cert.   13   (2009-10)   of   2   September   2009,   online   at http://senado.uprrp.edu/Informes/CJS-13-2009-10-ReglGenEst.pdf. Examined 14 April 2016.

C.  **DEFENDANTS ALIENOR AND ITS GOVERNING BOARD, OFFICERS AND CO-CONSPIRATORS**  (The UPR, the Board of Governors, the Members of the Board of Governors)

**1.UNIVERSITY OF PUERTO RICO BOARD OF GOVERNORS A.K.A. LA JUNTA DE GOBIERNO UPR** (**UPR JG**) is the authorized governing board of the University of Puerto Rico under Law 1 of 20 January 1966, as amended, succeeding the UPR Board of Trustees (**UPR JS**) with the fiduciary duty of ensuring that the UPR complies with existing law.  Only the UPR JG has power to alienate the campuses of the UPR or reorganize the functions of campus dependencies.[3]

Its address is **University of Puerto Rico Board of Governors, a.k.a. Junta de Gobierno UPR** c/o Secretario Ejecutivo,  UPR  Edificio Administración Central, Primer Piso , Jardín Botánico Sur , #1187 Calle Flamboyán , San Juan, Puerto Rico 00926; its mailing address: Junta de Gobierno UPR , PO Box 23400 , San Juan, Puerto Rico  00931-3400, Tel. 787-758-3350, Fax (787) 758-7196 jg.email@upr.edu

2. **Jorge L. Sánchez Colón M.D.**, UPR JG Member 2013-2020, President, University of Puerto Rico Board of Governors a.k.a. Junta de Gobierno UPR, whose official address is UPR  Edificio Administración Central, Primer Piso,  Jardín Botánico Sur , #1187 Calle Flamboyán , San Juan, Puerto Rico 00926

3.  **Dr. Carlos Pérez Díaz,** UPR JG Member 2014-2020, Vicepresident, University of Puerto Rico Board of Governors a.k.a. Junta de Gobierno UPR (address as above)

4. **Dr. Gloria Butrón Castelli**, UPR JG Member 2015-2016, University of Puerto Rico Board of Governors a.k.a. Junta de Gobierno UPR, Representante Claustral, (address as above)

5.  **Dr. Juan B. Aponte Vázquez,** Member, University of Puerto Rico Board of Governors a.k.a. Junta de Gobierno UPR  (address as above)

6. **Mr. Harold E. Soto Fortuño**, Student member, University of Puerto Rico Board of Governors a.k.a. Junta de Gobierno UPR (address as above)

7. **Dr. Edgard Resto Rodríguez**, Member, University of Puerto Rico Board of Governors a.k.a. Junta de Gobierno UPR (address as above)

8. **Mr. Dennis Hickey Rivera**, Member, University of Puerto Rico Board of Governors a.k.a. Junta de Gobierno UPR (address as above)

9. **Hon. Rafael Román Meléndez**, Commonwealth of Puerto Rico Secretary of Education, Member Ex officio, University of Puerto Rico Board of Governors a.k.a. Junta de Gobierno UPR (address as above)

10. **Fernando San Miguel Lloveras, Esquire**, Member 2013-2022, University of Puerto Rico Board of Governors a.k.a. Junta de Gobierno UPR  (address as above)

11. **Dr. Ana María García Blanco**, Member 2013-2018, University of Puerto Rico Board of Governors a.k.a. Junta de Gobierno UPR (address as above)

12. **Rafael Escalera Rodríguez, Esquire**, Member 2013-2022, University of Puerto Rico Board of Governors a.k.a. Junta de Gobierno UPR (address as above)

13. **Juan Acosta Reboyras, Esquire**, Member 2013-2018, University of Puerto Rico Board of Governors a.k.a. Junta de Gobierno UPR (address as above)

14. **Mr. Christian Arvelo Forteza**, Member 2015-2016, Junta de Gobierno (address as above)

15. **THE UNIVERSITY OF PUERTO RICO** (**UPR**) is the landgrant institution of the Commonwealth of Puerto Rico established by Law 1 and 2 of 20 January 1966, as amended. The UPR is charged by the State with the double mission of (1) transmitting and increasing knowledge by way of the science and the arts, putting itself at the service of the community by way of the actions of its professors, researchers, students and alumni; and (2) contributing to the cultivation and enjoyment of the culture's ethical and aesthetic values. Art. 2(a)(1)&(a)(2), Law 1 of 20 January 1966.

Fiscally autonomous by way of Law 2 of 20 January 1966, as amended, 18 LPRA §612(f), the UPR is empowered by law to engage in virtually any lawful business whatsoever. Art. 12(b) &(c), Law 1 of 20 January 1966, as amended.

The UPR is specifically authorized by law to charge its clients tuition and fees. Art. 3, Law 1-1966. By way of Law 7 of 7 April 2013, the Commonwealth of Puerto Rico legislature clarified

that it is the public policy of the Commonwealth to promote access to post-secondary education at the **lowest <u>viable</u> cost**, and, as far as possible, to guarantee **equal opportunity** of the residents of Puerto Rico to the academic opportunities at the University of Puerto Rico.[4]  By way of these laws, the Legislature of the Commonwealth of Puerto Rico established that the UPR is (a) constitutionally prohibited from impairing the obligations of contract, U.S. Const. Art. 1, §10, P.R. Const. Art. 2, §7, (b) fiscally autonomous from the state, capable of charging tuition; (c) entitled to receive a subsidy comprising 9.6% of the average of the last two years of the general fund, as that fund is defined by the Legislature, a statutory entitlement that is (d) subordinate under the local Constitution to the duty of the Commonwealth to pay the holders of its bonds. P.R. Const. Art. 6, §8.  The UPR is the employer of the Plaintiff, and is accredited by the defendant MSCHE.   Its address is The University of Puerto Rico, C/O, Executive Secretary, Junta de Gobierno (address as above)

16. **Uroyoán R. Walker-Ramos, Ph.D.,** President, University of Puerto Rico, is the married president of the UPR.  His address is Office of the President, University of Puerto Rico Central Administration, Jardín Botánico Sur, 1187 Calle Flamboyán , Second Floor, San Juan, Puerto Rico 00926-1117.

17. **Carlos Severino, Ph.D.,** Chancellor, is the **Chancellor of the UPR-RP campus**.   As chancellor, he is **LAWFUL BAILEE IN CUSTODY** of the UPR, Rio Piedras Campus, **<u>AND NOT TENANT-IN-POSSESSION</u>**.[5] Defining his custodial duties over the campus and its personnel, UPR General Regulations require the Chancellor to orient and supervise university personnel and the teaching, technical, research and administrative functions. UPR Gen. Reg. 19.3.1, to submit an annual budget to UPR President and Board of Governors, UPR Gen. Reg. 19.3.2, to represent the campus in ceremonial functions UPR Gen. Reg. 19.3.3, to preside over the Academic Senate, the Administrative Board, and meetings of the cloister. UPR Gen. Reg. 19.3.4, to send the campus Academic Senate's recommendations on general issues to the President, who may submit them to UPR Board of Governors, UPR JG) UPR Gen. Reg. 21.5.3, to name and contract personnel, UPR Gen. Reg. 19.3.5, to resolve appeals from decisions by the Deans, UPR Gen. Reg. 19.3.6, to submit an annual report of activities to President and Board of Governors, UPR

Gen. Reg. 19.3.7, to exercise maximum academic and administrative authority on campus, UPR Gen. Reg. 19.4, in particularly in disciplinary matters, among which are *"Interrupción, obstaculación o perturbación de las tareas y funciones regulares de la Universidad o de actividades legítimas de la institución que occurran dentro o fuera de los terrenos universitarios."* UPR Gen. Reg. 35.2.*5 "Actos de acometimiento o agresión física perpetrados contra miembros de la comunidad universitaria."* UPR Gen. Reg. 35.2.6 *"La sustracción y la ocupación illegal de bienes pertenecientes a la Universidad de Puerto Rico, o de bienes ajenos que se encuentren dentro de los predios en qu rige este Reglamento."* UPR Gen. Reg. 35.2.17 *"Conducta que contituya delito bajo las leyes del Estado Libre Asociado de Puerto Rico y sea prejudicial al buen nombre de la Universidad."* UPR Gen. Reg. 35.2.18, and *"Violaciones a la Ley de la Universidad, a las disposiciones de este Reglamento y de más reglamentos universitarios."* UPR Gen. Reg. 35.2.19.

In defining his authority as BAILEE of the campus and not TENANT IN POSSESSION, UPR law requires Dr. Carlos Severino when clothed in State power as Chancellor of the UPR-RP Campus **to maintain the campus commons open**: not only do the UPR General Regulations afford the Chancellor NO LAWFUL AUTHORITY to declare days or parts of days free for UPR personnel (such powers to declare free days vested in the UPR President or Board of Governors, UPR Gen. Reg.  34.2), they deny him even the power to concede the celebration of meetings in circumstances that may interrupt university functions. UPR Gen. Reg. 32.2.1.   Clarifying that UPR law affords him as bailee NO POWER to close the campus at the petition of others, Arts. 7 & 8 of UPR JS Cert. 90 (2004-5) charge the Chancellor with the duty to zealously suppress unlawful occupations and dispossessions of the campus commons that interfere with the legal rights of persons to use the campus commons, a duty which explicitly requires him to rigorously discipline those who violate UPR Gen. Reg. 35.2.17  which prohibits

"La sustracción y la ocupación illegal de bienes pertenecientes a la Universidad de Puerto Rico, o de bienes ajenos que se encuentren dentro de los predios en qu rige este Reglamento." UPR Gen. Reg. 35.2.17.

16

**Carlos Severino, Ph.D.'s** physical address on the UPR-RP campus is Office of the Chancellor, University of Puerto Rico, Río Piedras Campus,  Edificio Janer, 2nd Floor, San Juan, Puerto Rico 00931.

18.  **The Hon. Alejandro Garcia Padilla**, Governor, is the Governor of the Commonwealth of Puerto Rico, charged with supervising the members of his cabinet, including the Secretary of Education, in the execution of the laws of the Commonwealth of Puerto Rico, and naming persons to serve on the UPR Board of Governors.   His physical address is Office of the Governor, La Fortaleza, Fortaleza Street, Old San Juan, Puerto Rico; his mailing address is Office of the Governor, La Fortaleza, PO Box 9020082, San Juan, PR 00902-0082, Tel: 787.721.7000; mensajes@fortaleza.pr.gov

19.  **Hon. Cesar Miranda**, is the Secretary of Justice of the Commonwealth of Puerto Rico. His address is Office of the Secretary of Justice, Calle Olimpo, Esq. Axtmayer, Pda. 11 Miramar, San Juan, Puerto Rico; his mailing address is Secretary of Justice, Apartado 9020192, San Juan, PR 00902-0192, Tel.: (787) 721-2900

20. **Mr. GUILLERMO GUASP**, is the President of the UPR-RP GENERAL STUDENT COUNCIL, of unknown civil status, age, town of residence, and address.

22.  **Fulano de Tal, Inc.,** Insurer for UPR of unknown identity and address

23. **Fulana de Tal, Inc.,** Insurer for the UPR Board of Governors of unknown identity and address

**D.    DEFENDANTS AT LAW FOR TREBLE DAMAGES AND RESIDUAL CLAIMS COMPRISING The ALIENEE AND ALIENOR (defendants above), and**

1. **THE MID-ATLANTIC REGION COMMISSION ON HIGHER EDUCATION** doing business as the **The Middle States Association of Colleges and Schools** and as the **MIDDLE STATES COMMISSION ON HIGHER EDUCATION**, (**MSCHE**) citizen of the United States domiciled in the Commonwealth of Pennsylvania, is a regional accrediting agency incorporated in the Commonwealth of Pennsylvania in 2013, prior to which it was a unit of the Middle States Association of Colleges and Schools certified by the Secretary of Education of the United States of America in conformity with 34 CFR part 602, subpart C, §602, to effect the purposes of the Higher Education Act of 1965, as amended, in

accrediting institutions of higher education for the purposes of that Act. Its address is Mid-Atlantic Region Commission on Higher Education 3624 Market Street, 2nd Floor West, Philadelphia, PA 19104 Telephone: (267) 284–5000 E-mail: info@msche.org  Spanish: españolinfo@msche.org

2.   John Doe, Inc., insurer for MSCHE of unknown identity and address

3.   Richard Roe, insurer of unknown identity and address

### III. THE CLAIMS BROUGHT UNDER THE ALL WRITS ACT

A. A UPR PROFESSOR'S STANDING TO SEEK A POSSESSORY WRIT

1. The sum of a professor's rights, privileges and compensation is conceived at law as a freehold[6] and a life estate,[7]  which private property, once confirmed, cannot be taken or impaired by an election of Fellow professors or an executive pronouncement, absent a sentence from a court of record.[8]

2. Intrusions into these freeholds under color of sovereign executive right have justified the deposition of English kings.[9]

3. Inasmuch as the English statute, 25 Edward III, Stat. 5, c. 4, provided that

> Whereas it is contained in the Great Charter of the Franchises of England, that none shall be imprisoned or put out of his freehold, nor of his franchises nor free custom, unless it be by the Law of the Land, it is accorded and assented and stablished, that from henceforth none shall be taken by petition or suggestion made to our Lord the King, or to his Council, unless it be by Indictment or Presentment of good and careful People of the same neighbourhood where such deeds were done, in due manner, or by process made by Writ Original at the Common Law, nor that be none be out of his Franchises, nor of his Freeholds unless he be duly brought into answer, and forejudged of the same by the Course of Law; and if anything be done against the same, it shall be redressed and holden for none." 25 Ed. 3, Stat. 5, c. 4, 1 *Statutes of the Realm* 320.

the full extent of a UPR professor's freehold, his franchises and free customs are protected against both ejectment and confiscation by his fellow professors, the State, or its agents, to the extent that the Magna Carta informs the Fourteenth Amendment Due Process Clause and the Takings clause as it applies to the States, and the Takings Clause in Article 2, §7 of the Constitution of the Commonwealth of Puerto Rico of 1952. *Trustees of Dartmouth College v. Woodward,* 17 U.S. 518 (1819).

B. DEMANDANT'S PERSONAL STANDING TO SUE FOR A POSSESSORY REMEDY

1. After an exhaustive search, culminating on 27 May 1999, the University of Puerto Rico, Rio Piedras Campus, with the unanimous support of the Department of English Personnel Committee, offered DEMANDANT a tenure-track position, specified as Freehold (*Plaza*) #079-010, specifically to teach English Literature before 1800, especially English Renaissance specializing in Shakespeare in the Department of English in the College of Humanities at the University of Puerto Rico, Rio Piedras Campus UPR-RP. Alfonso Rubiano to Carlos Ramos, Ph.D., "Borrador" (21 June 1999), Amended Complaint, Exhibit 1. 2nd Amended Complaint, Ex. 2, p. 81.

2. DEMANDANT accepted the offer prior to 21 June 1999. Alfonso Rubiano to Carlos Ramos, Ph.D., "Borrador" (21 June 1999), Amended Complaint, Exhibit 1.

3. Tenure and advancement in rank was conditioned upon teaching evaluations, scholarly publication in his field, success in soliciting federal grant moneys, and attending scholarly conferences in his field.

4. DEMANDANT's occupation of Freehold (*Plaza*) #079-010 has been continuous and uninterrupted: He began as an Assistant Professor on 2 August 1999. Letter from George V. Hillyer, Ph.D., to Dr. James P. Conlan (24 August 1999).  He was named Associate Professor on 6 May 2002; Circular Letter, José Luis Vega, Dean of College of Humanities (20 May 2002); He was promoted to Full Professor on 1 May 2007, effective 1 July 2007. Aurora Sotogras Saldaña, Executive Secretary, Junta de Síndicos, to Dr. James P. Conlan, (1 May 2007) cf. JS Cert. 50 (2006-7). Amended Complaint, Exhibit 2.

5. In 1999, when plaintiff accepted the offer and took the position, a tenure-track professor's freehold in the Department of English at the University of Puerto Rico was a LIFE ESTATE, conditioned upon a tenure determination, that included among other rights, the following rights of property:

(a) An annual contract for lease of professional services for price certain, Puerto Rico Civil Code Art. 1434 (1930) ,[10] automatically renewable and terminable after tenure only for just cause or at the will and pleasure of the professor,   to teach four classes per semester in one's field of

expertise, the number of students in the class capped at 20, as signed releases filed with the English Department will show.

(b) The power and duty, amounting to a FRANCHISE, to conduct the business of the university as a member of department, the college, campus and university committees and boards, as appointed, or to be appointed to administrative positions with supervisory jurisdiction, with the promise that onerous appointments that, in combination with the regularly assigned, would impose a load on the professor of more than 37.5 hours per week, would allow either greater compensation[11] or relief from teaching responsibilities, or both;

(c) The contractual right to use, while teaching, a secure office on the campus to meet students and to store personal property typical of that used in the completion of one's duties, evidenced by the issuance of keys;

(d) Uninhibited access into and passage through the campus commons, appendant on the freehold, at all times in order to complete one's academic charge or conduct research or to retrieve personal property, including mail.

(e) The contractual right, amounting to a FRANCHISE, of choosing the research agenda to pursue in one's time outside of the classroom, and the privilege of using the facilities at the UPR to conduct research and produce intellectual property in one's field of expertise, with the corresponding expectation that said findings will be published either at professional conferences or in information products circulating in interstate and foreign commerce, or both.

(f) The contractual right to financial support or reimbursement for reasonable travel expenses to conferences attended in representation of the UPR-RP, which can ascend to four figures, and a per semester allowance of moneys for the purchase of materials used for teaching.

(g) The contractual right to be evaluated for promotion on the basis of merit as defined in the form employed by the College of Humanities, at the term scheduled in the UPR General Regulation, with the corresponding right of representing oneself by this title to the world as an honorable member of the UPR-RP community so long as one successfully completed his duty,   this contractual right protected by administrative enforcement of sanctions against defamation and

harassing disciplinary action, in compliance with Article 2, §8 of the Constitution of the Commonwealth of Puerto Rico;

(h) The contractual right to draw an annual salary based on rank at the UPR, adjusted upwards by $20 each pay period for every five years of service, to be paid twice monthly (roughly every 15 days), twelve months of the year.

(i) The contractual right to a medical plan that covered the professor and family members; Cf. Law 1-1966, art. 3(e).

(j) The contractual right to a tuition exemption for oneself and for members of one's immediate family who attended the UPR;[12]

(k) As part of the price certain of compensation, a license of 1.5 days leave for sickness per month, a credit granted for each day not taken accumulating, until liquidation in the form of cash money and provided to the professor upon 90 credits accumulating at the professor's rate of pay.[13]

(l) Tenure within the UPR system as a whole;

(m) As part of the price certain of compensation, an option under contract to retire after 30 years of service at 50% of one's final salary contingent upon a monthly contribution of 5% of one's annual salary to the pension fund, that the Board of Trustees or Governors had a fiduciary responsibility to maintain solvent by way of contributing funds sufficient to cover future obligations in accordance with the application of reasonable actuarial principles; See *UPR Manual de Profesor*, chapter 20, pp. 81-90 (2008)

(n) Academic liberty in the classroom and for research and, implicitly, institutional support so that the professor could complete the research in the field he was hired to teach.  UPR Gen. Reg. §§11.1-11.3.

(o) The privilege of soliciting course relief for research projects, awarded when resources are insufficient, on the basis of merit;

(p) The privilege, protected under contract and the UPR General Regulations, of soliciting a paid sabbatical every five years, awarded, when resources were insufficient, on the basis of merit

(q) The right of franchise, protected under contract and the UPR General Regulations, to vote for members of the academic senate, UPR Gen Reg. 21.7.1, 25.4.1 who represent **the interests of the teaching faculty**, UPR. Gen. Reg. 21.4, cf. 21.8, and to be consulted and contribute advice in matters of university governance to this body and through the University hierarchy.  UPR Gen. Reg. 21.11.3. & 23.3.

(r) The privilege of advising the UPR library in how best to develop the collection in his field so that it allows the professor and his students the opportunity to conduct basic research.   See Department minutes concerning Library Committee; Letters of support.   Second Amended Complaint, Exhibit 1.

(s) The privilege of applying for external funds as an agent of the UPR-RP with the assistance of administrative structures either to develop the professor's own research projects or to improve the campus educational infrastructure. 2nd Amended Complaint, Exhibit 1; Exhibit 2, p. 19; Exhibit 3..

(t) The expectation that the institution would bear the material costs of teaching, including Xerox copying, chalk, erasers, paper, etc., and an allowance to the professor each semester for teaching materials;

(u) The expectation that the institution would extend support for attendance of conferences in his field as a business expense.

(v) Quiet title in these rights, U.P.R. Gen. Reg. 27, including the administration's zealous and diligent protection of the person of the professor on campus against foreseeable harm arising from foreseeable felonious conduct engaged in by members of the university campus or others, Puerto Rico Civil Code Art. 1057, *Elba A.B.M. v. U.P.R. supra.*, U.P.R. Gen. Reg. 35.2, and Arts. 7 & 8 of UPR JS Cert. 90 (2004-5).

**C. ADJUDICATION OF WRITS**

**1.  POSSESSION IS ADJUDICATED SEPARATE FROM AND PRIOR TO PROPERTY**

 "That suit must first be brought on the possession rather than on the property.  And that possession rather than property must first be dealt with and that a possessory action must take precedence though in the end the property must prevail, may clearly be seen.  For suppose that the justices first pronounce upon the property rather than on the possession; if they later wish to take cognizance of the possessory issue between the same persons they achieve nothing, for the plea of right which was tried between the same parties with respect to the same tenement extinguished any recognition between them for claiming the plaintiff's own or another's seisin of the same tenement, because a plea *de recto* determines both rights, possession as well as

property." Henry de Bracton, *De Legibus* : *On the Laws and Customs of England*, tr. Samuel E. Thorne (Cambridge: Belknap Press of Harvard University Press, 1968), 2: 320.

## IV.    The WRIT OF ASSIZE OF NOVEL DISSEISIN

A.  APPLICABLE NORMS

1. STATUTES AS TO JURISDICTION AND REMEDY:

(a) Statute of Merton, 20 Henry III, c. 3, declares that where freeholder has been disseised, the Sheriff shall go into the land or pasture, arrest and jail the deforcers, perform diligent inquisition, and restore seisin to the demandant.[14] 1. S.R. 2.

(b) Statute of Merton, 20 Henry III, c. 4, declares that Assize of Novel Disseisin shall lie when deforcer prevents tenant ingress or egress into a common of pasture.   1 S.R. 2-3.

(c) Stat. of Westminster 2, 13 Ed. I, c. 25, declares that Writ of Assize of Novel Disseisin shall lie in the same manner as with any Common appendant to freehold as it has under the Statute of Merton in relation to a Common of Pasture. 1 S.R. 84.

(d) Stat. Westminster 2, 13 Ed. I, c. 30 awards exclusive jurisdiction to hold assize of Novel Disseisin to justices of the king's bench, except in cases of heinous trespass, which may be heard before Justices of Nisi Prius.  1. S.R. 86.

(e) Magna Carta, 25 Ed. I, c. 12 prohibits the Assize of Novel Disseisin from adjudicating outside of the shire or county in which disseisin occurs. 1 S.R. 115-116.

2. TREBLE DAMAGE LIABILITY FOR DISSEISIN OF COMMON OF PASTURE

(a) Stat. Westminster 2, 13 Ed. I, c. 46, qualifying assize under Statute of Merton, (1) allows lords to make apportionment of residue of wastes, woods and wilds when neighbors are found to have sufficient pasture, (2) disqualifies action on common of pasture owing to raising of windmill, sheepcote, dairy, enlargement of a court necessary, or courtelage, and (3) holds adjacent towns liable for damages for raising of hedge or dyke [i.e. nuisance impeding ingress and egress to commons of pasture]. 1 S.R. 94.

(b) 3&4 Ed. VI c. 3, §2 reciting Statute of Merton, 20 H. III, c. 4, and Statute of Westminster 2, 13 E. I, St. I, c. 46, awards treble damages to any in Assize of Novel Disseisin on those statutes for disseisin for common of pasture;

3. DOUBLE-DAMAGE LIABILITY FOR DECEITFUL OR COLLUSIVE ALIENATION

(a) 13 Edward I, Statute of Westminster, c. 25, affords **double damages** in Assize of Novel Disseisin when a defendant interposes a false exception.

(b) 1 Richard II, c. 9, affords **double damages** in Assize of Novel Disseisin against Disseisor when, to delay or hinder disseisees in their recovery, the Disseisor alienates property either to great men or to multiple persons, provided the suit is brought within a year of the disseisin. 2 S.R. 4.

(c) 4 Henry IV, c. 7, extends the term of 1 Richard II, c. 9, **to sue against Disseisor for the term of life of the Disseisor,** when there is fraud or collusion to hide who those are who actually have disseised demandant.  2 S.R. 134.

(d) 11 Henry VI, c. 3, allows **recovery against the Disseisors or their feoffees** in all manner of Writs grounded on Novel Disseisin, regardless of the gifts or feofments that are given to others to delay the demandant.  2 S.R. 279.

4.  TREBLE-DAMAGE LIABILITY FOR FORCIBLE DISSEISIN

(a) 15 Richard II, c. 2, authorizes Justices of the Peace to arrest those who enter into lands with forcible entry, and, equally, to arrest those who continue to hold with forcible entry and requires the persons of country and the sheriffs, under pain of imprisonment, to arrest the offenders.  2. S.R. 78.

(b) 8 Henry VI, c. 9, provides a disseissee a civil enforcement mechanism to enforce the situation specified in 15 Richard II, c. 2, by extending to the assize of novel disseisin and the court determining a writ of trespass a grant of jurisdiction to award **treble damages** to disseisee disseised by forcible entry or held out of rightful possession by use of force. 2. S.R. 244-6. Though in the disjunctive, both causes "entered with force" and "maintained with force" may be brought in the same case. *Barre and Others v. Leversegge & others*, Trin. 10 Edward IV (1470). *10 Edward I & 40 Henry VI AD. 1470*, ed. N. Neilson, Year Books Series Selden Society 47 (London, 1931) p. 100-1.

5. DOUBLE-DAMAGE LIABILITY FOR REDISSEISIN

(a) Stat. of Westminster 2, 13 Ed. I, c.26 declares Assize of Redisseisin lies for **double damages**

where, after seisin is restored to demandant, one of the same disseisors disseise him again.

## B. LEARNED COMMENTARY

1. "The writ of Assise of Novel Disseisin lieth where Tenant for Life, or Tenant in Fee-Simple, or in Tail is disseisined of his Lands or Tenements, or put out against his Will, that is a Disseisin; and he shall have an Assise of Novel Disseisin of that ouster." *The New Natura Brevium of the most reverend Judge Mr. Anthonie Fitz-herbert*, Sixth Edition (London, in the Savoy, by Eliz. Nutt & R. Gosling, for B. Lintote, R. Gosling, & C. Ward, 1718), 393 ¶A.

2. "An assize of *novel* (or recent) *disseisin* … recites a complaint by the demandant of the dissein committed, in terms of direct averment; whereupon the sheriff is commanded to reseise the land and all chattels thereon, and keep the same in his custody till the arrival of the justices of assize; (which since the introduction of giving damages, as well as the possession, is now omitted.) [Citing Booth, 211]. And in the mean time to summon a jury to view the premises, and make recognition of the assize before the justices.  [Citing F.N.B. 177] And if, upon the trial, the demandant can prove, first, a title; next, his actual seisin in consequence thereof; and, lastly, his disseisin by the present tenant; he shall have judgment to recover his seisin, and damages for the injury sustained. …Costs and damages were annexed to these possessory actions by the Statute of Gloucester, 6 Edw. I, c. 1. before which the tenant in possession was allowed to retain the intermediate profits of the land [187 | 188] to enable him to perform the feudal burthens incident thereunto.  3 Blackstone, *Commentaries* 187-188, c. 10.

3. "As | a writ of entry is a real action, which *disproves* the title of the tenant, by shewing the unlawful commencement of his possession; so an assize is a real action, which *proves* the title of the demandant, merely by showing his, or his ancestor's, possession."   Finch. L. 284, 3 Blackstone, *Commentaries* c. 10, p. 185.

4. "[A]ll writs, grounded upon the possession of the demandant himself, are directed to be sued out within thirty years after the disseisin complained of." 3 Blackstone, *Commentaries* 189, c. 10.

5. "And by the Statute of Westminster, 2 cap. 26, he who recovereth in a Redisseisin shall recover double Damages; and the Defendants shall not be bailed by common Writ; and by the same Statute is given a Writ of Post. Diss. in which he shall also recover double Damages against the Defendant.  Cf. Statute of Westminster 2, cap. 26.
            And if man do recover by Redisseisin, and afterwards is disseised again by him whom the first Disseisin was before, he shall have a new Redisseisin; and so one Redisseisin after another every time he is Redisseised. *The New Natura Brevium of the most reverend Judge Mr. Anthonie Fitz-herbert*, Sixth Edition (London, in the Savoy, by Eliz. Nutt & R. Gosling, for B. Lintote, R. Gosling, & C. Ward, 1718) 420 ¶D.

6. "And a redisseisin shall be maintainable against any of the disseisors.  And if a man recover Land by an assize of Novel Diss[eissin] into which a Common is appendant, &c, and after he is disseised of this Common again, he shall have a Redisseisin." *The New Natura Brevium of the most reverend Judge Mr. Anthonie Fitz-herbert*, Sixth Edition (London, in the Savoy, by Eliz. Nutt & R. Gosling, for B. Lintote, R. Gosling, & C. Ward, 1718): 420 ¶E.

7. "Against whom this remedy is available: against the one disseisor or the several disseisors, and all those who come to their force and aid." *The Mirror of Justices*, ed. Willaim Joseph Whittaker, intro. F.W. Maitland, Selden Society 7, (London 1895),  69.

## B.   STATEMENT OF FACT ENTITLING DEMANDANT TO A WRIT OF ASSIZE OF NOVEL

DISSEISIN

1. DEMANDANT entered into possession of FREEHOLD (*Plaza*) #079-010 on 2 August 1999. Letter from George V. Hillyer, Ph.D., to Dr. James P. Conlan (24 August 1999).  He was named Associate Professor on 6 May 2002; Circular Letter, José Luis Vega, Dean of College of Humanities (20 May 2002); He was promoted to Full Professor on 1 May 2007, effective 1 July 2007. Aurora Sotogras Saldaña, Executive Secretary, Junta de Síndicos, to Dr. James P. Conlan, (1 May 2007) cf. JS Cert. 50 (2006-7). Amended Complaint, Exhibits 1 & 2.

2. Plaintiff continues to enjoy title and occupy Freehold (*Plaza*) #079-010 at the UPR: he is presently a full professor of English in the College of Humanities at the University of Puerto Rico, Rio Piedras Campus, with nearly seventeen years in that position.

3. The completion of duties that allowed demandant to maintain himself in this freehold consisted principally in 37 ½ hours of university service per week during the semester,[15] which involved the creation and publication of scholarship, committee work, and the teaching of four classes (12 credits) per semester,[16] unless relieved to complete other duties or agreeing to a reduction in pay.[17]

4. Under university law, the contract between the student and the professor, and, by extension, the student and the university, for a particular class, is the syllabus:

> "The composition of the syllabus of a course is one of the duties and responsibilities of the professor for the students and the University of Puerto Rico.  The syllabus of a course constitutes the contract between the professor and the student, and by extension, between the Institution and the student, that guarantees that the professor promises to complete the objectives established for the curriculum of the corresponding academic program, and with the objectives and content for the course." Junta de Síndicos, Certificación núm. 130, (1999-2000), Anejo 2, p. 3.  My translation.U.P.R. Junta de Síndicos, Certificación núm. 130, (1999-2000)

4. As the UPR-RP requires students to drop classes within the first weeks of the semester to receive their money back, the contract is an executory contract whose pace of performance is defined in the Academic Calendar published on the first day of class. 2nd Amended Complaint, Ex. 2, pp. 240-1.

5. As the Academic Calendar published on the first day of class defines the pace whereby the demandant must perform those duties which maintain him in his freehold, the syllabus defining the term and material that the professor teaches thus constitutes **a contract for professional**

**services for a certain term governed by Puerto Rico Civil Code Art. 1473 (1930)**, *Soc. De Gananciales v. Vélez & Asoc*. 145 D.P.R. 508 (1998).

6. As "term certain" is an essential term of the contract described in Art. 1473, described above, this essential term defining where and when demandant must perform those services to maintain himself in his freehold is also protected against interruption by the State, or its agents, to the extent that the Magna Carta informs the Fourteenth Amendment Due Process Clause and the Takings clause as it applies to the States, and the Takings Clause in Article 2, §7 of the Constitution of the Commonwealth of Puerto Rico of 1952.

7. By way of UPR General Regulation §32, the UPR warranted and still warrants to the public, including demandant, that the rhythm of academic and administrative labors shall be protected against extracurricular interference by any and all members of the university.

8. By way of UPR Student Regulation §2.18(1)  (2)(5)(6) & (7), The UPR warranted to the public, including demandant, that the rhythm of academic and administrative labors shall be protected against extracurricular interference by students. Cf. 2nd Amended Complaint, Ex. 2, p. 236, art. 4.

9. In furtherance of the zealous enforcement of these warranties, each of which bears on the demandant's ability to pay those services that he owes for his freehold, the UPR JS passed the Institutional Policy of Opening and Access to University Premises (*Politica Institutional Sobre Apertura y Acceso a los Predios Universitarios*) in UPR Junta de Síndicos Certification 90 (2004-2005), which declares unequivocally that the unilateral closing of the UPR by a sector of the UPR population is not a legitimate act of free speech (Art. 5),  which requires the President, the Board of Trustees and the Chancellors to use UPR resources to the extent necessary to keep the UPR open to faculty and students at all times (Art. 7) and to impose responsibility on those persons who incur in violations of the law and university regulations,

> "exercising particular zeal in those cases in which the conduct is directed to impede any member of the community from normally realizing his labor, be it in the nature of teaching, research or service, or administrative or student-oriented." Art. 8, UPR-JS-Cert. 90 (2004-2005), published 27 June 2005, p. 2.

10. As outlined in Arts. 7 & 8 of UPR JS Cert. 90 (2004-5), quiet title in this right is enforceable as an explicit contractual right against (a) the chancellor of the UPR-RP Campus, and, under *Lipsett*

*v. UPR*, 864 F. 2d 881, 902 (1st Cir. 1988) (b) the UPR President, and (c) the Board of Trustees and Board of governors of the UPR; See U.P.R. Gen. Reg. 27.

11. In breach of these warranties, to the prejudice of demandant's freehold and, in particular, deforcing him from the expectation that he shall pay his duties of service within term certain, on 16 December 2003, the UPR-RP Academic Senate, under color of passing an academic norm of general education, passed **UPR-RP AS Cert. 49 (2003-4)** whereby his fellows, convened by the chancellor, have intruded into demandant's freehold rights and, breaching covenant, **have alienated the campus commons that is appendant to demandant's freehold to third party alienees the Chancellor of the UPR-RP Campus, APPU, OPU, HEEND, UBOS, and the UPR-RP General Student Council**:

12.  SPECIFICALLY, By way of UPR-RP AS Cert. 49 (2003-4), (available at http://senado.uprrp.edu/Certificaciones/Cert2003-2004/CSA-49-2003-2004.pdf), the UPR

(a) Set up a board called the Security Coordinating Board, (the JCS) not otherwise authorized in UPR law or Regulation;

(b) Constituted the JCS as a board of 11 persons, **7 elected members in representation of the 6 alienees** (2 representatives of the General Student Council, 1 representative of HEEND, 1 representative of the Sindicato de Trabajadores de la UPR (STUPR), 1 representative from APPU, 1 representative of the Organization of University Professors (OPU), (according to Plaintiff's information and belief, presently defunct), 1 representative of the security officers who has no supervisory or administrative responsibilities, (i.e. a member of the Unión Bonafide de Oficiales de Seguridad) (UBOS) cf. UPR-RP AS Cert. 53 (2005-6); AND and **four persons ex officio in representation of the Chancellor** (the Dean of Administration,  the Dean of Students, the Student Procurator, and the Director of Security who has no right to vote).

(c) Committed each alienee member of the JCS to appoint its members in accordance with its own bylaws every year.  UPR-AS-Cert. 49 (2003-2004), p. 7.

(d) By way of the passage,

> [the Chancellor] shall have the responsibility of propitiating and maintaining a climate of dialogue, communication and nonconfrontation between the parts.  The minimum number of persons required by the Chancellor in functions relative to the closing shall enter the

campus as discussed by the JCS and in coordination with the Office of Security.  UPR-RP AS, Cert. 49 (2004), II, (A), p. 11.[18]

pretended to strip the Chancellor of his CUSTODIAL DUTIES AS BAILEE FOR THE CAMPUS under the UPR General Regulations as the person who "shall exercise the maximum academic and administrative authority within the sphere of his or her particular unit," UPR Gen. Reg. §19.4, to prevent "interruption, obstruction, and disturbance of the tasks and regular functions of the UPR or of the legitimate activities of the institution that happen inside or outside of the university premises" UPR Gen. Reg. 35.2.5, to deny the Chancellor access to law enforcement powers when students or labor unions unlawfully take over the campus, in prejudice of his custodial duties, AND REVEST HIM IN THE AUTHORITY OF TENANT-IN-POSSESSION who, UNDER COLOR OF HOLDING FROM THE ACADEMIC SENATE OVER WHICH HE PRESIDES AND HAS A DUTY TO MAINTAIN WITHIN ITS LAWFUL JURISDICTION, on condition of implementation of the Institutional Policy of Nonconfrontation upon agreement of the OTHER ALIENEES, constituents who appoint members of the JCS.

13. **Further**, UPR-RP AS Cert. 49 (2003-4), under color of an Institutional Policy of Nonconfrontation, **allows no distinction whatsoever** between the cases when the "strike" is a legitimate industrial action undertaken by organized labor in the legitimate interest of its membership OR when it is undertaken by a group of students.

14. In furtherance of these possessory powers, UPR-RP Cert. 49 (2003-4) **authorized the JCS to exclude from the Commons of the campus all persons** other than the minimum crew named by the Chancellor, except for workers in the post office (not recipients of mail) and declares unequivocally that the branch offices of financial institutions located on the campus should be closed.[19]

15. **THEREFORE, by way of UPR-RP AS Cert. 49 (2003-4), the UPR**

(a) transformed the role of the Chancellor from BAILEE who held UPR property IN CUSTODY to TENANT IN POSSESSION of the campus common WITH THE AUTHORITY TO EXCLUDE ALL OTHERS FROM ITS USE AT THE WILL AND PLEASURE OF THE CONSTITUENTS WHO MAKE UP THE JCS.

(b) **alienated** the campus commons to the full control of the alienees, inasmuch as any powers that are exerted by the JCS to close the campus are exerted i**n representation of the alienees**, who have the power to remove their representative to the JCS, and **not the demandant or his class**, as demandant is not a dues-paying member of any of the alienees above, and ought not have to pay dues to determine who shall secure him in his freehold, inasmuch as such rights have already been covenanted.

(c) **disenfranchised demandant**, as an academic senate-qualified member of the UPR-RP faculty of a vote to hold members of the JCS accountable for their bad security decisions, inasmuch as the JCS members are elected by the alienees,

(d) unconstitutionally **impaired the covenants** that the UPR and UPR-JS have extended that allow demandant to expect that the UPR shall allow him to enter the Commons of the campus and his freehold on campus to do his work in the library; *Trustees of Darmouth College v. Woodward*, *supra*; *Fletcher v. Peck,*, *supra*

(e) **unlawfully vested** a board whose vast majority of voting members have zero security experience with the role of securing the commons of the UPR-RP campus, and plaintiff's freehold within it, both directly during interruptions of campus operations authorized by the alienees themselves and indirectly by way of the self-serving criteria that they must employ to vet the chief of security to maintain themselves in their positions.[20]

(f) **rendered inherently uncertain** when demandant will complete his contractual duties to the UPR each semester.

(g) **made more onerous the duties that demandant must pay each semester** to maintain himself in this much smaller Freehold (*Plaza*) #079-010 as the UPR has empowered the alienees to interrupt his payment of his duties at their will and pleasure which, in point of fact, has occurred.

16. **Disseisin of the campus commons is ongoing inasmuch as** the UPR-RP Academic Senate has reconfirmed these grants in UPR-RP AS Cert. 42 (2004-5); UPR-RP AS Cert. 10 (2005-6), UPR-RP AS Cert. 16, (2006-7), and, most recently, in UPR-AS Cert. 89 (2014-2015)

under the title, *Política Institucional de Convivencia y No Confrontación*, whereby under color of attempting to maintain a culture of peace, the UPR-RP cedes control of the campus commons.[21]

17. Thus, by way of UPR-RP AS Cert. 49 (2003-4), and later grants, the UPR alienated the campus commons of the UPR, Rio Piedras Campus, to alienees the UPR-RP Chancellor, APPU, OPU, HEEND, STUPR, UBOS, and the UPR-RP General Student Council, acting in concert as the Coordinating Security Board (*Junta Coordinadora de Seguridad*) (JCS); and, under color of a Policy of Nonconfrontation, disseised demandant of his rights of ingress and egress to the campus commons at the alienees' will and pleasure.

18. Under color of this grant, the Alienees, at their will and pleasure, have enfeoffed student-clients of the UPR-RP to deforce the demandant and others of their ingress to and use of the campus commons.

19. Preventing student-clients who are so enfeoffed from being identified and thereby hindering recovery of possession and at tort for trespass, alienees acting through the UPR-RP Academic Senate and the Chancellor himself have (a) refused to authorize the placement of cameras on campus; (b) exhorted the UPR-RP Chancellor not to discipline students who close down the campus, UPR-RP Cert. 71 (2010-11); and marched with rhetorically supported student-clients so enfeoffed.

20. Claiming an exclusive right of possession under color of such conveyance, the alienees' feoffees, student-clients of the UPR-RP, have deforced Demandant and others of their rights of ingress and egress to the campus commons, (a) On 6 and 7 October 2004; (b) for four weeks in Spring semester 2005, 6 April 2005 concluding on 3 May 2005 (c) from 12-16 October 2009, the Interim President Miguel Múñoz citing student safety for extending the 24 hour vote by the students to join a general strike to a closure for the whole week; (d) for 62 days in Spring semester, 2010; (e) on 19 October 2010, the UPR-RP declared open, but the entrances to the College of Humanities barricaded with garbage cans; (f) on 11 November 2010[22] ; (g) on 30 November 2010[23]; (h) on 1 December 2010[24] (i) on 7 and 8 December 2010, the roadways barricaded with lumber pilfered from construction sites; (j) on 23 February 2011[25] ; (k) on 23 April 2014; (l) on 14 and 15 May 2015; and (m) on 16, 17, and 18 March 2016;

21. Under color of holding from alienees, Feoffee Student clients of the UPR-RP have used force to enter into or to maintain themselves in possession of the campus commons (a) on 6 April 2005; (b) In May 2010; (c) On 7 December 2010[26]; (d) on 8 December 2010; (e) 20 December 2010[27]; (f) on 23 February 2011; and (g) on 23 April 2014;

22. Under color of TENANT-IN-POSSESSION, the UPR-RP Chancellor has interrupted the normal rhythms of the Academic and Administrative tasks by declaring academic and administrative recesses to allow meetings to be held on campus during teaching hours, in contravention of his CUSTODIAL DUTIES and in excess of his authority under UPR Gen. Reg. 32.2.1 and 34.2.

23. BOTH the meetings unlawfully celebrated under color of the Chancellor's TENANCY in the Campus Commons AND the deforcement by feoffee student clients of his and others' rights of ingress to and egress from the campus commons necessarily impede Demandant (a) in the payment of his service for his freehold, (b) in the free exercise of his franchises to do research, and (c) his ability to make firm plans at the end of the semester.

23. PRESUMED DAMAGES suffered by demandant include damages by reason of (a) uncertainty every semester as to when that semester shall end, (b) extension of the teaching semester in the semesters in which the alienees enfeoff the student-clients of the UPR-RP to close the campus, and (c) restricted time to do research in those same semesters in which the campus commons is closed or the academic calendar is changed so as to allow the celebration of meetings.

(a) Uncertainty as to the conclusion of the semester results in an increase in cost of plane tickets to travel amounting to a much as $200 per semester;

(b) extension of the teaching semester results in damages owing to (i) change orders, estimated at $500 per academic calendar change; (ii) resolution of student problems arising from change orders, estimated at $500 per semester; and (iii) 1/60 of salary for every additional day that demandant is required to teach;

(c) closing and rescheduling necessarily restricts time to do research, an opportunity cost calculated at hourly cost of of research by a scholar with demandant's level of education for each

8-hour day the campus is closed, plus  4-hours research for each additional day that demandant was not expecting to teach and was required to.

24.  By way of the following deforcements, demandant suffered additional injuries:

25. **In Spring 2005**, demandant was a student at the UPR-RP School of Law and a professor:

(a) immediately prior to the student assembly held on 6 April 2005, student clients seeking to close the UPR-RP, knowing that he identified such closures as unlawful on his syllabus, interrupted his class and circled him in an attempt to provoke a reaction;

(b) during the meeting held later, demandant was assaulted by these same individuals, mobbed, robbed of his instant camera, and had his pants torn, in which he had to teach that afternoon.

(c) At least one of the individuals who mobbed him solicited that the assembly vote to close down the campus;

(d) demandant had planned his wedding for the Sunday of Memorial Day Weekend;

(e) the campus closure lasted four weeks;

26.  By reason of the 2005 vote to forcibly deforce the demandant and others of their rights of ingress into the campus commons and forcibly maintain that possession, under color of enfeofment by alienees, demandant

(a) was compelled to take his torts exam two days after his wedding; family law and contracts were to follow;

(b) had the worst semester of his law school career, as the semester was accelerated in the UPR School of Law, , by far his worst semester;

(c) was prevented from going on his honeymoon for a year and a half as the semester was extended in the College of humanities, and his bride's children's custody arrangement had been planned with the understanding that demandant would be free of his teaching responsibilities after Memorial Day.

27.  **In Spring, 2010**, demandant was on sabbatical working on a research project and taking a BAR/BRI class in preparation for taking the New York Bar Examination:He was nearly thwarted in this latter goal by the violent deforcement of the UPR campus commons by student-clients enfeoffed by the Alienee members of the JCS:

(a). The solicitation and reception of an official university transcript is supposed to be a simple task involving the filling out of a form and the paying of a nominal fee.  2nd Amended Complaint, Ex. 2, *Graduate Catalog 2000-2003*, p. 13 lists this fee as $1 [ONE DOLLAR] per copy.

(b). Owing to the closure of the UPR-RP campus, Plaintiff could not secure his transcript in the ordinary course of business.

(c). Without the transcript, the New York Board of Legal Examiners would not let plaintiff take the examination.

(d). Because there had been no way of complying with the rule in May 2010 owing to the UPR's closure, on 2 June 2010, demandant submitted to the New York State Board of Law Examiners his Certificate of Graduation from the UPR School of Law with a sworn affidavit to explaining that he could not acquire a transcript because the UPR had shut down.

(e). In response, demandant received an email from John McAlary, Executive Director of the NYS Board of Law Examiners (BOLE) notifying him that

> "The Board requires an official transcript or a completed Law School Certificate of Attendance form in order to qualify a candidate to sit for the bar exam under Section 520.3 of the Rules of the Court of Appeals of the State of New York.  If you are not able to furnish either of those documents at this time because of the shut down of the University of Puerto Rico you may file a verified petition with the Board seeking a waiver under Section 6000.10 of the Rules of the State Board of Law Examiners."

(f) Demandant met with an attorney on two days, 25 June 2010 and 28 June 2010, to prepare a waiver to be submitted to the New York Court of Appeals.  Demandant engaged in multiple correspondences and debated whether or not he ought drive from Westchester County to Albany, NY.

(g). Only because demandant's department chair, Loretta Collins, Ph.D., was able to prevail on a third party to prevail on the Registrar himself to enter the closed office in Plaza Universitaria and issue the transcript and send it by way of express mail on Tuesday, 29 June, was an official transcript before the BOLE on 1 July 2010.

(h). The anxiety arising from the cessation of administrative labors for 62 days was both intense and foreseeable: its effect of the interruption of labors on demandant's ability to practice law

promised to be profound, had not extraordinary measures taken by third parties resolved the problem.

(i). For more than six weeks plaintiff fretted about whether or not he had studied for naught and was continuing to study for naught.  Dealing with the problem interrupted his research schedule.

27. **On 8 December 2010**, a student rode a bicycle into a piece of wood laid across the road as a barrier that demandant was removing.

28. **On 23 February 2011**, two men shut the gate on a female student who was trying to enter the UPR-RP and chained it; demandant interceded; succeeded in persuading the assailants to open the gate; removed the mantrap of logs.  Upon being twice assaulted by one of the original assailants, demandant executed an arrest; and was beaten on the back by some six or seven co-conspirators, hit roughly 20 times.

29. **In March 2016**:

(a) demandant had to prepare two papers for two different conferences, chair a panel on Spenser, and edit 400 pages of past issues of the electronic journal *Discoveries,*, or at least establish formatting, by 21 March 2016;

(b) demandant was prevented from completing these tasks to the best of his ability and delayed in the production of publishable work.

30.  Inasmuch as the anonymity of the student-client enfeoffed by alienees has been facilitated by alienees, and such anonymity hinders possessory actions and claims at tort against those in actual possession, demandant is entitled to DOUBLE DAMAGES from alieneees for all of the causes above under 4 Henry IV, c. 7,

31.  Inasmuch as alienees have surrendered control of the campus commons to feoffee associations of student-clients whose identities are not clearly defined at law, which effectively frustrates possessory actions and claims at tort against these feoffees, demandant is entitled to DOUBLE DAMAGES against Alienees for all of the causes above under 4 Henry IV, c. 7;

32.  Inasmuch as feoffee student-clients, under color of the Alienees' grants of possession, have forcibly entered into possession of the campus commons, demandant is entitled to TREBLE

DAMAGES from Alienees for their feoffees' forcible deforcement of the DEMANDANT from the campus commons by way of the copulation of  11 Henry VI, c. 3, and 8 Henry VI, c. 9.

33. INASMUCH AS Defendant MSCHE has acted TO MAINTAIN THIS DISSEISIN OF THE CAMPUS COMMONS PREJUDICIAL TO DEMANDANT'S FREEHOLD, by way of (a) fraudulently and feloniously certifying that the UPR-RP has properly complied with its Standard 6: Integrity and thereby (b) allowing both (i) the UPR-RP and (ii) those student-clients whom the Alienees have enfeoffed to continue to receive federal funding, MSCHE is jointly and severally responsible as a co-conspirator for demandant's damages owing to disseisin.

**C. PRAYER FOR RELIEF**

Having shown that he is prepared to show, first, a title in a freehold as a full professor of English in the UPR-RP; next, his actual and present seisin in consequence thereof as a full professor of English; his disseisin from the campus commons by the present tenant (the aforementioned alienees) and their feoffees, and that defendant MSCHE has willfully and feloniously acted to finance and maintain the disseisors and those student-clients whom they have enfeoffed in their possession, the DEMANDANT respectfully requests that the honorable district court order the U.S. Marshal to

1. **Reseise the UPR-RP campus** to put the alienees out of possession of the UPR-RP campus commons;

2. **Summon an assize** or jury of twelve good persons; **to try the possession and abate the demandant's dispossession**

3**. And award to demandant** DAMAGES OWING TO PERENNIAL UNCERTAINTY sustained by reason of the foreseeable harm which arises from the alienees' ability and willingness to unsettle his freehold rights, and the foreseeable costs that arise from having to plan travel at the last minute at which times ticket prices are some $200 higher per trip, or $400 per year x 12 = $4800 (FOUR-THOUSAND-EIGHT-HUNDRED DOLLARS), from 2003 to the present;

4. **Award to demandant** DOUBLE DAMAGES (a) for the extension of the Academic Calendar in Fall 2004, Spring 2014, Spring 2015, and Spring 2016, and (b) for the time lost doing research these semesters, calculated (conservatively) at the rate of $20 [TWENTY-DOLLARS-PER-

HOUR]; and (c) $500 per change of the Academic Calendar owing to the Chancellor's exercise of possession over in lieu of custody of the dampus since UPR-AS Cert. 49 (2003-4) was passed.

5. **Award to demandant** TREBLE DAMAGES (a) for the extension of the Academic Calendar in Spring 2004, Fall 2010, and Spring 2011; and (b) for the time lost doing research these semesters, calculated (conservatively) at the rate of $20 [TWENTY-DOLLARS-PER-HOUR].

6. Award to demandant of TREBLE DAMAGES for the injuries sustained on 6 April 2005; during Spring Semester 2005, during Spring semester 2010; on 8 December 2010; and on 23 February 2011, owing to the forcible deforcement employed by student-clients enfeoffed by alienees.

6. **Impose this obligation on MSCHE jointly and severally as a co-conspirator and facilitator of demandant's disseisin.**

## V. THE WRIT OF ASSIZE OF NUISANCE

A. APPLICABLE NORMS

1. At common law, the assize of nuisance could only be sued against the party who erected or levied the nuisance. *Baten's Case*, (Mich,, 8 Jac. I), 9 Coke *Reports*, 53.

2. Expanding the common law right, the Statute of Westminster 2, 13 Edward I, c. 24, allows a writ of assize of nuisance to be sued against both the party who levied the nuisance and the tenant to whom the nuisance was conveyed. 1 S.R. 83.

3. 6 Richard 2, Stat. 1 c. 3, allows Writs of Nuisance to be sued, at the election of the plaintiff, either in the nature of old times used, or else in the nature of the Assizes determinable before the Kings justices of either bench or before Justices of Assise in the county.


B. LEARNED COMMENTARY

1. "Assize of Nuisance lieth where a man levieth a Nuisance to my Freehold, which I have for Life or in Fee Simple; then I shall have the Writ to redress the Nuisance.  4 E. 3, 36, 5 E. 2 43. *The New Natura Brevium of the most reverend Judge Mr. Anthonie Fitz-herbert*, Sixth Edition (London, in the Savoy, by Eliz. Nutt & R. Gosling, for B. Lintote, R. Gosling, & C. Ward, 1718) 407 ¶I.

2.  "An assize of nuisance is a writ, wherein it is stated that the party injured complains of some particular fact done, *ad nocumentum liberi tenementi sui*, and therefore commanding the sheriff to summon an assize, that is, a jury, and view the premises, that justice may be done therein: and if the assize is found for the plaintiff, he shall have judgment in two things; 1. To have the nuisance abated; and 2. To recover damages.  [Citing 9. Coke, *Rep*. 55.] Formerly an assize of nuisance only lay against the very wrongdoer himself who levied, or did, the nuisance; and did not lie against any person to whom he had levied the tenements, wherein the nuisance was situated.

This was the immediate reason for making that equitable provision in Statute Westm. 2. 13 Edw. I, c. 24. For granting a similar writ, *in casu consimili*, where no former precedent was to be found. The statute enacts, that "*caetero non recedant querentes a curia domini Regis, pro eo quod tenementum transferertur de uno in alium*"; and then gives the form of a new writ in this case: which only differs from the old one in this, that, where the assize is brought against the very person only who levied the statute, it is said, "*quod A.* (the wrongdoer) et B. (the alienee) *levaverunt*. [Citing 9 Rep. 55.]  For every continuation, as was before said is a fresh nuisance; and therefore the complaint is as well grounded against the alienee who continues it, as against the alienor who first levied it."  3 Blackstone, *Commentaries* 221, c. 13.

3. "A third species of real injuries to a man's lands and tenements is by nuisance.  Nusance, *nocumentum*, or annoyance, signifies any thing that worketh hurt, inconvenience or damage….**Private nuisances…may be defined [as] any thing done to the hurt or annoyance of the lands, tenements, or hereditaments of another**."  [Citing Finch. L. 188] 3 Blackstone, *Commentaries* 216, c. 13.

4. [I]t follows, that if one does any other act, in itself lawful, which yet being done in that place necessarily tends to the damage of another's property, it is a nuisance: for it is incumbent on him to find some other [217 | 218] place to do that act, where it will be less offensive."  [3 Blackstone, *Commentaries* 217-8, c. 3

5. "And a man shall have the like Writ **if a man have a way to his land or House, and another stop the Way, he shall have an Assise of Nuisance for that stopping**." *The New Natura Brevium of the most reverend Judge Mr. Anthonie Fitz-herbert*, Sixth Edition (London, in the Savoy, by Eliz. Nutt & R. Gosling, for B. Lintote, R. Gosling, & C. Ward, 1718) 408, citing 21 E. 3 22; 20 E. 3. 18; 16 E.3. Fitz Nusance 3.6; 11 H.4. 25.

6. "Nuisance is generally applied to that **class of wrongs that arises from the unreasonable, unwarrantable, or unlawful use by a person of his or her own property** and produces such **material annoyance, inconvenience, discomfort or hurt** that the law will presume a consequent damage." [58 Am. Jur. 2nd 571, §1, *Booker v. Foose*, 216 W. Va. 727, 613 S.E. 2d 94 (2005).

5. "[A] cause of action in nuisance is predicated upon a particular type of injurious consequence, not wrongful behavior causing the harm." 58 Am Jur. 2d  573, §2, citing *Milwaukee Metropolitan Sewerage Dist. v. City of Milwaukee*, 2005 WI 8, 277 Wis. 2d 635, 691 N.W. 2d 658 (2005)

6. "[I]t is a condition that **substantially interferes with the use and enjoyment of land** by causing unreasonable discomfort or [573 | 574] annoyance to persons of ordinary sensibilities, *Schneider Nat. Carriers, Inc. v. Bates*, 147 S.W. 3d 264 (Tex. 2004), or the natural tendency of which is to **create danger and inflict injury upon person or property**, *Quinnett v. Newman*, 213 Conn. 343, 568 A. 2d 786 (1990), or that is so threatening as to constitute an impending danger to the public welfare, *Brandon Tp. V. Jerome Builders, Inc.,* 80 Mich. App. 180, 263 N.W. 2d 326 (1977), or that is a danger to the neighborhood. *Buchanan v. Los Angeles County Flood Control District*, 56 Cal. App. 3d 757, 128 Cal. Rptr. 770 (2d Dist. 1976). 58 Am. Jur. 2d, 573-4, §3.

7. "Liability for nuisance, unlike liability for negligence, exists **regardless of the degree of care exercised to avoid injury**." *Wilburn v. Boeing Airplane Co.*, 188 Kan. 722, 366 P. 2d 246 (1961); *Devoke v. Yazoo & M.V.R. Co.*, 211 La. 729, 30 So. 2d 816 (1947).   **The creation or maintenance of a nuisance is a violation of an absolute duty**, the doing of an act that is wrongful in itself, whereas negligence is a violation of a relative duty, the failure to use the degree of care required under particular circumstances in connection with an act or omission that is not of itself wrongful." *Kary v. Missouri Highway and Transportation Commission*, 687 S. W. 2d (Mo. Ct. App. E.D. 1985); *Huntsman v. Smith*, 62 N.M. 457, 312 P. 2d 103 (1957).  58 Am. Jur. 2d 576, §7.

8. "A 'nuisance per se' is an act, occupation or structure that, by ts very nature, and of itself, is a nuisance at all times and under any [579 | 560] circumstances, regardless of location or surroundings, and regardless of the care with which it is conducted, and hence is not permissible or excusable under any circumstance.  A "nuisance per se" has also been defined as that which cannot be so conducted or maintained as to be permitted to exist." 58 Am. Jur. 2d 579-80, §12

9. "To be a nuisance per se at common law, a thing must of itself, because of its inherent qualities, without complement, be productive of injury or, by reason of the manner of its use or exposure, threaten or be dangerous to life or property." The traditional test for determining what is a nuisance per se is that the nuisance has become dangerous at all times, and under all circumstances, to life, health or property.  That is, where an activity imminently and dangerously threatens the public health, it is a nuisance per se."  58 Am. Jur. 2d 580, §13

10. "A nuisance per se exists when the conduct creating the nuisance is [580 | 581] also prohibited by statute." 58 Am. Jur. 2d 580-81, §14.

11. "[I]n the case of a nuisance per se, the liability is absolute and injury to the public is presumed so that once a nuisance per se's existence is alleged and established by proof, it is established as a matter of law." 58 Am. Jur. 2d 581, §15.

12. "As distinguished from an absolute nuisance, a 'qualified nuisance' is essentially a tort of negligent maintenance of a condition that creates an unreasonable risk of harm, ultimately resulting in an injury." 58 Am. Jur. 2d 583, §18.

13. "A public nuisance is an unreasonable interference with a right com[monly] [589 | 590] said to be an offence against the state, and an offense against the public order and exonomy of the State by unlawfully doing any act or by omitting to perform any duty that the common good, public decency or morals or the public right to life, health and the use of property requires." 58 Am. Jur. 2d 589-90, §27.

14. "To be a public nuisance, the conduct involved must be continuous and repeated, not a single isolated act." 58 Am. Jur. 2d 590, §29.

15. "**Conduct that unreasonably and significantly interferes with the public health, safety, peace, comfort or convenience is a public nuisance** within the concept of tort law even if that conduct is not specifically prohibited by the criminal law. Further, **a public nuisance claim may be predicated on lawful activity conducted in such a manner that it imposes costs on others**." 58 Am. Jur. 2d 593, §29.

16. "A nuisance is public if **it occurs in a public place**, or where the public frequently congregates, or where members of the public are likely to come within the range of its influence. If the nuisance affects a place where the public has a legal right to go, such as a park, street, or alley, and if the conduct or condition necessarily annoys, offends, or injures those who come within the scope of its influence, it is a public nuisance." 58 Am. Jur. 2d 594, §30

17. "In order to be a public nuisance, the annoyance, discomfort, inconvenience, or injury to the public must be substantial." 58 Am. Jur. 2d 594, §31

18. "To be considered public, the nuisance must affect an interest common to the general public rather than peculiar to one individual or several." 58 Am. Jur. 2d 595, §33.

19. "[B]ecause a public nuisance may be considered a crime, liability for nuisance may, under certain circumstances, be criminal in nature." 58 Am. Jur. 2d 610, §52.

19. "The conduct necessary to make an actor liable for either a public or private nuisance may consist of an act or a failure to act under circumstances in which the actor is under a duty to take positive action to prevent or abate the interference with the public interest or the invasion of the private [612 | 613] interest.  The fact that the defendants alleged misconduct consists of omission rather than affirmative action does not preclude nuisance liability." 58 Am. Jur. 2d 612-13, §54.

20 "If an act in its inherent nature is so hazardous so as to make danger extreme and serious injury so probable as to be almost a certainty, it should be held to be a nuisance." 58 Am. Jur. 2d 613, §55.

21. "Absolute liability for nuisance may be imposed where the defendant carries on an abnormally dangerous activity in an inappropriate place, or where an enterprise involves so great a risk to its surroundings that its location may be considered unreasonable, regardless of the defendant's fault and despite the defendant's adhering to the highest standard of care." 58 Am. Jur. 2d 614, §55.

22. "Nuisance involves the idea of continuity or recurrence. The maintenance of a nuisance ordinarily implies a continuity of action over a substantial period of time, and the continuance of the acts constituting the nuisance for an unreasonable period.  Thus, to constitute a nuisance, there must be a continuousness or a recurrence of the acts [616 | 617] by which it is created….The duration of a particular condition is an important factor in determining whether the interference caused is sufficiently substantial to be deemed a nuisance but not a dispositive one. Thus, where a single act produces a continuing result, the nuisance may be complete without a recurrence of the act." 58 Am. Jur. 2d 616-17, §60.

23. "The existence of a nuisance does not depend on the intention of the party who created it.  It is immaterial in determining liability to inquire what the defendant's intention, design, or motive may have been, and it is immaterial how innocent the intent was because the element of motive or intent does not enter into the question of nuisance.  The existence of a nuisance is not affected by the absence of intention to injure." 58 Am. Jur. 2d 617, §61.

24. "A nuisance does not rest on the degree of care used but on the degree of danger, indecency, or offensiveness existing even with the best of [623 | 624] care.  Thus, a nuisance may exist regardless of the degree of care used, and a person who creates or maintains a nuisance is liable for the resulting injury to others without regard to the degree of care or skill that he or she exercised to avoid the injury." 58 Am. Jur. 2d 623-24, §65.

25. "[A] possessor of land is no longer absolutely immune from nuisance liability for injuries caused by natural conditions; rather, where negligence concerning a natural condition of one's land unjustly invades another's right to the use and [623 | 624] enjoyment of his or her own property, nuisance liability may arise.  Where the injury is allegedly caused by a natural condition, the imposition of liability on a nuisance theory, as a practical matter, generally requires a finding that there was negligence in dealing with it." 58 Am. Jur. 2d 623-24, §67.

26. "Generally, anything is a nuisance that endangers life or health or disturbs physical comfort to an injurious extent." 58 Am. Jur. 2d 625, §69.

27. "To satisfy pleading requirements, facts must be alleged in support of the four distinct elements of a public nuisance claim: the existence of a public right, a substantial and unreasonable interference with that right by the defendant, proximate cause, and injury." 58 Am. Jur. 2d 716, §189.  [private individual bringing public nuisance claim must show a special injury – an injury beyond that suffered by the public generally]

28. "A claim sounding in private nuisance must be based, among other things, upon the allegation of an intentional and unreasonable, negligent or reckless invasion upon the plaintiff's interest in the use and enjoyment of his or her property." 58 Am. Jur. 2d 718, §190.

29. "In an action to abate a nuisance, the pleading must show some tangible substantial injury to the plaintiff, or, if the activity in question is not alleged to be a nuisance per se, that a contemplated business or enterprise will, when established, produce injury." 58 Am. Jur. 2d 824, §328.

30. "The bill, complaint, or petition in a suit by an individual to enjoin a public nuisance must allege the essential elements of a public nuisance." 58 Am. Jur. 2d 825, §330.

31. "Unless an activity is a nuisance per se, a nuisance is never presumed, and the burden in an action to abate a nuisance is on the complaining party to show that the complained of activity or condition is a nuisance in fact and that the plaintiff is within the class of persons entitled to the relief sought and to establish the requisite elements of liability for nuisance." 58 Am. Jur. 2d 826, §331.

C. STATEMENT OF FACT ENTITLING DEMANDANT TO ISSUANCE OF WRIT OF ASSIZE OF NUISANCE

1. As established in the Statement of Fact supporting the Writ of Novel Disseisin, DEMANDANT, possessed of Freehold (*Plaza*) #079-010 in the position of professor of English in the UPR since 2 August 1999, has continuously occupied said freehold, and today occupies the freehold as a tenured full professor, and, by way of UPR-RP AS Cert. 2003-4 (2003-4) 2003-4, was unlawfully alienated from the covenants guaranteeing him in the full enjoyment of his freehold rights in favor of the Chancellor of the Rio Piedras Campus under color of vesting in that office holder possession as Tenant-in-possession, APPU, OPU, and other alienees HEEND, STUPR, UBOS, and the UPR-RP General Student Council.

2. The group of alienees including the Chancellor clothed in State power has exercised their unlawful rights of possession over the UPR-RP campus specifically to teach, authorize and protect groups of students from the consequences of their actions when said students elect to close off access to the commons of the UPR-RP Campus that is appendant to demandant's freehold.

3. Articulated as a system of campus undergraduate education in UPR-RP AS Cert. 49 (2003-4), this instruction shall be referred to as "the Student Strike Doctrine."

4. It is settled law that the Student-Strike doctrine is unlawful and a public nuisance:

5. In *UPR v. LABORDE*, 2010 TSPR 225, 180 DPR 253 (2010)   where the UPR defined in its initial complaint that the student closing of the campus encouraged, authorized, and protected under the color of student strike and protected speech, constituted a public nuisance (*estorbo*

*público˝*), citing Art. 277 of the Código de Enjuiciamiento Civil (1933) 32 L.P.R.A. §2761. Upholding the jurisdiction of the lower court when deciding the case, the Supreme Court of Puerto Rico held that

> " No hay referéndum, asamblea ni votación –sea electrónica o por papeleta, ya sea abierta o secreta- que conceda el derecho a ningún estudiante o grupo de estudiantes para interferir con el derecho de tan siquiera uno de sus pares a recibir su enseñanza." *UPR v. Laborde*, TSPR CT-2010-008, pág. 69-70.

6. This public nuisance of necessity is a private nuisance to the demandant in that every time that the alienees or those whom they enfeoff close down the common of the campus under color of student strike, demandant is prevented from enjoying his freehold and doing research both during the day that it is closed down and half a day when making up classes.

7. A nuisance per se, the nuisance exists in violation of other existing local regulation, statute and case law than Art. 277 of the Código de Enjuiciamiento Civil:

(a) The UPR General Regulation §§32.2.1, 32.2.4, 35.2.5, prohibits university personnel INCLUDING THE CHANCELLOR, a BAILEE, from engaging in conduct that interferes with the normal rhythms of academic and administrative labors on campus,[28] including by way of the unlawful occupation of the campus. U.P.R. Gen. Reg. 35.2.17.

(b) by way of Law 3 of 4 February 2011, the Legislature established that it was a misdemeanor even for labor unions to obstruct entrance to the UPR campus commons;

(c) UPR General Student Regulations Arts. 2.15(B) & 2.15(C); 2.18; 2.19; 6.2(5); 6.2(6) prohibit students from engaging in such conduct, including interfering with academic labors and closing off the campus; and UPR Gen. Student Reg. Art. 3.5 requires the General Student Council to honor these norms. UPR JS Cert. 13 (2009-10) online at http://senado.uprrp.edu/Informes/CJS-13-2009-10-ReglGenEst.pdf.   Cf. As per the Campus policies published to entering graduate students, see Article 4, as summarized in Graduate Catalog 2000-2003, pp. 236-7.

(d) the Supreme Court of Puerto Rico has ruled that no vote of students may authorize the closing of the campus, *UPR v. Laborde*, *supra.*

8. The nuisance per se is continuous in nature and constitutes an ongoing danger to demandant's enjoyment of his freehold:

9. Since 1999, within plaintiff's tenure at the UPR-RP, students at the UPR-RP campus, convened on the authority of the General Student Council and presided over by a member of the General Student Council, celebrated votes WITHOUT AN ATTORNEY TO KEEP THEM IN THEIR LAWFUL JURISDICITON to close the campus on

(a) 6 October 2004; (b) 6 April 2005 reconfirmed on 14 April 2005; (c) 28 September 2009; (d) 13 April 2010; (e) 23 April 2010; (f) 13 May 2010, for an indefinite closure; (g) 6 December 2010, (h) 22 February 2011;  (i) 8 April 2014; (j) 12 May 2015; and (k) 15 March 2016.

10.  Students  actually  took  possession  of  parts  of  or  all  of  the  commons  of  the  campus, interposing themselves as a nuisance to interrupt interstate commerce,

(a) On 6 and 7 October 2004; (b) for four weeks in Spring semester 2005, 6 April 2005 concluding on 3 May 2005; (c) From 12-16 October 2009, the Interim President Miguel Múñoz citing student safety for extending the 24 hour vote by the students to join a general strike to a closure for the whole week; (d) for 62 days in Spring semester, 2010; (e) on 19 October 2010, the UPR-RP declared open, but the entrances to the College of Humanities barricaded with garbage cans; (f) on 11 November 2010[29]; (g) on 30 November 2010[30]; (h) on 1 December 2010[31]; (i) on 7 and 8 December 2010, the roadways barricaded with lumber pilfered from construction sites; (j) on 23 February 2011[32] ; (k) on 23 April 2014; (l) on 14 and 15 May 2015; and (m) on 16, 17, and 18 March 2016.

11. The threat of the per se nuisance is exercised maliciously in violation of the law: On Tuesday, 5 April 2016, students convened in a general assembly celebrated a vote to close the UPR-RP campus SUBSEQUENT TO A POINT OF ORDER THAT PROPERLY DESCRIBED SUCH A VOTE AS UNLAWFUL.

12. Depriving demandant of access to his freehold, the nuisance per se causes the demandant harm:

(a).  Demandant is frustrated in the completion of those teaching duties that are necessary for him to accomplish to maintain his title in his freehold.

(b). A further harm is that demandant is prevented from enjoying his franchise to occupy himself in other activities, both money-making and personal, to his great emotional harm.

(c). An interruption of the academic calendar constitutes a change order to an essential term of the executory contract for a term certain that compels the professor to (i) alter the syllabus, (ii) resolve student logistical problems, (iii) teach on days that he was not contractually obligated to teach when the executory contract was perfected, (iv) defray the manufacture and creation of intellectual property to another time, and (v) refrain from traveling in interstate commerce either to do research or for personal reasons.

(d). A further harm arises when the extension of the semester prejudices the demandants' other plans during the period of time when he has not planned to teach:

13.   THE MID-ATLANTIC REGION COMMISSION ON HIGHER EDUCATION, in certifying as "ADEQUATE EDUCATION" the academic norms whereby under color of instruction the alienees levy this nuisance against the access to the campus commons APPLY A DIFFERENT STANDARD TO THE UNIVERSITY OF PUERTO RICO (a) THAN THEY DO OTHER STATE UNIVERSITIES IN THE UNITED STATES, (b) THAN IS LAWFUL THROUGHOUT THE UNITED STATES, and (c) THAN WAS CONGRESS'S INTENT TO FUND and thereby, having the duty to abate the levying of this public nuisance, maintain this public nuisance and cause to be awarded funds from the federal treasury to the alienees and those whom the alienees enfeoff, to the prejudice of the demandant's use of his freehold in violation of his constititonal rights.

C. PRAYER FOR RELIEF

Inasmuch as demandant has shown that he has title to a freehold on the UPR-RP campus, holding by way of service, that a right of access to the campus commons is appendant to that freehold right, that alienees have levied a nuisance per se in the form of wrongly taught deforcers whom alienees have enfeoffed to close off the campus commons that has prevented him from enjoying that right by blocking passage to the campus commons and his freehold, demandant respectfully requests that the honorable district court

1.   ISSUE A WRIT OF ASSIZE OF NUISANCE directing the U.S. Marshal to take possession of the UPR-RP campus AND

2.   THAT HE CONVENE an assize or jury of twelve good persons to abate the public nuisance protected under the color of the Institutional Policy of Nonconfrontation

3.   AND THAT SAID ASSIZE AWARD DEMANDANT DAMAGES OWING TO THESE
NUISANCES. including

(a) compensation for the additional classes he was required to teach in accordance with the principle of *quantum meruit* commensurate with his rank and salary for the extension of the semester, or 1/60 of his salary per day extended.

(b) damages owing to lost research time for each 8-hour day that the UPR was closed AND HALF of each 8-hour additional day that he had to teach, an opportunity cost calculated at the market rate he would have to pay a research assistant with the same qualifications as he to make up the lost time.

(c) Other particularized damages (as explained above and below)

4.   **Impose these damages** on defendant MSCHE who has fraudulently certified on multiple occasions within the last thirty years that the academic norms taught by the UPR-RP Academic Senate whereby this nuisance to the demandant's freehold has been levied constitutes "Adequate education" as that term is understood throughout the United States, and thereby has maintained this nuisance to the demandant's freehold that MSCHE had an affirmative duty to abate.

## VI. THE WRIT OF ENTRY, WITH PENALTY FOR TRESPASS *VI ET ARMIS*

A. RELEVANT NORMS

1. 4 Henry IV, c. 8, authorizes chancellor [of England] to allow a SPECIAL ASSIZE to grant **double damages** to deforced disseissee in the case of wrongful entry, with strong hand, provided three years continuous peaceful possession has not occurred. 2 S.R. 134-5.

2. 31 Eliz. I. c. 11 extends the statute of limitations of 4 Henry IV, c. 8. to prohibit indictment on cases of forcible entry after possession has been held peaceably for three years.

3. 8 Henry VI, c. 9, provides a disseissee a civil enforcement mechanism to enforce the situation specified in 15 Richard II, c. 2, by extending to the assize of novel disseisin and the court determining a writ of trespass a grant of jurisdiction to award **treble damages** to disseisee disseised by forcible entry or held out of rightful possession by use of force. 2. S.R. 244-6.

B. LEARNED COMMENTARY

1. "In general, the writ of entry is the universal remedy to recover possession, when wrongfully withheld from the owner." 3 Blackstone, *Commentaries* 181, c. 10.

2. A possessory remedy, "the *writ of entry*…is that which disproves the title of the tenant or the possessor, by shewing the unlawful means by which he entered or continued possession. [Citing Mirrour c. 4, §24].  The writ is directed to the sheriff, requiring him to command the tenant of the land that he render… to the demandant the premises in question, which he claims to be his right and inheritance; and into which, as he saith, the said tenant hath not entry but by a disseisin, intrusion, or the like, made to the said demandant, within the time limited by law: or that upon refusal he do appear in court on such a day, to shew wherefore he hath | not done it." This is the original process, the *praecipe*, upon which all the rest of the suit is grounded; and from hence it appears, that what is required of the tenant is in the alternative, either to deliver seisin of the lands, or to shew cause why he will not.  Which cause may be either a denial of the fact of having entred by such means as are suggested, or a justification of his entry by reason of title in himself, or htose under whom he makes claim: and hereupon the possession of the land is awarded to him who produces the clearest right to possess it." 3 Blackstone, *Commentaries* 181, c. 10.

3. "[B]y the statute 8 Hen. VI. c. 9. upon complaint made to any justice of the peace, of a forcible entry, with strong hand, on lands or tenements; or a forcible detainer after a peaceable entry, he shall try the truth of the complaint by jury, and, upon force found, shall restore the possession to the party so put out: and in each such case, or if any alienation be made to defraud the possessor of his right, (which is declared to be absolutely void) the offendor shall forfeit, **for the force found, treble damages to the party grieved**, and make such fine and ransom to the king.  But this does not extend to such as endeavor to keep possession *manu forti*, after three years peaceable enjoyment of either themselves, their ancestors, or those under whom they claim; by a subsequent clause of the same statute, enforced by statute 31 Eliz. C. 11."  3 Blackstone, *Commentaries* 179, c. 10.

4. [S]tatute 8 & 9 W. III. c. 11…enacts that in all actions of trespass, wherein it shall appear that the trespass was willful and malicious, and it is so certified by the judge, **the plaintiff shall recover full costs**.  Every trespass is willful where the defendant has notice, and is especially forewarned not to come on the land; as every trespass is malicious, though the damage not amount to forty shillings, where the intent of the defendant plainly appears to be to [214 | 215] to harass and distress the plaintiff.  3 Blackstone, *Commentaries* 214-215, c. 12.

## C. STATEMENT OF FACT ENTITLING DEMANDANT TO WRIT OF ENTRY

1. As per the prior statements of facts supporting the Writ of Novel Disseisin and Writ of Assize of

Nuisance, demandant has had continuous title to and possession of Freehold (*Plaza*) #079-010 in

the position of a tenure-track professor of English in the College of Humanities at the UPR-RP

campus since 2 August 1999; he presently occupies that freehold as a full professor of English,

promoted to that position in June 2007; by way of UPR-RP AS Cert. 49 (2003-4) and later

certifications of the same nature, the UPR has alienated him from his freehold in favor of the

alienees, APPU, OPU, HEEND, STUPR, UBOS and the UPR-RP General Student Council, who,

in combination, have, under color of this and later certifications of the same nature, exercised a

right to enter into demandant's freehold and establish a public nuisance to close down the commons of the UPR-RP campus, in prejudice of demandant's rights.

2. Demandant herein alleges that the right of entry exercised by those persons and entities who appoint members to the JCS is no good right.

3. First, the UPR-RP Academic Senate had no good right to convey the campus commons: It lacked authority to convey, and therefore lacked the right to convey.  *Fletcher v. Peck*, 10 U.S. (6 Cranch) 87 (1810).

4. Use of the campus commons is a right plaintiff enjoys in common with other professors and students, without particularization;

5. In English law in force at the time of the passage of the All Writs Acts, conclaves of professors acting in concert were prohibited such power of conveyance;[33]

6. Law 1 of 20 January 1966 declares that the powers

> "To authorize the creation, modification and reorganization of campuses, centers, and other institutional university entities" Art. 3(e)(2),[34] Law 1-1966.
> "to authorize the creation of subsidiary or affiliated corporations  to offer services to the university community and to the people of Puerto Rico" are powers that the Board of Trustees may not delegate.  Art. 3(e)(19) Law 1 20 January 1066, as amended.

7. UPR General Regulations Art. 16, declares that the "The Board of Governors shall determine the internal organization of the institutional units.   There shall be no internal changes, modifications or reorganizations of colleges, schools, faculties, departments or other dependencies withtout the express authorization of the Board."  UPR Gen. Reg. 16.

8. The UPR General Regulations vest the UPR-RP Chancellor in the role of BAILEE with custody of the campus commons, AND NOT tenant-in-possession of the campus commons;

9. **As BAILEE**, the Chancellor of the UPR-RP is charged specifically with the custodial duty of disciplining those who "**illegally subtract or occupy** the **property belonging to the University of Puerto Rico _or strangers' property_ that may be found within the premises** of the campus which this set of Regulations governs."  UPR Gen. Reg. 35.2.17.

10. Of the eleven awards of jurisdiction whereby Law 1 of 20 January 1966 grants the Academic Senate jurisdiction, none of them allow the Academic Senate to transfer the campus commons, or any other university property, from common use to third parties.[35]

11. The provision of UPR General Regulations executing the jurisdictional statement of Law 1-1966 declares that

> "The Academic Senate is the official forum of the academic community.  In it, the Teaching Faculty (*claustro*) participates in the institutional processes, **cooperating and collaborating narrowly (*estrechamente*)** in the establishing of academic norms within the jurisdictional award established by law." UPR Gen. Reg. §21.1.[36]

12. **THEREFORE**,

(a) the UPR-RP Academic Senate has no power to transform the Chancelor's relation to the property of the UPR campus from Bailee to Tenant in Possession.

(b) The UPR-RP Academic Senate has no power to alienate possession of the UPR-RP Campus commons to the alienees making up the JCS, to the prejudice of its common use.

(c) The UPR-RP Academic Senate acted outside of its lawful jurisdiction in passing the certifications UPR-RP AS Cert. 49 (2003-4); UPR-RP Cert. 42 (2004-5); UPR-RP AS Cert. 10 (2005-6), UPR-RP AS Cert. 16, (2006-7), and, most recently, in UPR-AS Cert. 89 (2014-2015);

(d) As Bailee and president of the UPR-RP Academic Senate, Carlos Severino, Ph.D., clothed in state power as the UPR-RP Chancellor, is strictly liable in his personal capacity for the Academic Senate exceeding its lawful jurisdiction in this case;

(e) Having failed to exercise the diligence of a good parent to his family to prevent the UPR Chancellors from allowing the Academic Senates from exceeding their lawful jurisdiction in these instances, the UPR President, Board of Governors and the UPR is vicariously responsible for the damages arising from the Chancellor's liability; Puerto Rico Civil Code Art. 1803.

(f) The the UPR President, the UPR Board of Governors (UPR-JG) and the UPR are (i) directly liable to demandant in their personal capacities for breach of contract;  and (ii) equally liable for damages, under 42 U.S.C. §1983 and fees and costs under 42 U.S.C. §1988 owing to the aforementioned UPR-RP Academic Senate's certifications impairing the constitutionally unavoidable obligations of contract and covenants of protection promised and owed to demandant.

10. Second, classified as a Research Intensive Doctoral Degree Granting Institution, the UPR-RP has two principal businesses, both of which are grounded in the movement of intellectual property in interstate and foreign commerce:

(a) The certification of clients, by way of its degree programs, in the accessing, use and evaluation of high-quality intellectual property contained in information products circulating in interstate and foreign commerce,[37] and

(b) the production of high-quality intellectual property destined to be included in information products that shall circulate in interstate and foreign commerce. See, for instance, UPR Junta de Síndicos, *Política Institucional Sobre Patentes, Invenciones y Su Comercialización*, Certificación Núm. 132 (2002-2003) de 11 de abril de 2003.

11. To support these two businesses,

(a) the UPR-RP imports millions of dollars per year in information products circulating in interstate and international commerce, AND

(b) To ameliorate the significant deficiencies in its collection that make its collection less than comprehensive, the Río Piedras Campus is authorized by law, Art. 12(g), Law 1 of 20 January 1966, to join and in point of fact belongs to consortia of colleges and libraries located in other States of the Union and in foreign countries which impose on each other the reciprocal obligation of lending books and providing articles to other consortia members.

(c) To support research and overhead, faculty at the UPR-RP apply for, secure and administer federal grants on behalf of the UPR-RP that often have specific dates of compliance.

11. The UPR-RP campus is the geographical locus of

(a) the UPR-RP's two principal businesses;

(b) the distribution of the information products circulating in interstate and foreign commerce necessary for the UPR-RP faculty to engage in its two principal businesses;

(c) the composition and administrative approval of federal grant proposals and the administration of federal grants.

12. The Sistema de Bibliotecas of the UPR-RP is open to the public.

13. The UPR-RP campus is also the geographical locus of

(a)     a BancoPopular branch;

(b)     several restaurant franchises

(c)     a local public school

(d)     plaintiff's office

(e)     the classrooms in which plaintiff teaches his classes

14. Prior to the closure of the UPR-RP campus for four weeks in 2005, the UPR-RP campus was the geographical locus of a U.S. post office branch.

15. Protecting the UPR-RP's businesses interests, the Sherman Act provides that

> "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."  15 U.S.C. §1

16. Exchanging money for educational services and awarding financial aid is "unquestionably commercial in nature." *U.S. v. Brown University*, 805 F. Supp. 288 (E.D. Pa. 1992) *aff'd* 5 F. 3d 658 (3d Cir. 1993).

17. The conduct of learned professions is not excluded from sanction under the plain language of the 15 U.S.C. §1.  *National Society of Professional Engineers v. U.S.*, 435 U.S. 679 (1978); see also *Goldfarb v. Virginia State Bar*, 421 U.S. 773 (1975).

18.  Until the passage of the Clayton Act, Act of October 15, 1914, 38 Stat. 730, now codified at 15 U.S.C. §§15-27, 29 U.S.C. §§52-53, even labor unions acting in the legitimate economic interest of their membership were subject to Sherman Act prosecutions when they restricted the local distribution of or local manufacture of products to be sold in interstate or foreign commerce. *Loewe v. Lawlor*, 208 U.S. 274 (1908), (where a Danbury company manufacturing hats to be sold in interstate commerce enjoyed Sherman Act protection against organized labor). Passage of §20 of the Clayton Act, codified at 29 U.S.C. § 52, exempted strikes by bona fide labor unions from Sherman Act prosecution and withdrew the civil extraordinary remedy of injunctive relief. "This statute was the fruit of unceasing agitation, which extended over more than 20 years and was designed to equalize before the law the position of workingmen and employer as industrial combatants." *Duplex Printing Press Co. v. Deering,* 254 U.S. 443, 484, qtd. in *U.S. v. Hutcheson*, 312 U.S. 219 (1941) at 230.

19. While the Clayton Act exemption from Sherman Act prosecution and injunctive relief, according to the Supreme Court of the United States, should be broadly read to include all labor disputes,[38] the Supreme Court did issue a proviso:

> **So long as a union acts in its self-interest and does not combine with nonlabor groups,** the licit and the illicit under § 20 are not to be distinguished by any judgment regarding the wisdom or unwisdom, the rightness or wrongness, the selfishness or unselfishness of the end of which the particular union activities are the means." *U.S. v. Hutcheson*, 312 U.S. 219, 232 (1941), (including within the Clayton Act organized labor exemption from Sherman Act prosecution a labor dispute between two labor unions with conflicting rights).

21. The Court of Appeals for the First Circuit has held that political motives, however laudable, do not immunize conspiracies or combinations in restraint of trade from private enforcement of the Sherman Act in treble damages suits, even when organized labor takes part;  *Allied International, Inc., v. International Longshoremen's Association,* 640 F2d 1368 (1st Cir. (Mass) 1981).

22. As UPR-RP AS Cert. 49 (2003-4) and successive certifications authorize a combination of labor and non-labor groups whose activity predictably causes a public nuisance that maliciously and necessarily interferes with the ability of the UPR and private persons, including demandant, to exercise their right to use the campus commons to access information products purchased in interstate commerce, and to manufacture intellectual property to circulate in interstate and foreign commerce, the right of entry exercised by the alienees is per se unlawful and void, as it authorizes a felony violation of federal law. *U.S. v. Hutcheson*, 312 U.S. 219, 232 (1941),

23.  **THEREFORE**,

(a) the right of exclusive possession that the JCS exercises in relation to the campus commons under color of UPR-RP AS Cert. 49 (2003-4) UPR-RP AS Cert. 42 (2004-5); UPR-RP AS Cert. 10 (2005-6), UPR-RP AS Cert. 16, (2006-7), and, most recently, in UPR-AS Cert. 89 (2014-2015), all which lack a separability clause, are unlawful and, indeed, authorize a felonious violation of federal law.

24. Third, inasmuch as the service required of the alienees requires them to violate federal and local law, taking possession of the campus commons for a purpose that, according to UPR-RP AS Cert. 49 (2003-4), subjects the alienees to discipline under UPR Gen. Reg. 35.2.18. and UPR

Gen. Reg. §35.2.19, the consideration proffered in exchange for exclusive possession is unlawful, rendering the Alienees' tenancy unlawful as well.[39]

25. Finally, **the UPR-RP Academic Senate award of possession to the alienees under color of the Institutional Policy of Confrontation and the Chancellor's acceptance of it is actually mutinous**:

26. The UPR Board of Trustees (JS) enacted the Institutional Policy concerning the Opening and Access to University Premises by way of UPR JS Certification 90 (2004-2005) which, in it Arts. 5, 7 & 8 of UPR-JS Cert. 90 (2004-5) intended to suppress the Institutional Policy of Nonconfrontation;

27. In response to this regulation of greater hierarchy, the UPR-RP Academic Senate defiantly rejected the interference of police or antiriot forces within the premises of the UPR-RP campus to break up any student demonstration that closed down the campus, reaffirmed the student strike doctrine under color of reaffirming the *Politica de No Confrontación*, as articulated in Cert. 49 (2003-4), demanded that the UPR Board of Trustees respect the autonomy of the UPR, and assigned all the resources necessary not to security to keep the campus open, as the Central Administration had required, but to a Special Committee created by Cert. 15 (2006-2007), to propitiate the process of institutional dialogue.  UPR-RP AS Cert. 16, (2006-7).

28. **THEREFORE**,

(a) **each and every instance** in which the alienees, acting by way of the JCS, exercised or enfeoffed others to assert a possessory right to exclude persons from the campus commons under color of the Institutional Policy of Nonconfrontation **subsequent to the UPR-JS Certification 90 (2004-5) constituted a knowingly willful impairment** of that covenant whereby demandant has a right to have quiet title in his freehold and complete the performance of his duties as scheduled without being interfered with. AND

(b) Inasmuch as the authorization of such felonious conduct authorizes students to engage in felonies under color of academic norm in breach of federal statute and university law, BOTH (i) MSCHE's certifications of such education as "adequate" as said term is understood throughout the United States and (ii) MSCHE's certifications of the UPR-RP's compliance with its Standard 6:

Integrity, are fraudulent, TREATING THE STATE UNIVERSITY OF PUERTO RICO DIFFERENTLY FROM OTHER PUBLIC UNIVERSITIES IN THE UNITED STATES, **AND THEREFORE**

(c) MSCHE is jointly and severally responsible for ALL DAMAGES owing to demandant's disseisin, in violation of his civil rights.

C. AGGRAVATING CIRCUMSTANCES ENTITLING DEMANDANT TO TREBLE DAMAGES IN ACCORDANCE WITH ENFORCEMENT OF UNLAWFUL, VIOLENT ENTRY BY WAY OF TRESPASS *VI ET ARMIS*

1. The alienees have enforced their unlawful title by enfeoffing student-clients or their own members to enter into possession of the campus commons (a) On 6 and 7 October 2004; (b) for four weeks in Spring semester 2005, 6 April 2005 concluding on 3 May 2005 (c) from 12-16 October 2009, the Interim President Miguel Múñoz citing student safety for extending the 24 hour vote by the students to join a general strike to a closure for the whole week; (d) for 62 days in Spring semester, 2010; (e) on 19 October 2010, the UPR-RP declared open, but the entrances to the College of Humanities barricaded with garbage cans; (f) on 11 November 2010[40] ; (g) on 30 November 2010[41]; (h) on 1 December 2010[42] (i) on 7 and 8 December 2010, the roadways barricaded with lumber pilfered from construction sites; (j) on 23 February 2011[43] ; (k) on 23 April 2014; (l) on 14 and 15 May 2015; and (m) on 16, 17, and 18 March 2016;

2. According to plaintiff's information and belief, alienees and/or those whom they enfeoffed entered into and/or maintain their unlawful possession of the campus commons (a) in April 2005; (b) In May 2010; (c) On 7 December 2010[44]; (d) on 20 December 2010[45]; and (e) on 23 April 2014;

3. As a consequence, demandant is entitled under 8 Hen. VI. c. 9. to **treble damages** for injuries arising from the use of violence to limit access to the campus commons on the dates listed above in C.2.;

4. As described above, alienees and/or those they enfeoffed employed violence **against Demandant himself** to unlawfully enter into or maintain their unlawful possession of the campus commons on (a) 6 April 2005; (b) 8 December 2010; and (c) 23 February 2011.

5. Demandant is consequently entitled to treble damages owing to injuries sustained by way of such assaults in addition to the treble damages owing to the unlawful possession.

6. Alternately, demandant is entitled to DOUBLE DAMAGES for the use of force against Alienees, who include members of the General Student Council, in enforcing that right of entry, under 4 Henry IV, c. 8.

7. Further, (a) having willfully, fraudulently, and feloniously certified multiple times over the past thirty years that (b) the UPR-RP was complying with university regulations and therefore with its Standard 6: Integrity, and (c) such false certifications have maintained rather than abated demandant's disseisin, and (d) have added additional color of right to the deforcers' unlawful entry into the campus commons,  and (e) maintained in federal funds to which they would not otherwise be entitled (f) the UPR-RP, the alienees and those whom the alienees have from time to time enfeoffed (g) to deforce demandant and others from their access to the campus commons and (h) to make his duties of service more onerous, (h) despite the representation held out to the world that they were an independent agency,   defendant MSCHE has conspired, aided and abetted, maintained and not abated, and concealed and not revealed this demandant's disseisin in violation of its duties under local and federal law to evaluate the education of the UPR AGAINST THE STANDARDS OF ADEQUACY EMBRACED throughout State Universities in THE UNITED STATES.

D. PRAYER FOR RELIEF

THEREFORE, it is respectfully requested

1. that the Honorable District Court issue a Writ of Entry authorizing the U.S. Marshal to raise a jury of twelve good persons to try the alienees' right of entry into possession of the campus commons and assess damages, as explained below, AND

2. that the Honorable District Court impose TREBLE DAMAGES LIABILITY jointly and severally on the alienees and defendant MSCHE.

---

## VIII.  PETITIONS FOR RELIEF UNDER THE RACKETEERING-INFLUENCED AND CORRUPT ORGANIZATIONS ACT

A. INTRODUCTION

1. The three R.I.C.O. complaints below, presented as a single consolidated complaint, lay out that (a) the alienees, (b) the UPR and (c) MSCHE constitute an associated-in-fact racketeering enterprise: the alienees encourage students to believe that they have the right to strike; MSCHE has, on the one hand, facilitated the associated-in-fact racketeering enterprise with multiple acts of MAIL FRAUD and WIRE FRAUD in which it has grossly misapplied its standards and, on the other hand, furthered the racketeers in their common purpose of maintaining the cost of education at its lowest absolute cost to the students WITH MULTIPLE VIOLATIONS OF THE TRAVEL ACT by requiring the UPR administrators to conspire with the student-strikers to intrude into plaintiff's freehold and impair plaintiff's constitutionally unavoidable contractual rights so as to tax the costs of running the UPR against plaintiff and his class, UPR professors.

2. Among the specific predicate acts of racketeering enumerated in the statute 18 U.S.C. §1961(1) that are referenced in this complaint are multiple counts of Hobbs Act extortion and extortion under the Puerto Rico Penal Codes of 2004 and 2012, (predicate acts of racketeering in themselves, and predicate acts of racketeering by way of reference to the Travel Act, which makes a predicate act of racketeering out of using the mails or the wires or traveling in interstate commerce in order facilitate one or the other of these crimes, or both); and multiple counts of wire fraud and mail fraud.

3. So as to cast light on the unlawful nature of some of acts committed in order to facilitate racketeering by co-conspirators, plaintiff details independently indictable violations of (a) the Major Fraud Act of 1988, (b) felonious acts of misprision of felony, 18 U.S.C. §4, AND (c) acts of condonation by superiors in the UPR hierarchy and the Commonwealth government to allow the associated-in-fact enterprise free reign to commit predicate acts of racketeering under color of right and threatening violence and intimidation that foreseeable violate of plaintiff's and others' civil rights, 42 U.S.C. §1983, as understood in *Lipsett v. UPR* , 864 F. 2d 881, 902 (1st Cir. 1988) such that each act of condonation furthers the common purpose of the associated-in-fact enterprise to tax the plaintiff and his class for the costs of running the UPR.

4. 18 U.S.C. §1964 allows the District Court two remedies to combat racketeering of pervasive nature: first, under 18 U.S.C. §1964(a), equitable relief to enjoin control acquired by way of racketeering activity; second, under 18 U.S.C. 1964(b), a suit for treble damages at the petition of a private plaintiff for injuries arising by reason of or naturally flowing from the commission of predicate acts of racketeering enumerated in 18 U.S.C. §1961(1).

4. Plaintiff in the three complaints very respectfully invokes both powers.  Inasmuch as the racketeers aim at violating U.S. Constitution Article 1, §10, by impairing the UPR's constitutionally unavoidable obligations of contract owed to Plaintiff, AND MSCHE, its accomplice, has failed to apply its standards in the same at the UPR as it would at a public Research-Intensive Doctoral Granting Institution in the United States, to the prejudice of Plaintiff, Plaintiff also invokes the court's jurisdiction under 28 U.S.C. §1323(a)(3)-(4)  and its powers to grant relief and award damages for constitutional violations under 42 U.S.C. §1983.

5. As the remedy of equitable relief prayed for cannot wait for the conclusion of discovery and the celebration of a trial on damages, PLAINTIFF lays out the causes for equitable relief in the first two complaints lest PLAINTIFF suffer irreparable harm to his freehold, the UPR suffer irreparable harm by way of the liability it shall incur, and the State suffer irreparable harm by reason of the extortionate actions of the racketeers.

### B. **STATEMENT OF LAW COMMON TO ALL THREE R.I.C.O. COMPLAINTS**

1. To survive a motion for dismissal in the First Circuit, A PLAINTIFF'S AMENDED COMPLAINT pursuant to Rule 15 arising under 18 U.S.C. §1962(c) MUST ALLEGE that the plaintiff, doing business in interstate or foreign commerce, suffered damage to his business or property owing to the defendants' "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985); see also *Arzuaga-Collazo v. Oriental Fed. Sav. Bank,* 913 F.2d 5, 5-6 (1st Cir.1990).  *Doyle v. Hasbro, Inc.*, 103 F.3d 186, 190 (C.A.1 (Mass.), 1996).

2. The complaint must allege that associated-in-fact racketeering enterprise has an ongoing organization, formal or informal, longevity and common purpose, and that the various associates function together as a continuing unit. [46]

3. To establish a "pattern," the statute requires a plaintiff to show (a) that at least two acts of racketeering injured the plaintiff within ten years of each other. 18 U.S.C. § 1961(5).  (b) that there is a relationship between the predicate acts[47]; (c) that the racketeering conduct was or is continuous[48]; (d) that the conduct of the racketeering activity demonstrates closed or open continuity or both.[49]

4. The plaintiff's burden under 18 U.S.C. §1962(d) is lighter than under 18 U.S.C. §1962(c): plaintiff need only show an unlawful agreement to facilitate a violation of 18 U.S.C. §1962(b) or 18 U.S.C. §1962(c).

5. 18 U.S.C. §1964 allows the District Court two remedies to combat racketeering of pervasive nature: first, under 18 U.S.C. §1964(a), equitable relief to enjoin control acquired by way of racketeering activity; second, under 18 U.S.C. 1964(b), a suit for treble damages at the petition of a private plaintiff for injuries arising by reason of or naturally flowing from the commission of predicate acts of racketeering enumerated in 18 U.S.C. §1961(1).

6. "Where the plaintiff alleges each element of the violation, the compensable injury necessarily is the harm caused by predicate acts sufficiently related to constitute a pattern, for the essence of the violation is the commission of those acts in connection with the conduct of an enterprise. Those acts are, when committed in the circumstances delineated in § 1962(c), "an activity which RICO was designed to deter." Any recoverable damages occurring by reason of a violation of § 1962(c) will flow from the commission of the predicate acts. *Sedima v. Imrex Company, Inc,* 473 U.S. 479, 497, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985)[50]

## C. PLAINTIFF'S STANDING: THE INTERSTATE NEXUS

1. When alleging harm by way of Hobbs Act extortion, Plaintiff

"need only show a "realistic probability that an extortionate transaction will have some effect on interstate commerce" in order to establish a federal crime. *United States v. Hathaway,* 534 F.2d 386, 396 (1st Cir.), Cert. denied, 429 U.S. 819, 97 S.Ct. 64, 50 L.Ed.2d 79 (1976). The effect need only be De minimis in any given case, for Congress has decided that the aggregate effect of extortion on commerce is a matter of federal concern. Id. A minimal depletion of the resources of a company engaged in interstate commerce or constructing a facility for interstate commerce will suffice. United States v. Phillips, 577 F.2d 495, 501 (9th Cir. 1978).  *U.S. v. DiGregorio*, 605 F2d 1184 (1979).

2. As alleged above, the UPR-RP has two principal businesses, both of which require the importation of millions of dollars of information products from interstate and foreign commerce, both of which are sustained by the awarding of federal grants.

3.Inasmuch as the requirement to produce intellectual property differentiates PLAINTIFF in his business and property from a public school teacher, the guarantee of his academic liberty as a tenured professor is his freehold.

4. Like the life estate afforded Article III judges by way of Article III, §1 of the United States Constitution, the freehold of a tenured professor in his state university is a guarantee of his academic liberty and his independence from political forces.  As such, the professor's freehold in his university contemplates and constitutes the basic infrastructure that allows him to create intellectual property of the highest quality destined for information products that shall be circulated and sold in interstate and foreign commerce.

5. Tenured in his freehold in what plaintiff has the right to expect to be the "quiet retreats of academic life," *Trustees of Dartmouth College v. Woodward,* 17 U.S. 518, 563-565 (1819) (argument for plaintiff-in-error who prevailed), Plaintiff is and has been an active participant in both of the UPR-RP's principal business ventures, and his job performance is assessed accordingly. See, for instance, U.P.R. Reg. §43.4; §45.3.6-8. Cf. UPR-RP AS Certification 38 (2011-12).

6. During his tenure at the UPR-RP, Plaintiff has presented papers at conferences in Toronto, Victoria, Philadelphia, Kalamazoo, Michigan, New Orleans, Bermuda, Saint Louis, and Saint Croix, among other places

7. Plaintiff presented academic papers in Saint Louis and New Orleans in March 2016.

8. Plaintiff has produced intellectual property that has been published with presses located in England, Colorado, Maryland, Texas, and New York.

7. Several of the articles Plaintiff has written are for sale online.

8. Plaintiff has evaluated the quality of intellectual property in his field that was submitted to be circulating in interstate and foreign commerce,

9. In October 2015, Plaintiff was named the editor of the electronic journal *Discoveries*, published by the South Central Renaissance Conference.

10. An archival scholar, Plaintiff has incorporated research in his publication and teaching that he has conducted in rare book rooms and museums located in New York, California, North Carolina, London and Prague.

11. On average, Plaintiff has traveled off-island at his own expense to do archival research for several week stints more than once per year.

12. Closure of the UPR-RP campus prevents, delays and/or makes more costly the PLAINTIFF's production of scholarly work.

13. By way of example, the most recent closure of the UPR-RP campus on 16-18 March 2016 prevented PLAINTIFF from using those days to canvas in advance the published scholarship on six specific Shakespeare plays that he shall be discussing in a paper delivered at the South Central Renaissance Conference in Saint Louis, Missouri, on Friday, 25 March 2016.

14. The closure of the UPR-RP on 16, 17 and 18 March also prevented Plaintiff from canvassing the scholarship on Edmund Spenser for a panel that he chaired on that same date and thereby affected the quality of response that he could offer to the four panelists.

15. The closure of the UPR, Humacao, Campus for ten days, ending on 16 April 2016, prejudiced plaintiff, in that Plaintiff was scheduled to deliver the plenary lecture at the UPR, Humacao, Shakespeare Festival on 19 April 2016, but, owing to the campus closure for ten days, the festival has been postponed and has not yet been rescheduled.

16. Given PLAINTIFF's business, **it should be presumed that any and all campus closures have affected and delayed or made more costly plaintiff's production of intellectual property**, whether by delaying his own travel in interstate commerce to do research, or compelling him to travel off island at his own cost to do research before making a presentation, all denying him access to information products for a time that he needs to do his work and delaying its completion, all closures for extortionate ends systemically harming plaintiff in both his business and property by preventing the UPR from investing in the library in his field and limiting institutional support for travel to archives and conferences that, based on the practices of other research universities, he would otherwise enjoy.

### XI.  R.I.C.O. COMPLAINT ONE:

CONLAN v. Carlos Severino, Ph.D., Chancellor, APPU, OPU, HEEND, STUPR, UBOS and the PRESIDENT OF THE UPR-RP STUDENT COUNCIL, an associated-in-fact racketeering enterprise, the suit at equity arising under 18 U.S.C. §1964(a) to prevent violations of 18 U.S.C. §1962(c)

## A. THE DUTIES THAT THE UPR-RP ACADEMIC SENATE OWED TO THEIR PUPILS AND TO THIRD PARTIES

1. Educators in general throughout the United States and at the UPR specifically owe a duty to protect persons from their students' felonious conduct:

2. In Puerto Rico this duty is owed by educators and the UPR-RP (a) under Puerto Rico Civil Code Art. 1803 (1930); (b) under Puerto Rico Civil Code Art. 1057 (1930) as indicated in *Elba A.B.M. v. U.P.R.*, 125 DPR 294 (1990), where the UPR was held liable for failing to take action to prevent foreseeable harm resulting from predictable felonious conduct occurring on the UPR-RP campus, and (c) under 42 USC §1983, as explained in *Lipsett v. University of Puerto Rico*, 864 F. 2d 881, 902 (1st Cir. 1988) (holding supervising public employees responsible for their "supervisory encouragement, condonation, or acquiescence" or "gross negligence amounting to deliberate indifference" for actions committed by their subordinates.

3. According to the UPR Organic law,

> "It especially corresponds to the Academic Senates (1) to determine the general orientation of teaching and research in the institutional unit, coordinating the initiatives of the corresponding colleges and departments." Law 1-1966, Art. 11(1)[51]

4. Under color of academic norm, UPR-RP AS Cert. 49 (2003-4) teaches the Student Strike Doctrine: that student clients of the UPR have a right to enter into possession of the UPR-RP campus and close it down under color of strike.

5. Toward the end of educating the public and the campus in the student strike doctrine, UPR-RP AS Certification 49 (2003-4) recommends (a) that panels be held at the Centenary Celebration that mix a discussion of the Policy of Nonconfrontation with a discussion of both student and labor conflicts on the campus, and a discussion of the freedom of expression, (b) that the Communications office prepare a permanent publicity campaign, (c) that the Academic Certification describing the policy be distributed widely throughout the campus, (c) that it be given to entering students, (d) that professors newly arrived at the UPR-RP receive it, (e) that the Dean of Students provide workshops for student leaders to be trained in its use. Recommendations 1, 2, 3, 4, 5 & 6, respectively. Cert. 49 (2003-4), pp. 1-2.

http://senado.uprrp.edu/Comites/PoliticaNoConfr/PNC-11-Cert49-2003-04.pdf, and (e) that a video be shown to entering on the *Política de No Confrontación* to students as they matriculate. Cert 49., P. 3, ¶(i)

6. Evidence that UPR personnel actually engaged in such instruction includes (a) Published statements by (i) individual UPR-RP professors, (ii) APPU, (iii) CONAPU, (iv) HEEND and (v) the Coalición en Defensa de la Educación Pública Superior (CEDEPS), successor to the Frente Multisectorial por una Universidad Púbiica; (b) APPU newsletters reporting official votes of the APPU-RP supporting the students' right to "strike" and reports of APPU negotiations on behalf of the "student strikers"; (c) Eyewitness testimony, press reports and admissions against interest announcing that (i) professors, (ii) APPU, (iii) CONAPU, and (iv) HEEND have marched in solidarity with the students and/or shall not cross the picket line; (d) Video, photographs and testimony describing students holding locks and chains, exercising a right unhindered by campus security (UBOS) or the police to allow persons to enter the campus, and (ii) acknowledging student racketeers' right to possess the UPR campus; (e) Scores of desks removed from otherwise locked classroom buildings to be employed as barricades, indicating active participation of UPR-RP security (UBOS) in these plots.[52] (f) Statements of encouragement by student members of the UPR Board of Trustees and Board of Governors from 2009 through 2015, admissible as admissions against interest; (g) Academic norms passed by the UPR-RP Academic Senate (i) defining the student-strike doctrine, UPR-RP AS Cert. 49 (2003-4) in the abstract and (ii) during an actual ongoing conflict, exhorting the interim chancellor to exempt student "strikers" from arrest, prosecution and UPR discipline, UPR-RP AS Certs. 66-81 (11 May 2010), esp. UPR-RP AS Cert. 71 (2009-2010).[53]

7. Under color of the student strike doctrine, the UPR-RP Chancellor, transformed from Bailee to Tenant, and other ALIENEES enumerated in UPR-RP Cert. 49 (2003-4) who elect their representatives to the JCS annually, have habitually taught and allowed students to create a nuisance with the intent of disrupting the UPR-RP's businesses and causing fear of economic harm, for the purpose of extorting concessions of property from the UPR and the State:

8. Specifically, (a) The 2004 student *paro* "Stoppage" targeted, according to plaintiff's recollection, the charging of parking; (b) The 2005 "student strike" targeted JS Cert. 70 (2004-5), which announced that tuition would be raised by ten dollars a credit hour; (c) The 28 September 2009 vote to close the campus was to protest the passage of Law 7-2009, which reduced the general fund; (d) The Spring 2009-10 "student strike" targeted JS Cert. 98 (2009-10), which reduced the quantity of tuition exemptions for entering students; (e) The Fall 2010-11 student strike targeted JS Cert. 146 (2009-10) which, in accordance with a court-mediated agreement, imposed an $400/semester fee,[54] and Law 7-2009, which reduced the UPR subsidy by redefining the general fund; (f) The 2011 "*paro*" or "stoppage" aimed at requiring the UPR to return the $800 of fees paid as a condition of matriculating that semester; (g) The 8 April 2014 vote for '*paro*" "stoppage" threatened the UPR Board of Governors to maintain a moratorium on the way that it calculated tuition which was destined to fail to cover the UPR's costs; (h) The 12 May 2015 "multisectoral" vote for "stoppage" "*paro*" threatened the legislature not to reduce the state subsidy of the UPR at the cost of social unrest; and (i) the 15 March 2016 vote to close the campus for three days required the State Treasury to disburse moneys to the UPR-RP and the repeal of Law 66-2014.

9. "Clear proof" of overt predicate acts of racketeering by the Río Piedras Campus chapter of APPU in furtherance of this extortionate enterprise includes

> (a) A DECLARATION OF INTENT TO OPPOSE A TUITION HIKE appearing in a bulletin issued March 2010 APPU-Río Piedras Bulletin which makes reference to an article published in *El Vocero* in which the cost of a UPR credit hour is shown to be one-third the market cost and in which the author rightly points out that the public funding is supposed to be a subsidy to accuse the legislature of "substituting" for the original UPR an institution of higher education where credits were sold, despite the fact that Law 2 required the UPR to be fiscally autonomous and explicitly provided that the State would not respond for its debts.[1]  Amended Complaint, Exhibit 3

---

[1] APPU-RP, "Ahora o nunca: La APPU en defensa de la educación pública" *APPU Río Piedras Informa* (March 2010), p. 2.

(b) A ratification of that intent in the APPU meeting held on 13 April 2010, when THE RIO PIEDRAS CHAPTER OF APPU celebrated a series of three unlawful votes in which APPU conspired to

(i) respect the legitimacy of the determinations of the Asemblea de Estudiantes to unlawfully shut down the campus for 48 hours in violation of the Hobbs Act and not cross their picket lines in support of this unlawful conspiracy, an act of ratification and participation.[2] Amended Complaint, Exhibit 3

(ii) ratify the unlawful *Política de No Confrontación*,[3] Amended Complaint, Exhibit 3

(iii) actively help students by approving a twenty-four-hour-long work stoppage "in defense of the public university" on 29 April 2010; an act of authorization and actual participation in the extortionate acts,[4] Amended Complaint, Exhibit 3

(iv) and, UNDER COLOR OF OFFICIAL RIGHT as the highly respected teaching employees of an agency of State charged with educating the population of Puerto Rico as a whole, INDUCED AND SUPPORTED THE UNLAWFUL SEIZURE OF UNIVERSITY PROPERTY by teaching minors of age, their membership, and the people of the Commonwealth of Puerto Rico that the extortionate conduct that APPU and disgruntled students had conspired to enter into, in violation of the express terms of Article 32 of the UPR Reglamento General, that CONSUMERS AND UNIVERSITY EMPLOYEES WERE LICENSED TO VIOLATE THE HOBBS ACT AND THE SHERMAN ACT by the copulation of Puerto Rico Law 2 of 20 January 1966 and the First Amendment of the Constitution of the United States.[5] Amended Complaint, Exhibit 3.

10. "Clear proof" of overt predicate acts of racketeering committed by APPU Nacional in furtherance of the extortionate price-fixing conspiracy includes:

---

[2] See Yolanda Rivera Castillo, *Carta a Miembros Rio Piedras,* APPU Boletín, 14 April 2010.

[3] See Yolanda Rivera Castillo, *Carta a Miembros Rio Piedras,* APPU Boletín, 14 April 2010.

[4] See Yolanda Rivera Castillo, *Carta a Miembros Rio Piedras,* APPU Boletín, 14 April 2010.

[5] See Yolanda Rivera Castillo, *Carta a Miembros Rio Piedras,* APPU Boletín, 14 April 2010. Amended Complaint, Exhibit 4

(a) A DECLARATION OF INTENT TO OPPOSE THE LAW appearing in APPU Press Release dated 17 March 2010, in which APPU Nacional president  Prof. María G. Rosado  explained the motive of opposition to the elimination of tuition exemptions as anti-competitive: APPU did not believe that the UPR should have to compete with the private institutions on the Island.[6]

(b) an act of authorization and/or ratification appearing in 2010 APPU Press release, in which APPU confused the legal issues in an incendiary way toward the end of pretending earlier UPR law was of a greater hierarchy and thus prevailed over later laws defining the general fund, declaring, "**¿Por qué el Gobierno Universitario no reclama el 9.6% de los ingresos del Fondo General y los Fondos Especiales, que legalmente corresponde a la UPR*?"[7]** Amended Complaint, Exhibit 3 & Exhibit 3a.

(c) An act of participation occurring, according to PLAINTIFF's information and belief, on 3 May 2010, when APPU picketed the Río Piedras Campus on behalf of the students protesting the end to certain *exenciones de matrícula* for students who would enter the UPR in 2011.[8] AND

(d) An act of authorization and ratification and verbal threat of extortion, when, at 8:22 am on 3 May 2010, according to PLAINTIFF's information and belief, APPU leadership emphasized unanimity across the campus with the "students'" cause, BROADCAST OVER THE AIRWAVES and reported by the press as follows:

(e) "La presidenta de la Asociación Puertorriqueña de Profesores Universitarios (APPU), María Gisela Rosado dijo en una entrevista radial (WKAQ)  que "no vamos a entrar. **Invitamos a los estudiantes a estar brazo a brazo con los manifestantes. Negarse al diálogo es darle la espalda a la democracia en la Universidad**". Añadió que "estamos a tiempo de

---

[6] María G. Rosado, Presidenta de APPU, "APPU se expresa sobre los dos medidas que amenazan la educación superior," APPU Press Release (17 March 2010), p. 2. Amended Complaint, Exhibit 4

[7] APPU, "A Restuir Fondos a la UPR" APPU Comunicado de Prensa (2010).

[8] Maritza Díaz Alcaide, "Huelga en la UPR de Río Piedras, Día 11, Minuto a minuto: Comité Negociador acuerda presentar respuesta a propuesta de la UPR" (3 May 2010).http://www.primerahora.com/huelga_en_la_upr_de_rio_piedras,_dia_11:_minuto_a_minuto-384763.html, examined 5 December 2012.. Amended Complaint, Exhibit 4

mostrar que **entre universitarios podemos hacer este tipo de diligencias**. **No queremos volver a tiempos de violencia en el Recinto**. Estamos defendiendo la institución. Éste es el momento, no es mañana, incluso para los hijos de los policías y los hijos de todos".[9]

12. The Votes of the UPR-RP Chapter of APPU over which Yolanda Rivera presided presume as a question of fact that APPU had so infiltrated the UPR-RP Academic Senate that it could, on its own, determine campus Academic Senate policy.

13. Consonant with APPU-RP's votes, the UPR-RP Academic Senate passed UPR-RP AS Certs. 66-81 (2009-10), which, even as indexed, lends the color of industrial action to an ongoing seizure of the campus by students that prejudiced the UPR in its two businesses for 62 days in violation of the Clayton Act, the Hobbs Act and local prohibitions against extortion by describing this predicate act of racketeering as a "huelga de estudiantes":

14. UPR-RP AS Certs. 66, 67 and 68 (2009-10) urged the immediate withdrawal of the police from campus, frustrating the return of the campus to a state of law; http://senado.uprrp.edu/Certificaciones/Cert2009-2010/CSA-66-2009-2010.pdf;

http://senado.uprrp.edu/Certificaciones/Cert2009-2010/CSA-67-2009-2010.pdf;

http://senado.uprrp.edu/Certificaciones/Cert2009-2010/CSA-68-2009-2010.pdf

15. UPR-RP AS Cert. 70 (2009-10) censured the administration for requiring university personnel to enter the campus. http://senado.uprrp.edu/Certificaciones/Cert2009-2010/CSA-70-2009-2010.pdf

16. UPR-RP AS Cert. 71 (2009-10) urged the administration to adopt a posture of misprision of felony, recognizing that the student racketeers might indeed be arrested and charged with local or federal crimes or disciplined, the certification repudiates the interim chancellor holding the racketeers responsible under federal, local or university law.  Amended Complaint, Exhibit 4.

16. UPR-RP Certs. 72 and 73 (2009-10) established a committee of the Academic Senate to mediate the conflict, in effect granting a right of possession to the racketeers over the campus, to

---

[9] Maritza Díaz Alcaide, "Huelga en la UPR de Río Piedras, Día 11, Minuto a minuto: Comité Negociador acuerda presentar respuesta a propuesta de la UPR" (3 May 2010) http://www.primerahora.com/huelga_en_la_upr_de_rio_piedras_dia_11_minuto_a_minuto-384763.html, examined 11 November 2011 Amended Complaint, Exhibit 4.

the   prejudice   of   others'   rights;        Amended   Complaint,   Exhibit   4.
http://senado.uprrp.edu/Certificaciones/Cert2009-2010/CSA-72-2009-2010.pdf;

http://senado.uprrp.edu/Certificaciones/Cert2009-2010/CSA-73-2009-2010.pdf

17. The certifications were hostile to the courts: UPR-RP AS Cert. 69 (2009-10) censured the administration for abdicating their duties to the judicial forum, http://senado.uprrp.edu/Certificaciones/Cert2009-2010/CSA-69-2009-2010.pdf, and UPR-RP AS Cert. 75 (2009-10) urged the interim chancellor to withdraw a court action against the President of the Consejo General de Estudiantes, Gabriel Laborde. UPR-RP AS *Índice de Certificaciones* (2009-2010), in the hope that proper doctrine should not determined by the courts or be enforced against the student racketeers.

18. Taken together, Certifications 66, 67, 69, 71, 72, 73, and 75 advocated that the interim chancellor execute her duties in relation as if the UPR-RP were a liberty from the civil and criminal laws of Puerto Rico and the United States and the Academic Senate were the legislative body of an independent sovereign state.

19. UPR-RP Certs. 66-81 (2009-10) directly contradicted and advocated disobedience of the contractual expectation of zealous enforcement of the article 32 of the UPR General Regulations as set out in arts. 7 & 8 of UPR JS Cert. 90 (2004-5), a norm of higher hierarchy,

21. The agenda that APPU-RP, the alienee that controls the Academic Senate, authorized be pressed through the Academic Senate resulted in the UPR-RP Academic Senate exceeding its lawful jurisdiction, under color of right, in an unconstitutional attempt to impair the obligations of contract owed by the chancellor to the persons, including students, employees and the public, who had a right to use the UPR-RP campus;

22. WHEREAS UPR-RP AS Certs. 66-81 (2009-10) advocate impairment of the obligations of contract so as to support what the Academic Senate describes as a student strike,

23. WHEREAS UPR-RP AS Certs. 66-81 (2009-10) acknowledge the illegality of the shut-down of the campus but, unlawfully advocating an unconstitutional impairment of the obligation of contract of zealous law enforcement to keep the campus open as laid out in Arts. 7 & 8 of UPR JS Cert. 90 (2004-5),

24. THEREFORE the agenda authorized by APPU pressed through the Academic Senate intended that the UPR-RP Academic Senate, in passing Certs. 66-81 (2009-10), would maliciously impede the enforcement of the law on campus so as to privilege execution of student racketeering under color of the student strike doctrine and, of necessity, maliciously impair the obligations of contract owed to plaintiff and students, to the prejudice of plaintiff's rights in his freehold, his contractual rights, and his and other persons' civil rights, enforceable at suit under 42 U.S.C. §1983, and 18 U.S.C. §1964.

B.   UPR-RP AS Cert. 49 (2003-4) IDENTIFIES THE MEMBERSHIP, STRUCTURE AND LONGEVITY OF THE LOCAL ASSOCIATED-IN-FACT RACKETEERING ENTERPRISE AND MECHANISM WHEREBY THE ASSOCIATED-IN-FACT ENTERPRISE ENGAGES IN EXTORTION UNDER COLOR OF RIGHT

1. As illustrated above, employee associations belonging to the JCS exercise their possessory rights under color of the Institutional Policy of Nonconfrontation on behalf of students who want to extort a lower tuition by causing the UPR economic harm;

2. Causing the UPR economic harm for the purpose of extorting a lower tuition is objectively not in the legitimate interest of the membership of an employee organizations, whose legitimate economic interest rests in their membership being paid;

3. The conduct practiced by the JCS on behalf of students under color of the Student Strike Doctrine thus falls outside the Clayton Act exemption and violates the Sherman Act, 15 USC §1.[55]

2. THEREFORE, in constituting the JCS, UPR-RP AS Cert. 49 (2003-04) establishes

(a) the structure of an associated-in-fact enterprise operating on the UPR-RP campus involving the organizations APPU, OPU, HEEND, STUPR and UBOS; (b) The open-ended continuity of the Associated-in-fact enterprise (it last being activated on 15 March 2016); (c) The mechanism whereby the JCS engages in racketeering under color of the student-strike doctrine under color of right, against the Chancellor's will, inasmuch as the seven voting members chosen by participants in the associated-in-fact enterprise outnumber the three voting members who answer directly to the Chancellor[56]; (d) the lack of expertise of the JCS in matters of security, inasmuch as the only person who was appointed to run security because of his expertise does not have a

vote on the board;   (e) The commitment of the several members of the associated-in-fact enterprise to furthering an ongoing and continuous pattern of racketeering conduct under color of the student strike doctrine to the prejudice of their membership,

(f) The continuous, open-ended conspiracy among the several members of the associated-in-fact enterprise to furthering a pattern of student extortion under color of right to the prejudice of the UPR-RP and others engaging in interstate and foreign commerce,

D.  CONTINUITY OF THE ENTERPRISE'S RACKETEERING CONDUCT IN SERVICE OF THE COMMON PURPOSE: WIRE FRAUD, IN PREJUDICE OF ITS MEMBERSHIP

1. WHEREAS HEEND, STUPR, and UBOS are trade unions;

2. WHEREAS APPU has ambitions to represent the professoriate in collective bargaining on behalf of the professoriate [see UPR-RP AS Cert. 41 (2011-12), where the Academic Senate unlawfully certified APPU and CONAPU as representatives of the professoriate in negotiating the medical plan].

3. WHEREAS these organizations hold out in written communications sent through the mails and over the wires that they represent the legitimate economic interests of their employee members,

4. WHEREAS, relying on these representations, their employee members pay them dues; and the UPR deducts these dues directly from their employees' salaries;

5. WHEREAS UPR-RP AS Cert. 49 (2003-4) commits the member organizations to participating a scheme whereby they shut down the UPR-RP on the basis of clients, not employees;

6. WHEREAS such an act does not entitle them to immunity under the Clayton Act from prosecution under the Sherman Act INASMUCH AS such an act is NOT in the legitimate economic interest of employee members in being paid;

7. WHEREAS the employee organization members of the JCS do not publish that fact to their employee members;

8. WHEREAS such a misrepresentation in the mails and over the wires, inducing reliance in a third party so as to collect moneys from them while they advance student-clients' ends, constitutes mail and wire fraud;

9. AND WHEREAS wire fraud and mail fraud are predicate acts of racketeering;

10. THEREFORE, the election of the JCS each year commits the employee member organizations to a continuous open pattern of racketeering aimed against their UPR-RP employee members and other UPR employees, including Plaintiff, whom they attempt to persuade to join their organizations and pay them dues.

11. AND THEREFORE, THE ASSOCIATED-IN-FACT ENTERPRISE has as one of its common purposes the use of extra-legal moral rhetoric to advance the student strike doctrine to the prejudice of its UPR-RP employee members' understanding of and respect for observance of the law on campus.

E.   THE OPEN CONTINUITY OF THE ENTERPRISE AND FREQUENCY OF ITS PATTERN EXTORTIONATE ACTS, TO THE PREJUDICE OF THE UPR AND PLAINTIFF'S ENJOYMENT OF HIS FREEHOLD

1. WHEREAS since at least the passage of UPR AS Cert. 49 (2003-4), the pattern of racketeering activity conducted under color of the student strike doctrine against the UPR and PLAINTIFF has been continuous, both in its closed and open forms:

2. WHEREAS, according to plaintiff's information and belief, the JCS was activated in each case.

3. WHEREAS each of the conspiracies aimed at enriching the student racketeers unlawfully at the expense of another by using force or the threat of force and other forms of intimidation under color of right to close the campus (See Above)[57];

4. WHEREAS, to effect these extortionate aims, students actually took possession of parts of or all of the campus, creating a nuisance on thirteen separate occasions that interrupted interstate commerce, as described above.

5. WHEREAS, according to plaintiff's knowledge, those putting into effect the Student Strike Doctrine employed violence and intimidation to effect their ends on (a) 6 April 2005; (b) 8 December 2010; and (c) 23 February 2011, as described above.

6. WHEREAS, according to plaintiff's information and belief, those putting into effect the Student Strike Doctrine employed violence and intimidation to effect their ends (a) in April 2005;

(b) In May 2010; (c) On 7 December 2010[58]; (d)On 9 December 2010[59]; and (e) on 23 April 2014;

7. WHEREAS, according to plaintiff's information and belief, those putting into effect the student-strike doctrine did so in all other cases under color of right, specifically the Institutional Policy of

Nonconfrontation outlined in Cert. 49 (2003-4) and advanced in that and later UPR-RP Academic Senate Certifications;

8. WHEREAS In the case *UPR v. Laborde*, 2010 TSPR 225, 180 DPR 253 (2010) the UPR alleged multiple instances of violence against campus security officers as students strove to shut the gates to the Río Piedras Campus.[60]

9. THEREFORE the foreseeability of the use of violence and intimidation of student racketeers to effect their ends is so well known within the jurisdiction that it may be judicially noticed.

10. THEREFORE, THE ASSOCIATED-IN-FACT ENTERPRISE HAS AS A SECOND OF ITS COMMON PURPOSES to deprive the UPR-RP and its clients of the use of the UPR-RP campus to compel the UPR Board of Trustees and/or the State to surrender an interest in property.

F.  THE ASSOCIATED-IN-FACT ENTERPRISE'S POLITICAL AIMS

1. WHEREAS "[n]owhere in either § 1962(c), or in the RICO definitions in § 1961, is there any indication that an economic motive is required." *NOW v. Scheidler*, 510 US 249 (1994);

2. WHEREAS U.P.R. Gen. Reg. 21.7.1 provides that rank-and-file Academic Senate members are elected by all Academic Senate qualified faculty;

3. WHEREAS UPR-RP Cert. 49 (2003-2004) entitles only professors who pay dues to the professional membership organizations APPU and OPU to vote for the teaching-faculty members of the JCS. See APPU Regulations, Art. VI (as amended 25 October 2013).

4. WHEREAS UPR-RP Academic Senate Certification 86 (2002-2003) (19 December 2002), authorized commentary on the Institutional Policy of Nonconfrontation (i.e. the Student-Strike Doctrine) only from those faculties and organisms appertaining to the JCS.

5. THEREFORE the very make-up of JCS is prima facie evidence of the infiltration of the associated-in-fact enterprise into the Academic Senate itself,

6. WHEREAS UPR-RP AS Certs. 66-81 (2009-10), urge defiance of the law and renounce obedience to Arts. 7 & 8 of UPR JS Cert. 90 (2004-5)

7. THEREFORE, the associated-in-fact enterprise has expressed its aims to assert itself over the power given to the UPR-RP Chancellor and UPR Board of Trustees and Governors in university law;

8. AND WHEREAS THE JUDICIAL DOCTRINE OF *UPR v. LABORDE*, TSPR CT-2010-008., 2010 TSPR 225, 180 DPR 253 (2010) handed down in December 2010, where the Supreme Court of Puerto Rico held that no vote by students or a group of students can prevent even one student from receiving his education has had virtually no effect on willingness of the associated-in-fact enterprise at the UPR-RP to teach and support student racketeering under color of the student-strike doctrine at the UPR-RP.

9. WHEREAS the UPR-RP associated-in-fact enterprise honored the vote of student racketeers to close down the campus on 22 February 2011.

10. AND WHEREAS the president of the student council GUILLERMO GUASP when presiding over the student assembly held on 15 March 2016 referred to the meeting as a "sovereign assembly" and was not corrected, and authorized a vote to close the UPR to compel the State legislature to repeal a law,

11. AND WHEREAS a vote was celebrated at the UPR-RP campus student assembly held on Tuesday, 5 April 2016, to close the campus subsequent to a properly founded point of order grounded on the holding in *UPR v. Laborde, supra.*,

12. THEREFORE the ASSOCIATED-IN-FACT ENTERPRISE has willfully expressed its ambitions to overrule the political and judicial branches of the local government:

13. WHEREAS in March 2013, the Unión de Juventud Socialista (UJS), a self-identified arm of the Movimiento Socialista de Trabajadores (MST) distributed handbills on the UPR-RP campus urging the reinstatement of the four students who had been expelled permanently as a consequence of their unlawful actions in shutting down the campus in 2010 and 2011 so as to extort moneys from the State and elimination of the per-semester fee; Amended Complaint, Exhibit 7.

14. WHEREAS UPR-RP AS Cert. 72 (2012-13) supported this reasoning, finding it a material fact that, owing to these students' unlawful actions in shutting down the UPR under color of the student-strike doctrine, the legislature had repealed the fee (*cuota*).

15. And whereas on such grounds, the Academic Senate recommended that students, permanently expelled from the UPR-RP for their actions in closing down the campus in 2010

under color of the student-strike doctrine so as to extort moneys from the state, be conditionally readmitted; UPR-RP AS Cert. 72 (2012-13) http://senado.uprrp.edu/Certificaciones/Cert2012-2013/CSA-72-2012-2013.pdf

16. AND WHEREAS the UPR Board of Governors acted in accordance with this petition;

17. AND WHEREAS the UPR-RP Academic Senate has refused to authorize security cameras to be placed on campus, though at the cost of the US Department of Justice, despite the rapes and armed robberies at knife-point, hypodermic-needle-point, and gunpoint within the last three years in broad daylight within 100 yards of plaintiff's office and classroom, and the obligation of the UPR under Puerto Rico Civil Code 1057, as explained in *Elba A.B.M. v. U.P.R.*, 125 DPR 294 (1990),

18. AND WHEREAS in 2014-2015, the UPR-RP Academic Senate rebottled the Policy of Nonconfrontation as the "Institutional Policy of Cohabitation and Non-confrontation" *Política Institucional de Convivencia y No Confrontación*, UPR-AP Cert. 89 (2014-2015)

19. AND WHEREAS the latest incarnation of the UPR-RP Student Regulations proposed by the UPR Academic Senate misidentifies the interference with another student receiving his education as a "minor infraction" for which probation is the appropriate sanction, instead of classifying such acts as violent felonies or crimes of violence, the way such predicate acts of racketeering have manifested themselves in the past and threaten to manifest themselves in the future.

20. THEREFORE the Associated-in-fact enterprise has as its ambition the aim to reward loyalty to the associated-in-fact enterprise's interests in extorting moneys from the State over the interests of the Commonwealth of Puerto Rico in suppressing violent crime;

21. AND WHEREAS in open meeting, which according to Plaintiff's information and belief was recorded, on Thursday, 6 February 2014, PLAINTIFF informed the interim chancellor, Ethel Ríos Orlandi and the Academic Senate Comité Institucional de Consulta sobre la Reforma de la Ley Universitaria (CIC), presided over by Dra. Eneida Vázquez, of two cases directly on point, *Elba A.B.M. v. U.P.R.*, 125 DPR 294 (1990) which holds the UPR civilly liable under Puerto Rico Civil Code Art. 1057 for damages arising from foreseeable felonies committed on the campus against students, and *U.P.R. v. Laborde*, 2010 TSPR 225, 180 DPR 253 (2010) which holds that student votes to close the campus for a "*paro*" have no lawful force, and, indeed, PLAINTIFF read this

paragraph out loud:

> No hay referéndum, asamblea ni votación –sea electrónica o por papeleta, ya sea abierta o secreta- que conceda el derecho a ningún estudiante o grupo de estudiantes para interferir con el derecho de tan siquiera uno de sus pares a recibir su enseñanza. *UPR v. Laborde*, TSPR CT-2010-008, pág. 69-70.

22. AND WHEREAS in the ensuing discussion at which the Interim Chancellor was present, the student deponent, Mr. Javier  J. Vélez Cruz, admitted publicly against interest that, in 2010 and 2011, he and others in the student movement had self-righteously committed felonious extortion against the UPR, had feloniously intimidated public employees not to complete their lawful duties, and had bullied students who merely wanted to receive the education that the UPR was contractually obligated to provide them, in an attempt to extort the concessions of a lower tuition that they craved employing the self-righteous morality that they had exercised in entering the federal territory in Vieques.

23. AND WHEREAS, on a separate occasion in 2014, also recorded, upon plaintiff's identifying the Policy of Nonconfrontation as applied in UPR-RP AS Cert. 71 (2009-10) in particular, as a policy of misprision of felony, and was therefore against the law, a violation of 18 U.S.C. §4,

24. AND WHEREAS, following that discussion, Eneida Vázquez, Ph.D., director of the Law and Regulation Committee of the Academic Senate, pronounced in open meeting in front of the Interim Chancellor Ethel Río Orlandi, that "The policy of Nonconfrontation is the policy of this campus."

25. AND WHEREAS NEITHER UPR-RP AS Cert. 71 (2009-10) NOR the hearings held in 2013-14 are presently available for public viewing on the UPR-RP Academic Senate website,

26. THEREFORE, the Associated-in-Fact enterprise has as its goal the thwarting of supervision and correction of its personnel by federal authorities or private plaintiffs invoking federal laws;

27. AND WHEREAS the Academic Senate vets persons named to the administration, including Deans, the Chancellor and the President, and votes for representatives to the University Board and the Board of Governors,

28. THEREFORE, the associated-in-fact enterprise has very real power within the administration of the UPR and the UPR-RP to coopt these officers into the culture of lawlessness that it promotes;

29. THEREFORE, the associated-in-fact enterprise has a third common purpose the goal of gaining political power within the UPR and establishing itself as a superior branch of government to the three branches of government in the local constitution and, insisting upon an Institutional Policy of Nonconfrontation and its other policies, rendering itself a liberty from the scrutiny of university, State and Federal law enforcement authorities.

G.   PLAINTIFF'S STANDING TO OPPOSE THE ASSOCIATED-IN-FACT ENTERPRISE ARISING FROM ONGOING INJURY TO HIS BUSINESS AND PROPERTY

1. Such powers authorized by UPR-RP Academic Senate to be given to the JCS are, *prima facie*, an injury to plaintiff's property as its existence constitutes a means of unsettling plaintiff's title to his freehold as a tenured UPR professor of English, as it deprives him, unlawfully, without cause, and without his consent of

  ( a )          enjoyment of the right to enter his office in the campus and work there, except at the will and pleasure of the JCS, during an unlawful seizure of the campus by students

  ( b )          enjoyment of the right to enter the campus and teach his students in his assigned classroom in accordance with the academic calendar, except at the will and pleasure of the JCS, during an unlawful seizure of the campus by students

  ( c )          enjoyment of his franchise as an Academic Senate-qualified teaching professor to elect those who shall serve on the JCS in representation of his interests in the face of a lawful strike by a labor union, save if he pays dues to join the professional associations APPU or OPU,

  ( d )          enjoyment of the right of an academic senate qualified teaching professor of the campus to be consulted concerning this policy, save if he pays dues to join the professional associations APPU or OPU

  ( e )          enjoyment of the right to use the information products circulating in interstate commerce acquired by the UPR-RP and made available in the library in exercise of his freehold and in fulfillment of his duties to produce high-quality intellectual property for inclusion in information products sold in interstate and foreign commerce;

(f)       the contractual right of the plaintiff under Arts. 7 & 8 of UPR JS Cert. 90 (2004-5)

and UPR General Regulation Art. 32, enforceable under 42 U.S.C. §1983, as interpreted

in *Lipsett v. University of Puerto Rico,* 864 F.2d 881, 902 (1st Cir.1988) cited in *Barreto*

*Rivera v. Medina*, 988 F. Supp. 28 (D.P.R. 1997),  to have the UPR-RP Chancellor and

the Board of Governors zealously enforce disciplinary remedies against those who

unlawfully disrupt plaintiff's freehold and unsettle his title to it at their will and pleasure

with the blessing of the JCS.

(g)       And, of course, the time that he might be dedicating to producing and refining the

intellectual property that he plans to publish in interstate commerce.

## H. PRAYER FOR RELIEF ARISING UNDER THE ALLEGATIONS RAISED IN RICO COMPLAINT ONE

1. WHEREAS 18 U.S.C. 1962(b), RICO provides that:

> "It shall be unlawful for **any person through a pattern of racketeering activity** or through
> collection of an unlawful debt to acquire **or maintain, directly or <u>indirectly</u>, any interest in
> or control of any enterprise which is engaged in, <u>or the activities of which affect</u>**,
> interstate or foreign commerce.

2. AND INASMUCH AS 18 U.S.C. 1964(a) provides that

> The district courts of the United States shall have jurisdiction to prevent and restrain
> violations of <u>section 1962 of this chapter</u> by issuing appropriate orders, including, **but
> not limited to**: ordering any person to divest himself of any interest, direct or indirect,
> in any enterprise; imposing reasonable restrictions on the future activities or
> investments of any person, including, but not limited to, prohibiting any person from
> engaging in the same type of endeavor as the enterprise engaged in, the activities of
> which affect interstate or foreign commerce; or ordering dissolution or reorganization of
> any enterprise, making due provision for the rights of innocent persons. 18 U.S.C.
> 1964(a)

3. THEREFORE, PLAINTIFF very respectfully prays that, in accordance with 18 U.S.C. §1962(b)

and 42 U.S.C. §1983, this honorable court

(a)  IMMEDIATELY DECLARE NULL UPR-RP Certification 49 (2003-4) and its later incarnations

(UPR-RP AS Cert. 42 (2004-5); UPR-RP AS Cert. 10 (2005-6), UPR-RP AS Cert. 16, (2006-7),

and, most recently, in UPR-AS Cert. 89 (2014-2015)) which affirm the Institutional Policy of

Nonconfrontation and any other such policy that aligns itself in accordance with a doctrine that

allows, encourages or affords legal and disciplinary impunity to students who conspire to close down the UPR-RP campus under color of right and/or commit predicate acts of racketeering;

(b) IMMEDIATELY ENJOIN APPU, OPU, HEEND, STUPR, and UBOS from having dues deducted automatically from employees' salaries, so as to protect those innocent persons who relied on their representations;

(c) AND IMMEDIATELY ENJOIN all members of APPU and OPU from sitting on the UPR-RP Academic Senate until the UPR is solvent and public employees have been fully paid their past debts.

OR, IN THE ALTERNATIVE,

(d) ISSUE AN ORDER FOR THE DEFENDANT PARTS OF THE ASSOCIATED-IN-FACT ENTERPRISE TO SHOW CAUSE WHY the honorable district court in its exercise of its powers of equity under 18 U.S.C. §1964(a) to defeat racketeering ought not implement such measures.

_____

## X.  R.I.C.O. COMPLAINT TWO:

CONLAN V. UPR BOARD OF GOVERNORS, ET AL, A COMPLAINT AT EQUITY ARISING UNDER 42 U.S.C. §1983 AND 18 U.S.C. §1964(a) to prevent violations of 18 U.S.C. §1962 (b) (c) and (d)

### A.  THE UPR'S OBLIGATIONS AT LAW

1. It is settled law in cases involving the UPR itself

(a) that the UPR has an affirmative duty to act diligently to eliminate foreseeable harm to persons on campus arising from foreseeable criminal conduct under Puerto Rico Civil Code Art. 1057 (1930). *Elba A.B.M. v. U.P.R.* 125 D.P.R. 294 (1990).

(b)  that no vote by a group of students on the UPR campus can prevent even one student from enjoying his or her right to attend classes as scheduled.  *U.P.R. v. Laborde*, 180 D.P.R. 253 (2010)

(c) that, in a civil rights claim brought under 42 U.S.C. §1983,

> "a state official ... can be held liable for the behavior of his or her subordinates if (1) the behavior of such subordinates results in a constitutional violation and (2) the official's action or inaction was "affirmative[ly] link[ed]," *Oklahoma City v. Tuttle,* 471 U.S. 808, 823, 105 S.Ct. 2427, 2436, 85 L.Ed.2d 791 (1985), to that behavior in the sense that it

could be characterized as "supervisory encouragement, condonation, or acquiescence" *or* "gross negligence, amounting to deliberate indifference." *Lipsett v. University of Puerto Rico,* 864 F.2d 881, 902 (1st Cir.1988) cited in *Barreto Rivera v. Medina*, 988 F. Supp. 28 (D.P.R. 1997).

2. Exhausting his administrative remedies, PLAINTIFF has, over the years, warned the UPR-RP Academic Senate, the UPR-RP Chancellor, the UPR Board of Trustees, and their successor the UPR Board of Governors that closing the campus under color of student strike constitutes an unconstitutional extrajudicial embargo of public and private property without the posting of bond, to no avail;

4. WHEREAS it was estimated that, in Spring 2010, unlawful closures of the UPR under color of student strike cost the Commonwealth of Puerto Rico $1,000,000 (ONE-MILLION-DOLLARS) PER DAY.[61]

5. WHEREAS no chancellor at the UPR-RP has ever sent an attorney into a student meeting to maintain that meeting within its lawful jurisdiction nor has required the posting of bond;

6. WHEREAS NEITHER THE UPR-RP CHANCELLOR NOR THE UPR JG, in the face of the foreseeable harm arising from unlawful conspiracies to interfere with other students' rights to receive an education HAS EVER required as a condition of matriculation that students sign pledges upon enrolling that they will not engage in racketeering under color of student strike under penalty of summary suspension and dismissal.

7. Whereas undergraduate students are often minors of age and, therefore, of tender contractual age.

8. WHEREAS, under university law, the syllabus is the contract between the student and the professor, and, by extension, the student and the university, for a particular class.[10]

---

[10] "The composition of the syllabus of a course is one of the duties and responsibilities of the professor for the students and the University of Puerto Rico.  The syllabus of a course constitutes the contract between the professor and the student, and by extension, between the Institution and the student, that guarantees that the professor promises to complete the objectives established for the curriculum of the corresponding academic program, and with the objectives and content for the course." Junta de Síndicos, Certificación núm. 130, (1999-2000), Anejo 2, p. 3.  My translation.U.P.R. Junta de Síndicos, Certificación núm. 130, (1999-2000)

9. WHEREAS the academic calendar is an essential term of the syllabus, providing the pace of performance of duties;

10. WHEREAS the academic calendar is protected by regulation against interruption by extracurricular activities, UPR General Regulations, Art. 32

11. WHEREAS, despite robberies at knifepoint, hypodermic needle-point and gunpoint within fifty yards of where plaintiff teaches his classes in the College of Humanities in broad daylight in the past three years, the UPR-RP Academic Senate has refused to authorize the installation of security cameras at the entrances of the campus, under color of concerns with protected rights of speech and protest.

12. WHEREAS the UPR-RP Chancellor, in charge of the security of the campus as its CEO, has refused to install security cameras, in violation of his duty and to the potential prejudice of his own patrimony and that of the UPR.

13. WHEREAS, according to plaintiff's information and belief, the UPR-RP has moneys to purchase such cameras OWING TO A UNITED STATES DEPARTMENT OF JUSTICE GRANT to protect women on campus from rape, sexual assault, and other violent crimes;

14. WHEREAS the UPR JG, in supervising the Chancellor's refusal to install cameras at the entrances of the campus and thereby protect those on the the UPR from foreseeable harm arising from foreseeable felonious activity has refused to require the installation of said cameras, save by authorization by referendum, to the prejudice of the physical safety of those in the minority and other persons not afforded a vote who have a right to use the UPR campus in safety and whom the UPR has a duty to protect against foreseeable harm under Puerto Rico Civil Code Art. 1057, *Elba A.B.M. v. UPR, supra*. https://camaras.uprrp.edu/#

15. WHEREAS, in Fall 2013 and Spring 2014, plaintiff, at the time a licensed attorney, AGAIN warned BOTH the Academic Senate Rule and Law Committee AND the Chancellor search committee that student racketeering could cause foreseeable harm to others and therefore must be prevented with the diligence of good parent to his family or the UPR would respond for damages under 42 USC §1983, and Puerto Rico Civil Code Arts. 1057, 1802 and 1803 (1930).

16. WHEREAS in 2014, at the threat of a tuition hike, students voted to close down the campus under color of industrial action to the prejudice of plaintiff and his freehold and other students' civil rights,

17. WHEREAS ANÍBAL YARIEL LÓPEZ-CORREA, a student member of the Board of Governors (a) was present at both meetings where these votes were held, on 13 April 2014[62] and 12 May 2015,[63] (b) did not dissuade students from voting to commit a crime in violation of plaintiff's enjoyment of freehold and his fellow students' civil rights, (c) actively persuaded his fellow students to engage in such felonious activity in order to pressure the JG not to increase tuition (2014), and in order to threaten the State, nearly bankrupt, not to reduce the formula whereby the tuition was calculated, and (d) notoriously supported the racketeering which followed the votes he induced with statements in the press.

18. WHEREAS, by committing said actions above to the prejudice of the UPR, its students, and plaintiff and his class, ANÍBAL YARIEL LÓPEZ-CORREA committed a criminal breach of his duty of loyalty to the UPR, in violation of his fiduciary duty of loyalty under Art. 4.04, Law 144 of 10 August 1995, General Law of Corporations of Puerto Rico.

19. WHEREAS NEITHER the UPR-RP Chancellor disciplined this student for his advocacy and participation in these extortionate acts in violation of Art. 200 of the Puerto Rico Penal Code of 2012, and the Hobbs Act, to the prejudice of his fellow students' civil rights, NOR DID the UPR JG remove this member of the governing board for cause owing to his criminal breach of fiduciary duty to the UPR, as they are empowered to do after an informal hearing. Carlos Díaz Olivo, *Corporaciones* (San Juan: Ediciones Puertorriqueñas, Inc., 1999), p. 80, citing *Campbell v. Loew's Inc.*, 134 A 2d 852 (Del. Ch. 1957); *Auer v. Dressel*, 118 N.E. 2d 590 (N.Y. 1954).

19. NOR DID the UPR Board of Governors (UPR JG) press charges against ANÍBAL YARIEL LÓPEZ-CORREA's two acts of extortion in the criminal courts or sued him for tortious interference in the civil courts.

20. WHEREAS this student member of the UPR Board of Governors (UPR JG) received payment from the UPR, despite his known involvement in these criminal activities, to the prejudice of the UPR's solvency and that of the State

21. WHEREAS CHRISTIAN ARVELO FORTEZA, in the student assembly celebrated on 8 April 2014 at the UPR-RP was the chief advocate for a shut-down of the UPR-RP under color of the student-strike doctrine on 23 April 2014, ONE DAY AFTER the JG met to discuss if they were going continue to maintain the system of charging students in accordance with JS 60 (2006-7),

22. WHEREAS, despite his extortionate behavior, CHRISTIAN ARVELO FORTEZA was not disciplined and IS NOW A MEMBER OF THE UPR JG, though he might have been excluded for cause, having already violated plaintiff's and his fellow students' civil rights as president of the Consejo de Estudiantes and was and continues to be treated with the same high regard as ANÍBAL YARIEL LÓPEZ-CORREA.

23. WHEREAS in July 2013, the UPR JG lifted the expulsions of six students who, under the color of the student strike doctrine, had closed down the UPR to the prejudice of the civil rights of plaintiff and other students, as known in *UPR v. Laborde*.

24. WHEREAS the lifting of the permanent expulsion accorded with the petition of the UPR-RP Academic Senate by way of UPR-RP AS Cert. 72 (2012-13) that found it a material fact that, owing to the students' unlawful actions in shutting down the UPR under color of the student-strike doctrine, the legislature had repealed the fee (*cuota*).

25. WHEREAS, in a racketeering context,

> "if an individual fails to act when he has an affirmative duty to do so, negative inferences concerning his intent can be drawn from this inaction." *U.S. v. Local 560 of Intern. Broth. of Teamsters, Chauffeurs, Warehousemen, and Helpers of America*, 780 F.2d 267 (C.A.3 (N.J.), 1986)

26. WHEREAS after the students entered into a conspiracy to close down the campus in 2014, PLAINTIFF circulated missives to the Interim Chancellor, the President, the Board of Governors to call the police to keep the UPR open, a duty consonant with UPR's duty to remove a public nuisance and to enforce the terms specifically laid out in UPR-JS Certification 90 (2004-5) so as to protect plaintiff's and his students' civil rights;

27. WHEREAS the UPR-RP interim chancellor ETHEL RIOS ORLANDI, Ph.D., and the UPR JG ignored these petitions and conceded the students who had entered into the extortionate

conspiracy racketeering an unconstitutional right to embargo the campus extrajudicially without the posting of bond.

28. WHEREAS the UPR-RP Student Regulations presently under consideration characterize impeding a student from receiving his education, typically conceived of as a felony under the Clayton Act, the Hobbs Act, and Article 200 of the Puerto Rico Civil Code (1930), as NO MORE THAN A MINOR INFRACTION FOR WHICH THE STUDENT SHALL RECEIVE PROBATION AS A MAXIMUM SANCTION and, in cases of recidivism, suspension for a defined term.[64]

29. WHEREAS the person presiding over thie committee of the Academic Senate, charged with keeping it within its lawful jurisdiction, was the president of the Student Council, GUILLERMO GUASP,[65]

30. WHEREAS singly, in combination, and in accumulation, such official acts constitute malicious omissions in furtherance and facilitation of student racketeering on the UPR-RP campus, that, denying others, including plaintiff, their constitutional rights, can accurately "be characterized as 'supervisory encouragement, condonation, or acquiescence' *or* 'gross negligence, amounting to deliberate indifference.' *Lipsett v. University of Puerto Rico,* 864 F.2d 881, 902 (1st Cir.1988) cited in *Barreto Rivera v. Medina,* 988 F. Supp. 28 (D.P.R. 1997).

31. WHEREAS the UPR JG, in light of the present economic crisis, has procured a consulting report concerning how to resolve the UPR's present economic situation in the face of declining revenues from the State coffers;

32. WHEREAS the dispositive paragraph outlining the objection to raising tuition reads,

> "Tuition increases should be the last revenue option after cost-reduction strategies, efficiencies, and other revenue options are attempted"

specifically because

> "In the past, the prospect of tuition increases led to **student demonstrations, strikes, closures throughout the system, sanctions from accrediting agencies and damage to the system's reputation.**"[66] Association of Governing Boards of Universities and Colleges, *Building a Sustainable University System: A Program of Change for the University of Puerto Rico* (Washington, D.C.,18 January 2016), p. 26. Amended Complaint, Exhibit 5.

33. WHEREAS the full-time undergraduate tuition at the UPR is the lowest of any public doctoral-degree granting research university in the region accredited by Middle States by a factor of more

than SEVEN and the lowest of any public university or college bestowing B.A. degrees by a factor of more than THREE.[67]

34. WHEREAS the sum total of tuition collected by the UPR in 2007 covered only utilities and ONE-SIXTH of declared depreciation;

35. WHEREAS LAW 2 of 20 January 1966 granted moneys from the state to a public university ALREADY IN EXISTENCE by way of LAW 1 of 20 January 1966, and capable of charging tuition, as a SUPPLEMENT to charging tuition in order to FACILITATE BUILDING PROJECTS and to INCREASE REMUNERATION FOR PROFESSORS;

36. WHEREAS LAW 7 -2013 established that it was the public policy of the Commonwealth of Puerto Rico to provide students the best education possible at the lowest viable cost that allowed residents equality of opportunity to enroll the state university;

37. WHEREAS similar clauses, like that of the Constitution of the State of North Carolina which provides that the residents of the state shall have the right to a free university education, so far as that is possible, have been interpreted to allow the University to authorize significant increases in tuition to pay its constitutionally unavoidable debts while at the same time offering its most indigent residents need-based financial aid;

38. WHEREAS the UPR has been delinquent in making payments to faculty and staff, including plaintiff, since at least 2008;

39. WHEREAS the UPR in 2010, under color of economic exigency CREATED BY ITS TOLERANCE OF THE ASSOCIATED-IN-FACT ENTERPRISE, stripped plaintiff of accumulated credits for sick days, a taking, and cancelled compensation for accumulation of sick days, impairing the obligation to pay the price certain of his contract by $5601.15 (FIVE-THOUSAND-SIX-HUNDRED-ONE-AND-FIFTEEN-HUNDREDTHS DOLLARS) per year, and has implemented other cuts to his compensation, including nonpayment of materials budget, reduced travel reimbursement, and refusals to purchase library materials in his field for which he has raised and donated funds;

40. WHEREAS the UPR JG by way of UPR-JG Cert. 140 (2014-15) published 8 June 2015 authorized the reduction in compensation to PLAINTIFF by 1% or $800 [EIGHT-HUNDRED

DOLLARS] per year to make up for the underfunding of the pension THAT IT HAD AUTHORIZED IN 2010;

41. WHEREAS APPU supported this impairment of the obligations of contract resulting in reduction of compensation, rather than raising tuition, to the prejudice of PLAINTIFF's and its memberships' rights;

42. WHEREAS the UPR-RP Academic Senate supported this impairment of the obligations of contract resulting in reduction of plaintiff's compensation;

43. WHEREAS such conditions where the formula is not sufficient to pay the past-due, present and future constitutionally unavoidable obligations would argue that an increase in tuition is warranted by law, and, indeed, long overdue;

44. WHEREAS the UPR JG, having allowed student racketeering to proceed unimpeded in 2014 and 2015, at the urging of one of its members, now has, since the time of the initiation of this suit in November, afforded open-ended continuity to ANÍBAL YARIEL LÓPEZ-CORREA's two prior acts of racketeering while a member of the Board of Governors, and which it has not corrected, in that the JG has

(a) Seized control of the campus budgets to itself, emptying out all campus accounts,

(b) Refused to certify that it is contributing what is owed to the retirement fund, despite petitions by instrumentalities and faculty organizations;

(c) Commissioned a study that, on the grounds that the UPR will continue to allow student racketeering to proceed unmolested and with impunity, claims that the UPR must be fundamentally restructured PRIOR to tuition being increased and the plaintiff and his class being paid what they are owed; [68]

(d) Authorized hearings on the restructurings, under the presumption that student racketeering **which its own membership has authorized** prevents tuition from being raised, knowing that such restructurings shall affect interstate commerce in that fewer campuses will purchase fewer items circulating in interstate commerce,

45. WHEREAS the UPR JG, under color of economic exigency, in January 2016, has already disavowed promised reimbursement for plaintiff and his class for travel in Spring 2016, to the

prejudice of plaintiff's ability to pay his commitments to attend professional conferences out of state in March 2016, and has restored it only partially in much reduced form.[69]

46. WHEREAS under color of economic exigency TOLERATED AND CREATED BY THE JG AND ITS MEMBERS WHO HAVE ENGAGED IN AND CONDONED STUDENT RACKETEERING to the prejudice of students' and faculty civil rights and the payment of unavoidable debts, plaintiff's and other employees' rights in their freeholds and to compensation may be fundamentally altered forever;

47. WHEREAS the Working Group for the Fiscal and Economic Recovery of Puerto Rico put forward the final draft of the *Puerto Rico Restructuring Proposal* on 1 February 2016 which proposes that UPR bonds shall be COMBINED into a single amalgamated bond issue to be exchanged for EXISTING OUTSTANDING PUERTO RICO GENERAL OBLIGATION DEBT of $42, 900,000,000 [FORTY-TWO-BILLION DOLLARS] to be swapped for other outstanding bonds, the total yield at 5%.

48. WHEREAS the dispositive terms of the bond issue proposed allow the present JG, advancing the UPR's restructuring on the grounds that its support and condonation of student racketeering make a tuition increase impossible, to implicate interstate and foreign commerce at the expense of the plaintiff's freehold FOR DECADES inasmuch as

> Targeted issuers included in the exchange are: the Commonwealth, PBA, COFINA, PRHTA, GDB, PRIFA, PRIDCO, ERS, UPR, CCDA, and PFC
>
> New securities would be issued by a new Puerto Rican special-purpose government instrumentality ("New Issuer") to holders who tender their existing securities in the exchange offer
> New Issuer would support its debt **using the debt service on tendered securities**, as well as up to approximately $325 million annually of petroleum products tax revenues and the 4.5% SUT revenues.  Working Group for the Fiscal and Economic Recovery of Puerto Rico, "Proposed Exchange Structure," *Puerto Rico Restructuring Proposal* (1 February 2016), p. 10 of pdf. Amended Complaint, Exhibit 6.

49. WHEREAS requiring the UPR to pay the outstanding debts of the Commonwealth is objectively not in the UPR's best interest, inasmuch as the UPR can maintain itself solvent and competitive by charging significantly more for its services, while the Commonwealth of Puerto Rico cannot,

50. WHEREAS the transaction proposed by the Working Group provides the underlying context to the proposal to restructure the UPR;

51. WHEREAS the transaction proposed by the Working Group is not in the UPR's best interest so much as in the interest of the Popular Democratic Party; AND

52. WHEREAS The UPR JG HAS YET TO ANNOUNCE THE "WORKING GROUP'S" PROPOSAL TO THE FACULTY which, under color of right, would make the payment of their salaries subordinate to payment of the Commonwealth's GOs.

53. WHEREAS the publication of the AGB proposal, whose conclusions are predicated on the UPR JG's own furtherance of student racketeering, constitutes both facilitation of racketeering and wire fraud in and of itself,

54. WHEREAS the AGP Report disguises under color of racketeering promoted and encouraged by the UPR JG the context in which the UPR JG shall acquire constitutional authority, under color of right under Article 6, §8 of the Local Constitution, to whittle away plaintiff's freehold and contractual rights so as to pay the outstanding debts of the Commonwealth of Puerto Rico.

55. WHEREAS on or before 14 MARCH 2016, an organization calling itself CAEL posted posters in the first floor of the Luis Palos Matos Building in entitled "ULTIMATUM" that both announced the student assembly to be held at 10 am on 15 March 2016 and, among its four points, demanded that the public debt be not paid if the UPR was not fully funded; 2nd Amended Complaint, Exhibit 4a; Exhibit 4b

56. WHEREAS such a measure, if adopted, would be unconstitutional, violating Article 6, §8 of the Constitution of the Commonwealth of Puerto Rico of 1952;

57. WHEREAS, in July 2015, MOODY's published that the Commonwealth's bond rating has fallen 12 notches in the past five years;[70]

58. WHEREAS subsequent to the passage of Law 7-2013, which provided public moneys to allow the UPR to cancel the $400-per-student-per-semester fee it had imposed in fall, 2010, bond rating agencies downgraded the Commonwealth's general obligations.

59. WHEREAS a deliberate default on the bond payments due in May and July 2016 shall produce at least as catastrophic consequences for the COMMONWEALTH and the UPR as the downgrading of the Commonwealth's general obligations;

60. WHEREAS, on 15 March 2016, the UPR administration sent no professor to the student assembly threatening to engage in racketeering on 14 March 2016 to explain these facts to the students;

61. WHEREAS the UPR administration, again, sent no attorney to the meeting of the students to maintain the assembly within its lawful jurisdiction, despite the holding in *UPR v. Laborde*;

62. WHEREAS the student members of the UPR Board of Governors EITHER did not attend the meeting  OR, attending, did not dissuade the students from celebrating a vote outside the lawful jurisdiction of the assembly, as was proposed a day earlier;

63. WHEREAS, on 15 March 2016, the student assembly, again, voted to unlawfully close the UPR, and the public school attached to it, so as to extort from the State an economic concession;

64. WHEREAS, the vote also required the repeal of Law 66 of 2014, *La Ley de Sostenabilidad Fiscal y Operacional del Gobierno*, Law 66 of 17 June 2014, as amended by Law 126 of 7 July 2015,

65. WHEREAS Article 26 of the aforesaid Law 66 provides specifically that State support offered in Art. 3(a) of Law 2-1966 constitutes a "subsidy" and requires that the UPR not generate any debt, obligation or promise of future payment to cure any breach between the budget actually assigned and what would have been the application of the formulas relative to other norms;

66. WHEREAS such a law, interpreted so as to limit the UPR's ability to take out a loan to pay its already existing debts, guaranteeing said loan against the next semester's tuition, would be make the law an unconstitutional impairment of the obligations of contract;

67. WHEREAS PLAINTIFF, listening to the transmission of the proceedings online, heard GUILLERMO GUASP, the President of the GENERAL STUDENT COUNCIL describe the student assembly as a "sovereign assembly" ("ASAMBLEA SOBERANA'), refusing to acknowledge the limitations imposed on its actions by UPR JS Cert. 13 (2009-10), Art. 3.5, to honor UPR Regulations and law;

68. WHEREAS the vote was tallied, 1986 in favor of shutting down the UPR-RP and 515 against, to achieve this end;

69. WHEREAS, it was established by the Assembly that if the State Treasury were not forthcoming with public funds by 3 April 2016, the students might vote to close down the UPR-RP indefinitely under color of student strike (*huelga*);

70. WHEREAS the Chancellor of the UPR-RP honored this vote and, again, under color of the student strike doctrine, granted the petition of the students to extrajudicially embargo the public and private property of the UPR and the plaintiff's freehold and other students' contractual rights, also interfering with the administration of a public school[71]

71. WHEREAS NEITHER the UPR President, UPR Board of Governors, the Secretary of Education, the Secretary of Justice, nor the Governor of the Commonwealth of Puerto Rico reversed the chancellor's determination, declared the vote void, enjoined the UPR's closure, or signaled that they were prepared to initiate prosecution,

72. WHEREAS such willful omissions of their duty to suppress student racketeering under color of the student strike doctrine is consistent with their pattern of conduct since entering into office;

73. Whereas a vote was celebrated in a student assembly on 3 April 2016 to close the UPR-RP, despite a point of order pointing out that such closure was unlawful;

74. Whereas the UPR campuses in Ponce, Humacao, and Bayamon celebrated similar student votes, and the campuses were closed, unimpeded by their chancellors, the UPR President, Board of Governors, Secretary of Education, or the Governor of the Commonwealth of Puerto Rico, to the prejudice of the students' and faculty's civil rights;

75. WHEREAS the Governor Alejandro Garcia-Padilla decided on 2 May 2016 not to pay the public debt;

B.      PRAYERS FOR RELIEF

1. WHEREAS 18 U.S.C. 1962(b), RICO provides that:

> "It shall be unlawful for **any person through a pattern of racketeering activity** or through collection of an unlawful debt to acquire **or maintain, directly or <u>indirectly</u>, any interest in or control of any enterprise which is engaged in, <u>or the activities of which affect</u>**, interstate or foreign commerce. 18 U.S.C. 1962(b)

2. AND WHEREAS 18 U.S.C. 1964(a) provides that

> The district courts of the United States shall have jurisdiction to prevent and restrain violations of section 1962 of this chapter by issuing appropriate orders, including, but not limited to: ordering any person to divest himself of any interest, direct or indirect, in any enterprise; imposing reasonable restrictions on the future activities or investments of any person, including, but not limited to, prohibiting any person from engaging in the same type of endeavor as the enterprise engaged in, the activities of which affect interstate or foreign commerce; or ordering dissolution or reorganization of any enterprise, making due provision for the rights of innocent persons. 18 U.S.C. §1964(a)

3. THEREFORE, PLAINTIFF humbly petitions that the Honorable District Court invoke its powers under 18 U.S.C. §1964(a) and the prohibition in 18 U.S.C. §1962(b) to deny the JG its control of the UPR and its finances

(a) by ISSUING A TEMPORARY RESTRAINING ORDER, *INJUNCTION PENDENT LITE*, and PERMANENT INJUNCTION VOIDING THE APPOINTMENTS IN THE BOARD OF GOVERNORS AND ENJOINING THE PERSONS THEREIN FROM SERVING AS OFFICERS OF THE UPR IN ANY CAPACITY WHATSOEVER.

FURTHER,

4. WHEREAS, on 15 March 2016, GUILLERMO GUASP, KNOWING FROM THE TALLIES THAT HUNDREDS OF STUDENTS OPPOSED SUCH A MEASURE, ENCOURAGED AND ALLOWED the Student Assembly to enter into AN OPEN—ENDED PATTERN OF RACKETEERING CONDUCT,  to close down the UPR-RP for three days, to the prejudice of the Plaintiff, students, the UPR and the STATE;

5. THEREFORE, PLAINTIFF HUMBLY PRAYS THAT THIS HONORABLE DISTRICT COURT SHALL

(a) ISSUE A TEMPORARY RESTRAINING ORDER, *INJUNCTION PENDENT LITE*, and PERMANENT INJUNCTION THAT SHALL VOID THE ELECTION OF GUILLERMO GUASP to the GENERAL STUDENT COUNCIL, AND PROHIBIT HIM FROM EVER SERVING IN A POSITION OF TRUST AT THE UPR AGAIN

AND FURTHER,

6. WHEREAS the HONORABLE RAFAEL ROMÁN MELÉNDEZ, Secretary of Education of the Commonwealth of Puerto Rico, is a member e*x officio* of the UPR JG;

7. AND WHEREAS the HONORABLE RAFAEL ROMÁN MELÉNDEZ has himself failed to object to the racketeering perpetuated by the student members of the UPR JG, WHICH ON THREE SEPARATE OCCASIONS DURING HIS TERM OF SERVICE CLOSED DOWN A LOCAL PUBLIC SCHOOL, and

8. AND WHEREAS Law 3 of 4 February 2011 makes closing down a public school a misdemeanor; AND

9. WHEREAS as the GOVERNOR, the HONORABLE ALEJANDRO GARCIA PADILLA, in the execution of the laws of the Commonwealth of Puerto Rico, failed to (a) prevent such closing from occurring or (b) prosecute the conspirators who made such a closure inevitable or (c) dismiss his Secretary of Education for failing to intervene and keep said school open or, in the alternative, for failing to hold his fellow member of the UPR JG responsible after the fact;

10. AND WHEREAS

> "a state official ... can be held liable for the behavior of his or her subordinates if (1) the behavior of such subordinates results in a constitutional violation and (2) the official's action or inaction was "affirmative[ly] link[ed]," *Oklahoma City v. Tuttle,* 471 U.S. 808, 823, 105 S.Ct. 2427, 2436, 85 L.Ed.2d 791 (1985), to that behavior in the sense that it could be characterized as "supervisory encouragement, condonation, or acquiescence" *or* "gross negligence, amounting to deliberate indifference." *Lipsett v. University of Puerto Rico,* 864 F.2d 881, 902 (1st Cir.1988) cited in *Barreto Rivera v. Medina*, 988 F. Supp. 28 (D.P.R. 1997).

11. THEREFORE PLAINTIFF also respectfully prays that the honorable district court

(a) ISSUE A TEMPORARY RESTRAINING ORDER, *INJUNCTION PENDENT LITE*, and PERMANENT INJUNCTION SUSPEND the right of the PRESENT GOVERNOR, THE HONORABLE ALEJANDRO GARCIA PADILLA, from appointing the successors for the UPR JG, in the light of the conclusions of the Court of Appeals of the First Circuit in *Lipsett v. University of Puerto Rico*, 864 F. 2d 881, 902 (1st Cir. 1988), and the argument above, and, invoking its powers under 18 U.S.C. §1964(a) to enforce the prohibitions in 18 U.S.C. §1962(b)(c) and (d) against persons achieving control of an enterprise's activities by way of racketeering activity, against associated-in-fact racketeering enterprises, and against conspiracies to commit acts of racketeering, AND

(b) APPOINT A JUDICIAL RECEIVER FOR THE UPR WHO WILL SERVE IN LIEU OF THE UPR BOARD OF GOVERNORS, AND

(c) INSTRUCT SAID RECEIVER TO

(i) Return the funds in their possession promised to the campuses for the 2015-2016 Academic Year IN FULL.

(ii) Investigate to what extent the UPR JG contributed to the retirement fund;

(iii) Take out a loan, should lack of liquidity make such a loan necessary, to safeguard the compensation of the faculty and staff and the full and timely payment of all contracts for lease of services for price certain as they come due throughout the UPR system;

(iv) Guarantee said loan against a fee increase for the upcoming semester;

(v) Publish a schedule of payments for each campus, in the following format, that displays the sum paid in full and certifies that such sum means that these debts are paid in full:


Obligations to retirees and retirement pension

Library acquisitions so as to ensure academic and research liberty to teaching faculty occupying freeholds on each campus and their graduate students.

Infrastructure repairs, maintenance and necessary improvements

The payment of utilities

Employee compensation obligations, (including reimbursement for materials, research and expenses of travel to conferences as an ordinary cost of business)

A contribution to the pension fund that will result in a 5% increase in the funding of pension obligations over the prior year's funding of pension funding, if the prior year's pension fund yield covered less than 75% of the obligations

Matching capital requirements for external funding

Provisions and contractual obligations to private service providers

Cost-of-living increase for employees and pensioners consistent with inflation

Financial aid obligations

Debt service

(vi) Authorize students to vote to submit grievances concerning the tuition increase, whether grounded in law or fact, to binding arbitration, costs to be assessed against tuition if the overcharge justifiable under a particular category does not exceed 5%.  AND

12. WHEREAS the Chancellor of the UPR-RP has demonstrated gross negligence in the face of student racketeering under color of student strikes,

13. WHEREAS the UPR Academic Senate over which he presides has characterized such racketeering as a "minor infraction," to the prejudice of the UPR's financial solvency, its ability to satisfy its constitutionally unavoidable debts to plaintiff and his class, and to the prejudice of plaintiff's and others' civil rights,

14. WHEREAS the Chancellor Dr. Carlos Severino has acted with the apparent blessing of the UPR JG, as its agent to permit impunity and thereby condone racketeering activity on the UPR-RP campus, in violation of 18 U.S.C. §1962(d),

15. WHEREAS the President Uroyoán R. Walker-Ramos, Ph.D., has failed to reverse determinations by the Chancellor,

16. THEREFORE, PLAINTIFF respectfully prays that the honorable district court invoke 18 U.S.C. §1962(b)(c) and (d)

      (a)      to issue a TEMPORARY RESTRAINING ORDER, INJUNCTION *PENDIENTE LITE* and PERMANENT INJUNCTION to ENJOIN said chancellor from exercising  control over the UPR-RP and the fruits of his conspiracy, and

      (b)      APPOINT in his stead a COURT APPOINTED RECEIVER OR US MARSHALL to serve as JUDICIALLY APPOINTED INTERIM CHANCELLOR of the UPR-RP Campus to secure the campus against the foreseeable and ever-present threat of student racketeering in the face of a tuition increase,

      (c)      with the instructions that

(i) When a duly celebrated vote of the student body seeks to invoke the option of binding arbitration, the arbitrator's opinion shall first quantify and then certify that the UPR has sufficient funds cover the following expenses in full in the following order:

Obligations to retirees and retirement pension

Library acquisitions, so as to ensure academic and research liberty to teaching faculty occupying freeholds on each campus and their graduate students.

Infrastructure repairs, maintenance and necessary improvements

The payment of utilities

Employee compensation obligations, (including reimbursement for materials, research and expenses of travel to conferences as an ordinary cost of business)

A contribution to the pension fund that will result in a 5% increase in the funding of pension obligations over the prior year's funding of pension funding, if the prior year's pension fund yield covered less than 75% of the obligations

Matching capital requirements for external funding

Provisions and contractual obligations to private service providers

Cost-of-living increase for employees and pensioners consistent with inflation

Financial aid obligations

Debt service

(ii) And authorize that deficits as calculated above shall be covered immediately by way of per-semester student fees.

(iii) AND THAT upon matriculation at the UPR-RP, Students be required to sign a statement that compels them to acknowledge that closing down the campus is a felony;

(iv) Faculty be required to certify that, with the diligence of a good parent of his family, in conformity with Puerto Rico Civil Code 1803 (1930), they have reminded students not to contract in bad faith at the start of each and every semester

(v) All student assemblies, to be valid, must be supervised by a licensed attorney, who has the duty to maintain the assembly within its lawful jurisdiction;

(vi) Security Cameras be set up at the entrances of the campus;

(vii) Upon notice of conspiracies to close the campus and disrupt the academic calendar that Police and/or US marshals be convened to keep the UPR-RP open

(vii) Misprision of felony not be tolerated

(viii) All persons conspiring to close down the UPR under the COURT APPOINTEE's tenure be prosecuted to the full extent of the law.

(ix) No eavesdropping devices or other aural monitoring devices be used in the classrooms or halls.

(x) The COURT APPOINTED RECEIVER initiate no prosecutions based on past offenses.

(xi) The COURT APPOINTED RECEIVER fully cooperate with private plaintiff civil actions to enforce the R.I.C.O. statute.

**OR IN THE ALTERNATIVE,**

17. THAT this HONORABLE DISTRICT COURT ISSUE AN ORDER TO SHOW CAUSE why the Honorable District Court ought not exercise its lawful powers at equity to defeat racketeering under 18 U.S.C. §1964(a) to implement the measures outlined above.

### XIV.  R.I.C.O. COMPLAINT THREE:

CONLAN V. MID-ATLANTIC REGION COMMISSION ON HIGHER EDUCATION (MSCHE) ET AL.,  A COMPLAINT ARISING UNDER 18 USC §1964(d) FOR TREBLE DAMAGES FOR INJURIES SUSTAINED BY REASON OF AND NATURALLY FLOWING FROM PREDICATE ACTS OF RACKETEERING

### LEGAL DUTIES OF THE MID-ATLANTIC REGION COMMISSION ON HIGHER EDUCATION (MSCHE)

A. MSCHE'S DUTY AS A VISITOR

1. When speaking of private colleges and other eleemosynary corporations, it was held at English common law and well understood in the Supreme Court presided over by John Marshall, C.J., that

> "the founder [of a university or college] is, by the common law, visitor.  In early times, it became a maxim, that he who gave the property might regulate it in the future, *Cujus est dare, ejus est disponere*….When the AND legislature gives to these institutions, it may, and does, accompany its grants with such conditions as it pleases….When donations are made, by the legislature or others, to a charity, already existing, without any condition, or the specification of any new use, the donation follows the nature of the charity." *Trustees of Dartmouth College v. Woodward,* 17 U.S. 518, 563-565 (1819) (Argument for plaintiff in error, who prevailed).

2. As a condition of receiving federal funds authorized under Title IV of the Higher Education Act (HEA), Congress required all institutions of higher education, whether their founder was public or private, to voluntarily submit to an accreditation process whereby accrediting agencies operating as visitors appointed by the federal sovereign would assess the adequacy of education in the same way as a visitor at Common law.

3. An accrediting agency like MSCHE is delegated by statute with a visitatorial duty owed to the Secretary of Education, on which duty depends the disbursal of millions of dollars of federal funds a year to ensure that the education at the institution is accrediting is "adequate."

4.  Governments rely on agency determinations:

"Both federal and state governments consider accreditation to be a reliable authority on academic quality. The federal government relies on accreditation to assure the quality of institutions and programs to which the government provides federal funds and for which the government provides federal aid to students." Judith S. Eaton, President, Council for Higher Education Accreditation, *An Overview of U.S. Accreditation* (Washington, D.C.: CHEA, December 2015), p. 1. http://www.chea.org/pdf/Overview%20of%20US%20Accreditation%202015.pdf

5. When accrediting a university campus, even one with extensive graduate programs, an agency warrants to the public that the education at the institution is "adequate" chiefly for undergraduates who are eligible for Pell Grants.[72]

6.  MSCHE communicates the same understanding INASMUCH AS

(a)  MSCHE publishes on its Statements of Accreditation Status that it will place on probation any institution whose education is inadequate. Complaint, Exhibit 1, Statement of Accreditation Status (SAS), UPR-Rio Piedras Campus, p. 7;

(b)  MSCHE publishes that "The accreditation granted by an institutional agency has reference to the quality of an institution as a whole." MSCHE *, Advertising, Student Recruitment, and Representation of Accredited Status*, p. 5, §6(a), referenced in Complaint, Exhibit 1, Middaugh to Guadalupe, p. 2;

(c)  MSCHE indicates that accreditation contemplates all of the doctrine taught at the institution as the Statement of Accreditation Status "does not imply specific accreditation of any particular program in the institution" MSCHE, *Advertising, Student Recruitment, and*

*Representation of Accredited Status*, p. 5, §6(a), referenced in Complaint, Exhibit 1, Middaugh to Guadalupe, p. 2;

(d) MSCHE expects that institutions that receive these certificates of accreditation will publish them to the public online and in mailings. Complaint, Exhibit 1, Michael F. Middaugh, Ed.D. to Ana Guadalupe, 18 November 2011, p. 2

(e) MSCHE expects that the public has a right to make decisions about matriculation and other matters based on these certifications of adequate education, Commission policy Statement, *Advertising, Student Recruitment, and Representation of Accredited Status*, referenced in Complaint, Exhibit 1, Middaugh to Guadalupe, p. 2;

7.  When defining the norm of "adequate education," the Accrediting Agency may not merely rely on the list in 34 CFR §602.16(a), which the Secretary deems to be minimally acceptable, nor may it blindly implement its own standards, which are self-generated: rather, it has a prior duty, enforceable under 42 U.S.C. §1983, **to objectively measure the adequacy of education at a an institution against the standard of what is appropriately deemed "adequate education" as reliable authorities throughout the United States of America understand that term** and to properly amend its own published standards "as it deems appropriate." 34 CFR §602.16(e), cf. 20 U.S.C. 1099b(p)(1).

8. When an agency applies DIFFERENT STANDARDS **to a STATE UNIVERSITY IN PUERTO RICO from the STANDARDS that it applies to State Universities in the rest of the United States, SO AS TO HONOR A CUSTOM OR USAGE IN PUERTO RICO THAT, impairing the obligations of contract, depriving persons of property without due procees of law, and denying them equal protection of the law, willfully allows the UPR to VIOLATE the residents of Puerto Rico's civil rights under color of this custom, those injured by such determinations have standing to sue the agency in District Court u "to redress the deprivation under color" of that custom or usage in State law,** 28 U.S.C. §1343(a)(3) "in an action at law, suit in equity, **or other proper proceeding for redress" 42 U.S.C. §1983, and be awarded costs and fees under 42 U.S.C. §1988.**

9. When a determination of "adequate education" and statute disagree, the courts lack discretion to defer to the agency determination,[1] for "[I]t is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. 137, 138 (1803).

10. The question that a Court must ask of the accrediting agency's determination of adequacy of education is whether the subject of education is a subject that Congress intended its funding to promote.

11.  When Congress has already defined the conduct that is taught to be a felony, and defined the means of teaching the doctrine to be felonious, the Court must determine that the education is *per se* inadequate, as it may be presumed that it is CONTRARY TO Congress's intention to fund conduct that federal statute defines as a felony.

B.  MSCHE'S DUTY AS AN ACCREDITING AGENCY THAT DEVELOPS ITS OWN STANDARDS

1. The HEA conceives of accrediting agencies as standard-developing, 34 CFR §602.19, 34 CFR §602.16(e), cf. 20 U.S.C. 1099b(p)(1)standard-disseminating, 34 CFR §602.16 (a), and certifying organizations, 34 CFR §602.20 (1)&(2).

2.  Standard-developing and disseminating organizations and certifiers, accrediting agencies are liable **UNDER STATE LAW** (i.e. Puerto Rico Civil Code Art. 1802 (1930)) to private plaintiffs for damages that have arisen owing to their lack of diligence in at least three circumstances:

(a) **when such organizations have been negligent in the <u>development</u> of proper standards**, such negligence has resulted in an unacceptable level of risk, and the plaintiffs, members of the public, have suffered foreseeable harm by persons who have relied on those inadequate standards; *Meneely v. S.R. Smith, Inc.*, 5 P. 3d 49, 53, 60 (Wash. Ct. App. 2000), upholding seven-figure award to plaintiff pool users who collided with bottoms of pools compliant with NSPI standards found to create an unreasonable risk of harm); and the HIV-infected-blood transfusion cases where testing standards were found inadequate, *Douglass v. Alton Ochsner Med. Found.*, 696 So. 2d 136, 140 (La. Ct. App. 1997), Snyder II, 676 A. 2d at 108.  *Weigand v. Univ. Hosp. of N.Y. Univ. Med. Ctr.*, 659 N.Y.S. 2d 395, 400 (Sup. Ct. 1997), Doe v. Am. Nat'l red Cross, 848 F. Supp. 1228,

1234 (S.D. W. Va. 1994), *United Blood Services, Div. of Blood Sys. Inc., Inc v. Quintana*, 827 P. 2d 509, 525 (Colo. 1992), *Gilmore v. Memorial Sloane Kittterning Cancer Ctr.*, 707 N.Y.S. 2d 546, 550 (Sup. Ct. 1993), *Doe v. Univ. Hospital of the N.Y. Univ. Med. Ctr.,* 561 N.Y.S. 2d 326, 328 (Sup. Ct. 1990)

(b) **when such organizations have been negligent in their <u>publication</u> of proper standards,** and the public has suffered foreseeable harm from the failure to so publish. [In a school setting. See *Peterson v. Multnoman County Sch. District. No. 1*, 668 P. 2d 385 (Or. Ct. App. 1983), presuming affirmative detrimental reliance of school on private regulatory association's negligence in publishing appropriate caused physical injury to plaintiff cf. *Wissel v. Ohio State Sch. Athletic Association*, 605 N.E. 2d 458 (Ohio Ct. of Appeals 1992), (dismissing on the same standard, private plaintiff failing to show that affirmative, detrimental reliance on negligent determination caused injury); and

(c) **when such organizations have been <u>negligent in issuing certifications warranting an entity's compliance</u> with standards of adequacy**, and, owing to the actual inadequacy, the public, relying on the standard, has suffered foreseeable harm. (*United States Lighting Serv. Inc. v. Llerad Corp.*, 800 F. Supp. 1513 (N.D. Ohio 1992), finding liability where reliance on UL certification increased risk to consumers in general,; *Peacocks Inc. v. Shreveport Alarm Co.,* 510 So. 2d 387 (La. Ct. App. 1987)) (holding UL liable for for 20% of economic harm suffered by business due to UL negligent failure to assure burglar alarm sustem's compliance with UL's previously-issued certificate, finding reliance; *Yassin v. Certified Grocers of Ill*, 502 N.E. 2d 315 (Ill. App. Ct. 1986), holding UL owes duty to consumer, although not negligent on the facts; no finding of either reliance or increased risk); *Groppel Co. inc. v. U.S. Gypsum Co.*, 615 S.W. 2d 49, 66 (Mo. Ct. App. 1981) (seeming to assume duty by UL to consumer but finding no liability on the facts; no finding of either reliance or increased risk).  *Hanberry v. Heart Corp.*, 81 Cal. Rptr. 519, 521, 523-4 (Ct. App. 1969) where Good housekeeping seal of Approval in the form of Consumer's Guaranty Seal warranted that shoes purchased by the plaintiff were safe.  *Canipe v. Nat'l Loss Control Serv. Corp.*, 736 F. 2d 1055, 1057, 1061-62 (5th Cir.

1984) (holding that summary judgment in favor of an inspection company was inappropriate when that corporation contracted to provide inspection services and the injured plaintiff produced evidence that a negligent inspection caused his injuries); *Toman v. Underwriters Labs*., Inc., 707 F. 2d 620, 620-21 (1st Cir. 1983), discussing the liability of Underwriters Laboratories when it certified that the particular product injuring the plaintiff); *Hempstead v. General Fire Extinguisher Corp.* 269 F. Supp. 109, 117-18 (D. Del. 1967) finding plaintiff injured by fire extinguisher explosion could sue UL for negligence in inspecting, testing and approving design.

3.  In conformity with its duty to the Secretary and to the public under 34 CFR §602.16 (a), MSCHE has developed standards against which it measures members' conduct in determining whether or not to grant affiliation and accreditation.

4. When judging whether an institution complies with its own **Standard 6: Integrity**, MSCHE declares that it focuses on the extent that the institution **complies with its promises, rules and objective standards of ethical conduct** in specific instances:

(a) According the MSCHE, a finding of substantive compliance with Standard 6: Integrity signals to the public that

> "In the conduct of its programs and activities involving the public and the constituencies it serves, **the institution demonstrates adherence to ethical standards and its own stated policies,** providing support for academic and intellectual freedom." Middle States Association of Colleges and Schools, *Characteristics of Excellence in Higher Education: Requirements of Affiliation and Standards for Accreditation* Twelfth Edition (Philadelphia, 2002; pages xii & xiii, 2009), p. x, online at http://www.msche.org/publications/CHX06_Aug08REVMarch09.pdf,

(b) In contextualizing Standard 6: Integrity, MSCHE explains,

> In all its activities, whether internal or external, **an institution should keep its promises, honor its contracts and commitments, and represent itself truthfully**.  **The same adherence to ethical standards and conduct should extend equally to all members of the institution**, whether they are part of the institution through distance learning programs, subsidiaries, or other arrangements.  **Institutions should adhere to such integrity in all institutional settings, venues and activities**. Middle States Association of Colleges and Schools, *Characteristics of Excellence in Higher Education: Requirements of Affiliation and Standards for Accreditation* Twelfth Edition (Philadelphia, 2002; pages xii & xiii, 2009), p. 21.

(c) Within the category of "Fundamental Elements" that qualify an institution under **Standard 6, Integrity**, MSCHE publishes its members are expected to adhere to the following norms:

98

An accredited institution is expected to possess or demonstrate the following attributes or activities:

Fair and impartial processes, published and widely available, to address student grievances, such as alleged violations of institutional policies  **The institution assures that student grievances are addressed promptly, appropriately, and equitably**…

**Sound ethical practices and respect for individuals through its teaching**, **scholarship/research, service, and administrative practice,** including the avoidance of conflict of interest or the appearance of such conflict in all its activities and among all its constituents.

**Equitable and appropriately consistent treatment of constituencies**, as evident in such areas as the application of academic requirements and policies, **student discipline**, student evaluation, **grievance procedures** [22 | 23] **faculty promotion, tenure, retention and compensation**, administrative review, curricular improvement, **and institutional governance and management.**

**A climate that fosters respect** among the students, faculty, staff and administration for a range of backgrounds, ideas and perspectives….

Availability of factual information about the institution, such as the Middle States Commission on Higher Education annual data reporting, the team report, and the Commission's action, accurately reported and made publicly available to the institution's community.

**Periodic assessment of the integrity evidenced in institutional policies, processes, practices and the manner in which these are implemented.**" Middle States Association of Colleges and Schools, *Characteristics of Excellence in Higher Education: Requirements of Affiliation and Standards for Accreditation* Twelfth Edition (Philadelphia, 2002; pages xii & xiii, 2009), pp. 22-23.

(d)   The SPECIFIC NEXUS in **Standard 6: Integrity** that warrants the connection between honoring contracts and supporting academic freedom lies in the University's protection of the extent of the professor's freehold in the University, in that, much like Article III, §1 of the United States Constitution relative to this honorable Court's exercise of judicial independence, the professor's freehold constitutes the University's guarantee of the tenured scholar's academic liberty;

5.      MSCHE represents to the public that **Standard 4: Leadership and Governance** is a different standard from **Standard 6: Integrity:**

(a) **In** judging whether an institution complies with **Standard 4: Leadership and Governance**, MSCHE represents to the public that it considers if

"The institution's **system of governance clearly defines the roles of institutional constituencies in policy development and decision-making**.  The governance structure includes an active governing body with sufficient autonomy to assure institutional integrity and to fulfill its responsibilities of policy and resource development, consistent with the mission of the institution." Middle States Association of Colleges and Schools, *Characteristics of Excellence in Higher Education: Requirements of Affiliation and Standards for Accreditation* Twelfth Edition (Philadelphia, 2002; pages xii & xiii, 2009), p. ix.

(a) The class of evidence that MSCHE publishes to the public that it examines when it considers the institution's compliance with standard 4 are the institution's **governing documents and written rules.**  See Middle States Association of Colleges and Schools, *Characteristics of Excellence in Higher Education: Requirements of Affiliation and Standards for Accreditation* Twelfth Edition (Philadelphia, 2002; pages xii & xiii, 2009), 15-18.

## C.  MSCHE'S DUTY AS A PUBLIC OFFICER TO REVEAL AND NOT CONCEAL FELONIOUS CONDUCT

1. MSCHE as an accrediting agency has sought certification to complete a public investigatorial duty on behalf of the Secretary of Education that would otherwise devolve to him or to some other appointee for that purpose.

2. MSCHE as an accrediting agency stands in the position of a public officer for all intents and purposes of the Higher Education Act.

3. 18 U.S.C. §4, defining the felony of misprision of felony, provides:

> "Whoever, having knowledge of a felony cognizable by a court of the United States, conceals and does not as soon as possible make known the same to some judge or other person in civil or military authority under the United States, shall be fined under this title or imprisoned not more than three years, or both. 18 U.S.C. §4

4. Regarding this crime, the Supreme Court has declared,

> "Although the term "misprision of felony" now has an archaic ring, gross indifference to the duty to report known criminal behavior remains a badge of irresponsible citizenship. This deeply rooted social obligation is not diminished when the witness to crime is involved in illicit activities himself.  *Roberts v. United States*, 445 U.S. 552, 100 S.Ct. 1358, 63 L.Ed.2d 622 (1980)

5. To uphold a conviction under 18 U.S.C. §4, the First Circuit has held that

> "the offense of … misprision of felony, requires proof that: "1) the principal committed and completed the alleged felony; 2) defendant had full knowledge of that fact; 3) defendant failed to notify the authorities; and 4) defendant took steps to conceal the crime." Cefalu, 85 F.3d at 969 (citing Ciambrone, 750 F.2d at 1417; United States v. Baez, 732 F.2d 780, 782 (10th Cir.1984)).  *U.S. v. Caraballo-Rodriguez*, 480 F.3d 62 (1st Cir., 2007) at 70.

6. In terms of *mens rea*,

> "The degree of knowledge required to bring a party within the misprision described, is such as is sufficient to justify an arrest; and well-founded suspicion is sufficient for that purpose. Chit. Cr. Law 10, 27; 4 Bl. Com. 290. *United States v. Daniel*, 19 U.S. 542, 5 L.Ed. 326, 6 Wheat. 542 (1821) (Attorney General argument for defendant-in-error, the indictment sustained without qualification by the Supreme Court)

7. Regarding the *actus reus*, **all circuits** would sustain conviction under the statute on proof of an affirmative act of concealment  -- such as a fraudulent statement published in Statement of Accreditation Status.[73]

8. The burden to be met to convict **is less in the First Circuit**: In upholding a conviction for the crime on the facts alleged where an affirmative act of concealment was NOT alleged or proven arising out of this honorable district court, the First Circuit established binding precedent on this honorable district court, distinct from the position held by the majority of circuits,[1] grounding its holding both on the dictionary definition of "conceal" and the 700 years of commentary concerning the obligation at common law of the citizen to raise the hue-and-cry upon observing a felony, in holding that,

> "Even at common law, commission of misprision appears to have been **especially culpable for public officers**, since they received a higher penalty for the crime than that received by ordinary citizens." Mullis, supra, at 1113 (citing W. Blackstone, 4 Commentaries 121). *U.S. v. Caraballo-Rodriguez*, 480 F.3d 62 (1st Cir., 2007) at 76.

9. Thus, when MSCHE sees a felony when accrediting an institution, or sees felonious doctrine being taught, it has an affirmative duty to reveal and not conceal it, under penalty of conviction for misprision of felony.

D. MSCHE'S DUTY UNDER THE MAJOR FRAUD ACT OF 1988

1. Accreditation by an agency approved by the U.S. Secretary of Education is generally a prerequisite for an institution of higher education to receive and administer federal funds under Title IV of the Higher Education Act. 20 U.S.C. §§1001, 1002; 34 C.F.R. §600.4(a)(5).

2. Conversely, loss of institutional accreditation results in immediate loss of Title IV eligibility. 20 U.S.C. § 1099b(j); 34 C.F.R. § 600.40.

3. In each determination of accreditation, millions of dollars of federal funds are at play.

4. A fraudulent accreditation of an undeserving institution whose education is *per se* inadequate is prosecutable under the Major Fraud Act of 1988 (Pub. L. No. 100-700, §2, 102 Stat. 4361) codified at 18 U.S.C. §1031, which provides that

> (a) Whoever knowingly executes, or attempts to execute, any scheme or artifice with the intent –
>> (1)  to defraud the United States; or

(2) to obtain money or property by means of false or fraudulent pretenses, representations, or promises

in **any grant, contract, subsidy, loan**, guarantee, insurance procurement of property or services as a prime contractor with the United States or subcontractor **or other form of Federal assistance**…, an economic stimulus, recovery or rescue plan provided by the government… or in any procurement of property or services as a prime contractor with the United States or as a subcontractor or supplier in which there is a prime contract with the United States, if the value of the contract, subcontract, or any constituent part thereof , is $1,000,000 or more shall, subject to the application of subsection (c) of this section, be fined not more than $1,000,000, or imprisoned not more than 10 years, or both.

(b) the fine imposed for an offense under this section may exceed the maximum otherwise provided by law, if such fine does not exceed $500,000 and –

    (1) the gross loss to the Government or the gross gain to the defendant is $500,000 or greater, or
    (2) the offense involves conscious reckless risk of serious personal injury…..

(a) A prosecution of an offense under this section may be commenced any time **not later than 7 years after the offense is committed**, plus any additional time after the offense is committed, plus any additional time otherwise allowed by law. 18 U.S.C. §1031 (a)(b) & (f)

5. THEREFORE, regardless of the outcome of this private plaintiff suit, plaintiff is protected by the terms of the Major Fraud Act of 1988, 18 U.S.C. §1031(h) in bringing this case to the attention of the Department of Justice by way of filing suit in the honorable District Court.[74]

E.  MSCHE'S DUTY UNDER THE STATUTES DEFINING WIRE FRAUD, 18 U.S.C. §1343, AND MAIL FRAUD, 18 U.S.C. §1341

1. MSCHE sends its correspondence and certifications through the mails and over the wires.

MSCHE requires the institutions that it accredits to publish its certifications and Statements of Accreditation Status online.  And MSCHE publishes its Statement of Accreditation Status online on its website.

2. The accuracy of the representations are protected by the mail fraud statute, 18 U.S.C. 1341, and the wire fraud statute, 18 U.S.C. §1343.

3. "To prove wire fraud the government must show (1) scheme to defraud by means of false pretenses, (2) defendant's knowing and willful participation in scheme with intent to defraud, and (3) use of interstate wire communications in furtherance of scheme. *United States v. Cassiere*, 4 F.3d 1006 (1st Cir. 1993).

4. Inasmuch as Wire Fraud and Mail Fraud are predicate acts of racketeering,  18 U.S.C. 1961(1), private plaintiffs have standing to bring treble damage actions against those who engage

in a pattern of wire fraud and their co-conspirators under R.I.C.O.'s civil enforcement mechanism, 18 U.S.C. §1964(d). R.I.C.O. and like-phrased state-law enactments have been successfully enforced by private plaintiffs seeking treble damages both **under R.I.C.O.   and under state statutes patterned on R.I.C.O,** against institutions (a) that have used electronic communications and (b) misrepresented their accreditation status, *Lauber v. Bedford High School, et al*. Civil Action No. 09-Cv-14345 (E.D. Mich. 2009), and (c) that have made misrepresentations to an accreditation agency to secure accreditation, *Beckett v. Computer Career Institute, Inc*., **852 P.2d 840, 120 Or. App. 143 (1993)** (enforcing the Oregon R.I.C.O. statute patterned on the federal R.I.C.O. statute).

5. This honorable district court has recently held that (1) All members of a RICO conspiracy are liable for treble damages for injuries sustained by a plaintiff who has been injured in his business and property by the exchange of false certifications inasmuch as knowing and falsely certifying that a good or service complies with a standard in a written communication to be circulated by mail or wire is a predicate act of racketeering and knowingly accepting that the false certification is valid aids and abets the crime AND that each publication and acceptance of the false certification constituted an individual count of mail or wire fraud. *Marrero-Rolón v. Autoridad de Energía Eléctrica de P.R.* (D.P.R., 2015) (holding that "each time a shipment of Non-Compliant Fuel Oil was knowingly accepted by PREPA along with a false Certificate of Analysis, the relevant PREPA, Fuel Oil Supplier, and Laboratory Participants aided and abetted each other in committing mail or wire fraud.")

6. This local doctrine is amply supported by the Supreme Court's holding that

> "[A]n actor who does not himself commit or agree to commit the two or more predicate acts requisite to a" § 1962(c) conviction **may nonetheless be liable under § 1962(d) if he "adopt[s] the goal of furthering or facilitating the criminal endeavor."** Id. at 64. An overt act is not even required for § 1962(d) liability; the **conspirator need only "agree[] to facilitate . . . some of the acts leading to the substantive offense**." Id. 63, 65. Salinas v. United States. See 522 U.S. 52, 63, 65 (1997) , as quoted in *Marrero-Rolón v. Autoridad de Energía Eléctrica de P.R.* (D.P.R., 2015) at 61.

And the First Circuit's holding that

> "under the Pinkerton doctrine, a defendant can be found liable for the substantive crime of a coconspirator provided **the crime was reasonably foreseeable and committed in furtherance of the conspiracy**. *United States v. Gobbi,* 471 F.3d 302, 309 n. 3 (1st

Cir.2006) (citing *Pinkerton v. United States*, 328 U.S. 640, 647-48, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946)). *U.S. v. Vazquez-Botet*, 532 F.3d 37, 62 (1st Cir., 2008).

F.  MSCHE'S DUTY UNDER THE TRAVEL ACT, 18 U.S.C. §1952

1. Violation of the Travel Act, 18 U.S.C. §1952, is a predicate act of racketeering. 18 U.S.C.

§1961(1)

2. The Travel Act, 18 U.S.C. §1952, provides that

   (a) Whoever **travels in interstate or foreign commerce or uses the mail or any facility in interstate or foreign commerce**, with intent to—
      (1) distribute the proceeds of any unlawful activity; or
      (2) commit any crime of violence to further any unlawful activity; or
      (3) **otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity**,

   and thereafter performs or attempts to perform—
      (A) **an act described in paragraph (1) or (3)** shall be fined under this title, imprisoned not more than 5 years, or both; or
      (B) an act described in paragraph (2) shall be fined under this title, imprisoned for not more than 20 years, or both, and if death results shall be imprisoned for any term of years or for life.

   (c) As used in this section (i) "unlawful activity" means (1) any business enterprise involving gambling, liquor on which the Federal excise tax has not been paid, narcotics or controlled substances (as defined in section 102(6) of the Controlled Substances Act), or prostitution offenses in violation of the laws of the State in which they are committed or of the United States, (2) **extortion**, bribery, or arson **in violation of the laws of the State in which committed or of the United States**, or (3) any act which is indictable under subchapter II of chapter 53 of title 31, United States Code, or under section 1956 or 1957 of this title and (ii) **the term "State" includes a State of the United States**, the District of Columbia, **and any commonwealth**, territory, or possession **of the United States**.  18 U.S.C. §1952.

3. The Supreme Court has declared in interpreting the Travel Act that

   "Because the offenses are defined by reference to existing state as well as federal law, **it is clear beyond all doubt that Congress intended to add a second layer of enforcement supplementing what it found to <u>be inadequate state authority and state enforcement</u>**."  *Perrin v. United States*, 444 U.S. 37, 42, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979), (commenting on the reference to Federal and State law crimes, including extortion, in The Travel Act, enacted in 1961.)

4. THEREFORE, any communication sent through the mails or over the wires that advances or facilitates a conspiracy to extort as that term is defined in the Hobbs Act or State law falls within the heartland of the crime.

5. Also prosecutable under the Travel Act is a criminal omission that facilitates extortion.

6. One such criminal omission arises when an accrediting agency, noticed of an institution's violation of a federal law but disinclined to reveal it, pretends to complete its visitatorial duty by sending an investigatory team that is incapable of conducting a proper investigation into the criminal activity.

7. The mens rea arises under the copulation of agency's duty as a public officer under 18 U.S.C. §4 and its visitatorial duty as defined under the Higher Education Act: Federal law and regulation requires the U.S. Secretary of Education to ensure that an accrediting agency is "separate and independent," 34 CFR part 602, subpart C, §602 (b) from the institutions that it is accrediting so as to

> "ensure that these agencies are, for the purpose of the Higher Education Act of 1965, as amended (HEA) or for other Federal purposes, **reliable authorities regarding the quality of education or training offered by the institutions or programs they accredit**." 34 CFR Part 602, subpart A, §602.1.

8. Inasmuch as to secure its status as an accrediting agency from the Secretary, an accrediting agency

> "must demonstrate that its standards, policies, procedures, and decisions to grant or deny accreditation are widely accepted in the United States by –
>
> (a)    Educators and educational institutions; and
> (b)    Licensing bodies, practitioners, and employers in the professional or educational fields for which the educational institutions or programs within the agency's jurisdiction prepare their students." 34 CFR §602.13, as authorized by 20 U.S.C. §1099b.

and the Secretary requires that an accrediting agency

> "must have the administrative and fiscal capability to carry out its accreditation activities in light of its requested scope of recognition." 34 CFR §602.15.

9. a team of visitors to a State campus on probation for a lack of leadership and governance must be capacitated by legal training and forensic inclination to evaluate the statutes of the institution and conduct of the administration independently of the initial determination or the agency falls afoul of its duty as a public officer under 18 U.S.C. §4, its duty as a visitor under the Higher Education Act, and, when the act thereby concealed is Hobbs act or state law extortion, its duty under the Travel Act not to travel in interstate commerce to facilitate that sort of "unlawful activity."

10. MSCHE has no excuse for failing to complete this duty at the University of Puerto Rico inasmuch as MSCHE accredits the Interamerican University School of Law.

G. TEACHING THE STUDENT STRIKE DOCTRINE IS AGAINST THE LAW AND THEREFORE INADEQUATE EDUCATION PER SE

1. The Supreme Court of Puerto Rico in UPR v. LABORDE, 2010 TSPR 225, 180 DPR 253 (2010) clarified that no vote by students may prohibit even one student from receiving his or her education. [75]

2. The student strike doctrine is legally incompatible both with the duties owed by the University to its students, the statutory duties the employees owe the public, and contractual duties that its employees owe the UPR, as described above.

3. The Court of Appeals for the First Circuit has held that political motives, however laudable, do not immunize conspiracies or combinations in restraint of trade from private enforcement of the Sherman Act in treble damages suits, even when organized labor takes part;  *Allied International, Inc., v. International Longshoremen's Association,* 640 F2d 1368 (1st Cir. (Mass) 1981).

4. Were a professor hired for such a purpose of teaching the student strike doctrine, such a contract for lease of services would be VOID inasmuch as the doctrine, the teaching of the doctrine to minors of age without discouraging them from acting on it, and the protection of those who act on it, constitute acts that are unlawful, immoral, and contrary to public order as a matter of law:  SPECIFICALLY,

5.  the teaching of the Student Strike Doctrine is unlawful in that

(a) under Puerto Rico Civil Code Article 1803, the professor has a duty to discourage students in his or her classroom from entering into the executory contract of the syllabus in bad faith by reserving to themselves the right to tortiously interfere with the pace of performance agreed upon at the start of semester between the UPR, the professor and the rest of his or her classmates. AND

(b) urges impressionable undergraduate students, most of whom are unemancipated minors, all of whom are unskilled in labor law, to engage in what the Sherman Act defines as felonious conduct.

6. The teaching of the student-strike doctrine is IMMORAL in that it

(a) encourages conduct that exposes students and public employees to violence and intimidation at student-offenders' hands,

(b)  corrupts the morals of the students who follow these teachings;

(c) exposes the student-offenders to potential injury at the hands of the police and to criminal charges, and

(d) under color of education, exposes minors-of-age, to whom professors stand in a position of *in loco parentis*, to suit at tort to which their parents have to respond under Puerto Rico Civil Code Art. 1803 (1930)

(e) has confused the labor movement in Puerto Rico as to what conditions legitimate labor unions must fulfill when undertaking industrial action to meet the Clayton Act exemption.

(f) encourages students to believe that they can vote to engage in an illegal strike under color of protected speech when, in fact, the local Court of Appeals here in San Juan has held that neither the motion nor the vote to enter into an illegal "strike" falls within the category of Constitutionally protected speech.  *Federación de Maestros v. Departamento de Educación*, KLRA 200800115 (TA, San Juan, 2008),

(g) encourages students to believe that they can engage in extortion under color of protected speech when, in fact, "Extortion is not a constitutionally protected form of speech." (*R.A.V. v. City of St. Paul* (1992) 505 U.S. 377, 420, 112 S.Ct. 2538, 120 L.Ed.2d 305 (conc. opn. of Stevens, J.) cited in *Flatley v. Mauro*, 139 P.3d 2, 46 Cal.Rptr.3d 606, 39 Cal.4th 299 (Cal., 2006)

11. WHEREAS the execution of a closure for such ends above prevents the UPR and plaintiff and his class from engaging in interstate and foreign commerce, and thereby falls within the prohibition of the Hobbs Act extortion statute violation,

12. WHEREAS data collected by UPR-RP Dean of Students Mayra Chárriez indicates that in March 2011 alone, 18 students transferred from the Río Piedras Campus to other institutions – including University of Notre Dame, Marquette University, University of Pittsburgh, University of Dayton, and Boston University – listing "huelga" or "incertidumbre sobre el estatus de la UPR" as their reason for choosing a much more expensive educational option.

13. THEREFORE, APPU's educational mission to advance the student strike doctrine through the UPR-RP Academic Senate, and the UPR-RP Academic Senate's enacting of such an educational program that prejudices the UPR and persons who have a right to use the campus is (a) contrary to law, morality and public order, (b) just cause for firing, and (c) not protected by the University's academic freedom or the professor's First Amendment rights,

H.  THE COMMON PURPOSES OF THE ASSOCIATED-IN-FACT ENTERPRISE SERVES NO LEGITIMATE STATE PURPOSE

1. WHEREAS the explicitly declared common purpose of the associated-in-fact enterprise – the stated reason for the exercise of the student-strike doctrine -- is to require the UPR to offer higher education to the student-clients of the UPR at the lowest absolute cost to the students,

**2.** WHEREAS Law 2 of 20 January 1966, established a supplementary grant to the UPR, an institution already in existence capable of and actually charging its students tuition to pay its professors' salaries.

3. WHEREAS the motives of Law 2 of 20 January 1966 justify granting the UPR a percentage of the general fund specifically on the grounds that such a supplement shall serve to increase professors' salaries and finance building projects.

4. WHEREAS by way of Law 7 of 7 April 2013, the Legislature of the Commonwealth of Puerto Rico clarified that education shall be offered to students at the "lowest <u>viable</u> cost," <u>viability</u> what Law 7-2013 provides is public policy and what the Constitution requires when the subsidy is insufficient to pay the UPR's existing debts (i.e., the cost that, under the law, allows the UPR to pay its existing obligations and further its aims).[11]

5. WHEREAS, as matter of law, "Viability" is defeated at a public research-intensive doctoral degree granting institution

---

[11] "Es política pública del Estado Libre Asociado de Puerto Rico promover el acceso a la educación post secundaria al más bajo costo viable y, en lo posible, garantizar la igualdad a nuestros residentes de oportunidades académicas en la Universidad de Puerto Rico." Art. 1, Law 7 of 7 April 2013.

(a) when the institution lacks sufficient funds to pay its constitutionally unavoidable obligations to pay contracts for lease of services for price certain to plaintiff and others in full and on time as these obligations come due, or

(b) when, to balance its budget, the institution must intrude into plaintiff's and others' freeholds and take property without prior tender of just compensation, or

(c) when the institution has encouraged plaintiff to make representations to third parties who have donated moneys on the condition that library resources are purchased or permanently leased, and, owing to insufficient funds, the purpose of the donation is not honored. Or

(d) when, the institution, having defined its mission to become a first-rate doctoral-degree-granting research institution in public documents, cannot afford to acquire the basic infrastructure to complete that mission, including the importation of works of intellectual property circulating in interstate commerce that are basic necessities for working at the doctoral level in specific fields in which the degree is offered in which plaintiff works.

6. THEREFORE, the common purpose served by the teaching of the Student-strike doctrine serves no legitimate state interest.

7. WHEREAS

(a) The practice of students' voting celebrated under the Student Strike Doctrine to close down the campus in order to secure a concession of a property right, and using violence and intimidation in order to secure that end violates FEDERAL CRIMINAL STATUTES defining felonies, in particular,(i) The Sherman Act; (ii) The Clayton Act; (iii) The Hobbs Act,

(iv) RICO, as a pattern of Hobbs act violations, (v) among other statutes;  AND

(b) The aforesaid student conduct celebrated under the Student Strike Doctrine also violates PUERTO RICO CRIMINAL STATUTES penalizing (i) Conspiracy to extort, a misdemeanor under Puerto Rico Penal Code Art. 249 (2004) ; (ii) Extortion, a felony under Puerto Rico Penal Code Art. 200 (2004); (iii) R.I.C.O., again, as a pattern of state law extortion violations; (iv) The use of violence and intimidation against public employees, a felony under Puerto Rico Penal Code 251 (2004); (v) Riot [*motin*], a felony under Puerto Rico Penal Code, Art. 248 (2004);

(vi) The unauthorized obstruction of the entrance to school campuses, hospitals and other public buildings, a misdemeanor established by Law 3 of 4 February 2011, codified at Puerto Rico Penal Code Art. 246-A (2004),  (vii) among other statutes; AND

(c) The aforementioned conduct is also TORTIOUS under (i) the doctrine of Public nuisance, *U.P.R. v. Laborde*, TSPR CT-2010-008., 2010 TSPR 225, 180 DPR 253 (2010); (ii) the doctrine of Tortious interference, Puerto Rico Civil Code Art. 1802 (1930)  AND

(d) The aforementioned conduct violates codified University law, specifically (i) UPR General Regulation §32, and (ii) UPR Student Regulation §2.18(1)  (2)(5)(6) & (7), which promises disciplinary action against students should they interfere with the normal rhythms of the academic and administrative calendar; (iii) The *Politica Institutional Sobre Apertura y Acceso a los Predios Universitarios* published in UPR Junta de Síndicos Certification 90 (2004-2005), which declares unequivocally that the unilateral closing of the UPR by a sector of the UPR population is not a legitimate act of free speech (Art. 5),  which requires the President, the Board of Trustees and the Chancellors to use UPR resources to the extent necessary to keep the UPR open to faculty and students at all times (Art. 7) and to impose responsibility on those persons who incur in violations of the law and university regulations, "exercising particular zeal in those cases in which the conduct is directed to impede any member of the community from normally realizing his labor, be it in the nature of teaching, research or service, or administrative or student-oriented." Art. 8, UPR-JS-Cert. 90 (2004-2005), published 27 June 2005, p. 2. AND

8.  WHEREAS the "student strikers" only engage in this unlawful conduct after they are enrolled and have paid their fees to the U.P.R., the pattern of unlawful conduct exhibited in these "student strikes" constitutes one of the specific evils that the R.I.C.O. statute aimed at correcting: the situation where "racketeers would corner the market on a good or service and then withhold it from a businessman until he surrendered his business or made some other related economic concession." 116 Cong. Rec. 607 (1970) cited in *Sedima* at 517 (Marshall dissent).

9. THEREFORE the teaching of the student-strike doctrine is a per se violation of Puerto Rico Civil Code, Art. 1803 (1930) as its teaching invites students on its campus to violate and does not discourage students from violating statute.

10. AND THEREFORE, as it teaches students to violate the R.I.C.O. statute and engage in State law and Hobbs Act extortion under color of industrial action, the UPR-RP's teaching of the student-strike doctrine under color of academic norm constitutes INADEQUATE EDUCATION PER SE and just grounds for firing.

I.  MSCHE WAS NOTICED THAT THE UPR-RP WAS ENGAGED IN INADEQUATE EDUCATION *PER SE*

1. Article 3(e) of Law 1-1966 charges the UPR Board of Trustees with the nondelegable power of making Regulations for the UPR as a whole;

2. Article 11(1) of Law 1-1966 provides that

> "It especially corresponds to the Academic Senates (1) to determine the general orientation of teaching and research in the institutional unit, coordinating the initiatives of the corresponding colleges and departments."  Law 1-1966, Art. 11(1)[76]

3. Under color of passing a program of undergraduate education, the UPR-RP Academic Senate passed UPR-RP Cert. 49 (2003-4):

4. UPR-RP Cert. 66 (2009-10) of 11 May 2010, passed one month prior to MSCHE placing the UPR-RP on probation for leadership and governance in June 2010, SPECIFICALLY CITES TO UPR-RP Cert. 49 (2003-4).

5.  In April 2005, under color of the student-strike doctrine, the associated-in-fact enterprise closed down the UPR-RP camous for four weeks in an effort to prevent the UPR-JS from raising tuition TEN DOLLARS PER CREDIT HOUR (as above);

6.  In April 2010, the associated-in-fact enterprise engaged in similar conduct, closing the UPR-RP for 62 days, in an effort to require the UPR to authorize tuition exemptions to incoming students (as above).

7. The conduct authorized by way of the educational program violated the Sherman Act, 15 U.S.C. 1, and the Hobbs Act, other local statutes defining felonies, including extortion, and the use of violence and intimidation against public employees (as above).

8.  To determine whether the UPR ought be put on probation for **Standard 4: Leadership and Governance**, or **Standard 6: Integrity**, MSCHE's own standards and duties as a vistor and

public officer required that MSCHE examine, at a minimum, **the norms passed by the Legislature and the UPR Board of Trustess**, including

(a) The assignment of duties under the UPR Organic Law, Law 1-1966, and the UPR General Regulations

(b) UPR General Regulation §32

(c) UPR General Student Regulations Arts. 2.15(B)&(C); 2.18; 2.19; 3.5; 6.2(5); 6.2(6); 6.2(8); UPR JS Cert. 13 (2009-10), (2 September 2009) http://senado.uprrp.edu/Informes/CJS-13-2009-10-ReglGenEst.pdf.

(d) UPR JS Cert. 90 (2004-5), describing the *Politica Institutional Sobre Apertura y Acceso a los Predios Universitarios* and suppressing the Institutional Policy of Nonconfrontation; AND, in terms of campus norms,

(e) UPR-RP AS Cert. 49 (2003-4)

(f) UPR-RP AS Cert. 16 (2005-6) which renewed the Academic Senate's commitment to the campus's observance of the *Política Institucional de No Confrontación,* and

(g) UPR-RP Academic Senate Certifications 66-81 (2009-10), passed on 11 May 2010;

9. Subsequent to an evaluation of said norms, MSCHE had a duty to assess whether the felonious acts above arose from the UPR JS issuance of confusing regulations or the UPR-RP Academic Senate's willful noncompliance with norms of higher hierarchy.

10.  The cause of the campus shut-down was not a lack of clarity of the rules but the UPR-RP Academic Senate's willful, felonious noncompliance with norms of higher hierarchy, **a gross violation of MSCHE Standard 6: Integrity**.

11.  The honorable district court can independently verify this conclusion by

(a) Comparing UPR-RP AS Cert. 16 (2005-6) to UPR JS Cert. 90 (2004-5);

(b) examining the index of UPR-RP AS Certifications passed on 11 May 2005, which refer to the legally void concept, "student strike," or

(c) examining   UPR-RP AS Cert. 71 (2009-10), whereby the UPR-RP Academic Senate recognized that students were engaged in conduct that was in violation of local and federal law

and UPR Regulation and nonetheless exhorted the UPR-RP Interim Chancellor to commit misprision of felony.

J. ALLEGATIONS OF WRONGDOING

1. Prior to certifying that the UPR-RP complied with Standard 6: Integrity, MSCHE read the norms UPR-RP AS Cert. 16 (2005-6); UPR JS Cert. 90 (2004-5); the index of UPR-RP AS Certifications passed on 11 May 2005, which refer to the legally void concept, student strike, and UPR-RP AS Cert. 71 (2009-10); It has since read UPR-AS Cert. 89 (2014-2015).

2. ALTERNATELY, prior to putting the UPR-RP on probation for lack of compliance with Standard 4: Leadership and Governance, MSCHE failed to read the norms above.

3. Actually and/or constructively noticed that the UPR-RP Academic Senate had passed and published UPR-RP AS Cert. 49 (2003-4) under color of an educational program that violated university law, and local and federal statute, and, in particular, the Sherman Act, 15 U.S.C. 1, a felony, AND knowing that under color of this doctrine, students had closed down the UPR-RP for weeks in April 2005 and April 2011, MSCHE, knowing that the UPR-RP Academic Senate had not repealed the policy, certified that the education at the UPR-RP was adequate for undergraduates on

(a) 22 June 2005, in a Statement of Accreditation Status (SAS)

(b) 17 November 2011, in an SAS

(c) 18 November 2011, in a letter from Michael Middaugh to Ana Guadalupe

(d) 31 March 2016, by way of a team traveling in interstate commerce and communicating to the UPR-RP Chancellor. "Comité Evaluador de la Middle States recomendará reacreditación de la UPR en Río Piedras" (31 March 2016) http://www.uprrp.edu/?p=8594

4. Actively and/or constructively noticed that the UPR-RP AS Cert. 49 (2003-4), UPR-RP AS Cert. 16, (2006-7), UPR-RP AS Certs. 66-81 (2009-10), and UPR-AS Cert. 89 (2014-2015), existed in mutinous relationship to norms of greater hierarchy, including local and federal statutes, the public nuisance doctrine, UPR Gen. Reg. §32, similarly phrased sections of the UPR General Student Regulations, especially Arts. 2.5(B) & (C),; 2.18, 2.19, 6.2(5), 6.2(6), 6.2(7), 6.2(8) and

3.5, and UPR JS Cert. 90 (2004-5), MSCHE certified the UPR-RP's compliance with Standard 6:

Integrity on

(a) 22 June 2005, with the issuance of an SAS

(b) 24 June 2010, by way of an SAS

(c) 15 July 2010, by way of letter from Luis Pedraja to Jaime de la Torre[77]

(d) 18 November 2010, in a Memorandum sent to the UPR-RP

(e) April 2010, by way of the Visiting Team Report

(f) 24 June 2011

(g) September 2011, by way of its visitors, traveling in interstate commerce to speak in open

meeting on the UPR-RP campus

(h) 17 November 2011, with the issuance of an SAS

(i) 18 November 2011, in correspondence from Michael Middaugh to Ana Guadalupe

5.  MSCHE caused its certifications of UPR-RP's compliance with Standard 6: Integrity, each paid

for by the UPR or UPR-RP, to be sent through the mail and/or over the wires to the UPR and the

UPR-RP on or subsequent to

(a) 22 June 2005

(b) 24 June 2010, by way of an SAS

(c) 15 July 2010

(d) 18 November 2010[78]

(e) 7 April 2010

(f) 18 November 2011

6. By way of its own Standard 6: Integrity, MSCHE required the UPR-RP to publish these

certifications online on or subsequent to

(a) 22 June 2005

(b) 24 June 2010

(c) 15 July 2010

(d) 18 November 2010

(e) 7 April 2010

114

(f) 18 November 2011

7. MSCHE published these certifications online on its own website on or subsequent to

(a) 22 June 2005

(b) 24 June 2010

(c) 15 July 2010

(d) 18 November 2010

(e) 7 April 2010

(f) 18 November 2011

8. Having already issued these certifications of compliance with Standard 6: Integrity, MSCHE arranged for a team of persons, all nonlawyers, to travel through interstate commerce to Puerto Rico to examine the veracity of the cause

(a) In July 201O

(b) In April 2011

(c) In July 2011

9. Having already issued these certifications of compliance with Standard 6: Integrity, MSCHE sent a team of persons, all nonlawyers, to travel through interstate commerce at the UPR's expense to study the problem in

(a) September 2010

(b) April 2011

(c) July 2011

10. Though UPR JS Cert. 90 (2004-5) in insisting upon the duty of the chancellor to zealously enforce the opening of the campus perfectly meshes with UPR Gen Reg. §32.4, §35.2.5, §35.2.17, §35.2.18, and §35.2.19, and corresponding dispositions of the UPR General Student Regulations, the Sherman Act, and the Hobbs Act AND

11.  UPR-RP AS Certs. 66-81 show the UPR-RP Academic Senate in mutiny against these dispositions, and criticizing the UPR-RP administration for honoring the law.

12.  MSCHE put the UPR-RP on probation for noncompliance with **Standard 4: Leadership and Governance** and required new policies increasing shared governance (meaning a larger share of power to the racketeers) on

(a) 24 June 2010 by way of SAS

(b) 15 July 2010, in correspondence from Luis Pedraja to Jaime de la Torre[79]

(c) 18 November 2010, in a Memorandum sent to the UPR-RP[80]

(d) April 2011, in the Visiting Team *Report*, p. 6.[81]

(e) MSCHE Visit Team Recommendations, 12 September 2011[82]

(f) 17 November 2011, in the SAS [3 places, under Standards 4, 2 and 6]

(f) 18 November 2011, in the correspondence sent by Michael Middaugh to Ana Guadalupe, in 3 places, under Standards 4, 2 & 6.

13.  MSCHE received inquiry, constructive and/or actual notice of the UPR's inability to raise tuition to a level commensurate with its needs in

(a) April 2005, by way of the closure of the campus for 4 weeks owing to an increase in tuition of $10 per credit hour

(b) UPR JS Cert. 60 (2006-7), which could never produce relief from a deficit if the CPI was rising and the funding from the State was declining

(c) April 2010, by way of the closure of the campus for 62 days

(d) June 2010, by way of The UPR's Certified budget[83]

(e) April 2011, by way of the Monitoring Report[84]

(f) September 2011, by way of protest by plaintiff in open meeting.

14.  MSCHE received actual notice that students were engaged in extortion on the UPR-RP campus in April 2011, by way of the Monitoring Report[85]

15.  MSCHE received actual notice that UPR was going to tax the costs of running the UPR against the faculty rather than the students by reducing faculty compensation in

(a) June 2010, by way of the UPR JS Certified budget.[86]

(b) UPR-JS Certification 153 (2009-2010), taking accumulated credits for sick pay; and UPR JS Certification 147 (2010-11), cancelling all reimbursement for sick days not taken. [87]

(c) April 2011, by way of Monitoring Report, p. 14

(d) UPR-JS Certification 147 (2010-11) of 20 June 2011

(e) September 2011, by way of plaintiff's protest in open meeting against relieving (f) UPR and UPR-RP from probation for compliance with Standard 3: Institutional Resources owing to its outstanding debts to faculty;

16.   Thus noticed of the UPR-RP's plan to balance the budget on the backs of the faculty, MSCHE

(a) represented that the UPR and UPR-RP had complied with Standard 6: Integrity in

(i) 15 July 2010

(ii) 18 November 2010

(iii) April 2011

(iv) 17 November 2011[88]

(v) 18 November 2011

AND FURTHERMORE

(vi) In April 2011, commended the UPR-RP for dishonoring these obligations to pay faculty[89] AND recognized that the reduction in compensation would continue through 2015.[90]

(vii) In September 2011, traveled in interstate commerce to assert in open meeting, against plaintiff's objections, that the UPR-RP ought be relieved from probation despite the nonpayment of these outstanding debts;

(viii) On 17 November 2011, relieved the UPR-RP and the UPR from probation in its SAS on 17 November 2011, on the grounds of institutional resources though noticed of these outstanding debts.

(ix) On 17 November 2011, declared implicitly by relieving the UPR-RP from probation that the UPR-RP had adequate institutional resources in its SAS.[91]

(x) On 17 November 2011, warranted that it would require monitoring reports and examine future budgets for compensation in its SAS.[92]

(xi) On 18 November 2011, repeated the warranties of 17 November 2011 by way of its letter from Michael Middaugh to Ana Guadalupe of 18 November 2011.

(xii) Failed to ensure that the outstanding compensation it knew the UPR owed faculty was budgeted for in 2012

(xiii) Failed to ensure that the outstanding compensation it knew the UPR owed faculty was budgeted for in 2013

(xiv) Failed to ensure that the outstanding compensation it knew the UPR owed faculty was budgeted for in 2014

(xv) Failed to ensure that the outstanding compensation it knew the UPR owed faculty was budgeted for in 2015.

(xvi) failed to ensure that the outstanding compensation it knew the UPR owed faculty was budgeted or paid when its reaccreditation committee visited in February 2016.

K.  APPLICATION OF THE LAW TO THE FACTS

Each of MSCHE's acts enumerated in SECTION J above was

1. A misapplication of the term "adequate education"

2. A misapplication of the term "adequate education" that did not hold the State University in Puerto Rico to the same standard of adequacy as agencies hold State universities in the United States.

3. A misapplication of MSCHE's published standards

4. A misapplication of MSCHE's published standards that concealed and did not reveal the felonious doctrine taught at the UPR-RP

5. A felonious misapplication of MSCHE's published standards that concealed and did not reveal the identity of an associated-in-fact racketeering enterprise operating on campus under color of right advanced under color of an educational program advanced in UPR-RP AS Cert. 49 (2003-4)

6. An act of misrepresentation on which the U.S. Secretary of Education relied, and thereby extended funds to the UPR-RP and its students and faculty in excess of $1,000,000 [ONE MILLION DOLLARS]

7. An act that, joining with the UPR-RP Academic Senate's criticism of the administration for calling the police and/or raising tuition, facilitated the common purpose of the associated-in-fact

118

racketeering enterprise in maintaining the cost of education at the lowest absolute cost to the student.

8.  A PREDICATE ACT OF RACKETEERING IN THAT IT WAS

(a) EITHER a violation of the Travel Act that, in its commission, gave material support to extortionists operating on the UPR-RP Campus

IN THAT IT

(i) ensured the student racketeers received funding while they were engaged in extorting the UPR for concessions of property, AND/OR

(ii) granted the professorial members of the associate-in-fact enterprise legitimacy as educators from which platform they could defame their opponents, and compel these opponents by fear of defamation not to oppose their felonious acts AND/OR (iii) concealed the associated-in-fact enterprise from the Secretary and thereby ensured that federal funding would not be made contingent upon the end of the Institutional Policy of Nonconfrontation under color of which the associated-in-fact enterprise maintained its possession of the UPR-RP campus commons, AND/OR

(iv) under color of right, extorted that the UPR administration afford the members of the associated-in-fact enterprise more rights within the system under color of "shared governance," AND/OR

(v) under color of right, extorted by way of the iron fist within the velvet glove, that the UPR and UPR-RP comply with the common purpose of the associated-in-fact enterprise by commending and rewarding the UPR and UPR-RP for the implementation of a policy that taxed the faculty rather than the students for the costs of running the UPR-RP.

OR (b) an act of wire and/or mail fraud perpetuated

(i)        EITHER against the federal treasury OR

(ii)       against the plaintiff and his class, for the benefit of the student racketeers.

8.  By way of this pattern of racketeering conduct, culminating in the issuance of the SAS reaccrediting the UPR-RP on 18 November 2011, MSCHE

(a) allowed the structure of the local associated-in-fact enterprise to remain in place;

(b) induced reliance in the Secretary of Education, who relying upon MSCHE's certification of compliance, extended federal funds made available under the HEA without the Academic Senate having to reverse its teachings in regard to student strikes or repealing the Institutional Policy of Nonconfrontation.

(c) effectively provided student racketeers with federal funding and extended that promise into the future;

(d) permitted UPR teaching employees committed to the student-strike doctrine to receive federal funding and thereby licensed them to continue to assist student racketeers in the future;

(e) gave material support and legitimacy to those who advanced the student strike doctrine in their claim that they were adequate educators and thereby defended them against those who properly cited the law to correct the doctrine that they taught.

(f) lent the weight of an independent agency determination to the racketeers' prior and future defamatory remarks, ratifying them by way of the determination that the felonious educational program was adequate and by way the award of millions of dollars of federal funding that followed upon this determination; AND

(g) extorted the UPR to impair and to continue to impair the obligations of contract owed to faculty to pay for the UPR's debts rather than increase tuition to pay these constitutionally unavoidable debts.

9. MOREOVER, as READ THROUGH THE SAS ISSUED BY MSCHE fraudulently certifying that the general program of education that UPR-RP offers in the Student Strike Doctrine is "Adequate Education",, (a) UPR RP AS Cert. 49 (2003-4), UPR-RP AS Cert. 42 (2004-5); UPR-RP AS Cert. 10 (2005-6), UPR-RP AS Cert. 16, (2006-7), and, most recently, in UPR-AS Cert. 89 (2014-2015), ALL PUBLISHED ONLINE, CONSTITUTE INDEPENDENT ACTS OF WIRE FRAUD that MSCHE has conspired to issue, EACH AN INDEPENDENT INJURY IN A CONTINUING CONSPIRACY under color of state custom or regulation, to the prejudice of Plaintiff's business and property, his ability to produce intellectiual property, his freehold, his convenient payment of his duties of service, his compensation, his safety, his reputation, and his constitutionally unavoidable contractual rights.

## XV. DEMANDANT'S/PLAINTIFF'S DAMAGES

### A.   DAMAGES CLAIMED OWING TO DISPOSSESSION OF CAMPUS COMMONS

1.   UNCERTAINTY AS TO THE SEMESTER'S END

(a) The alienation of the campus commons to the JCS makes planning travel inherently uncertain.

(b).Demandant is entitled to $200 per semester since 2003 in the concept of increased airfare owing to the unlawful alienation of the campus commons or the sum of $5200 [FIVE-THOUSAND-TWO-HUNDRED DOLLARS].

2.   DAMAGE TO FREEHOLD

(a) As illustrated above, to maintain himself in his freehold, Plaintiff is required to teach four classes per semester, except where he is granted course relief to complete other duties.

(b). Said contract is a contract for price certain and term certain, as defined in local law.

(c). Under Puerto Rico Civil Code Art. 1473 (1930), when the certain term of the executory contract is exceeded, the party with the right to remuneration owing to the change order may sue in any competent court and obtain in trial against the other party, the reasonable value of those services. *Rodriguez v. Ward*, 74 D.P.R. 880 (1953).

(e) Each time the alienees's enfeof students to deforce demandant, the demandant must redo his syllabus, accommodate students with incompletes or special exemptions, teach on days that he was not scheduled to teach at the start of the semester, forego his research for the days that the campus was closed, and forego his research for portions of the days that he must teach.

(f) For the concept of redoing his syllabi, DEMANDANT requests $500 per academic calendar issued subsequent to the original academic calendar at the start of the semester.

(g) For the concept of accommodating students, DEMANDANT requests $500 per semester in which students must be accommodated.

(h) For each day in which he must teach beyond what was specified in the Academic Calendar, demandant is entitled to 1/60 of his salary;

(i)  For each 8-hour day lost in which he might do research, demandant is entitled to the hourly wage that he would pay someone with his education and training to conduct research for him;

(j)  For each day he is rescheduled to teach on which he might have done research, demandant is entlled to four hours at the wage specified above.

B. FOR THE INSTANCES, SPECIFIED ABOVE AND BELOW,

(1) in which the alienee co-conspirators enfeoffed students to hinder demandant in his recovery, demandant is entitled to DOUBLE the quantities so specified;

(2) in which the alienees and/or those whom they enfeoffed employed violence in order to secure their unlawful possession or to maintain themselves in it, demandant is entitled to TREBLE the quantities so specified.

(3) alternately, under R.I.C.O., as threat of violence is a modality of extortion, plaintiff is entltled to TREBLE the quantities specified above.

C. DAMAGES CLAIMED AS A STUDENT UNDER UPR JS 130 (1999-2000) FOR FOUR WEEK SHUT DOWN IN APRIL 2005

1. Plaintiff was a student at the UPR School of Law from 2004 to 2009.

2. Under UPR General Regulation Art. 32, PLAINTIFF had a contractual right to expect to attend classes each semester as laid out in the academic calendar without them being interrupted by the actions of other students.  UPR General Regulation §32; *UPR v. Laborde*, TSPR CT-2010-008, pág. 69-70.

3. As explained in Arts. 7 & 8 of UPR JS Cert. 90 (2004-5), quiet title in this right is enforceable as an explicit contractual right against (a) the chancellor of the UPR-RP Campus, and, under *Lipsett v. UPR*, (b) the UPR President, and (c) the Board of Trustees and Board of Governors of the UPR.

3. In 2005, Plaintiff was prevented from attending his classes as a law school student for four weeks under color of vote to student strike and UPR Chancellor's granting of the petition to embargo the campus in April 2005:

4. The petition to close the campus was solicited pursuant to a student assembly during which time demandant, at the time BOTH a student in the UPR School of Law AND a professor in the College of Humanities, was mobbed, robbed of his camera, and had his pants torn, by alienees who afterwards raised the motion to sieze possession of the campus under color of student strike;

5. Three sorts of foreseeable actual damages arose from the alienation of the campus to the alienees and their enfeofment of student deforcers under color of the student strike doctrine:

6. First, Plaintiff had the worst semester of his law school career, as the semester was compressed in the UPR School of Law following the resumption of classes, receiving a B, a C, and a C in ten credits of law school classes he was taking that semester.

7. Plaintiff estimates his damages to his academic record at $40K [FORTY-THOUSAND DOLLARS].

8. As injury to demandant's academic record arose owing to the use of violence to secure the authorization to close the campus, plaintiff is entitled to treble damages from the UPR and the Alienees;

9. Alternately, as injury to the academic record of plaintiff arose by reason of the University administration's *Lipsett* liability for condoning under color of right Hobbs Act & State law extortion in implementing UPR-RP AS Cert. 49 (2003-4) rather than zealously enforcing UPR Reg. Gen. Art. 32, plaintiff is entitled to treble damages from all co-conspirators owing to their participation in the Racketeering enterprise.

10. Alternately, as injury to the Academic Record of plaintiff naturally flows from the Hobbs Act & State law extortion scheme engaged in by the associated-in-fact enterprise structured in UPR-RP AS Cert. 49 (2003-4), the lack of integrity not noted by MSCHE in its review in 2005, despite the Certification's contradiction of §32.4 and §35.2.5 of the UPR General Regulations, plaintiff is entitled to treble damages from all co-conspirators owing to their participation in the Racketeering enterprise.

10. Alternately, as MSCHE failed to note the lack of integrity and inadequate education in its assessment of the UPR in 2005, despite UPR-RP AS Certification 40 (2003-4)'s obvious contradiction of Article 32 of the UPR General Regulations, and its proposal to indoctrinate students in a doctrine that was a per se violation of the Sherman Act, plaintiff is entitled to simple damages on the grounds of false warranty of integrity and fraudulent certification of adequate education;

11. Alternately, as injury to the plaintiff's academic record was a Foreseeable consequence of allowing third party to breach UPR JS Cert. 130, appendix 2, p. 3 and UPR-RP's willful breach of contractual duty owed plaintiff as student under Arts. 7 & 8 of UPR JS Cert. 90 (2004-5), to zealously enforce UPR Gen. Reg. Art. 32; UPR Student Regulation §2, and *Lipsett*, plaintiff is entitled to simple damages to paid by the UPR.

12. Second, Plaintiff had scheduled his wedding for Memorial Day weekend, 25 May 2005.  Two days after his wedding, owing to the closure of the campus, he had to take his torts examination. An examination in Family law was to follow.

13. Because the College of Humanities extended the semester rather than compressing it and his bride's sons' custody schedule had been prescheduled by the court in preparation of vacation following Memorial Day, plaintiff could not go on his honeymoon for over a year and a half.

14. Plaintiff claims the sum of $40K [FORTY THOUSAND DOLLARS] in emotional damages for being unlawfully restricted in his liberty from going on his honeymoon;

15. Plaintiff claims the sum of $20K [TWENTY THOUSAND DOLLARS] in emotional damages for being compelled to take his final exams immediately following his wedding.

16. As injury to demandant arose from the alienees' use of force to secure the transfer of possession, demandant is entitled to treble damages owing to trespass *vi et armis*;

17. As emotional injury to the plaintiff arose by reason of the University administration's *Lipsett* liability for condoning under color of right Hobbs Act & State law extortion in implementing UPR-RP AS Cert. 49 (2003-4) rather than zealously enforcing UPR Reg. Gen. Art. 32, the lack of integrity not noted by MSCHE in its review in 2005, despite the Certification's contradiction of Article 32 of the UPR General Regulations, plaintiff is entitled to treble damages from all co-conspirators owing to their participation in the Racketeering enterprise.

18. Alternately, as emotional injury to the plaintiff naturally flows from the Hobbs Act & State law extortion scheme engaged in by the associated-in-fact enterprise structured in UPR-RP AS Cert. 49 (2003-4), the lack of integrity not noted and willfully ignored by MSCHE, plaintiff is entitled to treble damages from all co-conspirators owing to their participation in the Racketeering enterprise.

19. Alternately, as emotional injury to plaintiff arises from the false warranty of the UPR-RP compliance with Standard 6: Integrity, despite the Certification's contradiction of Article 32 of the UPR General Regulations, and "Adequate Education" despite the plan to indoctrinate students in a per se violation of the Sherman Act that was guaranteed to harm other students,  Plaintiff is entitled to collect simple damages from MSCHE on the grounds that the damages arose owing to MSCHE's fraudulent warranty in 2005.

20. Alternately, as emotional injury to the plaintiff was a Foreseeable consequence of allowing third party to breach UPR JS Cert. 130, appendix 2, p. 3 and UPR-RP's willful breach of contractual duty owed plaintiff as student under Arts. 7 & 8 of UPR JS Cert. 90 (2004-5), to zealously enforce UPR Gen. Reg. Art. 32; UPR Student Regulation §2, and *Lipsett*, plaintiff is entitled to simple damages to paid by the UPR as specified above.

D. PLAINTIFF's DAMAGES AS PROFESSOR OWING TO CLOSURE OF CAMPUS IN 2005

1. As a consequence of the closure for four weeks under color of the Student Strike doctrine, the accrediting body MSCHE required the UPR to make up classes.

2. Plaintiff was compelled to teach four weeks beyond the term: in the sum of damages for compensation owing to past due wages owing to the change order, plaintiff claims the sum of $8007 (EIGHT-THOUSAND-SEVEN DOLLARS);

3. In the concept of changing his syllabus and making specific plans for students to complete the course, plaintiff claims the sum of $2K (TWO THOUSAND DOLLARS).

4. As these two injuries arose from the transfer of possession subsequent to alienees' use of force and violence to secure the alienation of the possession of the campus commons, demandant is entitled to treble damages for this cause

5. As these two injuries arise by reason of or, alternately, flow from the conspirators' racketeering activities, as above, plaintiff is entitled to treble damages on this cause;

6. Alternately, plaintiff is entitled to collect simple damages on this score from MSCHE, inasmuch as any delay in completing his academic program and a change order is a foreseeable consequence of MSCHE's failure to signal, out of respect for an unconstitutional state custom,

that UPR-RP AS Cert. 49 (2003-4) instituted a program of per se inadequate education that perennially would endanger the timely completion of the term.

7. Alternately, plaintiff is entitled to simple damages, chargeable against the UPR, under 42 U.S.C. §1983 owing to its unconstitutional impairment of the obligations of contract by way of allowing, under color of state custom, UPR-RP AS 49 (2003-4) to overrule UPR JS 90 (1999-2000), or, alternately, for breach of contract and compensation in the form of *quantum meruit* as Article 1473 of the Puerto Rico Civil Code (1930) provides.

E.      DAMAGES ARISING FROM INABILITY TO SECURE TRANSCRIPT AS ALUMNUS IN THE ORDINARY COURSE OF BUSINESS IN MAY 2010

1. As an alumnus of the UPR School of Law, plaintiff enjoys an implicit contractual right to petition the UPR-RP Registrar in the ordinary course of business that an official transcript of grades from his law school be sent to a State Bar of his choice and that, subsequent to that petition, that said transcript be sent in a timely manner so that he may qualify to take that bar examination.

2. As implied by Arts. 7 & 8 of UPR JS Cert. 90 (2004-5), quiet title in these rights is enforceable as a breach of contractual expectation in enforcement of Article 32 of the UPR General Regulations.

3. During this time he was seeing a psychologist, at a cost of $200 per session.  Half the time in these sessions was dedicated to this problem.  Plaintiff thus claims $600 in form of special damages owing to medical costs.

4. The breakdown in the basic administrative functionality of the UPR-RP by reason of the unimpeded student racketeering made the plaintiff feel at once angry and helpless.

5. On the grounds of mental anguish, plaintiff seeks $2000 [TWO THOUSAND DOLLARS] in damages.

6. As such injuries arose naturally flowed from the fact that alienees enfeoffed student clients to deforce Demandant and others from the campus commons, employing force to sustain themselves in their possession, demandant is entitled to treble damages for this cause;

7. Alternately, as these injuries arose by reason of the fact that the chancellor's honoring of the student strike doctrine, and/or flowed naturally from the operations of the associated-in-fact enterprise to close down the campus as a means of leverage, MSCHE willfully silent as to the

lack of compliance with Standard 6: Integrity and falsely certifying compliance in 2005 and 2010, that the instructional program in UPR AS Cert. 49 (2003-4) constituted adequate education, plaintiff is entitled to three times the amount above under 18 U.S.C. §1964(d);

8. Alternately, as MSCHE was willfully silent as to the lack of compliance with Standard 6: Integrity and falsely certified the UPR-RP's compliance in 2005 and 2010, that the instructional program in UPR AS Cert. 49 (2003-4) constituted adequate education, plaintiff is entitled to collect simple damages from MSCHE;

9. Alternately, as the UPR allowed the UPR-RP Academic Senate to renew by way of a 2006 certification the Institutional Policy of Nonconfrontation, impairing the plaintiff's obligations of contract, plaintiff is entitled under 42 U.S.C. §1983 to collect from the UPR and its tenants and MSCHE simple damages, costs and a fee for denying him his civil rights; or, alternately, he is entitled to compensation for these injuries under state law as moral damages that foreseeably arose from the UPR's malicious breach of contractual expectation.

F. BATTERY UPON REMOVAL OF PUBLIC NUISANCE IN DECEMBER 2010

1. During the daylight hours on 7 December 2010, plaintiff witnessed students inside the campus, some wearing masks, riding bicycles behind makeshift barricades. Amended Complaint, Exhibits 9a, 9c, 9d. One young woman had painted diamonds on her face to disguise her identity; sticking out of her backpack was a three-quarter-inch metal pipe, one end taped with four inches of electrical tape.

2. Plaintiff witnessed other persons, masked and disguised, carrying pipes.

3. A destroyed security van stood as a monument to the violence of the night before.  Amended Complaint, Exhibit 9b. A woman, her face painted in a diamond pattern, carrying a pipe in her backpack admitted against interest that the van had been destroyed because the security guards had resisted their takeover of the campus.

4. On the afternoon of 8 December 2011, Plaintiff, recognizing that an unattended barrier in front of the Pedreira Building was a public nuisance, began to disassemble the plywood and garbage cans that it was made of and move it out of the road.  Amended Complaint, Exhibit 9c. One of the students on a bicycle described that as provocation and, intentionally battering plaintiff, rode his

bicycle into the piece of plywood that plaintiff was holding.  Plaintiff was surrounded by persons armed with makeshift hand-weapons.  Security Officer Rosario informed plaintiff that campus security could not keep him safe.

5. The chancellor had not called the police, a breach of contract.

6. On the grounds of the battery and intimidation in his workplace in breach of the contractual terms of UPR JS Cert. 90 (2005-6), plaintiff claims the sum of $1000 (ONE THOUSAND DOLLARS).

7. As the injury from the battery arose by reason of the alienees enfeofing student clients who unlawfully used force and violence to deforce and maintain their possession of the campus commons, demandant is entitled to treble damages from alienees and MSCHE, who, noticed of the faculty support for the student strike doctrine, caused the violent deforcers to be maintained with federal funds.

8. As the the battery and intimidation occurred by reason of the associated-in-fact enterprise's conspiracy to enforce Hobbs Act and state law extortion under color of the student strike doctrine, plaintiff is entitled to treble damages;

9. Alternately, as the injury from the battery and intimidation naturally flowed from (a) the UPR-RP interim chancellor's honoring the student-strike doctrine and Academic Senate certifications 66-81 (2009-10) and later certifications of a similar color, rather than the obligation as defined in UPR JS Cert. 90 (2004-5) and (b) MSCHE's dangerously feloniously fraudulent certification that, despite teaching the Student-strike doctrine, which allows students to interfere with others' rights so as to extort monies, the UPR-RP met its Standard 6: Integrity, and was providing adequate education, plaintiff is entitled to treble damages for his injury;

10. Alternately, demandant is entltled to double damages against alienees owing to the student-feofees forcible maintainance of their possession;

11. Alternately, demandant is entltled to double damages from alienees owing to the refusal of alienees to authorize cameras to identify those forcibly deforcing demandant and others from ingress into the campus commons.

12. Alternately, plaintiff is entitled to simple damages chargeable against the UPR owing to the

UPR's breach of contract in failing to call in the police to bring order to the campus.

H.    ASSAULT AND BATTERY, DEFAMATION PER SE, DEFAMATION PER QUOD AND FALSE LIGHT DEFAMATION BY REASON OF PLAINTIFF'S INTERCESSION ON BEHALF OF A FEMALE STUDENT WHO WAS SHUT OUT OF THE CAMPUS BY TWO MALE ASSAILANTS WHO SHUT THE GATE ON HER LEG AS SHE WAS TRYING TO ENTER, THE CAMPUS DECLARED OPEN ON 23 FEBRUARY 2011

1.    CIRCUMSTANCES OF THE BATTERY

1. The Supreme Court of Puerto Rico handed down its decision in *UPR v. Laborde* in December 2010, on the grounds that student strikes qualified as public nuisances under local law.

2. In February 2011, spokesmen for student racketeers announced that they would pay the $800 matriculation fee due that semester so as to guarantee their right to be on campus with the understanding that they would engage in the same tactics that they had employed throughout 2010 under color of the student strike doctrine to secure the return of these moneys.

3. Aware of this scheme and intending to prevent it, plaintiff warned his students by way of his syllabus and orally that entering such a strategy when entering his class was entering into the contract that was the syllabus in bad faith and might relieve plaintiff of the contractual duty to grade their work.

4. On 21 February 2011, plaintiff walking to his car in the UPR School of Law parking lot, saw students debating whether or not they ought celebrate a vote to shut down the campus under color of "student strike" the following day.  Plaintiff warned them against it, pointing out that it was illegal, and that, as the UPR was on probation with Middle States and that, By way of Law 3 of 4 February 2011, the Legislature added Art. 246-A to the Puerto Rico Penal Code, which penalized as a misdemeanor interfering with access to educational and health facilities and other like government buildings, the police would likely come.

5. On Tuesday, 22 February 2011, plaintiff learned by way of the radio that students had nonetheless authorized a 48 closure of the UPR, under color of industrial action.  As the vote was celebrated and tallied, plaintiff learned that the UPR Administration had failed to implement simple measures, like assigning an attorney to the meeting to maintain it within its lawful jurisdiction as identified in *UPR v. Laborde*, handed down just two months before.

6. Plaintiff also heard on the radio that Interim President Miguel Muñoz and Interim Chancellor, Ana Guadalupe, Ph.D., declared that the UPR and the UPR-RP were going to be open for classes the following day.

7. By way of this announcement, Plaintiff learned that he had a duty to teach an 8:30 A.M. class on Wednesday, 23 February 2011, in his assigned classroom in the Luis Palos Matos Building, regardless of what the student racketeers were planning the following day.

8. In Spring semester 2011, by way of UPR-RP Dean of Academic Affairs Circular 09 (2010-11) issued by Dra. Astrid Cubana, Dean of Academic Affairs, on 7 February 2011, published to plaintiff electronically by Professor Loretta Collins, Ph.D., director of the Department of English, on 9 February 2011, the U.P.R. administration required all professors to certify that they were holding classes in the assigned classroom and to list how many students attended each day. Professors who breached this duty were threatened with a docking of their pay.

9. The policy articulated in UPR-RP DAA Circular 09 (2010-11) renewed a policy instituted in the semester before by way of UPR-RP DAA Circular 06 (2010-11), dated 13 December 2010, sent by Dra. Sonia Balet, Dean of Academic Affairs, and published electronically in missives sent by Professor Collins to the department on 14 December 2010, 15 December 2010, and 22 January 2011.[93]

10. UPR-RP DAA Circular 9 (2010-2011) based the policy on MSCHE's insistence that failure of UPR-RP professors to teach in their assigned classrooms would constitute a failure of the UPR-RP to comply with Standards 4 and 11.

11. By way of these announcements, the UPR had a corresponding contractual duty, under Arts. 7 & 8 of UPR-JS-Cert. 90 (2004-5) and U.P.R. Gen. Reg. §§35.2.5, 35.2.6, 35.2.17, 35.2.18 and 35.2.19 to zealously protect the location of the course offering on the campus itself and, by extension, the normal pace of the performance of the executory contract that constitutes the syllabus of each course, even to the extent of calling in the police to enforce the newly minted Law 3 of 4 February 2011.

12. By way of the *Vocero*, Chancellor Ana Guadalupe announced that the UPR would take measures to keep the UPR-RP open the following day.  "Ilegal la Asamblea Estudiantil," *Vocero* (22 February 2011). http://www.vocero.com/noticias-es/ilegal -la-asamble-estudianil,

13. Plaintiff completed his contractual duty; defendant UPR breached:

14. At roughly 8:30 A.M., plaintiff arrived at the pedestrian gate of the UPR-PR on Ponce de León Avenue.

15. The pedestrian gate was UNLOCKED and UNCHAINED when plaintiff arrived at the campus. Plaintiff saw two men, roughly twenty years of age, closing the iron gate forcefully on the leg of a female student who was attempting to enter the campus to take her classes.

16. Neither security nor the police were present.

17. After forcibly removing her from the open gate, the woman's assailants then chained the gate shut.

18. Seeing a female student being bullied in front of him by two men who were preventing her from attending her classes, knowing the duty of the UPR under Puerto Rico Civil Code Art. 1057 and the doctrine in *Elba A.B.M. v. UPR*, and knowing his own liability under a bullying tort under Puerto Rico Civil Code Article 1802 (1930) and perhaps Article 1803 and 42 U.S.C. §1983, for allowing this female student to be deprived of her civil rights, plaintiff intervened.

19. By threatening to remove the chain that was creating the public nuisance and by threatening judicial action, plaintiff managed to persuade the woman's two assailants to open the pedestrian gate.

20. Plaintiff then removed the mantrap of logs and branches, a public nuisance built with the intention to menace the footing of the police, should they enter in a rush.

21. Upon notifying one of the woman's assailants that the University was open and that the legislature had published a law making it a crime to shut down the UPR, One of the men countered with a defense of the higher ethic of the student strike doctrine: "Just because it's the law doesn't make it right."

22. Plaintiff answered that the legislature had defined the activity in which the men were engaged in as a crime and that he was prepared to execute an arrest.

23. Upon making this announcement, plaintiff was twice battered by the other of the woman's assailants, who twice thrust the entire force of his legs and hips into plaintiff's hip, endevouring to again unlawfully close the gate on students who were entering;

24. After duly warning the assailant, plaintiff executed a lawful arrest, grabbing his assailant around the torso.

25. Plaintiff's hold – over one shoulder and under the opposite arm -- was and is a permissible hold in wrestling and in a rugby maul and exactly that recommended by the American Red Cross to control an active victim.

26. Plaintiff practiced wrestling in required gym classes at Scarsdale Junior High School and Scarsdale High School from 1975 to 1982; he had played Men's Club rugby for fifteen years in Riverside, California, and White Plains, New York, and he had lifeguarded at the Scarsdale Municipal Pool and other places from 1979 through 1987.

27. Plaintiff was immediately pummeled by some six or seven co-conspirators who hit him in the back more than 20 times.

28. Plaintiff moved with the arrested assailant to the grass to attract the attention of security and to prevent injury should he be hit in the head and fall.

29. His assailant escaped his grasp.

30. Part of the encounter was filmed, televised, then posted online by SONGSBYMAX at www.youtube.com/watch?v=0fjnm24QIjc.

31. Following the physical injury, plaintiff went to security; the officers were playing dominoes. Amended Complaint, Exhibit 10e.

32. The officer who wrote his statement would not write what he declared: He claimed that plaintiff brought a hammer and chisel for teaching purposes; As plaintiff informed the security guard, plaintiff brought a hammer and chisel because, in the past, students had vandalized the locks with toothpicks and glue, and it seemed foolish to be trapped inside a classroom building or lose a day of class and risk certification but for an eight-dollar lock.

33. Plaintiff attempted to cross out and correct the statement, but the officer said that his marks invalidated it.  Plaintiff signed the blank statement form and left to seek medical attention.

34. Plaintiff had bruises across his back and shoulders from the blows and pain and lack of mobility in his hip from the initial two thrusts against him by his assailant.  Amended Complaint, Exhibit 10, 10a-10d.

34. Plaintiff suffered from some sciatica for a couple of weeks.  After lifting in the weight room on some five days or so after, plaintiff suffered back spasms that kept him immobilized in bed such that he could not even get up to eat.

35.  Police would not come to the UPR-RP campus, even hearing of the battery.   Plaintiff consequently went to the police precinct in Rio Piedras to offer his statement.

DAMAGES OWING TO BATTERY

1. On the grounds of the public battery at his place of work, which was filmed, plaintiff seeks $1000 per blow, or $20,000 [TWENTY-THOUSAND DOLLARS].

2. As demandant sustained these injuries as a result of the alienees having enfeoffed student-clients who used force and violence to seize and maintain possession of the campus commons, demandant is entitled to treble damages for his injuries.

3. As plaintiff sustained these injuries because, in the absence of police, he had a legal duty to protect students entering the campus from violent bullies, and, but for the willful refusal to implement the policies established in UPR JS Cert. 90 (2004-5) over the student-strike doctrine by the UPR President and UPR-RP Chancellor's, who were aware that the student-strike doctrine was unlawful and prejudicial to plaintiff's and students' civil right, but that MSCHE (a co-conspirator if not by then a member of the enterprise) had not declared its teaching to be inadequate education, plaintiff is entitled to treble damages under 18 U.S.C. 1964(d) for a violation of 18 U.S.C. §1962(c) and/or (d).

4. Alternately, demandant is entitled to double damages from alienees owing the alienees and/or those they enfeoffed employing force to maintain an unlawful right of entry.

5. Alternately, demandant is entitled to double damages from alienees for the collusive enfeofment of those whom they, by refusing to authorize video cameras, allowed to remain anonymous;

6. Alternately, demandant is entitled to treble damages from MSCHE owing to the maliciously

false and dangerous warranty issued in the mails and over the wires in 2005 and again in 2009 and again in 2011, finding that teaching undergraduates to engage in racketeering under color of industrial action is adequate education.

5. Alternately, plaintiff is entitled to simple damages from the UPR under 42 USC §1983, invoking the *Lipsett* doctrine, and/or damages owing to the UPR's breach of the contractual duties acknowledged in UPR JS 90 (2004-5), that can be collected from MSCHE, its co-conspirator in depriving Plaintiff of its rights.

I. DAMAGES OWING TO THE ASSOCIATED-IN-FACT ENTERPRISE'S USE OF DEFAMATION AS MEANS OF INTIMIDATION

1. Immediately subsequent to the incident, the associated-in-fact enterprise began to defame plaintiff as a means of excusing their unlawful conduct in execution of the Student Strike Doctrine AND to compel others to comply with it.

(a)  INSTANCES OF DEFAMATION PER SE

(1) Plaintiff was immediately defamed at the hands of the associated-in-fact enterprise and their co-conspirators.  Cf. video; & Statement of José del Valle.  "Huelga UPR: Minuto a Minuto," *El Nuevo              Día              (23              February              2-11)*

http://www.elnuevodia.com/noticias/locales/nota/presidentedelauprconsiderapedirlaentradadelap oliciaalrecintoderiopiedras-898239/

(2) On 24 February 2011, *UPR Dialogo* published that he grabbed a student around the neck. http://dialogoupr.com/regresa-policia-al-recinto/

(3) One female student enforcing the student-strike doctrine shouted from behind the pedestrian gate to the person videotaping the conflict that plaintiff had provoked the conflict.

(4) On 2 March 2011, Raquel Ovalle writing for *Justicia Global* alleged that "a northamerican professor, James Peter Conlan, assaulted a student, which provoked the reaction of the others to attack said professor." [Plaintiff's translation].[94]

(5) Juan Berrios Concepción, seeing the videotape of the plaintiff executing the arrest, identified himself as a martial arts master and, falsely claiming that plaintiff had decades of martial arts training, also falsely claimed that plaintiff had executed a potentially fatal judo hold called **kataha**

**jime** that plaintiff intended to crush the carotid arteries of the assailant whom plaintiff had arrested.

(i) Subjecting the plaintiff to per se libel in defense of the student strike doctrine, Juan Berrios Concepción claimed falsely that plaintiff's arrest of his assailant "demonstrate[d] intolerance, mental and emotional exhaustion, a quest for confrontation, provocation, lack of respect for foreign law, presence of conflict, absence of dialogue, absence of institutional and governmental good will to resolve this conflict that intends to convert it into a conflict that will never end."[95]

(ii) Consummating the multiple acts of defamation per se with intent to provoke intentional emotional distress and to alienate him from his colleagues throughout the UPR, the librarian sent the letter accusing plaintiff of attempted murder to plaintiff, to UPR Interim President Dr. Miguel Muñoz and to co-conspirators in the associated-in-fact enterprise represented by Prfo. Segundo Díaz (APPDCUC), Prof. María Gisela Rosado Almedina (APPU); and Prof. Luis P. Sánchez-Longo y Prof. Raúl Guadalupe (CONAPU)

(6) Reaching a still larger audience was an anonymous article posted online at http://james-conlan-student-assault.tumblr.com/post/3509587398/james-peter-conlan-bullies-and-physically-assaults.  The article was replete with defamatory statements that qualify as defamation per se:

(i) It accused plaintiff of enforcing "white entitlement," "bullying," and "physical assault" for executing the arrest.

It called plaintiff a "thug."

(ii) It promised that, "*for the rest of his life and academic career, students all over the world will know what a* **violent bully James Peter Conlan** is,"

(iii) It falsely described plaintiff as not "truly an educator."

(iv) The article claimed falsely

"This man disdains democracy, popular education and the people of Puerto Rico. He is a pig."

(v) Falsely describing the plaintiff as the aggressor and in defense of the Student-Strike Doctrine, the article falsely characterized the students as "peaceful" and "striking for access to the university."

(vi) The statement,

"Students may also learn what kind of car **James Peter Conlan** drives and his license plate number. They may share what he does *late at night* (that might not look so good in committee reports). They may share what they know of his trips abroad and *what he does on them.* Since people are paying attention, maybe he'll learn what the rule of law is all about."

was intended to cause plaintiff emotion distress and aimed to intimidate plaintiff by encouraging persons to stalk him in his free time off-campus and make reports of where he went to his employer.

(vii) Such defamation was also intended to intimidate others like plaintiff who might intervene on behalf of the law.

(viii) Plaintiff was sent this article in an email originating in the account gardenia073@yahoo.com dated 3 March 2011 that hoped that he was feeling the pressure and calling him a "Big Piece of Republican shit."

(ix) The anonymous harassment in furtherance of the student-strike doctrine was framed to cause plaintiff emotional distress so that he would leave his position.

(x) Another email dated 5 March 2011 from the same account read,

"LOOKING REALLY BAD IN THE MEDIA AND INTERNET...YOU WILL BE PACKING YOUR BAGS PRETTY SOON"

(b) FALSE LIGHT DEFAMATION

1. Plaintiff continues to be defamed by those conspiring with or sympathetic to the associated-in-fact enterprise and members of the enterprise itself:

2. Plaintiff's best defense against this sort of defamation remains the video.

3. The video, however, lacked the beginning of the conflict – where the students were closing the gate on a girl trying to enter the campus – and, by way of the angle, failed to show the extent of the force that the assailant was using to drive him off the gate.

4. The video thus casts plaintiff in a false light.

5. The false light in which the plaintiff was cast spread throughout the academic and legal community:

6. Plaintiff received commentary in email from professors and students in California, New Jersey, and New York.

7. Plaintiff received commentary personally from well-placed members of the legal community in New York concerning the video.

8. Persons in his field as recently as 21 March 2016 made reference to the video, having just seen it.

9. What the video does make clear is that at issue is an incompatible conflict between the student strike doctrine, which the UPR employee at the end of the video supports, and the education in the law and the rights of students to enter the campus without being bullied, which plaintiff interposed his body to support.

J. SPECIAL DAMAGES ARISING FROM FALSE LIGHT INVASION OF PRIVACY OWING TO THE POSTING OF THE VIDEO OF THE ASSAULT

1. From December 2010 through February 2011, plaintiff and his now-ex-wife were attempting to reconcile after their separation begun in February 2010.

2. Plaintiff's ex had stopped paying the mortgage in December 2010.  She had moved out of the house to an apartment in January 2011.

3. The video was televised and posted to her while plaintiff was at the police station filling out a report.  Scandal-shy, she withdrew her intention to reconcile, a withdrawal which also brought with it a break-down in communications concerning the house. She filed for divorce for irreconcilable differences in December 2011.  The cause of divorce did not allow issues of property to be resolved. Plaintiff learned in 2012 from a process server that she had left the jurisdiction for Texas in fall, 2011, the house not being sold.

4. Only a 30% owner of the house, plaintiff could neither sell nor rent the house by himself.  He is nonetheless a consolidated debtor on the notes.  The first mortgage for $360,000 was executed and satisfied by the judicial auction of the house; the second mortgage for $90,000 (NINETY-

THOUSAND DOLLARS) has yet to be satisfied.  Banco Popular is presently suing to collect the outstanding debt in the Court of First Instance, San Juan.  *Banco Popular de Puerto Rico v. Viola Teresa Núñez Ríos & James Peter Conlan Broderick* KCD 2015-0786 (503) (CFI, San Juan) As plaintiff's ex has all of the paperwork and has been served only by edict, plaintiff cannot answer the complaint or pretend to satisfy the judgment.

5. In terms of Special Damages arising from the False Light invasion of privacy, plaintiff on this cause is entitled to the sum of $90,000 and interest plus 10% in legal fees and costs, or $99,200 (NINETY-NINE-THOUSAND-TWO-HUNDRED DOLLARS and interest.

6. As the special damages are pursuant to the alienees' use of unlawful force to sieze possession of the UPR-RP campus commons and the alienor's tolerance of this public nuisance, demandant is entitled to treble damages.

7. Alternately, as the damages sustained by plaintiff owing to this false light invasion of privacy is by reason of and flows naturally from the predicate acts of racketeering aiming to intimidate plaintiff, plaintiff is entitled to three times this sum in terms of special damages under this honorable district court's jurisdiction under 18 U.S.C. §1964(d) to punish violations of 18 U.S.C. §1962(c)

8. Alternately, as the damages sustained by plaintiff owing to this false light invasion of privacy flow naturally from the UPR and UPR-RP's administration's *Lipsett* liability as a co-conspirator in condoning the act of racketeering by failing to call the police as UPR JS Cert. 90 (2004-5) requires, plaintiff is entitled to treble damages under this honorable district court's jurisdiction under 18 U.S.C. §1964(d) to punish violations of 18 U.S.C. §1962(d)

9. Alternately, as ""Clear proof of [MSCHE's] actual participation in, or actual authorization of . . . [the unlawful acts of 23 February 2011], or of ratification of such acts [and the acts of defamation] after actual knowledge thereof" 28 U.S.C. §106, includes

> (i) the requirement that professors teach on campus in their classrooms in order for the UPR-RP to comply with MSCHE Standards 4 and 11, the underpinnings of the policy articulated in UPR-RP DAA Circular 09 (2010-2011).

(ii) the SAS published on 18 November 2011, where, doubling-down on its prior determinations which held that the Student-Strike Doctrine was adequate education, MSCHE sided once again in 17 November 2011, with the associated-in-fact enterprise on the side of racketeering, and published the SAS on 18 November 2011, fraudulently declaring that the UPR-RP was in compliance with **Standard 6, Integrity**, knowing the consequence of that finding of fact would be to aid-and-abet the defamation of plaintiff and others of his class who, intervening on behalf of students to keep them from being deprived of their rights, were being defamed as provocateurs, violent criminals, and inadequate educators as a means of intimidating him and others into complying with the unlawful doctrine taught at and by the UPR-RP, to the prejudice of their reputations and their rights of property and compensation, AND

(iii) the fact that read through the SAS published online by MSCHE, the later certifications UPR RP AS Cert. 49 (2003-4), UPR-RP AS Cert. 42 (2004-5); UPR-RP AS Cert. 10 (2005-6), UPR-RP AS Cert. 16, (2006-7), and, most recently, UPR-AS Cert. 89 (2014-2015), ALL PUBLISHED ONLINE, CONSTITUTE INDEPENDENT ACTS OF WIRE FRAUD that, sustained by, by reason of and naturally flowing from MSCHE's fraudulent characterization of the UPR-RP's instruction of undergraduates in the Student Strike doctrine as adequate education as that term is understood throughout the United States, each new certification constitutes a new injury to the Plaintiff's reputation in that it serves to reinfornce the defamation per se leveled at the the Plaintiff that characterized him as an inadequate educator and an aggressor in insisting against the local custom and usage, that entering students' rights be protected.

As a consequence, Plaintiff is entitled to treble damages from MSCHE owing to their initiation of and ratification of support for these defamatory acts in the SAS published on 18 November 2011;

10. Alternately, plaintiff is entitled to simple damages under 42 U.S.C. §1983 owing to foreseeable damages arising under the UPR's and the UPR-RP's impairment of contracts clause, or, alternately, arising under the UPR's breach of contract for failing to call the police, knowing on

22 February 2011 that the associated-in-fact enterprise had conspired to commit exactly this felony on the morning of the next day.

K. PRESUMED DAMAGES FOR DEFAMATION PER SE AND FALSE LIGHT DEFAMATION

1. Plaintiff spent 7 years working full time to acquire an M.A. and Ph.D. in his field of work, and he also earned a law degree, typically a 3-year degree.

2. A fair market value of each-degree-year on the market is $50,000 (FIFTY-THOUSAND DOLLARS).

3. Plaintiff shall have this video posted for the rest of his life as defense against the defamatory statements that the associated-in-fact racketeering enterprise has threatened to post for the rest of his life.

4. Those seeking to learn about him or thinking about publishing a scholarly book will look past his qualifications toward the defamation and the video of that day.

5. It can be presumed that plaintiff has suffered injury to his professional reputation owing to defamation per se and false light defamation amounting to $500,000.

6. As these damages arise from the unlawful use of force to secure unlawful entry and possession of the campus commons, demandant is entitled to treble damages owing to trespass *vi et armis*;

7. Alternately, as the presumed damages sustained by plaintiff owing to this false light invasion of privacy is by reason of and flows naturally from the predicate acts of racketeering aiming to intimidate plaintiff, acts that could not have been accomplished without MSCHE's active participation, plaintiff is entitled to three times this sum in terms of special damages under this honorable district court's jurisdiction under 18 U.S.C. §1964(d) to punish violations of 18 U.S.C. §1962(c)

8. Alternately, as the presumed damages sustained by plaintiff owing to this false light invasion of privacy flow naturally from the UPR and UPR-RP's administration's *Lipsett* liability as a co-conspirator in condoning the act of racketeering by failing to call the police as UPR JS Cert. 90 (2004-5) requires, plaintiff is entitled to treble damages under this honorable district court's jurisdiction under 18 U.S.C. §1964(d) to punish violations of 18 U.S.C. §1962(d)

9. Alternately, plaintiff is entitled to simple damages under 42 U.S.C. §1983 owing to foreseeable damages arising under the UPR's and the UPR-RP's impairment of contracts clause, or, alternately, arising under the UPR's breach of contract.

L. ACTUAL DAMAGES OWING TO DEFAMATION PER QUOD AND INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

1. The effect of defamation per quod is to damage a victim's reputation so as to encourage others to disassociate with the victims and thereby subject victims to feelings of isolation.

2. Plaintiff felt intense feelings of isolation on account of defamation conducted by associated-in-fact enterprise, especially in his place of work.

3. Several of the officers of APPU were members of the Department of English.  Conflict began in January 2010 when members of APPU in his department using the Department listserv began pushing the agenda of the associated-in-fact enterprise in lieu of the interests of their members, and plaintiff, not a member of APPU, informed them of the illegality of their acts.

3. Plaintiff's isolation deepened when his attempts at reconciliation with his ex-wife collapsed subsequent to this incident.

4. To counter these feelings of isolation, plaintiff sought communities outside the small apartment he rented and the UPR.  He consoled himself with rituals: he ate breakfast at the same restaurant and worked on his computer there throughout the day.  He lifted heavy in the gym.  He played rugby two nights a week. And to an extent, he self-medicated, going out to the same bar between four and five nights a week and drinking three or four glasses of wine.

5. During his marriage, he had never frequented bars at night.

6. Conservatively estimated, Plaintiff's bar bill amounted to 3 x $8 x 5 x 52 = $8320 per annum

7. Conservatively estimated, Plaintiff's additional dry cleaning costs amounted to $3.00 x 250 = $780 per annum

8. As defamation per quod and per se was employed by the racketeers and their conspirators as a means to damage plaintiff's international reputation, plaintiff is entitled to treble damages that flows naturally from this predicate act of racketeering.

9. As MSCHE facilitated said defamation in its fraudulent finding, published on the wires on 18 November 2011, that the education offered by the UPR-RP was "adequate," when, in point of fact, education in the student-strike doctrine was felonious and, thus, inadequate education per se, plaintiff is entitled to treble damages on this cause.

10. UPR-AS Cert. 89 (2014-2015), PUBLISHED ONLINE, CONSTITUTE AN INDEPENDENT ACT OF COMMITMENT OF THE CAMPUS TO THE STUDENT STRIKE DOCTRINE that, in the context of MSCHE's own certifications, makes the injury to the Plaintiff's reputation fresh.

K. ADDING INSULT TO INJURY: THE UPR ADMINISTRATION JOINED THE CONSPIRACY TO DEFAME THE PLAINTIFF:

1. Having failed to call the police and thwart the closure of the campus announced the day before, in breach of the duties owed plaintiff under UPR JS Cert. 90 (2004-5), Miguel Muñoz, Interim President, AFTER seeing the video, published to the press that plaintiff would be subject to a disciplinary action on the false grounds that he had grabbed a student around the neck;

2. Plaintiff's department filed charges that plaintiff was not allowed to read under fear that plaintiff would sue for defamation.

3. The charges that Plaintiff did read from the personnel committee, plaintiff answered in writing with legal foundation for his actions;

4. Rather than conducting research in his field, Plaintiff worked some 80 hours on researching the law in an attempt to answer a personnel action brought either in enforcement of the Student Strike Doctrine or flowing from acts of defamation aimed to extort his compliance with it.

5. Rick Swope, Ph.D., failed to have the writing examined by a licensed attorney before submitting charges up the ladder, despite plaintiff's counsel to do so both in the original submission and on request for reconsideration.

6. The UPR Chancellor Ana Guadalupe, Ph.D., who had failed to call the police on 23 February 2011, knowing plaintiff was required to teach his classes in his classroom that day under penalty of being docked pay, initiated an investigation of the Plaintiff;

7. Chancellor Ana Guadalupe did not contact plaintiff in relation to disciplinary until AFTER MSCHE reaccredited the UPR-RP, fraudulently finding it in compliance with Standard 6, Integrity.

8. Plaintiff had to hire an attorney to defend himself against the charges: He paid a fee of $2000 for representation before the OE.

DAMAGES IN TERMS OF LABOR IN HIS OWN DEFENSE

1. In 2005, at the end of his first year of Law School, plaintiff had been offered a part time job as a law clerk for $20/hour at the end of an internship with a bankruptcy/immigration firm.

2. By 2011, plaintiff had clerked as an intern with the Bankruptcy Court, graduated from the UPR School of Law, published two articles in two different law reviews, and had passed the New York Bar Exam and the Professional Responsibility examination.  The only hoop pending the award of his license to practice law in New York State and sit for the bar examination in the U.S. District Court of Puerto Rico was his Character and Fitness interview.

3. In terms of quantum meruit, plaintiff's 80 hours of legal work to explain the duty he as a faculty member owed to the UPR in intervening on behalf of the student who was bullied and to prevent foreseeable harm arising to others from the felonious actions of his assailant with the duty of a good parent to his family is reasonably valued at $50 per hour, or $4000 (FOUR THOUSAND DOLLARS).

4. The 80 hours cut into his research time; in terms of opportunity cost, plaintiff is entitled to 80 hours of what it would have cost him to hire a research assistant with a Ph.D. and a J.D., his own training at the time, or $20-per-hour x 80 = $1600

5. Owing to his interview with the Official Examiner in December 2011, Plaintiff did not take a Christmas vacation and postponed his Character and Fitness examination for a year, until March 2013.  He sat for the examination for the U.S. District Court of Puerto Rico in the summer of 2013, and he was admitted to the bar in the District of Puerto Rico in December 2013.

6. Plaintiff was contacted again by the Official Examiner in October 2012, who notified him at that time that the investigation was still open.

7. As the damages sustained by plaintiff owing to causes of defamation per se, defamation per quod, and false light defamation, is by reason of and flows naturally from the predicate acts of racketeering aiming at intimidating plaintiff into complying with the demands of the associated-in-

fact enterprise or leaving his position at the UPR, plaintiff is entitled to three times this sum in terms of special damages.

8. As the damages sustained by plaintiff owing to this defamation per se arise by reason of and flow naturally from MSCHE's several acts of wire fraud and violations of the Travel Act to further racketeering by feloniously concealing and not revealing the inadequacy of education at the UPR-RP in teaching students to engage in racketeering under color of industrial action, and as MSCHE falsely warranted compliance of the UPR-RP with Standard 6: Integrity and false attested to the public concerning the adequacy of education at the UPR-RP on 18 November 2011, fully knowing that the Academic Senate had not repealed the Institutional Policy of Nonconfrontation whereby the associated-in-fact enterprise taught that students had a right if not a higher duty than the law to extort moneys for the UPR from the State or the Board of Trustees, plaintiff is entitled to collect treble damages from MSCHE for these predicate acts of racketeering whereby he was prejudiced in his reputation for completing his duty under the law;

9. Alternately, Plaintiff is entitled to collect simple damages owing to MSCHE's dangerously false warranty of adequate education;

10. Alternately, Plaintiff is entitled to collect damages from the UPR under 42 U.S.C. §1983, for impairment of the obligations of contract, *Lipsett* liability in condoning the student strike by failing to call the police, and/or foreseeable damages arising from its willful breach of contract and unjust persecution.

11. Alternately, he is entitled to the sum in simple damages from the UPR owing to the UPR's breach of contract that essentially set up plaintiff and students to be ambushed as he completed his contractual duty to teach his class, under penalty of being docked pay.

M.  REDUCTION OF COMPENSATION TO FUND RETIREMENT SYSTEM IN JUNE 2015 THAT UPR JS AND JG DETERMINED TO UNDERFUND IN JUNE 2010, WITH MSCHE'S COMMENDATION

1. In June 2010, the UPR JS decided to reduce the employer contribution to the Retirement System as a "Cost-reduction measure" rather than increasing revenue to pay its debts.

2. The UPR JS also allowed early retirements and did not dedicate a proportion of the savings to the operating budget to pay for the increasing obligations.

3. In April 2011, MSCHE commended the UPR's decision.

4. In Spring 2014, the UPR JG condoned closures of the UPR-RP campus under color of the student-strike doctrine, under the rumor, spread by a student member of the UPR JG itself, that the UPR JG was going to certify a different means of calculating tuition that included a needs-based financial aid plan.

5. Despite the rising deficit, a moratorium was allowed on the means of calculating tuition.

6. In fall, 2014, the UPR Retirement System Board declared that the retirement system was underfunded; they blamed the decreasing contributions of the UPR JG relative to the increased needs to pay out to retirees.

7. The UPR Retirement board, elected by the employee member organizations of the associated-in-fact enterprise, voted to recommend an increase in employee contributions of 1% rather than sue the UPR JG for wastage in failing to invest sufficient moneys in the fund.

8. In opposition, Plaintiff objected in open meeting in both the UPR College of Humanities and before the UPR Retirement System Board that, (a) 7. Curiously, though, the UPR Retirement System Board did not recommend suing to increase the JG's contribution.  Nor did they look favorably upon PLAINTIFF's suggestion in open meeting that, in keeping the tuition so low that the UPR could not pay its debts, the UPR JG was violating the public policy of the Commonwealth as laid out in Law 7-2013 and (b) by way of this measure, what was being instituted was a fine of the UPR faculty of a certain age to continue to work at the UPR.

9. APPU voted to approve the measure, to the prejudice of plaintiff's compensation.

10. Influenced by APPU, the UPR-RP Academic Senate voted to approve the measure, to the prejudice of plaintiff's compensation.

11. On 30 June 2015, the UPR JG passed a certification that reduced PLAINTIFF's compensation by 1%-per-year (ONE-PER-CENT-PER-YEAR) under color of an attempt to render solvent the UPR Retirement Fund.

12. Such a policy inverts the UPR's own recognition of responsibility in an earlier but identical case in UPR-JS Cert. 162 (1995-96), in which the UPR JS agreed to increase the institutional

support from 14% to 15% so as to correct underfunding and pay for additional benefits offered pensioners.[96]

13. As this reduction in compensation involves the same members of the associated-in-fact enterprise and furthers the purpose of the UPR and the associated-in-fact enterprise in taxing plaintiff and his class to run the UPR, plaintiff is entitled to receive from the racketeers and their co-conspirators in the JG and MSCHE **three times what is being deducted from his salary** (roughly $800-per-annum) for as long as the measure remains in place, and the retirement fund remains underfunded.

N.   OTHER DAMAGES ARISING FROM RACKEETEER-INFLUENCED IMPAIRMENTS OF CONTRACT TO COMPENSATION

1. In 2010-2011, the UPR Board of Trustees published that its proposed budget would finance the UPR by substantially reducing reimbursement for travel costs, substantially reducing the awards of course relief for research, minimizing the acquisition of equipment, only compensating persons for additional work *that was essential*, limiting the use of office materials (which came to include the cancellation of reimbursement for teaching materials), and declaring a moratorium on increases in pay for professors and promotions in rank for professors.[97]

2. The proposal recommended that there be instituted a minimum class size of THIRTY STUDENTS PER CLASS, a fifty-per-cent increase in labor for PLAINTIFF.[98]

3. The UPR JS proposed that with the approval of the 2010-2011 Budget, the applicable rules, understood at law as contractual obligations, for payment of additional compensations for courses taught, bonuses for administrative work, benefits and employer support for Christmas bonus, payment of unused accumulated sick pay, special bonuses, and employer support for the UPR Retirement System would be ADJUSTED DOWNWARD.

4. SPECIFICALLY, the budget announced that Compensations for teaching extra classes were adjusted downward by 5%, Pay for professors serving in administrative positions was adjusted downward by 5%, the Christmas bonus was halved from $1125 to $563, Special bonuses, payment of other types of remuneration, and payment in excess of 90 days accumulated sick leave were scheduled to be reduced to zero.[99]

5. The UPR implemented these "economies," impairing the obligations of contract for price certain, rather than taking out a commercial loan on which the UPR would have to pay interest;

6. His contract impaired, PLAINTIFF is entitled to

(a) an additional 33% in compensation for each class taught over the contractual expectation of 20 students per class in 2010-11; 2011-12; and 2012-13;

(b) the full Christmas bonus of which he was deprived -- an additional $562 [FIVE-HUNDRED-SIXTY TWO DOLLARS] per year;

(c) $400 [FOUR HUNDRED DOLLARS] per semester for materials

(d) travel funds amounting to $1700 [ONE-THOUSAND-SEVEN-HUNDRED DOLLARS] per year, minus what has been extended.

(e) Compensation for lack of course relief in 2010-11, 2011-12, and 2012-2013;

(f) ANNUAL Sick pay totaling $5601.15 [FIVE-THOUSAND-SIX HUNDRED ONE DOLLARS AND FIFTEEN CENTS] per year. Amended Complaint, Exhibit 11.

(g) ACCUMULATED SICK PAY totalling $22,404.60 [TWENTY-TWO THOUSAND-FOUR-HUNDRED-FOUR DOLLARS AND SIXTY CENTS] that was taken;

(g) interest on the above sums at the rate of AN UNSECURED PERSONAL LOAN;

(h) Attorney fees of $1000 to pursue the abovementioned rights as an intervenor in *UPR v. APPU* Civil Case no.: KPE 2012-3588 (Court of First Instance, San Juan);

7. As the UPR impaired the contract so as to serve the common purpose of a racketeering scheme involving the members of the JCS, the UPR, and MSCHE, MSCHE fraudulently certifying the UPR's compliance with Standard 3 and 6 and its adequacy of institutional resources on 17 and 18 November 2011 in furtherance of the unlawful scheme to maintain tuition below the lowest viable cost, plaintiff is entitled to THREE TIMES the quantities above.

**VII. CONLAN AS NEXT FRIEND TO THE UPR V. TENANTS CARLOS SEVERINO, PH.D, APPU, OPU, HEEND, STUPR, UBOS AND GUILLERMO GUASP, PRESIDENT OF THE GENERAL STUDENT COUNCIL, ORGANIZED INTO AN ASSOCIATED-IN-FACT ENTERPRISE; UROYOAN WALKER, PH.D, THE PRESIDENT OF THE UPR; THE MEMBERS OF THE UPR BOARD OF GOVERNORS, AND THE MID-ATLANTIC REGION COMMISSION ON HIGHER EDUCATION FOR TREBLE DAMAGES OWING TO WASTAGE TO LIBRARY COLLECTION AFFECTING ACADEMIC LIBERTY OF OCCUPANT OF FREEHOLD 079-010 ARISING FROM DIVERSION OF PRIVATE FUNDS RAISED FOR THE UPR LETTERPRESS TREASURES PROJECT, ACTIONABLE BOTH PURSUANT TO (A) R.I.C.O, 18 U.S.C. §1964(c), AND (B) A WRIT OF WASTE**

1. In 1999, the University of Puerto Rico, Rio Piedras Campus, was classified as a Research II Doctoral-Degree Granting Institution.  2nd Amended Complaint, Ex. 2, *Grad. Catalog* 2000-2003, p. 5.  Its published ambition was to become a Research I Doctoral-Degree Granting Institution.

2. In 2000, the College of Humanities offered seven masters of arts degrees: Comparative Literature, English, Hispanic Studies, History, Linguistics, Philosophy and Translation.  Of these, the M.A. English program, founded in the 1960s, was organized by historical field.

3. Among the oldest of these programs was the M.A. in English, established in 1960s, and organized by historical field, in the first two of which Plaintiff was qualified by training and publication to teach.

4.  In 2000, the College of Humanities offered three doctoral degrees: History, Hispanic Studies, and English. 2nd Amended Complaint, Ex. 2, *Graduate Catalog* 2000-2003, p. 77

5. The newest of these doctoral programs was the English Ph.D., , approved in 1999: it was so new that, at the time of going to press in February 2000, the *Graduate Catalog* listed no approved numbers for the literature courses. Amended Complaint, Ex. 2, pp. 87-89.

6. Though plaintiff occupied a much older freehold, it was anticipated that Plaintiff would contribute to the doctoral program:

(a) The Ph.D. boasted a specialization in Language and Literature of the English-speaking Caribbean. *Graduate Catalog* 2000-2003, Amended Complaint, Ex. 2, p 82.

(b) The *Graduate Catalog of 2000-2003* listed Plaintiff as a member of the Graduate English Department specializing in "Medieval and renaissance literature, textual criticism and early New World Travel narrative." *Graduate Catalog* 2000-2003, Amended Complaint, Ex. 2, p. 81.

(c) Plaintiff had written his dissertation *Marvelous Passages: English Nautical Piety in the Middle Ages and the Renaissance*" on the style of piety employed by the English to justify their earliest intrusions into the Spanish New World.

(d) Plaintiff had published in that field: cf. "*Paradise Lost*: Milton's Anti-Imperial Epic, *Pacific Coast Philology* 33.1 (1998): 31-43."*The Tempest* and the King's Better Knowledge," Ben Jonson Journal 6 (1999): 161-188; and on literature related to English piety following the destruction of

the Spanish Armada: "Shakespeare's *Edward III*: A Consolation for English Recusants"

*Comparative Drama* 35.2 (2001): 177-07.

(e) Plaintiff has since published in the field: "The Role of El Dorado in Washington Irving's

Histories of the Spanish Caribbean" *Propero's Isles* (Oxford: Macmillan, 2004), 89-102;  "[W]hoso

Hath Clothed the Naked with a Garment: The Homespun Origins of the English Reformation"

*Reformation* 9 (2004): 49-66; "Atlantic Ocean, Explorations Across" *Literature of Travel and*

*Exploration: An Encyclopedia,* ed. Jennifer Speake (London: Routledge, 2003).

7. As imagined in February 2000, part of the specific mission of the Rio Piedras Campus was

> 2. "to provide graduate education of the highest quality, the key elements of which are research and creative activity, and which can strengthen undergraduate education."
> 3. To provide an undergraduate education of excellence, one which offers students a unified vision of knowledge that brings general education and specialization into harmony and to foster in students a capacity for independent study and research.
> 4. To develop teaching and research skills, and to promote partcipation in the life of the community and service of the community, with respect for the historical and social conditions of Puerto Rico, taking into account its Caribbean and Latin American surroundings, yet reaching out into the international community; to enrich and strengthen the storehouse of knowledge associated with the consolidation of Puerto Rican nationality, its history, language and culture, while at the same time to foster the growth and dissemination of knowledge at an international level.
> 5. To develop innovative, relevant programs of research, community service, and continuing education that will support and contribute to the academic and professional life of the campus…. *Graduate Catalog* 2000-2003, Amended Complaint, Ex. 2, p. 4.

8. The most fundamental and necessary institutional resource that allows a professor to complete

the campus's mission "to provide graduate education of the highest quality," to "foster in students

a capacity for independent study and research," to."develop … research skills," and "To develop

innovative, relevant programs of research" is the library collection in that particular professor's

field.  See *Graduate Catalog* 2000-2003, "Academic Facilities: An Overview" "The Library

System," Amended Complaint, Ex. 2, p. 247.  Department of English, "Special Facilities: Lewis

Richardson Seminar Room, p. 81.  College of Humanities, Special Facilities: Center for Historical

Research; Lewis Richardson Seminar Room, 2nd Amended Complaint, Ex. 2, p. 77.

9. To perform these tasks and, in particular, to compete successfully for grants, the library

collection must be up-to-date.

10. Scholarly publications – and, in particular monographs – go out of print within a few years.

11. Consequently, underfunding the library in a particular year creates permanent holes in the collection.

12. The UPR Sistema de Bibliotecas, the UPR-RP library system and the National Library of Puerto Rico, has been desperately underfunded since at least 2000:

13.  Since 2001, the UPR Sistema de Bibliotecas (UPR-RP SB) has spent $4M per year on acquisitions.

14. This constitutes more than $4.8MM (FOUR-MILLION-EIGHT-HUNDRED-THOUSAND DOLLARS) LESS on acquisitions than the mean expenditure on acquisitions by American Research Library members. 2nd Amended Complaint, Ex. 5.

14. Underfunding hits the Humanities disproportionately: The UPR-RP SB spends roughly 70% of their funding on acquisitions in the fields of natural sciences.

15. This pattern of funding, rendering the collection largely obsolete in certain fields of the humanities, constitutes WASTAGE.

16. The UPR-RP confessed to MSCHE that underfunding library resources compromised its goals of supporting its teaching and expanding its graduate offerings both

(a) in "A Word of Welcome," written in February 2000,where  then-Dean of Graduate Studies Ethel Rios Orlandi wrote:

> "Rio Piedras now offers 38 programs at the masters and 11 at the doctoral level. Department by department, it is making a large effort to do more, and do it better.  That will mean **increasing educational resources** and also more graduate departments **over these next few years**". *Graduate Catalog* 2000-2003,,2nd Amended Complaint, Ex. 2, p. 1.

AND

(b) in 2006, when the UPR-RP published to MSCHE that "The Vision of the Río Piedras Campus" was as "A university community, with a marked doctoral character and endowed with first-rate resources, dedicated to research, creation and the dissemination of knowledge…" *Strategic Plan Vision University 2016*, p. 26, modeled on the type of University that that

> "maintains an infrastructure that promotes high intellectual productivity levels, invests a large percentatge of its budget in capital improvement, designate[s] space for intellectual concourse, reflect[s] their academic priorities in their capital improvement plans, and

implement[s] effective maintenance schedules in agreement with the use of their physical facilities." *Strategic Plan Vision University 2016*, p. 26.

And that, in order o "accelerate its transformation into a research institution of international prestige, devoted to the creation of new knowledge through research and scholarship," *Strategic Plan Vision University 2016*, p. 17, the UPR-RP was going to have to "strengthen its working environments, buttress its equipment infrastructures and research spaces, and emphasize on its research activities and creative work when assigning teaching loads." *Strategic Plan Vision University 2016*, p.19, and, in particular, **"increase the library resources needed for teaching," §**§1.7.4,§ **2.7.1, §7.2. 1,** *Project University 2011: Operational Component of the Strategic Plan for the Rio Piedras Campus from 2006-2011*, **p. 17. §1.7.4.3, at** http://opep.uprrp.edu/referencia/autoestudio/PLAN_ProjectUniversity2011.pdf **by increasing the funding for acquisitions for the library by 8%-10% per year, seeking out private donors, and securing external grants.** *Project University 2011,* **p. 17. §1.7.4.1-3.**

17. WHEREAS

(a) Puerto Rico is an island located in the Caribbean

(b) The failure to maintain the library in a particular field imposes de facto logistical restrictions on the research of freehold occupants that cover that field that impsir the ability of that freehold occupant to conduct his research with objectivity, intellectual honesty and dedication to the search for truth in his labor without investing significant moneys to travel off-island to other collections. 2nd Amended Complaint, Ex. 1, Letters of Support.

(c) The failure to maintain the library in a particular field imposes *de facto* logistical restrictions on the instruction of that freehold occupant that impair the ability of that teaching faculty member to properly and ethically instruct students in the essential elements of an approved undergraduate curriculum, which, different from a high school curriculum, objectively requires the professors to instruct the students how to evaluate the merits of differing arguments published in the high-quality intellectual property bound in information products circulating in interstate and foreign commerce in accordance with the appropriate standards of the field. Cf. U.P.R. Gen Reg. 11.1.

(d) Such wastage in historical fields in the Humanities has, in fact, precluded graduate study of those fields, compromised retention and frustrated recruitment. 2nd Amended Complaint, Exhibit 1, Proposal, & Letters of support.

AND WHEREAS,

18.  In UPR law,

(a) "La libertad de catedra consiste en el derecho de todo miembro del personal docente a enseñar con objetividad y honradez la material que profesa, **sin otras restricciones** que les imponen la responsabilidad intellectual y moral de cubrir todos los elementos esenciales del curso, según aprobados por la autoridad correspondiente, el respect al criterio discrepante y el deber de impartir sus conocimientos mediante procedimientos pedagógicos identificados con la ética de la enseñana y la busqueda de la verdad."  UPR Reg. Gen. 11.1

(b) "La libertad de la investigación consiste en el derecho de todo miembro del personal docente dedicado a trabajo de investigación a realizar su labor **libre de restricciones que limiten la objetividad, la honradez intellectual o la dedicación a la búsqueda de la verdad** en su trabajo." UPR Reg. Gen. 11.1

AND

19. the UPR covenants with ALL TENURE-TRACK FACULTY ENTERING THEIR FREEHOLDS that, under the concept of academic liberty, they shall be free of restrictions that limit their search for truth both in teaching and in their research UPR Gen Reg. §11.3, referencing §§11.1 and 11.2.

20. THEREFORE, this wastage arising from the UPR-RP's failure to maintain the library collection both sends scholar tenants of the UPR into temporary or permanent exile and places the UPR in BOTH in breach of its educational mission AND impairs covenants of academic liberty with occupants of particular freeholds.

19. In the Humanities, the most important hedge available against the wastage that comes from the perennial underfunding of the collection that allows the Humanities' professor to fulfill the University's mission is **access to archives of primary source material**.

 20. With such archives, the most recently published arguments circulating in interstate commerce can be evaluated against primary source data.  Without such archives, no such evaluation can be accomplished: the scholar is completely dependent on arguments raised by other persons with access to primary source materials.

21. Absence of archives thus exacerbates the effects of wastage.

22. In so far as graduate programs teach their students to manufacture intellectiual property that questions arguments circulating in information products circulating in interstate commerce, the absence of archives also frustrates the ambitions of the campus graduate programs to expand their offerings into historically organized fields.

24. Upon occupying his freehold 079-010, as an Assistant Professor of English, dedicated principally to the teaching of English Renaissance literature, in particular Shakespeare, DEMANDANT, having worked at the Huntington Library, the British Library, and the New York Public Library on his dissertation, having published articles incorporating such primary source evidence and having generated external funds to support his research as a consequence, became acutely aware that the library was largely obsolete in his field owing to underfunding and that the lack of primary source archives made effects of  that wastage more acutely than later fields of English study.

24. In good faith, with the hopes of BOTH abating the wastage to his freehold AND fulfilling the mission of the Graduate English Department, the Campus, the Dean of Graduate Studies and the Chancellor, DEMANDANT

(a) Identified that the wastage of the library in particular affected the ability of past and present occupants of his freehold and neighboring freeholds in other historically oriented fields in the College of Humanities to properly teach the approved curriculum in his field. Second Amended Complaint, Exhibit 1, cf. Letters of Support

(b) Identified that the wastage of the library affected the ability of past and present occupants of his freehold to engage in research in their field without incurring in great expense;

(c) Identified that the permanent acquisition of the Early English Books I and II Microfilm Series would serve as a practical means for the UPR to restore to the occupants of freehold 079-010 their academic liberty both in the classroom and in doing research, in fulfillment of the campus's mission;

(d) Wrote up his findings in the form of a grant proposal to the National Endowment of the Humanities. Second Amended Complaint, Exhibit 1.

(e) Secured 24 letters of support, 12 from faculty members in the College of Humanities, identifying how the acquisition in addressing the deterioration of the library holdings, would also improve their academic liberty and their ability to do research; Second Amended Complaint, Exhibit 1.

(f) Submitted the proposal, entitled *The Letterpress Treasures Project,* with the blessing of the UPR, Rio Piedras Campus, chancellor, and other administrators, to the National Endowment of the Humanities Challenge Grant Program; Second Amended Complaint, Exhibit 1.

(g) Clarified that the acquisition would (i) reduce costs of scholarly research (ii) improve the excellence of existing graduate programs; (iii) provide greater historical depth to student study AND (iv) serve as the practical means for scholars occupying his and similar freeholds in the College of Humanities to generate more external funding for the Humanities; 2nd Amended Complaint, Ex. 1.

(h) Identified that the acquisition was perfectly consonant with the strategic vision of the campus in becoming a Research I Doctoral Degree Granting Institution; 2nd Amended Complaint, Ex. 1.

(i) On these grounds, persuaded the NEH Challenge Grant program to award the UPR $150,000 (ONE HUNDRED-FIFTY-THOUSAND DOLLARS) to secure the acquisition of the Early English Books I & II Microfilm Series, contingent upon the UPR, Rio Piedras Campus, raising from private donors $450,000 (FOUR-HUNDRED-FIFTY-THOUSAND DOLLARS). 2nd Amended Complaint, Ex. 1.

(j) Worked to secure certified pledges and donations amounting to over $85K (EIGHTY-FIVE-THOUSAND DOLLARS) during the term of the grant, which would have been matched by federal funds at a 1:3 ratio. 2nd Amended Complaint, Ex. 6, Letter Fred Winter to Gladys Escalona (14 Sept. 2005); Ex. 3.

(k) Donated his own moneys to the grant; 2nd Amended Complaint, Ex. 3.

(l) Succeeded in securing permission from the NEH to novate the object of the grant to purchase permanent access to EEBO (Early English Books Online), offered to the UPR, Rio Piedras Campus at a third of the price originally quoted in initial conversations; much more complete than

at the time of the grant application, and much more useful owing to the commodification of cd burning technology than at the beginning of the grant application; 2nd Amended Complaint, Ex. 6. (m) Communicated to then-Chancellor Gladys Escalona, Ph.D. that such a novation was possible;

25.   On 19 August 2005, Dr. Escalona, apparently thinking such a novation impossible, committed the UPR in a letter to Dr. Fred Winter of the NEH Challenge Grant Program, to divert the $54,705 (FIFTY-FOUR THOUSAND SEVEN-HUNDRED-FIVE DOLLARS) of nonfederal moneys raised to purchase the Early English Books I & II microfilm Series to acquire permanent access to EEBO by way of a four-year purchase agreement for $122,500. 2nd Amended Complaint Ex. 3.

25. Clarifying the situation, Dr. Fred Winter authorized BY LETTER dated 14 September 2005, a novation of the grant to purchase EEBO using a matching proportion of federal funds. 2nd Amended Complaint, Ex. 6.

26.  Establishing a final deadline for the return of the federal moneys, Dr. Fred Winter required by letter dated 7 September 2006 that the UPR-RP to enter into a purchase agreement with ProQuest, by October or return all federal moneys. 2nd Amended Complaint, Ex. 7.

27.   Following up on Dr. Winter's letter, Plaintiff secured a letter from then-director of the Department of English, signed by members of the department, to Dr. Gladys Escalona, that the purchase of the Electronic archive was still a necessary resource for the department's graduate programs; 2nd Amended Complaint, Ex. 8.

NONETHELESS,

28. (a) The wastage was not abated:  (b) The Federal funds were returned. (c) The database was not purchased. (d) The Strategic Plan was not completed in Plaintiff's field.  (e) Plaintiff, despite his training and publication, was restricted from contributing to the doctoral program. (f) The campus mission was abandoned, (g) the funding for library acquisitions has remained the same, AND (h) no accounting has been made for the private moneys donated to the project for the purpose of acquiring the database.

29. Invested at 6% interest, the funds raised for the Letterpress Treasures Project would have matured to cover $110,076.25 of the purchase in 2016, with the full cost of EEBO available in 2018.

WHEREAS

30. THE DUTY TO ABATE WASTAGE RUNS WITH THE LAND. The Statute of Westminster, 13 Edward I, c. 14, *Lavington v. Seymark*, Hil. 11 Edward II (1317); the Statute of Waste, 20 Edward I, 1 S.R. 109; *Pollard v. Shaffer*, 1 U.S. 210 (1787), citing *Spencer's case*, 5 Co. 16. b. and 1 Salk. 199. 2 Levinz. 206. 1 Rolls Abr. title, (covenant) letter M pl. 1, and N. pl. 2. Vin. Abr. 6 vol. pa. 411. letter M. pl. 1. 2. 1 Bacon's Abr. 534. c. 5. and the books cited in these abridgements."

31. under color of UPR-RP Academic Senate 49 (2003-4), UPR-RP AS Cert. 49 (2003-4), UPR-RP Cert. 42 (2004-5); UPR-RP AS Cert. 10 (2005-6), UPR-RP AS Cert. 16, (2006-7),  AND UPR-AS Cert. 89 (2014-2015), Carlos Severino, Ph.D., occupant of the office of Chancellor of the University of Puerto Rico, Rio Piedras Campus, lawfully by that appointment Baillee and Custodian of the premises of the University of Puerto Rico, Rio Piedras Campus has entered into that campus under color of the aforesaid grants with **APPU, OPU, HEEND, UBOS, and the UPR-RP General Student Council, who** hold as tenants for their own life or that of the University of Puerto Rico under color of an Institutional Policy of Nonconfrontation to DEFORCE other tenants from the campus so as to prevent the UPR from raising tuition sufficiently to cover this wastage;

32. these present tenants holding the UPR, Rio Piedras Campus, jointly and severally under such color hath committed Waste, Sale or Destruction of Lands, Houses, Woods, or Gardens, or tenements, and exile of men against the premises of the U.P.R., and, in particular, to the Rio Piedras Campus library appendant to the freeholds of the teaching and research faculty in the College of Humanities of the University of Puerto Rico by requiring by way of extortionate acts and enfeoffing student clients and other unknown persons to commit extortionate acts that tuition be maintained so low that said library be underfunded relative to the mean at other American Research Libraries by at least $4 million (FOUR-MILLION DOLLARS) since at least year 2001;

33.  the President of the University of Puerto Rico, Uroyoán Walker, Ph.D., who supervises Carlos Severino, Ph.D., the chancellor of the Rio Piedras Campus, has both the duty to discipline

his subordinates for wastage and the obligation to submit a budget to the UPR Board of Governors, and has neither disciplined Carlos Severino, Ph.D., despite his levying of several deforcements of faculty from the UPR, Rio Piedras Campus, nor budgeted to repair this waste to the UPR, to the prejudice of the UPR, and the academic liberty of its present generation of scholars and its ability to sustain research and education in certain fields in the future;

34.   the University of Puerto Rico, creature of Law 1 of 20 January 2016, is a ward of the University of Puerto Rico Board of Governors, and holds its several campuses in fee simple from the Commonwealth of Puerto Rico which endowed it,

35.   the UPR Board of Governors, the legal guardians of the UPR, knowing that the Tenants above have compelled such waste have failed to eject such tenants from their unlawful possession, encouraged them in their unlawful aims, and have perennially failed to authorize sufficient funds to abate this waste,

AND WHEREAS

36. plaintiff has documented sufficiently for a federal agency to potentially award six-figures in federal moneys that his interest in resolving this wastage to his freehold is earnest and personal, and that his injury is specific, as it compels him to choose either exile from his home in Puerto Rico, whereby he must travel in interstate commerce at his own cost, OR to cease manufacturing intellectual property circulating in Interstate commerce,

37. AND, had the UPR-RP acquired the database, Plaintiff would have been able to fund at least one research assistant, a $10,000 (TEN-THOUSAND-DOLLAR) benefit to him, per year, and he also would have covered his travel to conferences and to collections abroad.

38. THEREFORE, plaintiff has standing to appear as NEXT FRIEND, to sue BOTH THE AFOREMENTIONED TENANTS AND THE MEMBERS OF THE BOARD OF GOVERNORS IN THEIR PERSONAL CAPACITY to sue for a WRIT OF WASTE for TREBLE DAMAGES owing to the WASTAGE done to the UPR-RP SB appendant to freehold 079-010 by way of BOTH (a) the failure of the UPR-RP to purchase the hedge against WASTAGE identified in the Letterpress Treasures Project and Dr. Fred Winter's letter novating the grant; AND by way of encouraging, by way of its pattern of extortionate behavior in 2005, 2010, 2011, 2014, 2015, and 2016, that no

WASTAGE to the UPR-RP SB be abated, should it mean increasing the cost imposed on Students attending the UPR-RP Campus.

AND WHEREAS

39. In asserting itself to be an accrediting agency, MSCHE implicitly aver familiarity with the library resources at other doctoral institutions in the United States that offer doctoral degrees in History, English and Spanish Studies;

AND WHEREAS

40. Plaintiff objected to the state of the library and the absence of such resources standard in his field of investigation to visitors in 2005, AND

41. As part of its self-study for reaccreditation the Graduate Department of English registered BOTH its ongoing need for the database to the Dean of Graduate Studies and Research (DEGI) AND its concern that the sum of private moneys DONATED SPECIFICALLY to satisfy the object of the Letterpress Treasures Project was diverted to other ends;

AND WHEREAS

42. HAVING ACTUAL, CONSTRUCTIVE and/or INQUIRY NOTICE of (i) the need for additional educational resources to fulfill its mission of growth as a research campus, (ii) the WASTAGE of the collection owing to underfunding of the library; AND (iii) the failure of the UPR-RP to complete its promise to puchase EEBO to resolve this problem, (iv) the importance of EEBO to graduate programs in English in the United States AND (v) the suspected diversion of private funds donated SPECIFICALLY for the purpose of acquiring the archive to other purposes,

43. AND SO NOTICED of the Campus plans to become an Institution "of marked doctoral character," and the wastage and the diversion of funds raised pursuant to a federal grant for the acquisition of a specific archive necessary hedge against this wastage, and having the ability to calculate that the formula employed by the UPR Board of Trustees/Board of Governors to calculate the tuition would never resolve this wastage, and having a duty when certifying not to misrepresent to the Secretary that the UPR had sufficient Institutional Resources;

MSCHE nonetheless certified that the UPR complied with BOTH Standard 6: Integrity in 2005, 2010 and 2011, AND Adequate Institutional Resources in 2005 and 2011;

AND WHEREAS

44. MSCHE certified that the general education in the Student Strike Doctrine authorized by various academic Senate certifications constituted "Adequate Education" in 2005, 2010, and 2011;

AND WHEREAS

45. these certifications (a) were fraudulent, (b) were published in the mails and over the wires, (c) gave legitimacy to the TENANTS in their project of committing WASTE against the UPR, Rio Piedras Campus, (d) caused the multitude of students whom the TENANTS enfeoffed to commit nuisances to prevent such WASTE from being abated to be paid with federal moneys; and THEREBY (e) were predicate acts of racketeering of (i) mail fraud, (ii) wire fraud, (iii) and violations of the Travel Act, (f) in furtherance of the common purpose of the TENANTS' associated-in-fact enterprise to keep the tuition UNLAWFULLY LOW, (g) causing a definable injury to the UPR in general, and, (e) specifically, to freehold 079-010, (f) of which Demandant is the present occupant, and (f) thereby causing the UPR to impair its obligations covenanted with DEMANDANT under UPR Gen. Reg. §11.3, in breach of his civil rights, and in furtherance of a common custom and usage of State, already declared unlawful'

46. AND WHEREAS MSCHE commended the UPR-RP in communications sent though interstate commerce WHILE THE UPR-RP WAS ON PROBATION when it announced that, in order to make budget without raising tuition to a level commensurate with other research universities, it had impaired and was going to continue to impair AT LEAST THROUGH 2016 similar constitutionally unavoidable obligations of compensation in covenants owed to plaintiff;

47. THEREFORE, MSCHE is jointly and severally responsible for TREBLE DAMAGES owing to the WASTAGE perpetuated against (a) the UPR-RP SB appendant to DEMANDANT's freehold 079-010 and (b) any and all injuries arising from this wastage to Demandant himself

(a) as an aider-and-abetter of the TENANTS, in maintaining those whom they enfeoff in federal funds;

(b) for having breached its visitatorial duty and duties under 18 U.S.C. §4 to cause the nuisance the TENANTS levy against the UPR and the demandant himself to the prejudice of the Waste

being abated, to be abated by denying or threatening to deny federal funding to the UPR-RP, should the UPR-RP not abandon the felonious student-strike doctrine that UPR-RP AS Cert. 49 and later certifications teach undergraduates to honor;

(c) for having breached its visitatorial duty to cauae the UPR's guardians AND the UPR-RP's custodians to budget properly so as to abate the waste complained of;

(d) owing to its own predicate acts of wire fraud, mail fraud, and Travel Act violations, on behalf of the associated-in-fact in service of the common purpose of keeping the tuition charged the students unlawfully lower than is viable.

48.  AND WHEREAS, Had Plaintiff had the database, he would likely have been able to fund at least one research assistant, a $10,000 (TEN-THOUSAND-DOLLAR) benefit to him, per year, and also would have covered his travel to conferences.

PRAYER FOR RELIEF

49.  **THEREFORE**, demandant respectfully prays that, this Honorable District Court, adjudicating under R.I.C.O.'s civil enforcement mechanism, 18 U.S.C. §1964(c), the sum of 3 X $110,076.25 (ONE-HUNDRED-TEN-THOUSAND-SEVENTY-SIX DOLLARS AND TWENTY-SIX CENTS) = $330,228.75    (THREE-HUNDRED-THIRTY-THOUSAND-TWO-HUNDRED-TWENTY-EIGHT DOLLARS AND SEVENTY-FIVE CENTS) be awarded to FREEHOLD 079-010 for the purpose of purchasing PERMANENT ACCESS to EEBO, remainder to FREEHOLD 079-010 for the purpose of defraying its occupant's future travel, research expenses, and acquisitions of materials for the permanent collection to offset the past injuries done to its occupant and his students owing to the restrictions placed on his academic and research liberty that have delayed and inconvenienced him in his pursuit of his career, remainder to plaintiff and his heirs.

50.  AND THEREFORE, DEMANDANT respectfully prays that the sum of ($2000 x 10) x 3 = $60,000 (SIXTY-THOUSAND DOLLARS) be awarded Plaintiff **in his personal capacity** in concept of LIQUIDATED DAMAGES owing to cash outlays for travel to do research, injuries naturally flowing from the commitment of the guardians of the UPR, and the custodians of the UPR, conspiring with the tenants and the associated-in-fact enterprise and MSCHE, to leave unabated the wastage of the library collection appendant to plaintiff's freehold 079-010; to impair

the obligations of academic liberty covenanted to him by way of UPR Gen. Reg. §11.3, so as to honor a State usage and custom, known to them to be unlawful taught and practiced by the tenants, in furtherance of the common purpose to maintain tuition lower than was necessary to abate  wastage known to them in 2001-2.

51.  ALTERNATELY, DEMANDANT respectfully prays that this honorable District Court issue a WRIT OF WASTE for the grounds mentioned above and affording the same TREBLE DAMAGES relief.


**WHEREFORE**, DEMANDANT/PLAINTIFF RESPECTFULLY PRAYS THAT

1. THE HONORABLE DISTRICT COURT ASSEMBLE A JURY SO THAT DAMAGES MAY BE CALCULATED, ASSESSED AGAINST THE GUILTY PARTIES AND AWARDED TO DEMANDANT/PLAINTIFF AS SPECIFIED ABOVE, AND

2. THAT DEMANDANT/PLAINTIFF MAY BE AWARDED COSTS AND FEES.


**I HEREBY CERTIFY** that I did serve this AMENDED COMPLAINT this day, the 19th day of April 2016, after ATTEMPTING AND UNSUCCESSFULLY FILING this second amended complaint on the 10th day of May 2016, on the CM/ECF account which shall serve it on CARLOS A. RODRIGUEZ VIDAL, GOLDMAN ANTONETTI & CORDOVA, LLC, P.O. Box 70364, San Juan, P.R. 00936-0364, and *pro hac vice* applicants Roberto Rivera-Soto and Paul Lantieri III. RESPECTFULLY SUBMITTED, this day in San Juan, Puerto Rico

/s/ JAMES P. CONLAN, PH.D., ESQUIRE

USDPR # 232007


James P. Conlan, Ph.D., Esquire

Condominio San Mateo Plaza, Apartment PH-3

1626 San Mateo Street

San Juan, Puerto Rico 00912

James.conlan@gmail.com

787-996-9301

---

[1] See 3 Blackstone, *Commentaries*, c. 10, p. 184-89, and 25 Ed. 3, Stat. 5, c. 4, 1 *Statutes of the Realm* 320. Cf. *The New Natura Brevium of the most reverend Judge Mr. Anthonie Fitz-herbert*, Sixth Edition (London, in the Savoy, by Eliz. Nutt & R. Gosling, for B. Lintote, R. Gosling, & C. Ward, 1718) p. 393 *et seq*. cf. Coke, *On Littleton* 46a; Littleton §58,

[2] *The New Natura Brevium of the most reverend Judge Mr. Anthonie Fitz-herbert*, Sixth Edition (London, in the Savoy, by Eliz. Nutt & R. Gosling, for B. Lintote, R. Gosling, & C. Ward, 1718), p. 407, *et seq*; *Baten's Case*, (Mich. 8 Jac. I), 9 Coke, *Reports* 54.

[3] "La Junta de Gobierno determinará la organización interna de las unidades institucionales.  No se harán cambios, modificaciones o reorganizaciones internas de colegios, escuelas, facultades, departamentos u **otras dependencias sin la autorización expresa de la Junta." Art. 16,** UPR General Regulations UPR JG Cert. 160 (2014-2015).

[4] "Es política pública del Estado Libre Asociado de Puerto Rico promover el acceso a la educación post secundaria al más bajo costo viable y, en lo posible, garantizar la igualdad a nuestros residentes de oportunidades académicas en la Universidad de Puerto Rico." Art. 1, Law 7 of 7 April 2013.

[5] See Oliver Wendell Holmes, Jr. *The Common Law*, ed. Sheldon M. Novick, (New York: Dover Publications, 1991) lectures 5 & 6, 164-246 on the strict liability of the bailee at common law, p. 167..

[6] "No description of private property has been regarded as more sacred than college livings. They are the estates and freeholds of a most deserving class of men (sic), of scholars who have consented to forego the advantages of professional and public employments, and to devote themselves to science and literature, and the instruction of youth in the quiet retreats of academic life. Whether to dispossess and oust them; to deprive them of their office, and turn them out of their livings, not by the power of their legal visitors, or governors,…and to do it, without forfeiture, and without fault; whether all this be not in the highest degree an indefensible and arbitrary proceeding, is a question, of which there would seem to be but one side for a lawyer or scholar to espouse." *Trustees of Dartmouth College v. Woodward*, 17 U.S. 518, 563-565 (1819) (Argument for plaintiff in error, who prevailed)

[7] "And the lessor is properly where a man lets to another lands or tenements for term of life or for term of years, o to hold at will, he who makes the lease is called the lessor, and he to whom the lease is made is called lessee.  And everyone who has an estate in any lnds or tenements for term of his own or another man's life, is called tenant of the freehold, and no other of less estate can have a freehold: but those of greater estate have a freehold."  Coke, *On Littleton* 42b; Littleton §57.  Thomas Coventry, Esq. *A Readable Edition of Coke upon Littleton* (London: Saunders & Benning, 1830)

"[T]enant in fee, tenant in tail, and tenant for life, are said to have a frank-tenement or freehold, to distinguish it from terms for years, or chattels, and customary, or copyhold lands.  Coke *On Littleton*, 43b; Littleton §57. Thomas Coventry, Esq. *A Readable Edition of Coke upon Littleton* (London: Saunders & Benning, 1830)

[8] [Bishop Burnet writes in relation to the affairs of Magdalen College in 1686-87, in which the King attempted to force out an elected officer:

"Parker, bishop of Oxford, was now recommended; and the fellows were commanded to proceed to a new election in his favor.  They excused themselves since they were bound by their aoths to maintain their statutes: and **by these an election being once made and confirmed could not proceed to a new choice, till the foremer was annulled in some court of law:** church benefices and **college preferments were freeholds, and could only be judged in a court of record."**  3 *Bishop Burnet's History of his own Time: with the Suppressed Passages of the First Volume* (Oxford: Clarendon Press, 1823), p. 146.]

[9] "The Prince of Orange in his declarations of the reasons inducing him to come to this country [England] notices, amongst other particulars, the deprivation of the president and fellows of Magdalen College [by executive authority], stating that the turning them out of their freeholds was contrary to law, and to an express provision in the Magna Charta." 3 *Bishop Burnet's History of his own Time: with the Suppressed Passages of the First Volume* (Oxford: Clarendon Press, 1823), p. 149, n. thorn.

[10] "En el arrendammiento de obras o servicios, una de las partes se obliga a ejecutar una obra, o prestar a la otra **un servicio**, por **precio cierto**." C.C.P.R. Art. 1434 (1930).  "Sabemos que mediante un contrato una persona se obliga a dar una prestación a otra.  Una vez constituido, ese convenio se convierte en la ley entre las partes, cosa que se traduce en el principio de *pacta sunt servanda*, o en otras palabras, en que las partes están comprometidas a cumplir lo pactado.  Véase, BPPR v. Sucn. Talavera, 174 D.P.R. 686 (2008).  Por ello, contravenir una obligación contractual acarrea el pago de alguna indemnización o quedar sujeto al cumplimiento específico de las cláusulas pactadas.  Véase: Arts. 1230 y 1054 del Código Civil de Puerto Rico, 31 L.P.R.A. secs. 3451 y 3018." *Puerto Rico Freight System, Inc. v. Corporación para el Desarrollo de las Exportaciones de Puerto Rico,* 2012 DTS 158
Como el contrato de un abogado, el contrato de un catedrático universitario, "[e]s un contrato propio de los de prestación de servicio de las profesiones y artes liberales." J. Puig Brutau, Fundamentos de Derecho Civil, 2da ed. Barcelona, Ed. Bosch, 1982, T. II, Vol. II, pág. 450.
"[D]entro del amplio molde de la figura de contrato de arrendamiento de servicios están claramente comprendidas las llamadas profesiones y artes liberales." *Empresas Capote, Inc. v. Tribunal Superior,* 103 D.P.R. 765, 770 (1975), por cuanto, "En todos los casos [de trabajadores intelectuales, domésticos y operarios] se describe el mismo fenómino: el individuo que es dueño de sus fuerzas físicas o intelectuales las ejercia en provecho cierto de sus semejantes a cambio de la pactada compensación económica: el trabajo es el objeto del contrato." X. Manresa, *Comentarios al Código Civil Español*, pag. 676 (1969), citado en *Empresas Capote, Inc. v. Tribunal Superior,* 103 D.P.R. 765, 772 (1975).
"Empero, para que el contrato de servicios cumpla con el requisito de *precio cierto*, no es indispensable fijar de antemano su importe, pues el precio cierto existe a los efectos del artículo 1434 no sólo cuando está pactado expresamente, sino también cuando dicho precio es conocido por la costumbre y uso frecuente en el lugar en que tales servicios se prestaron." *Morales v. Álvarez*, 63 D.P.R. 208, 211 (1944).
"Precio *cierto* en la modalidad locativa que estudiamos es sinónimo de precio *predeterminado*, precio *determinado*, y precio *determinable*, porque en cualquiera de estas tres formas, siempre que consensualmente coexista con la prestación personal, o la obra a ejecutar, podremos afirmar la presencia de un contrato de arrendamiento perfecto….Cualquiera de estas tres variedades constituye sin ningún género de duda precio cierto." Scaevola, *Código Civil*, Tomo 24 (parte primera), págs. 430 y 435, citado en *Morales v. Álvarez*, 63 D.P.R. 208, 211 (1944).
"[C]abe señalar que en ausencia de un pacto expreso sobre la cuantía que debe ser cobrada por los servicios profesionales, aplica el Artículo 1473 del Código Civil, 31 L.P.R.A. sec. 4118, el cual establece, en lo pertinente:

…En cuanto a los servicios profesionales, se estará, para la remuneración de los mismos, a lo convenido entre las partes; cuando no hubiere convenio y surgieren diferencias, la parte con derecho a la remuneración podrá reclamar y obtener en

> juicio de la otra parte, … el importe razonable de dichos servicios." *In Re: Rodríguez Mercado*, 2005 DTS 144; 2005 TSPR144; 165 D.P.R. 630, 641-2 (2005), *per curiam*."

Es decir, en ausencia de una causa, se establece lo que debe al otro contratante por el servicio mediante el concepto de *quantum meruit*. *In Re: Rodríguez Mercado*, 2005 DTS 144; 2005 TSPR144; 165 D.P.R. 630, 643 (2005), *per curiam*."

Por lo tanto, por disposición de ley, un patrono no puede establecer unilateralmente que su empleado, contratado por arrendamiento de servicios profesionales, una vez contratado por precio cierto, trabaje gratis: le debe "el importe razonable de dichos servicios." C.C.P.R. Art. 1473 (1930), 31 L.P.R.A. §4118.

El deber de fijar un precio por los servicios o bajo contrato o bajo el concepto de *quantum meruit* es de rango constitucional: La esclavitud se puso ilegal en Puerto Rico mediante decreto real español el 22 de Marzo de 1873; en 1898, con la llegada de la Armada Estadounidense, se puso la abolición constitucional, ya que la enmienda decimotercera enmienda de la Constitución de los Estados Unidos dispone que , "Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, **or any place subject to their jurisdiction**. Congress shall have power to enforce this article by appropriate legislation." U.S. Const., XIII Amendment (1865); en 1952, se hizo la prohibición parte integra de la Constitución local con la disposición:

"No existirá la esclavitud, ni **forma alguna de servidumbre involuntaria** salvo la que pueda imponerse por causa de delito, previa sentencia condenatoria." Const. E.L.A., Art. II, §12.

[11] *Sección 65.11- Compensación adicional*
La concesión de compensaciones adicionales debe responder siempre al interés institucional. Las Juntas Administrativas establecerán criterios de calidad académica, incluyendo el máximo de compensaciones que pueden aprobar los directores de departamentos y los decanos. Estos tendrán presente, además, la disponibilidad de los recursos presupuestarios. **Los directores de departamentos autorizarán las compensaciones cuando se trate de la enseñanza de cursos**. **Corresponde a los decanos la autorización si el programa regular del profesor ha sido objeto de sustitución de tarea, irrespectivamente del número de créditos sustituidos, y también cuando la tarea adicional sea una actividad distinta a la enseñanza de cursos**." UPR Gen Reg. 65.11.

[12] Consejo Superior de Educación Cert. 2 (1974-75) authorizes a tuition exemption for professors' dependents. Consejo de Educación Superior Cert. 9 (1980-81) extended tuition exemption benefit to wife.  UPR-JS Cert. 41 (1994-95) extended benefit to children of those professors who died after giving ten years of service to the UPR.   UPR-JS Cert. 40 (1996-97) qualified Consejo de Educación Superior Cert. 74 (1987-88) by extending license to pay salaries at private schools to only one academic degree and that being in the area that the professor already teaches for three years or six academic semesters.

[13] Todo miembro del personal docente con nombramiento de tarea completa, tendrá derecho a acumular licencia por enfermedad con sueldo.  La licencia por enfermedad se acumulará a razón de un día y medio por cada mes natural de servicio." Reglamento General de la U.P.R., §55.1.1, "La licencia por enfermedad no utilizada **podrá acumularse hasta un máximo de noventa (90) días a la terminación del año natural"** U.P.R. Reglamento General §55.2. (énfasis suplido).

This promise of compensation preceded Law 156 of 20 August 1996, and the UPR was excluded from the terms of Law 184 of 3 August 2004.

[14] Great Britain, Parliament. *The Statutes of the Realm* (1810). 11 vols. (Reprinted London: Dawson of Pall Mall, 1963).

[15] *Sección 64.1- Horas semanales*
La tarea docente regular exige completa dedicación al servicio universitario durante treinta y

siete horas y media (37 ½) por semana. UPR Gen. Reg. 64.1.

[16] *Sección 65.1- Horas de contacto directo*
La tarea propiamente de enseñanza de cada profesor será equivalente a doce (12) horas-crédito semanales de contacto directo con el estudiante, según las tablas de equivalencia aprobadas por la Junta de Síndicos, que formule la Junta Universitaria en consulta con las juntas administrativas.
*Sección 65.2 - Horas de oficina para atención individual de estudiantes*
Como complemento a las labores en el salón de clases, el profesor dedicará seis (6) horas semanales a la atención individual de sus estudiantes. En este sentido el horario de oficina será fijado por el profesor, con la aprobación del director del departamento, tomando en consideración las horas que resulten más beneficiosas para sus estudiantes. La consejería académica de los alumnos es función inherente a la docencia y debe entenderse que el profesor se esforzará por impartirla cuando sea menester.
*Sección 65.3 - Horas de oficina para la preparación de cursos y otros menesteres relacionados con su labor*
El profesor dispondrá de quince (15) horas semanales para la preparación efectiva de sus cursos de enseñanza, la realización de investigaciones, la preparación y corrección de exámenes y el trabajo de oficina que conlleva su labor.
*Sección 65.4 - Reuniones y otras actividades*
El profesor dispondrá de aproximadamente cuatro horas y media (4 ½) semanales para labores relacionadas con la docencia, que incluirán reuniones de departamento, facultad y claustro, así como reuniones de coordinación de cursos. UPR Gen Reg. §§65.1-65.4.

[17] *65.9 - Trabajo complementario para completar tarea regular*
De ser necesario por reducción en la matrícula o por eliminación de cursos, el director del departamento, con la aprobación del decano, y previa consulta con el profesor afectado, le asignará al profesor trabajo para completar su tarea docente regular en los cursos nocturnos o de extramuros u otras tareas académicas o administrativas. Una vez asignada la tarea, si el profesor rehusare aceptar esa asignación, se le hará la correspondiente reducción en sueldo. UPR Gen. Reg. 65.9.

[18] [*"Tendrá la responsabilidad de propiciar y mantener el clima de diálogo, comunicación y no confrontación entre las partes. Entrará al recinto el personal universitario mínimo requirido por el (la) Rector(a) enfunciones relativas al cierre discutido en la JCS y en coordinación con la Oficina de Seguridad."*] UPR-RP AS, Cert. 49 (2004), II, (A), p. 11.
[19] "II. Actividades y operaciones durante una Cierre, C & E. D., *Política Institucional de No Confrontación y Protocolo para atender Situaciones que Conlleven el Cierre del Recinto de Rio Piedras*,  UPR-AS Cert. 49 (2003-4), p. 11."
[20] The JCS, representatives of a group of alienees whose membership not hired on the basis of merit to evaluate security problems, has the opportunity to scrutinize the candidates for the position of the Director of Campus Security.  See Carlos Severino, Ph.D., Chancellor, UPR-RP, Circular Letter, "Designación del Licenciado Samuel González González como director de la division de seguridad y manejo de riesgos" (1 May 2015), ¶1., http://www.uprrp.edu/?p=3933
[21] "Es una filosofía de solución pacífica de conflicto mediante la cual se resiste a la violencia con la no violencia a través del diálogo y la negociación para lograr que predomine la razón. De este modo, los propios universitarios preservan los ideales de libertad de expresión, respeto, tolerancia y convivencia pacífica en una institución universitaria. Se fundamenta en el diálogo honesto y franco dirigido a crear confianza y demostrar respeto, para establecer una cultura de paz." UPR-RP AS Cert. 89 (2014-5), p. 5, http://senado.rrp.upr.edu/Certificaciones/Cert2014-2015/CSA-89-2014-2015.pdf examined 14 April 2016.
[22] "On November 11, 2010, during an unauthorized assembly, a group of students voted to continue pressing towards eliminating the Fee by performing illegal acts such as taking over the

Chancellor's Office, *Plaza Universitaria* and other administrative offices, the Student Center, and the Popular Bank Campus branch." UPR-RP Monitoring Report submitted in April 2011, p. 3.

[23] "In the morning of November 30, 2010, a contingent of more than 40 students struggled with University guards and forcibly gained access to *La Torre* (the main administrative building on Campus), blocked access to the Chancellor's office, and staged a protest that disrupted operations until past 4:00 PM by chanting slogans through a loudspeaker and demanding to meet with the Board of Trustees. Through dialog and persuasion students were advised to channel their request through the GSC." UPR-RP Monitoring Report submitted in April 2011, p. 3.

[24] In the early morning of December 1, 2010, three students were detained carrying brass knuckles, knives, gloves, glue and toothpicks used to vandalize locks in the Natural Sciences College and were arrested. In another unauthorized assembly, also held on December 1, 2010, students in attendance voted for a 48-hour stoppage to be enacted on December 7-8, 2010, and for a strike vote to be enacted on December 14, 2010, if the Stabilization Fee was not eliminated by then." UPR-RP Monitoring Report submitted in April 2011, p. 4.

[25] On February 22 the Chancellor authorized a student assembly requested by the General Student Council, thus announcing an academic recess from 9:00 am to 4:30 pm. During this assembly a large majority of 1,454 students voted to continue classes in order to complete the second semester, against a minority of 593 who voted to continue the strike. In spite of this, later on during the assembly, 1,052 students voted against 714 for a stoppage of academic and administrative works for Wednesday, February 23. On this date a group of hooded protesters blocked the Campus's gates with chairs and tables. Few professors were able to hold their classes and many administrative offices had to remain closed, with personnel working in the *Plaza Universitaria* offices across the street from Campus. However, the following morning, with the State Police stationed again on the Campus's gates, classes and administrative work resumed normally. The academic calendar will be amended to account for the loss of class days in the month of February. UPR-RP Monitoring Report submitted in April 2011, p. 9.

[26] On the eve of December 7, 2010, a contingent of 300-400 protesters, many of them masked and hooded (branded in Spanish as *encapuchados*) armed with knives, sticks, chains, rocks, bats, slingshots and other harmful weapons, started building barricades with University property, damaged close to 300 locks of classrooms and offices doors, spread an oily substance on the floor of some buildings, and vandalized several official and private vehicles, among other violent illegal acts. Since the early morning hours, groups of protesters, including *encapuchados*, intimidated and insulted employees, faculty, and students entering Campus. During a meeting of the Chancellor with her deans and staff at the Official Chancellor's Residence on Campus, over 100 protesters surrounded the facility throwing rocks and other objects at security guards in the area and threatening to enter by force. Also on this date, a bomb threat to the *Plaza Universitaria* (the main off-campus building complex) forced the evacuation of all personnel. In addition, *Plaza Universitaria* cooling tower was vandalized and protesters prevented the access of workers to service it. These events affected, among other operations, the processing by the Finance Office of the PELL Grant disbursement due on December 10, 2010. The Chancellor promptly informed the Community that the due date would be rescheduled. UPR-RP Monitoring Report submitted in April 2011, p. 4. As reported in the *Vocero,* the Chancellor's declaration that the campus was open did not prevent (a) violent clashes between disgruntled students attempting to unlawfully takeover the campus and private security, (b) conduct instigated by students constituting a riot, (c) the unlawful creation of barriers to impede entrance into and exit out of the campus, (d) bomb threats, and (e) the possible sabotage of the air conditioning system in campus office buildings. Jorge Figueroa Loza & Yennifer Álvarez Jaimes, "Radican cargos a estudiante por incitación a motín (videos y fotos)" *El Vocero,* http://www.vocero.com/noticias-es/violencia-en-la-upr, examined 11 November 2011.

[27] Among the more intensely violent events, the intrusion of protesters into the College of Natural Sciences of December 20, 2010 stands out. A group of protesters stormed in with the purpose of impeding the administration of a departmental Calculus 1 exam scheduled from 5:30 to 7:30 PM for approximately 450 students. A fire deliberately set on the third floor of the Natural Sciences

Library activated the sprinkler systems. A large part of the third floor of the library was flooded with water. An estimate of around 200 protesters rallied by a student with a megaphone dispersed into the hallways of the building throwing smoke bombs, overturning chairs and desks and physically threatening and removing Calculus I students and Mathematics professors from the classrooms. State Police and Campus Security posted in the hallways were overwhelmed. The Tactical Operations Unit of the Police finally restored order, though the disturbances continued in other parts of the campus. There were 4 arrests as well as summary suspensions in connection with this attack. The Calculus I exam was canceled and rescheduled for January. Though the quick action of employees and Police limited the damages in the library, they are still substantial. A significant portion of the Biology collection-which included titles over 100 years old-was permanently damaged by water. Replacement costs of journals only exceed $2.5 million. UPR-RP Monitoring Report submitted in April 2011, p. 4.

[28] *Sección 32.1- Libertad de expresión y asociación y el orden institucional*
El personal universitario tendrá derecho a expresarse, asociarse, reunirse libremente, formular peticiones, auspiciar y llevar a cabo actividades de toda índole de acuerdo con la Ley y los Reglamentos universitarios, siempre que ello no conflija con otras actividades legítimas y no interrumpa las labores institucionales o quebrante las normas establecidas para salvaguardar el orden, la seguridad y la continuidad de las tareas institucionales, y cumpla con los cánones de respeto propios del nivel universitario. Las actuaciones extracurriculares dentro de la Universidad se llevarán a cabo en forma libre y responsable.

*Sección 32.2 - Notificación al Rector y su previa autorización*
El uso de cualquier lugar en las facilidades universitarias para la celebración de actos, reuniones o ceremonias, requiere la previa notificación al rector o al funcionario en quien éste haya delegado, así como la previa autorización por el funcionario en cuestión.

*Sección 32.2.1- Criterios para conceder o denegar autorización*
El rector o el funcionario en quien éste haya delegado, concederá las autorizaciones liberalmente, asegurándose de que no existan dificultades tales como la celebración de más de una actividad en un mismo lugar a la misma fecha y hora, o su celebración en circunstancias que interrumpan las funciones universitarias.

*Sección 32.3 - Responsabilidad de los auspiciadores*
A los fines de que no se interrumpa la labor docente y administrativas, ni el buen orden institucional, y sin que esto constituya censura previa, los auspiciadores de cualquier acto, reunión o ceremonia a celebrarse, serán responsables de los medios que se empleen para anunciarlos y de la adopción de las medidas necesarias para mantener el orden y la seguridad durante tales actividades.

*Sección 32.4 - Normas aplicables a las actividades extracurriculares autorizadas en este Artículo*
A los fines de armonizar el ejercicio de los derechos descritos en el presente Artículo, con las especiales exigencias del orden institucional, y el debido respeto a los derechos de otros miembros de la comunidad universitaria, los participantes en
Ed. 02/16/2002
Página 44    REGLAMENTO GENERAL
actividades extracurriculares, incluyendo piquetes, marchas, mítines y otros géneros de manifestaciones, se regirán por las normas que se enumeran a continuación. Las infracciones a dichas normas conllevarán las sanciones disciplinarias correspondientes.

*Sección 32.4.1- Interrupción o perturbación de tareas regulares u otros actos*
No se interrumpirán, obstaculizarán ni perturbarán las tareas regulares de la Universidad o la celebración de actos o funciones debidamente autorizados, efectuándose en las facilidades de la Universidad.

*Sección 32.4.2 - Coacción o uso de la violencia*
Los referidos actos no podrán conllevar coacción hacia otras personas, ni recurrirán o incitarán a la violencia en forma alguna.

*Sección 32.4.3 - Lenguaje utilizado*
No se usará lenguaje obsceno, impúdico o lascivo.

*Sección 32.4.4 - Daños a la propiedad*
No se producirán daños a la propiedad de la Universidad o a la de otras personas ni se incitará a

producirlos.
*Sección 32.4.5 -Acceso y salida para las facilidades*
No se obstaculizará en momento alguno el libre acceso y salida de personas de las facilidades de la Universidad y de las aulas o edificios que forman parte de la misma.
*Sección 32.4.6 - Tránsito de vehículos*
No se obstaculizará ni interrumpirá el tránsito de vehículos dentro de las facilidades de la Universidad.
*Sección 32.4. 7 - Uso de amplificadores de sonido*
No se utilizará altoparlantes, bocinas ni instrumento alguno por medio del cual se amplifique el sonido, fuera de las aulas o salas de conferencia que los requieran, sin autorización previa escrita del rector correspondiente o del funcionario en quien éste haya delegado, de acuerdo con las normas que deberán ser adoptadas y promulgadas por cada uno de los recintos y otras unidades institucionales, para tales fines. En todo caso, el uso de tales instrumentos se realizará en forma tal que no constituya una infracción a las normas contenidas en este Reglamento.
*Sección 32.4.8 - Piquetes y marchas dentro de edificios*
No se podrá llevar a cabo piquetes ni marchas dentro de ningún edificio de la Universidad.
*Sección 32.4.9 - Proximidad a salones de clase u oficinas*
Las manifestaciones, mítines y piquetes notificados previamente o los que surjan de forma espontánea, se llevarán a cabo a una distancia de no menos de 250 metros del salón de clases más próximo u oficina administrativa. El Presidente o el rector podrán designar un sitio específico en las facilidades de la Universidad donde tales actividades
Ed. 02/16/2002
REGLAMENTO GENERAL      Página 45
puedan llevarse a cabo y para la celebración de estos actos en el sitio designado, no será necesario notificar previamente al rector o a sus representantes.
*Sección 32.4.9.1- Situaciones especiales*
En aquellas facilidades de la Universidad en que, por la configuración física de sus terrenos y edificios, se hace imposible cumplir con la disposición anterior relativa a la distancia de 250 metros del más próximo salón de clase más próximo u oficina administrativa para la celebración de tales actos, se faculta al Presidente o al rector a adoptar aquella distancia mínima que razonablemente sea suficiente para cumplir con los propósitos de este Reglamento.
*Sección 32.4.10 - Suspensión temporera de los derechos reconocidos en el presente Artículo*
En caso que exista peligro claro e inminente de que el ejercicio de los derechos reconocidos en el presente Artículo habrá de resultar en la interrupción, obstaculización o perturbación sustancial y material de las tareas regulares de la Universidad, o de otras actividades o funciones legítimas universitarias, efectuándose en las facilidades de la Universidad, los rectores podrán, por resolución escrita fundamentada suspender temporalmente tales derechos en sus respectivos centros educativos. Igual derecho le asistirá al Presidente de la Universidad, con relación a todo el Sistema. En caso de que se ejercite el poder aquí conferido a los funcionarios de la Universidad, esta prohibición no podrá extenderse por más de treinta (30) días, a menos que la Junta de Síndicos autorice extender la misma por un período mayor. UPR Gen. Reg. §32.

[29] "On November 11, 2010, during an unauthorized assembly, a group of students voted to continue pressing towards eliminating the Fee by performing illegal acts such as taking over the Chancellor's Office, *Plaza Universitaria* and other administrative offices, the Student Center, and the Popular Bank Campus branch." UPR-RP Monitoring Report submitted in April 2011, p. 3.

[30] "In the morning of November 30, 2010, a contingent of more than 40 students struggled with University guards and forcibly gained access to *La Torre* (the main administrative building on Campus), blocked access to the Chancellor's office, and staged a protest that disrupted operations until past 4:00 PM by chanting slogans through a loudspeaker and demanding to meet with the Board of Trustees. Through dialog and persuasion students were advised to channel their request through the GSC." UPR-RP Monitoring Report submitted in April 2011, p. 3.

[31] In the early morning of December 1, 2010, three students were detained carrying brass knuckles, knives, gloves, glue and toothpicks used to vandalize locks in the Natural Sciences College and were arrested. In another unauthorized assembly, also held on December 1, 2010, students in attendance voted for a 48-hour stoppage to be enacted on December 7-8, 2010, and for a strike vote to be enacted on December 14, 2010, if the Stabilization Fee was not eliminated by then." UPR-RP Monitoring Report submitted in April 2011, p. 4.

[32] On February 22 the Chancellor authorized a student assembly requested by the General Student Council, thus announcing an academic recess from 9:00 am to 4:30 pm. During this assembly a large majority of 1,454 students voted to continue classes in order to complete the second semester, against a minority of 593 who voted to continue the strike. In spite of this, later on during the assembly, 1,052 students voted against 714 for a stoppage of academic and administrative works for Wednesday, February 23. On this date a group of hooded protesters blocked the Campus's gates with chairs and tables. Few professors were able to hold their classes and many administrative offices had to remain closed, with personnel working in the *Plaza Universitaria* offices across the street from Campus. However, the following morning, with the State Police stationed again on the Campus's gates, classes and administrative work resumed normally. The academic calendar will be amended to account for the loss of class days in the month of February. UPR-RP Monitoring Report submitted in April 2011, p. 9.

[33] "All feoffments, gifts and leases by bishops (albeit they be confirmed by the dean and chapter) or by any of the colleges or halls in any of the Universities or elsewhere, or by deans and chapters, masters and guardians of any hospital, parson, vicar or any other living spiritual, are also likely to be avoided; and all the said bodies politic or corporate are by the statutes of the realm disabled t make any conveyances to the king, or to any other, as it hath been adjudged: which statutes have been made since Littleton wrote." Coke, *On Littleton* 43b. Thomas Coventry, Esq. *A Readable Edition of Coke upon Littleton* (London: Saunders & Benning, 1830)

[34] (2) Autorizar la creación, modificación y reorganización de recintos, centros y otras unidades institucionales universitarias; de colegios, escuelas, facultades, departamentos y dependencias de la Universidad, pero no podrá abolir las unidades institucionales autónomas que por esta ley se crean, ni los Colegios Regionales existentes, sin previa autorización de ley.


[35] (c) Los Senados constituirán el foro oficial de la comunidad académica para la discusión de los problemas generales que interesen a la marcha de la Universidad y para los asuntos en que tiene jurisdicción.

(d) Corresponderá especialmente a los Senados Académicos:

(1) Determinar la orientación general de los programas de enseñanza y de investigación en la unidad institucional, coordinando las iniciativas de las facultades y departamentos correspondientes.

(2) Establecer para su inclusión en el Reglamento General de la Universidad las normas generales de ingreso, permanencia, promoción de rango y licencias de los miembros del Claustro.

(3) Establecer los requisitos generales de admisión, promoción y graduación de los estudiantes.

(4) Entender en las consultas relativas a los nombramientos de los rectores y directores, y los decanos que no presidan facultades, conforme a lo dispuesto en este Capítulo.

(5) Elegir sus representantes en la Junta Universitaria y en la Junta Administrativa.

(6) Hacer recomendaciones al Consejo sobre la creación o reorganización de facultades, colegios, escuelas o dependencias.

(7) Hacer recomendaciones a la Junta Universitaria sobre el proyecto de Reglamento General de la Universidad que ésta le proponga.

(8) Someter a la Junta Universitaria, con sus recomendaciones, el proyecto de Reglamento de los Estudiantes.

(9) Hacer recomendaciones al Consejo para la creación y otorgamiento de distinciones académicas.

(10) Rendir anualmente un informe de su labor a los Claustros correspondientes.

(11) Establecer normas generales sobre todos aquellos asuntos del recinto o unidad institutional

no enumerados en esta sección, pero que envuelvan responsabilidades institucionales en común.
(Enmendada en el 1966, ley 1.)

[36] "El senado académico es el foro oficial de la comunidad académica. En él, el claustro participa en los procesos institucionales, cooperando y colaborando estrechamente en el establecimiento de normas académicas dentro del ámbito jurisdiccional establecido por ley." UPR Reg. Gen. §21.1, citing Certificaciones CES Núms. 2 (1976-77); 92 (1978-79); 24 y 46 (1979-90).
[37] Toward this end, the UPR's Board of Governors has established by rule

> (1) that its campuses shall hire only persons with terminal degrees in the fields they teach to tenure-track positions on the basis of merit after an extensive interstate and international search, U.P.R. Reg. Gen. §44.1.1; §47.5.1.1.
> (2) that each course syllabus submitted to be taught even at the undergraduate level provide an extensive and updated bibliography, U.P.R. Junta de Síndicos, Certificación núm. 130, (1999-2000), Anejo 2.
> (3) that its degree programs train its clients in accessing information online in accordance with particular norms, U.P.R. Junta de Síndicos, Certificación 72, (1999-2000); Certificación Núm. 192 (2002-3); Certificación Núm. 35 (2007-8), for which its clients are assessed a fee, U.P.R. Junta de Síndicos, Certificación núm. 70 (2004-2005) and
> (4) that it enforce against both clients and its employees with severe administrative sanctions that include suspension and dismissal, willful refusals to cite intellectual property preserved in information products in accordance with professionally agreed upon standards used in each particular field. UPR Reglamento General, §35.2.3.

[38] The term "labor dispute" defined under the Norris-Laguardia Act, §13(c), is a dispute that
> "includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee." Norris-Laguardia Act, §13(c), Cf. National Labor Relations Act, Act of July 5, 1935, 49 Stat. 448, 450, 29 U.S.C. § 152(9).

[39] "Las autoridades nominadoras podrán tomar acción disciplinaria contra los miembros del personal universitario por cualquiera de las siguientes causas:
Sección 35.2.18 - Conducta que constituya delito bajo las leyes del Estado Libre Asociado de Puerto Rico y sea perjudicial al buen nombre de la Universidad.
Sección 35.2.19 - Violaciones a la Ley de la Universidad, a las disposiciones de este Reglamento y demás reglamentos universitarios. UPR Gen. Reg. §§35.2.18 & 35.2.19.

[40] "On November 11, 2010, during an unauthorized assembly, a group of students voted to continue pressing towards eliminating the Fee by performing illegal acts such as taking over the Chancellor's Office, *Plaza Universitaria* and other administrative offices, the Student Center, and the Popular Bank Campus branch." UPR-RP Monitoring Report submitted in April 2011, p. 3.

[41] "In the morning of November 30, 2010, a contingent of more than 40 students struggled with University guards and forcibly gained access to *La Torre* (the main administrative building on Campus), blocked access to the Chancellor's office, and staged a protest that disrupted operations until past 4:00 PM by chanting slogans through a loudspeaker and demanding to meet with the Board of Trustees. Through dialog and persuasion students were advised to channel their request through the GSC." UPR-RP Monitoring Report submitted in April 2011, p. 3.

[42] In the early morning of December 1, 2010, three students were detained carrying brass knuckles, knives, gloves, glue and toothpicks used to vandalize locks in the Natural Sciences

College and were arrested. In another unauthorized assembly, also held on December 1, 2010, students in attendance voted for a 48-hour stoppage to be enacted on December 7-8, 2010, and for a strike vote to be enacted on December 14, 2010, if the Stabilization Fee was not eliminated by then." UPR-RP Monitoring Report submitted in April 2011, p. 4.

[43] On February 22 the Chancellor authorized a student assembly requested by the General Student Council, thus announcing an academic recess from 9:00 am to 4:30 pm. During this assembly a large majority of 1,454 students voted to continue classes in order to complete the second semester, against a minority of 593 who voted to continue the strike. In spite of this, later on during the assembly, 1,052 students voted against 714 for a stoppage of academic and administrative works for Wednesday, February 23. On this date a group of hooded protesters blocked the Campus's gates with chairs and tables. Few professors were able to hold their classes and many administrative offices had to remain closed, with personnel working in the *Plaza Universitaria* offices across the street from Campus. However, the following morning, with the State Police stationed again on the Campus's gates, classes and administrative work resumed normally. The academic calendar will be amended to account for the loss of class days in the month of February. UPR-RP Monitoring Report submitted in April 2011, p. 9.

[44] On the eve of December 7, 2010, a contingent of 300-400 protesters, many of them masked and hooded (branded in Spanish as *encapuchados*) armed with knives, sticks, chains, rocks, bats, slingshots and other harmful weapons, started building barricades with University property, damaged close to 300 locks of classrooms and offices doors, spread an oily substance on the floor of some buildings, and vandalized several official and private vehicles, among other violent illegal acts. Since the early morning hours, groups of protesters, including *encapuchados*, intimidated and insulted employees, faculty, and students entering Campus. During a meeting of the Chancellor with her deans and staff at the Official Chancellor's Residence on Campus, over 100 protesters surrounded the facility throwing rocks and other objects at security guards in the area and threatening to enter by force. Also on this date, a bomb threat to the *Plaza Universitaria* (the main off-campus building complex) forced the evacuation of all personnel. In addition, the *Plaza Universitaria* cooling tower was vandalized and protesters prevented the access of workers to service it. These events affected, among other operations, the processing by the Finance Office of the PELL Grant disbursement due on December 10, 2010. The Chancellor promptly informed the Community that the due date would be rescheduled. UPR-RP Monitoring Report submitted in April 2011, p. 4. As reported in the *Vocero,* the Chancellor's declaration that the campus was open did not prevent (a) violent clashes between disgruntled students attempting to unlawfully takeover the campus and private security, (b) conduct instigated by students constituting a riot, (c) the unlawful creation of barriers to impede entrance into and exit out of the campus, (d) bomb threats, and (e) the possible sabotage of the air conditioning system in campus office buildings. Jorge Figueroa Loza & Yennifer Álvarez Jaimes, "Radican cargos a estudiante por incitación a motín (videos y fotos)" *El Vocero,* http://www.vocero.com/noticias-es/violencia-en-la-upr, examined 11 November 2011.

[45] Among the more intensely violent events, the intrusion of protesters into the College of Natural Sciences of December 20, 2010 stands out. A group of protesters stormed in with the purpose of impeding the administration of a departmental Calculus I exam scheduled from 5:30 to 7:30 PM for approximately 450 students. A fire deliberately set on the third floor of the Natural Sciences Library activated the sprinkler systems. A large part of the third floor of the library was flooded with water. An estimate of around 200 protesters rallied by a student with a megaphone dispersed into the hallways of the building throwing smoke bombs, overturning chairs and desks and physically threatening and removing Calculus I students and Mathematics professors from the classrooms. State Police and Campus Security posted in the hallways were overwhelmed. The Tactical Operations Unit of the Police finally restored order, though the disturbances continued in other parts of the campus. There were 4 arrests as well as summary suspensions in connection with this attack. The Calculus I exam was canceled and rescheduled for January. Though the quick action of employees and Police limited the damages in the library, they are still substantial. A significant portion of the Biology collection-which included titles over 100 years old-was permanently damaged by water. Replacement costs of journals only exceed $2.5 million. UPR-RP Monitoring Report submitted in April 2011, p. 4.

[46] "An enterprise reaches a group of persons associated for a common purpose of engaging in course of conduct." *U.S. v. Turkette,* 452 U.S. 576, 583 (1981), and "is proven by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit. *U.S. v. Turkette* at 485, and restated in *Boyle v. United States,* 556 U.S. 938 (2009) An "associated in fact" enterprise must have at least three structural features: (1) purpose, (2) relationship, and (3) longevity. *Boyle v. United States,* 556 U.S. 938 (2009).

[47] As the Supreme Court has pointed out, "The term 'pattern' itself requires the showing of a relationship" between the predicates, ibid., and of " 'the threat of continuing activity,' " ibid., quoting S.Rep. No. 91-617, at 158. "It is this factor of continuity plus relationship which combines to produce a pattern." Ibid. (emphasis added). RICO's legislative history reveals Congress' intent that to prove a pattern of racketeering activity a plaintiff or prosecutor must show that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity." "The latter requirement is called the "continuity" requirement." Giuliano v. Fulton, 399 F.3d 381, 386-87 (1st Cir. 2005), at 386-87.

[48] "As the language of H.J. Inc. indicates, the Supreme Court held that a plaintiff can show continuity in one of two ways. Under the "closed" approach, a plaintiff would have to prove a "closed period of repeated conduct" that "amounted to . . . continued criminal activity." 492 U.S. at 237, 241. Alternatively, under the "open-ended" approach, a plaintiff could satisfy the continuity requirement by showing "past conduct that by its nature projects into the future with a threat of repetition." Id. Home Orthopedics Corp. v. Rodriguez (1st Cir., 2015)
[49] According to the First Circuit's most recent holding, "even in the absence of closed continuity, a plaintiff can still demonstrate a "pattern" by showing a "threat of" future criminal activity -- that is, "a realistic prospect of continuity over an open-ended period yet to come." [page 20] Feinstein v. Resolution Trust Corp., 942 F.2d 34, 45 (1st Cir. 1991). "This approach necessitates a showing that the racketeering acts themselves include a specific threat of repetition extending indefinitely into the future [or] . . . are part of an ongoing entity's regular way of doing business." Id. (quotations omitted)." Home Orthopedics Corp. v. Rodriguez, 19-20 (1st Cir., 2015)]
[50] The court goes on to explain, "This less restrictive reading is amply supported by our prior cases and the general principles surrounding this statute. RICO is to be read broadly. This is the lesson not only [498] of Congress' self-consciously expansive language and overall approach, see *United States v. Turkette,* 452 U.S. 576, 586-587, 101 S.Ct. 2524, 2530-2531, 69 L.Ed.2d 246 (1981), but also of its express admonition that RICO is to "be liberally construed to effectuate its remedial purposes," Pub.L. 91-452, § 904(a), 84 Stat. 947. The statute's "remedial purposes" are nowhere more evident than in the provision of a private action for those injured by racketeering activity. See also n. 10, supra. Far from effectuating these purposes, the narrow readings offered by the dissenters and the court below would in effect eliminate § 1964(c) from the statute." *Sedima v. Imrex Company, Inc,* 473 U.S. 479, 497-8, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985)

[51] "Corresponderá especialmente a los Senados Académicos: (1) Determinar la orientación general de los programas de enseñanza y de investigación en la unidad institutional, coordinando las iniciativas de las facultades y departamentos correspondientes." Ley 1 de 20 Enero 1966, Art. 11(1).

[52] **7:25 a.m. -** El presidente interino de la Universidad de Puerto Rico (UPR), Miguel Muñoz, dijo

que personas encapuchadas se encargaron de sacar pupitres de los salones y bloquear tres de las entradas al Recinto de Río Piedras.

Muñoz dio a entender en una entrevista radial (WKAQ) que nada va a satisfacer al estudiantado de Río Piedras.

"La certificación de la Junta de Síndicos, la certificación 98 de las exenciones, se aguantó en aquellos acuerdos que llegaron, ahora es la cuota y mañana será otra cosa, porque esas personas lo que le interesan es precisamente paralizar la Universidad de Puerto Rico en Río Piedras. Y que estemos claros, porque a veces que el pueblo como que se engaña y piensan que la Universidad de Puerto Rico es Río Piedras. Aquí hay 11 recintos y siempre ha habido su manifestación en uno que otro recinto, pero el que está paralizado o el que ha habido huelga es Río Piedras. Y eso no es la Universidad de Puerto Rico, que estemos claros de eso también."

Añadió que "hoy hay encapuchados. Uno ve como esa minoría quiere seguir sembrando el temor y el desasosiego... no podemos dejarle el paso. Exhorto al estudiantado que vaya a sus clases... que enfrente a ese grupo pequeño de personas que lo que quieren es hacerle daño a la Universidad".

"Quieren continuar con el desorden que hay en Río Piedras. Lo que le digo a la ciudadanía y al estudiantado es que la acreditación está en juego. Esto es serio", agregó Muñoz en la entrevista radial.

**7:24 a.m. –** Oreste Villegas, jefe de seguridad del recinto de Río Piedras, dijo que por el momento mantienen vigilancia preventiva y no tienen planificado intervenir con los estudiantes. Añadió que las barricadas comenzaron a colocarse a partir de las 3:00 de la mañana." "Huelga en la UPR: Minuto a Minuto" *Primera Hora* (23 February 2011)
http://www.primerahora.com/noticias/gobierno-
politica/nota/huelgaenlauprminutoaminutoproponencuotade200yriveraschatzelregresodelapolicia-477076/

[53] UPR-RP AS-Certification 71 (2009-10) provides in its dispositive sections:

El Senado Académico enfáticamente repudia cualquier intento de las autoridades universitarias de disciplinar y criminalizar a los estudiantes y los participantes en este proceso huelgario.

Igualmente rechaza la utilización de la policia y alguaciles para el arresto de los estudiantes que participan en este conflicto universitario. UPR-RP AS Cert. 71 (2009-2010)

[54] "The Fee was a court-mediated agreement signed on June 16, 2010 by the UPR President, the President of the Board of Trustees, and a group of students that had assumed leadership of the April-June 2010 protests, as stated in the Board of Trustees' Certification 131 (2009-2010). According to this agreement the total payment of the full year's Fee would begin in January 2011 with the payment of $800. Thereafter, the Fee would be applied twice a year, at the registration process of the fall and spring semesters."  UPR-RP Monitoring Report submitted in April 2011, p. 3.

[55] The Sherman Act declares felonious conspiracies and combinations that restrain trade or commerce of businesses involved in interstate and international commerce) and, under the Clayton Act, 15 U.S.C. §15 allows a civil action for treble damages for violations of the Sherman Act, 15 U.S.C. §1 et seq..  Among the types of conspiracies and combinations that are pre se unlawful under the Sherman Act are price-fixing conspiracies, *Arizona v. Maricopa County Med. Soc'y,* 457 U.S. 332, 345, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982) (quoting *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 218, 60 S.Ct. 811, 84 L.Ed. 1129 (1940)), as applied to labor unions, *Duplex Printing Press v. Deering,* 254 US 43 (1921), *Allied International, Inc., v. International Longshoremen's Association,* 640 F2d 1368 (1st Cir. (Mass) 1981), *C & W Construction C. v. Brotherhood of Carpenters and Joiners,* Local 745, 687 F Supp 1453 (DC Hawaii); and conspiracies entered into by unions who combine in violation of the legitimate economic interest of their membership, *Gompers v. Bucks Stove & Range Co.*, 221 U.S. 418 (1911).

---

[56] i.e. April 2005: "LOS ESTUDIANTES residentes del recinto de Río Piedras de la Universidad de Puerto Rico (UPR) viven momentos de incertidumbre.
.
La tensión arropó ayer el ambiente en Torre Norte. La Junta Coordinadora de Seguridad -- con representantes de la administración, de los estudiantes, de la Hermandad de Empleados Exentos no Docentes (HEEND) y la Unión Bonafide de Oficiales de Seguridad-- se reunió anoche para determinar si a pesar de la huelga se le permitirá a los estudiantes permanecer en las residencias Torre Norte, en la avenida Universidad, y Resicampus, ubicada dentro del recinto. Firuzeh Shokooh Valle, "Alumnos Residentes no saben si los dejarám permanecer en el Recinto" Primera Hora (14 April 2005)
http://corp.primerahora.com/archivo.asp?guid=A2DFDCE27808498FBAC2F8FF8F97BC42&year=2005&keyword=

2006: "El pasado 17 de mayo la Sra. Gladys Escalona, rectora del Recinto de Río Piedras de la Universidad de Puerto Rico (UPR-RP), informó de la radicación de cargos a tres oficiales de la Guardia Universitaria. La rectora pretende someter a procesos disciplinarios a estos oficiales por alegadamente no intervenir con los estudiantes que se manifestaron en el Teatro UPR el sábado 16 de septiembre del 2006. La administración esta alegando insubordinación, por el comportamiento de los miembros de la Unión Bonafide de Oficiales de Seguridad. Los oficiales unionados solo cumplieron con la política de no confrontación, proceso que ha sido abalado por la misma administración universitaria. La rectora está sancionando a los oficiales por seguir una política "institucional". Pero lo que está detrás de todo esto, es el afán de la administración de destruir el sindicato de oficiales para tener el camino libre y poder privatizar la seguridad del Recinto. La Junta de Síndicos quiere imponer su voluntad a como de lugar y para eso es necesario un Universidad de ley y orden. Ante esta coyuntura represiva se hace evidente la necesidad de organizarnos para defender la Universidad pública de las garras de la Junta de Síndicos y los intereses de los ricos." Raúl Báez Sánchez, Unión de Juventudes Socialistas (UJS-MST) "La UPR quiere sancionar a guardias universitarios por no reprimir: Castigo por no fomentar la confrontación" Bandera Roja (16 June 2007)
http://www.prueba.bandera.org/node/113

[57] The 2004 *paro* "Stoppage" targeted, according to plaintiff's recollection, the charging of parking The 2005 "student strike" targeted JS Cert. 70 (2004-5), which announced that tuition would be raised by ten dollars a credit hour;
The 28 September 2009 vote to close the campus was to protest the passage of Law 7-2009, which reduced the general fund
The Spring 2009-10 "student strike" targeted JS Cert. 98 (2009-10), which reduced the quantity of tuition exemptions for entering students;
The Fall 2010-11 student strike targeted JS Cert. 146 (2009-10) which, in accordance with a court-mediated agreement, imposed an $400/semester fee,[57] and Law 7-2009, which reduced the UPR subsidy by redefining the general fund
The 2011 "*paro*" or "stoppage" aimed at requiring the UPR to return the $800 of fees paid as a condition of matriculating that semester
The 8 April 2014 vote for '*paro*" "stoppage" threatened the UPR Board of Governors not to raise tuition
The 12 May 2015 "multisectoral" vote for "stoppage" "*paro*" threatened the legislature not to reduce the state subsidy of the UPR at the cost of social unrest.
The 15 March 2016 vote to close the campus for three days required the State Treasury to disburse moneys to the UPR-RP and the repeal of Law 66-2014

[58] On the eve of December 7, 2010, a contingent of 300-400 protesters, many of them masked and hooded (branded in Spanish as *encapuchados*) armed with knives, sticks, chains, rocks, bats, slingshots and other harmful weapons, started building barricades with University property,

damaged close to 300 locks of classrooms and offices doors, spread an oily substance on the floor of some buildings, and vandalized several official and private vehicles, among other violent illegal acts. Since the early morning hours, groups of protesters, including *encapuchados*, intimidated and insulted employees, faculty, and students entering Campus. During a meeting of the Chancellor with her deans and staff at the Official Chancellor's Residence on Campus, over 100 protesters surrounded the facility throwing rocks and other objects at security guards in the area and threatening to enter by force. Also on this date, a bomb threat to the *Plaza Universitaria* (the main off-campus building complex) forced the evacuation of all personnel. In addition, the *Plaza Universitaria* cooling tower was vandalized and protesters prevented the access of workers to service it. These events affected, among other operations, the processing by the Finance Office of the PELL Grant disbursement due on December 10, 2010. The Chancellor promptly informed the Community that the due date would be rescheduled. UPR-RP Monitoring Report submitted in April 2011, p. 4.

[59] Among the more intensely violent events, the intrusion of protesters into the College of Natural Sciences of December 20, 2010 stands out. A group of protesters stormed in with the purpose of impeding the administration of a departmental Calculus 1 exam scheduled from 5:30 to 7:30 PM for approximately 450 students. A fire deliberately set on the third floor of the Natural Sciences Library activated the sprinkler systems. A large part of the third floor of the library was flooded with water. An estimate of around 200 protesters rallied by a student with a megaphone dispersed into the hallways of the building throwing smoke bombs, overturning chairs and desks and physically threatening and removing Calculus I students and Mathematics professors from the classrooms. State Police and Campus Security posted in the hallways were overwhelmed. The Tactical Operations Unit of the Police finally restored order, though the disturbances continued in other parts of the campus. There were 4 arrests as well as summary suspensions in connection with this attack. The Calculus I exam was canceled and rescheduled for January. Though the quick action of employees and Police limited the damages in the library, they are still substantial. A significant portion of the Biology collection-which included titles over 100 years old-was permanently damaged by water. Replacement costs of journals only exceed $2.5 million. UPR-RP Monitoring Report submitted in April 2011, p. 4.

[60] "el 13 de abril de 2010 se celebró una Asamblea General de Estudiantes convocada por la Presidente del Consejo General de Estudiantes, el Sr. Gabriel Laborde Torres. Allí se aprobó un "paro" de 48 horas, para los días 21 y 22 de abril y se creó un Comité Negociador. Llegado el 21 de abril, se inició la protesta estudiantil y los estudiantes cerraron los portones del Recinto de Río Piedras. La U.P.R. expone que ese día unas personas encapuchados forcejearon con los guardias universitarios y cerraron los portones con cadenas. Además, alega que | hubo varios incidentes de violencia en las afueras y dentro del Recinto. Como consecuencia de tales actos, la Rectora decretó un receso académico indefinido al entender que la administración perdió el control del acceso a la universidad." UPR v. Laborde, p. 8.

[61] "Cuesta un millón de dólares a la policia vigilancia en recintos universitarios," *Primera Hora* (4 May 2010) http://www.primerahora.com/noticias/policia-tribunales/nota/cuestaunmillondedolaresalapoliciavigilanciaenrecintosuniversitarios-385008/

[62] http://www.metro.pr/locales/universitarios-exigen-a-agp-que-no-reduzca-presupuesto-upr/pGXndm!cRbUmThUsEPEU/

[63] http://www.elnuevodia.com/noticias/locales/nota/uprderiopiedrasapruebaparode48horas-2046257/

[64] Art. 7.02 (faltas menores) (c), (d) "*PROPUESTA* Reglamento de Estudiantes del Recinto de Rio Piedras." *Tabla Comparativa* (18 November 2015) pp. 90-1. http://senado.uprrp.edu/Comites/ReglEstud-2015/Tabla-ComparacionReglamentos-18noviembre2015.pdf

[65] Guillermo Guasp Pérez, Comité Especial Para Evaluar La Propuesta de Un Nuevo Reglamento De Estudiantes Para El Recinto De Río Piedras, Comunicado a Decanos y

Directores (17 November 2015), http://senado.uprrp.edu/Comites/ReglEstud-2015/Carta-Decanos.pdf

[66] Association of Governing Boards of Universities and Colleges, *Building a Sustainable University System: A Program of Change for the University of Puerto Rico* (Washington, D.C.,18 January 2016), P. 26

[67] 2015-16 Full-time Undergraduate Tuition and fees at Doctoral-Degree Granting public universities accredited by MSCHE

University of Delaware, $12480,
http://www.udel.edu/finaid/rates.html

University of Maryland, College Park, $9,966 https://www.admissions.umd.edu/costs/index.php

Rutgers, $11,217
http://www.rutgers.edu/admissions/financial-aid-tuition

SUNY, Albany  $10,164
http://www.albany.edu/studentaccounts/2016_SPRING_UG_PerCredit_RATES.pdf

University of Puerto Rico, $55 / credit hour (2012-2017) = $1320 per year for 24 credits

**Tuition and fees at associate-to-MA granting public universities**:

University of District of Columbia, (2015), $7420.56, (no doctoral degrees granted; 8% graduate within six years) http://www.udc.edu/admissions/tuition_fee_schedule#stu

The University of the Virgin Islands,: $4,794
 (no doctoral degrees granted):
http://www.uvi.edu/research/institutional-research-and-planning/fact-sheets.aspx

[68] "Whatever organizational model the board adopts, changing the structure alone will not of itself yield the savings required to meet the expected shortfalls. Additional cost reduction measures are required. The board, president and the UPR system's financial leaders fully realize the importance in the near term of sharply reducing cash outflows. The president and his financial team have examined reserves, major accounts and fund balances to determine amounts available to meet the impact of Fiscal Year (FY) 17 reductions. We understand that the president has swept balances in non-salary accounts. As the administration fully understands, freezing spending in discretionary areas such as non-essential hiring, travel and capital costs is a necessary step while the longer-term adjustments, some of which are noted below, are put in [22 | 23 ] place. These short-term reductions demonstrate the kind of tough mindedness and prudence that will be required throughout the cost reduction process.
In this section, and the accompanying Appendix D, we identify a number of opportunities for reducing costs. We realize that the system's financial and operational professionals are quite knowledgeable in these areas, and have studied many cost reduction options and initiated many as well. The report itemizes a number of opportunities for savings for two reasons: first, to highlight options that may not yet have been applied at the university and, second, to alert readers of this report who are not financial experts to the host of opportunities available to reduce unnecessary cost in this time when every dollar counts. Association of Governing Boards of Universities and Colleges, *Building a Sustainable University System: A Program of Change for the University of Puerto Rico* (Washington, D.C.,18 January 2016), p. 22-23.

[69] The UPR-RP authorized $1414 + $200 in 2014-2015; Account 11263866;  The UPR-RP authorized only $700.00 for conference travel in 2015-2016.

[70] **"Moody's downgrades Puerto Rico GOs and COFINA Sr Bonds to Caa3 from Caa2; outlook negative" (1 July 2015)** https://www.moodys.com/research/Moodys-downgrades-Puerto-Rico-GOs-and-COFINA-Sr-Bonds-to--PR_329297

[71] "El rector del Recinto de Río Piedras de la Universidad de Puerto Rico, Dr. Carlos Severino Valdez, decretó un receso académico y administrativo del 16 al 18 de marzo, en respuesta al paro aprobado hoy, martes 15 de marzo, en una asamblea de estudiantes que tuvo lugar en el campus.

Severino Valdez señaló que la decisión fue tomada esta noche junto al Cuerpo de Decanos y Decanas del recinto. ¨Reafirmando la política de no confrontación en el Recinto de Río Piedras, hemos tomado esta determinación¨, sostuvo Severino Valdez.

Añadió que ¨la Junta Coordinadora de Seguridad, cuerpo integrado por personal docente y no docente y estudiantes, ha sido activada para garantizar las actividades esenciales y del personal de investigación científica que requiere continuidad en sus experimentaciones¨ http://www.uprrp.edu/?p=8915, examined 15 March 2016.

[72] Willam A. Kaplan & Hunter J. Philip, "Legal Status of the Educational Accrediting Agency: Problems in Judicial Supervision and Governmental Regulation," 52 *Cornell Law Quarterly* 106 (Fall 1966)

[73] "[M]any courts have interpreted the "conceals and does not as soon as possible make known" language as requiring an affirmative act of concealment. See, e.g., United States v. Goldberg, 862 F.2d 101, 104 (6th Cir.1988); United States v. Davila, 698 F.2d 715, 717 (5th Cir.1983); United States v. Sampol, 636 F.2d 621, 653 (D.C.Cir.1980); Daddano, 432 F.2d at 1124; Lancey v. United States, 356 F.2d 407, 410 (9th Cir.1966); Neal v. United States, 102 F.2d 643, 646 (8th Cir. 1939); Bratton v. United States, 73 F.2d 795, 797-98 (10th Cir.1934) (citing United States v. Farrar, 38 F.2d 515, 517 (D.Mass.), aff'd on different grounds, 281 U.S. 624, 50 S.Ct. 425, 74 L.Ed. 1078 (1930)).

[74] **(h)** Any individual who—
**(1)** is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment by an employer because of lawful acts done by the employee on behalf of the employee or others in furtherance of a prosecution under this section (including investigation for, initiation of, testimony for, or assistance in such prosecution), and
**(2)** was not a participant in the unlawful activity that is the subject of said prosecution, may, in a civil action, obtain all relief necessary to make such individual whole. Such relief shall include reinstatement with the same seniority status such individual would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorney's fees. 18 U.S.C. §1031(h)

[75] " No hay referéndum, asamblea ni votación –sea electrónica o por papeleta, ya sea abierta o secreta- que conceda el derecho a ningún estudiante o grupo de estudiantes para interferir con el derecho de tan siquiera uno de sus pares a recibir su enseñanza. " *UPR v. Laborde*, TSPR CT-2010-008, pág. 69-70.

[76] "Corresponderá especialmente a los Senados Académicos: (1) Determinar la orientación general de los programas de enseñanza y de investigación en la unidad institucional, coordinando las iniciativas de las facultades y departamentos correspondientes."  Ley 1 de 20 Enero 1966, Art. 11(1).

[77] The second paragraph of this letter reads,

> As you are aware, on June 24, 2010, the Commission acted to place the institution on probation because of a lack of evidence that the institution is in compliance with Standard 4 (Leadership and Governance) and Standard 11 (Educational Offerings). Luis Pedraja to Jaime de la Torre, 15 July 2010.

[78] In the 18 November 2010 Memorandum, MSCHE noted that periodic review contained little information on Standard 3 (Institutional Resources) and recommended institution's probation "due [to] the lack of evidence is in compliance with Standard 3 (Institutional Resources) and Standard 4 (Leadership and Governance)."

[79] The Monitoring Report Pedraja required as a condition of removal of the UPR-RP from probation required the UPR to commit itself to the ""**development and implementation of clear institutional policies specifying the respective authority of the different governance bodies and their respective roles and responsibilities in shared governance**."

[80] In the 18 November 2010 Memorandum, MSCHE noted that periodic review contained little information on Standard 3 (Institutional Resources) and recommended institution's probation "due [to] the lack of evidence is in compliance with Standard 3 (Institutional Resources) and Standard 4 (Leadership and Governance)."

[81] After the 2-7 April 2011 visit, MSCHE determined that "the institution continues on probation with lack of evidence of Standard 3 (Institutional Resources) and Standard 4 (Leadership and Governance). Extorting the UPR to give students more power, MSCHE published as "Requirement(s)" of reaccreditation the blame-shifting prerequisite that

> "1. The Visiting Team requires UPR Rio Piedras to provide the means through which authority and responsibility are assigned, delegated, and shared in a climate of trust, mutual support and respect.

> 2. The Visiting Team also requires UPR Rio Piedras to provide evidence of an effective process and opportunities for student input regarding decision that affect them, including evidence that student input is considered in decision making." *The Report to the Faculty, Administration Trustees and Students of University of Puerto Rico Rio Piedras*, p. 6.

[82] The MSCHE Visit Team Recommendations required that the "chancellor create additional opportunities, both formal and informal, wherebyshe can directly and personally receive input from students," and the UPR continues to improve administration, especially with respect to soliciting and considering campus input in decision-making," toward the end of creating a stronger climate of trust. MSCHE Visit Team Recommendations, 12 September 2011.

[83] In 2010-2011, the UPR Board of Trustees published that its proposed budget would finance the UPR by substantially reducing reimbursement for travel costs, substantially reducing the awards of course relief for research, minimizing the acquisition of equipment, only compensating persons for additional work *that was essential*, limiting the use of office materials (which came to include the cancellation of reimbursement for teaching materials), and declaring a moratorium on increases in pay for professors and promotions in rank for professors. Dr. José Ramón de la Torre, UPR President, *Proyecto de Presupuesto Recomendado de la Universidad de Puerto Rico, Año Fiscal 2010-2011* (June 2010), pp. 9-10. (Distributed by Department Chair Loretta Collins, Ph.D., electronically on 30 June 2010). The proposal recommended that there be instituted a minimum class size of THIRTY STUDENTS PER CLASS, a fifty-per-cent increase in labor for PLAINTIFF; Dr. José Ramón de la Torre, UPR President, *Proyecto de Presupuesto Recomendado de la Universidad de Puerto Rico, Año Fiscal 2010-2011* (June 2010) Appendix "Disponiéndose Recomendados," p. 2 of 4, ¶6. AND FURTHER, proposed that with the approval of the 2010-2011 Budget, the applicable rules, understood at law as contractual obligations, for

payment of additional compensations for courses taught, bonuses for administrative work, benefits and employer support for Christmas bonus, payment of unused accumulated sick pay, special bonuses, and employer support for the UPR Retirement System would be ADJUSTED DOWNWARD. Dr. José Ramón de la Torre, UPR President, *Proyecto de Presupuesto Recomendado de la Universidad de Puerto Rico, Año Fiscal 2010-2011* (June 2010) Appendix "Disponiéndose Recomendados," p. 3 of 4, ¶11, and Table.

[84] In boasting that the UPR-RP would be concluding the year with a balanced budget, the Monitoring Report of April 2011 had noticed MSCHE of the full extent of these debts still outstanding:
> "An economy of $10,962,243 is expected for the incoming fiscal year (2011-2012) calculated from the salary, fringe benefits, Christmas bonus and health Insurance. This leaves UPR-RP with a projected insufficiency of $1,402,908 for year 2011-2012. This insufficiency is much less than the projected economy for the current fiscal year, 2010-2011." UPR-RP Monitoring Report April 2011, p. 14.

MSCHE acknowledged the origins of this sum of "cost savings" in *The Report to the Faculty* (April 2011), p. 3.

[85] FROM THE MONITORING REPORT FILED BY THE UPR-RP IN APRIL 2011, MSCHE HAD ACTUAL NOTICE OF Multiple acts of racketeering under color of student strike, including occupations of bank facilities within the campus, arson destroying $2.5 million dollars worth of scientific journals purchased in interstate and foreign commerce,  a bomb scare, masked, hooded and armed mobs attacking campus security guards, conflict between the students and police on campus AND APPU and HEEND marching on behalf of the students to remove the police from campus, despite Arts. 7 & 8 of UPR-JS Cert. 90 (2004-5) and the holding in *Elba A.B.M. v. UPR* concerning the UPR's duty under Puerto Rico Civil Code Art. 1057 (1930) AND the extortionate common purpose furthered by the associated-in-fact racketeering enterprise to require the repayment of a judicially ordered per-semester fee of $400 (FOUR-HUNDRED-DOLLARS) per semester.

[86] The budget announced that Compensations for teaching extra classes were adjusted downward by 5%, Pay for professors serving in administrative positions was adjusted downward by 5%, The Christmas bonus was halved from $1125 to $563, Special bonuses, payment of other types of remuneration, and payment in excess of 90 days accumulated sick leave were scheduled to be reduced to zero.

[87] By way of UPR-JS Certification 153 (2009-2010), the UPR JS ordered

> *Dejar sin efecto la liquidación monetaria anual de toda licencia por enfermedad acumulada y no usada por el empleado en exceso del máximo acumulable anual de noventa (90) días laborables al finalizar cualquier año natural; disponiéndose, además, que al 31 de diciembre de cada año se cancelará todo balance sobre dicho máximo acumulable.*

> *Disponer que la presente Certificación es aplicable a todo balance de licencia por enfermedad en exceso del máximo acumulable a partir del año natural 2010; disponiéndose, además, que **la presente Certificación deja sin efecto cualquier norma, disposición o determinación que sea contraria a la misma**.* Certificación Núm. 153 (2009-2010).

By way of UPR-JS Certification 147 (2010-11) of 20 June 2011, the UPR JS ordered

> *Dejar sin efecto la liquidación monetaria anual de toda licencia por enfermedad acumulada y no usada por el empleado en exceso del máximo acumulable anual de*

> *noventa (90) días al finalizar cualquier año natural; disponiéndose, además, que al 31 de diciembre de cada año se cancelará todo balance sobre dicho máximo acumulable.*

> *Disponer que la presente Certificaciíb es aplicable a todo balance de licencia por enfermedad en exceso del máximo acumulable a partir del año natural 2011, disponiéndose además, que la presente Certificación deja sin efecto cualquier norma, disposición o determinación que sea contraria a laa misma."* UPR JS Cert. 147 (2010-11)

By way of UPR JS Cert. 20 (2012-13) of 22 October 2012, the UPR JS ordered

> *Todo personal docente, no docente o de confianza que registra su asistencia por reloj, o mediante otro sistema de control de asistencia, debidamente autorizado, tendrá derecho a recibir un pago que corresponde a la licencia por enfermedad acumulada y no usada por éstos en exceso de noventa (90) días.*

> *Este beneficio no se hará efectivo en febrero de 2013 en relación com la licencia acumulada al 31 de diciembre de* <u>2012</u>*.  No obstante, los días de licencia por enfermedad acumulados en exceso de noventa (90) días en el año natural 2012 podrán utilizarse por seis (6) meses hasta el 30 de junio de 2013.*

> <u>*Efectivo en febrero de 2014,*</u> *en relación con la licencia por enfermedad acumulada durante el año natural 2013 en excesp de noventa (90) días al 31 de diciembre e 2013, y en años naturales subsiguientes,* <u>*el pago máximo por este concepto de dicho acceso no excederá de mil seiscientos dólares*</u> *($1,600) por empleado.  No obstante, cualquier exceso de licencia por enfermedad remanente luego de este pago, podrá utilizarse durante los primeros (6) meses del año natural en que se recibe el pago.*

> *El pago a efectuarse a cada empleado elegible se hará en la nómina final del mes de febrero siguiente al año natural  por el cual se hace el pago.*

> *A partir de la fecha de aprobción de esta Certificación, se deja sin efecto cualquier certificación, norma, disposición o determinación que sea contraria a la misma.*  UPR-JS Certification 20 (2012-13).

[88] MSCHE chose, by way of the Statement of Reaccreditation dated 17 November 2011, mailed and published electronically 18 November 2011,

> "To remind the institution that a monitoring report is due April 1, 2012 on Standard 2 (Planning, Resource Allocation, and Institutional Renewal), Standard 3 (Institutional Resources), Standard 7 (Institutional Assessment), Standard 12 (General Education), and Standard 14 (Assessment of Student Learning). Exhibit 1.

[89] *The Report to the Faculty, Administration Trustees and Students of University of Puerto Rico Rio Piedras*, prepared by "A Team representing Middle States Commission on Higher Education after a follow-up visit to the Institution on 2-7 April 2011" published to the world, "The University should be commended for making sound decisions and careful planning to offset budget cuts" under Section "III: Commendations and Institutional Strengths";
The only "decisions and…planning" made "to offset budget cuts" were the Certified budget, prepared in June 2010, effectively IMPAIRED THE CONSTITUTIONALLY UNAVOIDABLE OBLIGATIONS OWED BY THE UPR to PLAINTIFF and his class, by the way of the implementation of "Measures in effect to cut costs  [that] include a pause in replacing retirements of staff and replacing faculty on a 1 for every 3 retirements, elimination of the sick leave reimbursements, reductions in fringe benefits and a reduction in Christmas bonus." *The Report to the Faculty, Administration Trustees and Students of University of Puerto Rico Rio Piedras*, p. 3

[90] In the *Report* following the visit in April 2011, MSCHE published that "The University is working toward reducing the high percentage of salaries and benefits currently 85% of the budget to 76% by FY 2015." *Report*, p. 3.

[91] According to the Statements of Accreditation Status, (SAS) that MSCHE issues,

"The Commission [defendant MSCHE] places an institution on Probation when, in the Commission's judgment, the institution is not in compliance with one or more Commission standards and that the non-compliance is sufficiently serious, extensive, or acute that it raises concern about one or more of the following:

1. the adequacy of the education provided by the institution;
2. the institution's capacity to make appropriate improvements in a timely fashion; or
3. the institution's capacity to sustain itself in the long term."

[92] The specific passage provides:

> **The monitoring report should document further progress in (1) strengthening institutional resources and developing alternative forms of income**, including institutional pro-forma budgets that demonstrate the institution's ability to generate a balanced budget for fiscal years 2012 through 2014, **including the personnel, compensation, and other assumptions on which these budgets are based** (Standard 3);" Exhibit 1.

93 That professors had a duty in the second semester to certify that classes were held in the assigned classroom and the number of students who attended their class was first communicated to me on Wednesday, 9 February 2011, at 9:12 AM, when the director of the English department, Loretta Collins, Ph.D, now Acting Associate Dean of the College of Humanities, sent an email, entitled in the subject line, " PLEASE READ Attendance sheets for teaching," from collins.loretta@gmail.com to the teaching faculty of the English department and myself.  The communication reads in its entirety:

Dear Colleagues,

Yesterday at a meeting of the directors of Humanities, the Dean discussed the new directive for documenting compliance with contact hours in the classroom.

Although he did not circulate to us the memo from the Deanship of Academic Affairs, which Rick circulated to you, the Dean announced that the university administration and he are requiring that:

1. Professors teach in their assigned classrooms unless otherwise authorized;
2. Professors sign in on each day that they teach, indicating also the exact number of students (not percentage) that attended.
3. During each class session, professors must take student attendance and keep accurate records of it.

The table form that Professor Swope circulated was used at the end of last semester; however, we were told by the Dean that a different kind of form will be used. I haven't seen it yet, but apparently it includes a print out of each class offered in the department, by day and time. This form is not a creation of the Office of the Dean, but has been sent to him by the Registrador or Asuntos Académicos.

He explained that the university is going to continue this practice until our campus is taken out of probationary status by the Commission from Middle States.

He expects us to begin the practice on Thursday (tomorrow).

The directors did raise the point that professors will undoubtedly react negatively to this imposition.

However, I think you need to know that this is what is coming down from upstairs so that you can take an informed decision about how you are going to handle the directive.

If you want to discuss it at the next departtmental meeting, we can put it on the agenda.

On a daily basis, I will have the forms available in the departmental office.

Cordially,
Loretta Collins, Ph.D.
Director
English Department
College of Humanities
UPR, RP"

Toward the end of defining the duty of professors BOTH to teach in their classrooms AND to certify how many students attended, on Wed, Feb 9, 2011 at 9:23 AM, the director of the English department, Loretta Collins, Ph.D., now Acting Associate Dean of the College of Humanities, forwarded Circular 09 (2010-2011) from the Decanato de Asuntos Académicos, dated 7 February 2011, and signed by Astrid Cubano, Ph.D., which, in its dispositive parts reads,

A partir del JUEVES 10 de febrero, cada decanato, y escuela preparará un Informe Diario de Ofrecimientu *de* Clases. Los informes se entregaran cada viernes a partir de las 4:00 PM al Decanato de Asuntos Acadernicos *e* incluiran información sobre todas las clases programadas por dias de la semana y periodos de clase. Se adjuntará ademas una Tabla de Resumen Semanal de cada facultad o escuela.

Adjuntamos los formularios modelo para enviar los informes diarios y resumidos cada viernes. Para facilitar la recopilacibn de datos, el Registrador cnviara a cada facultad y escucla en formato electrhnico, la tabla modelo para el Infonne Diario con la ioformacibn de las clases programadas en cada unidad incluyendo el número de estudiantes en la sección y el saI6n asignado. En el caso de clases no reunidas *o* no ofrecidas en el salón asignado. debe anotar en la columna de "Comentarios" si el profesor cumplió con el visto bueno del Director *de* Departamento o del Decano.

Deberrán llenar las tablas y enviarlas en versión PDF según indicado arriba. La Sra. Adria Bermudez recibirá los informes en la siguiente dirección electrónica: adria.bermudez@upr.edu. Los decanos deberán asegurarse del cumplimiento exacto de la normativa vigente en cuanto a la asistencia a clase de los profesores y el ofrecimiento de clases programadas en el salón indicado. Circular 09 (2010-2011), (UPR, Recinto de Río Piedras, Decanato de Asuntos Académicos, 7 Febrero 2011)

Attached to this email was the chart that the department chair would have to fill out.

Indicating that professors were supposed to strictly comply with this directive, on Wed, Feb 9, 2011 at 12:32 PM, Loretta Collins, Ph.D., then Director of the English Department, now Acting Associate Dean of the College of Humanities, sent a further communication entitled in the subject line, "Authorization for teaching off campus" to the teaching faculty of the English department from collins.loretta@gmail.com, that reads in its entirety:

"While the good news is abundantly flowing:

I've also been told by the Dean that there is no authorization for classes to be taught off campus.

If you want to teach in Plaza Universitaria rather than in your assigned room, a few classrooms are available if you present a medical excuse that justifies a "reasonable accommodation."

According to Astrid Cubano, Ph.D, the author of Circular 09 (2010-2011), and then Acting Dean of the Decanato de Asuntos Académicos,

"El objetivo de esta circular [Circular 09 (2010-2011), which required professors to teach their classes in their classrooms that day] es lograr **que** el Recinto mantenga la continuidad **y** el rigor **de sus** ofrecimientos académicos **en** el marco que establece el Consejo de Education Superior de Puerto Rico **y** la Middle Slates Commission **for** Higher Education **(MSCHE).** La misma asegura cumplimiento con **10s** Estándares **4 y** 11 de MSCHE **y** es necesario mantenerla **hasta** que **el** Recinto supere la Probatoria **en** su Estatus de **Acreditación. Decanato de Asuntos Académicos,** Circular 09 (2010-2011) (7 February 2011)

[94] "En un caso, un professor norteamericano, llamado James Peter Conlan, agredió a un estudiante, lo cual provocó la reacción de los demás que a su vez atacaron a dicho profesor." Raquel Ovalle, "La Lucha Continua en la Universidad de Puerto Rico," *Justicia Global* (1 March 2011), https://enjusticia global.wordpress.com, examined 7 April 2016.
[95] Ésta, como muchas de las acciones que ocurrieron ayer, demuestra  intolerancia, cansancio mental y emocional, búsqueda de confrontación, provocación, falta de respeto al derecho ajeno, presencia de conflicto, ausencia de diálogo, ausencia de la buena voluntad institucional y gubernamental para solucionar este conflicto que pretenden convertirlo en el conflicto de nunca acabar. No le otorgue continuidad a la intransigencia que venía sucediendo en la Universidad antes de ser usted el presidente. Juan J. Berrios Concepción to UPR President Miguel Muñoz, 24 February 2011.

[96] *"Aumentar el por ciento de la aportación patronal al Sistema de Retiro a aquel nivel recomendado por los actuarios consultores independientes, de manera que la insuficiencia en recursos del sistema causada por aportaciones insuficientes en años anteriores sea eliminada en un periodo de 30 años.  El ajuste necesario a estos efectos representa un .4% en la aportación patronal al Sistema de Retiro de la UPR.*

*Además se incorpora un aumento de un .6% para cubrir el costo de las Certificaciones de la Junta de Síndicos números 194 y 195 e 1994095, las cuales aprueban beneficios adicionales a los pensionados, efectivo al 1ro de Julio de 1995.*  UPR JS Cert. 162 (1995-96)

UPR JS Cert. 127 (1998-99) authorized a reduction of institutional support, but then declared that prospectively the institituctional support ought exceed 2% above the percentage determined by the actuaries.

[97] Dr. José Ramón de la Torre, UPR President, *Proyecto de Presupuesto Recomendado de la Universidad de Puerto Rico, Año Fiscal 2010-2011* (June 2010)*,* pp. 9-10.  (Distributed by Department Chair Loretta Collins, Ph.D., electronically on 30 June 2010).
[98] Dr. José Ramón de la Torre, UPR President, *Proyecto de Presupuesto Recomendado de la Universidad de Puerto Rico, Año Fiscal 2010-2011* (June 2010) Appendix "Disponiéndose Recomendados," p. 2 of 4, ¶6.
[99] Dr. José Ramón de la Torre, UPR President, *Proyecto de Presupuesto Recomendado de la*

---

*Universidad de Puerto Rico, Año Fiscal 2010-2011* (June 2010) Appendix "Disponiéndose Recomendados," p. 3 of 4, ¶11, and Table.